UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**JOHN DOE**, *an individual*,

     Plaintiff,

vs.

**UNIVERSITY OF MICHIGAN** (as to Title IX violations), **BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN**, *a constitutional corporate body* (as to Title IX & ELCRA violations), **PAMELA HEATLIE, ROBERT SELLERS, MARTIN PHILBERT, ERIK WESSEL, LAURA BLAKE JONES, E. ROYSTER HARPER, SUZANNE MCFADDEN**, and **PAUL ROBINSON**, *employees of the University of Michigan*, *sued in his or her personal and official capacities*, *jointly and severally*,

     Defendants.

Case No.: 18-cv-
Hon.
Mag.

_____

**DEBORAH GORDON LAW**
**Deborah L. Gordon (P27058)**
**Elizabeth A. Marzotto Taylor (P82061)**
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff John Doe, by and through his attorneys Deborah Gordon Law, complains against Defendants as follows:

## **Introduction**

Plaintiff John Doe is a student who has met all the requirements to receive a degree from the University of Michigan. Defendants are engaged in an investigation as to whether he has violated the University's Sexual Misconduct Policy. No findings against him have been made. Based only on a mere allegation against him, Defendants have placed an indefinite hold on his official transcript and his degree, halting his ability to pursue his education or obtain employment. This is a violation of his due process rights.

On September 25, 2017, the Sixth Circuit Court of Appeals held:

> The Due Process Clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process. Here, the University's disciplinary committee necessarily made a credibility determination in finding John Doe responsible for sexually assaulting Jane Roe given the exclusively "he said/she said" nature of the case. Defendants' failure to provide any form of confrontation of the accuser made the proceeding against John Doe fundamentally unfair.

*Doe v. Univ. of Cincinnati*, 872 F.3d 393, 396 (6th Cir. 2018). Here, the issue is the same as in *University of Cincinnati*—a "he said/she said" case. Defendants refuse, though, to provide Plaintiff with any form of hearing or cross-examination and are in the process of deciding whether he will be disciplined without the due process protections provided by this Circuit. This is clearly unconstitutional. On the other

2

hand, Defendants provide complete due process protections, including cross-examination, for students facing all forms of discipline *other* than that involving sexual misconduct. Defendants have no explanation for this separate and unequal policy.

In addition, Defendants are discriminating against Plaintiff on the basis of his gender in violation of federal and state law.

<u>**Jurisdiction and Parties**</u>

1.      This is an action for due process violations under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983; for violations of Title IX, 20 U.S.C. § 1681, *et seq.*; and for violations of the State of Michigan's Elliot-Larsen Civil Rights Act, M.C.L. § 37.2101, *et seq.*

2.      This Court has federal subject matter jurisdiction over Plaintiff's 42 U.S.C. § 1983 and Title IX claims pursuant to 28 U.S.C. § 1331 and § 1343. This Court has supplemental jurisdiction over Plaintiff's ELCRA claims pursuant to 28 U.S.C. § 1367.

3.      Plaintiff John Doe ("Plaintiff") is or was a student at the University of Michigan (the "University"). Plaintiff's claims arise out of actions taken against him by Defendants for alleged violations of the University's Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence ("Sexual Misconduct Policy").

4. Defendant Pamela Heatlie is the University's Associate Vice Provost for Academic and Faculty Affairs, Senior Director of the Office of Institutional Equity ("OIE") and serves as the University's Title IX Coordinator.

5. Defendant Robert Sellers is the University's Vice Provost for Equity and Inclusion and Chief Diversity Officer, which office is responsible for oversight of the Associate Vice Provost for Academic and Faculty Affairs, Senior Director of the OIE, and the Title IX Coordinator.

6. Defendant Martin Philbert is the University's Provost and Executive Vice President for Academic Affairs, which office is responsible for oversight of the Vice Provost for Equity and Inclusion and Chief Diversity Officer.

7. Defendant Erik Wessel is the University's Director of the Office of Student Conflict Resolution ("OSCR").

8. Defendant Laura Blake Jones is the University's Dean of Students.

9. Defendant E. Royster Harper is the Vice President for Student Life at the University, which office is responsible for oversight of OSCR and the Dean of Students.

10. Defendant Suzanne McFadden is the OIE investigator assigned to investigate the complaint made against Plaintiff, and who carried out the investigation without due process of law.

11. Defendant Paul Robinson is the University's Associate Vice Provost

and University Registrar.

12.    The above-named individual Defendants are sued both in their personal and official capacities.

13.    Defendant University of Michigan is a public university, with its main campus located in Ann Arbor, MI. Through the OIE and the OSCR, the University has a stated goal of promoting federal and state laws regarding nondiscrimination, such as Title IX and the Elliot Larsen Civil Rights Act.

14.    Defendant Board of Regents of the University of Michigan (hereinafter, "Defendant Board of Regents") is a constitutional corporate body operating and governing the University of Michigan, within this District.

15.    The events underlying this Complaint occurred in Ann Arbor, Michigan, and thus venue is proper in this District.

## Background

16.    In April, 2014, Plaintiff enrolled at the University of Michigan as an undergraduate student.

17.    As of April 2018, Plaintiff had successfully achieved all the University's requirements necessary to graduate, *cum laude*, with the degree of Bachelor of Science in Engineering.

18.    The cost of the degree was approximately $260,000.

19.    On February 26, 2018, Plaintiff was admitted to the University's

College of Engineering master's degree program to begin on September 4, 2018. He accepted the offer of admission and secured a research position. He registered for classes on March 30, 2018. He was admitted to other graduate engineering programs as well, one of which is now awaiting his official transcript, due June 8, 2018, in order to be admitted.

20.     On March 12, 2018, a complaint was filed against Plaintiff with the OIE by a female student ("Claimant") alleging that a non-consensual sexual encounter had occurred four months earlier, on November 11, 2017. There were no witnesses to the encounter, which occurred in Plaintiff's residence hall room. No alcohol or drugs were involved.

21.     The complaint is false; the sexual encounter was consensual.

22.     At the time of these events Plaintiff was in his second year as a Residence Advisor in his residence hall. He reported to University supervisors and had received extensive training on University policies, including sexual assault and consent.

23.     The parties knew one another prior to November 11, 2017. A few days prior to November 11, 2018, Claimant messaged Plaintiff, asking to come to his residence hall room.

24.     Earlier in the evening on November 11, 2018, the Claimant contacted Plaintiff and asked him to get together. In reply, Plaintiff suggested that she come

6

to his residence hall room. She did so. They watched movies and engaged in sexual intercourse. Claimant later left the room and returned to her own residence hall two or more hours after she left Plaintiff's room.

25.     Claimant later told her roommate at her residence hall that she had sex with Plaintiff. She did not say it was without consent.

26.     In the next several weeks Claimant sent text and Snapchat messages to Plaintiff several times. She also ran into Plaintiff at a campus dining hall, asked to eat dinner with him, to which he obliged, and they chatted pleasantly.

27.     In one of Claimant's text messages to Plaintiff she suggested that she come to his resident hall room to have sex again. Plaintiff declined.

28.     In another one of Claimant's texts to Plaintiff she asked him what it meant to their relationship now that they had engaged in sex. Plaintiff responded that all he could offer was friendship.

29.     Four months went by before Claimant filed a report with the OIE.

30.     Plaintiff was first advised that a report against him had been filed via an email from the OIE on April 2, 2018, which was sent and received while Plaintiff attended a lecture, two weeks before his final exams began.

31.     In spite of the fact that the parties had been on campus together for four months after the sexual encounter with no problems of any kind, that Claimant had sought out Plaintiff via text and Snapchat messages during this period, and that

there was no finding by the University against Plaintiff, on April 2, 2018, the OIE Senior Director and Title IX Coordinator, Defendant Pamela Heatlie, issued Plaintiff a No Contact Directive, which will last indefinitely. The list of prohibited conduct is extensive, and includes, in part:

- Placing the responsibility on Plaintiff to avoid "incidental" or "indirect" contact with Claimant;

- An order that if there is incidental contact Plaintiff must leave the premises, including a social or public event, immediately;

- If Plaintiff shares a class, employment, organization, activity or dining hall with Claimant, or lives in close proximity to her, he must "immediately" notify the University for further direction.

32.     The directive states: "This No Contact Directive prohibits you from having contact with the Claimant **but does not restrain the Claimant's conduct**." (emphasis added).

33.     The penalty for violation of the No Contact Directive "may result expulsion, suspension, or the revocation of degree."

34.     The No Contact Directive improperly interferes with Plaintiff's ability to have full access to University facilities and activities and forces him to be continually on guard as to whether Claimant may be anywhere where he may have "incidental" contact with her.

35.     On April 18, 2018, Claimant made a false complaint to the OIE that Plaintiff had violated the No Contact Directive.

8

36.     Plaintiff was immediately admonished by the OIE investigator, Defendant Suzanne McFadden:

> It has come to my attention that you may be in violation of the no contact directive that was issued to you on April 2, 2018. **I understand that on April 13, 2018, [Claimant] walked into the . . . dining hall, you looked at her, did not get up to leave and continued to sit and eat your meal.**

(emphasis added).

37.     The complaint of a "violation" had been made by Claimant only to harass Plaintiff but the OIE investigator immediately adopted it as true.

38.     Plaintiff was able to prove to the OIE investigator (through his electronic swipe card required to be used to enter a dining hall) that he was not in the dining hall that entire day. The OIE took no action against Claimant with regard to her false report of a violation of the No Contact Directive.

39.     After Claimant filed her sexual misconduct report with the OIE on March 12, 2018, the OIE commenced an investigation to determine if Plaintiff had violated the Sexual Misconduct Policy, which continues to this day.

40.     It is the responsibility of the OIE investigator, Defendant McFadden, to investigate the Claimant's complaint and to make a determination in a final report as to whether a violation of the Sexual Misconduct Policy has occurred.

41.     The Sexual Misconduct Policy states that the investigation process, through the final report, should not take more than 60 days.

42.     Here, 84 days have now passed and the investigation and report are not complete. No findings have been made.

43.     There are no parameters for the amount of time to complete the entire process, including a sanctioning/penalty process if a violation has occurred, and an appeal, which can be filed by either party. It is likely that the process may not be complete for many months.

44.     On April 19, 2018, the OIE notified Plaintiff that

given the pending OIE investigation and your approaching graduation, an administrative hold has been placed on your student account until the OIE investigation is complete [this was later clarified to include the entire process, including any appeal, which will take an indeterminate period of time]. While the hold is in place, you will not be able to register for classes or receive an official copy of your transcript.

45.     This "hold" has barred Plaintiff from receiving his official transcript or credentials that he has graduated and therefore bars him from enrolling in school elsewhere or obtaining any employment. This has occurred despite the fact that there is no finding that Plaintiff has violated any policy.

46.     It is uncontested that Plaintiff has a property interest in his education and that he cannot be deprived of that interest without due process. *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 396 (6th Cir. 2017).

47.     The issue to be determined here is whether the sexual encounter between Plaintiff and the Claimant was consensual. Because there are no witnesses

to the encounter the findings will be based on a credibility determination.

48.     The Due Process Clause of the United States Constitution guarantees fundamental fairness to state university students facing exclusion from the educational process based on discipline. A student must be provided with notice and an opportunity to be heard. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633-34 (6th Cir. 2017).

49.     The Sixth Circuit has clearly established that where, as here, credibility is at stake, in that one party maintains that the sexual encounter was consensual and the other says it was not, a live hearing in front of the ultimate fact finder, with some form of cross-examination is required. *Univ. of Cincinnati*; 872 F.3d at 396, 401-02; *Doe v. Miami Univ.*, 882 F.3d 579, 600 (6th Cir. 2018).

50.     Defendants are intentionally refusing to provide Plaintiff with the required due process protections.

51.     Defendants refuse to provide any student accused of a violation of the Sexual Misconduct Policy with the required due process protections.

52.     In fact, the University maintains two separate and very unequal policies governing student misconduct and the due process that will be provided.

53.     "The Statement of Student Rights and Responsibilities" (the "Statement") applies to all University students **other** than those accused of "sexual" misconduct, including, in part, those accused of:

11

- physically harming another including killing;

- stalking;

- stealing, vandalizing or destroying property;

- possession, manufacturing or distribution of drugs.

**Ex. A**, at 3-4.

54.     The Statement requires that a complaint or report against a student is made **in writing**. The Statement also guarantees the accused: a **live hearing** in front of the fact finder(s) where both parties are present and witnesses can be called; **cross-examination of parties and witnesses** is allowed; a **complete packet of all evidence is produced by the University and provided prior to the hearing**; the **right to make statements** on the record; and an **audio recording of the hearing**, which will be made available to the parties. **Ex. A**, at 6-7

55.     In sharp contrast, the Sexual Misconduct Policy does not require that a complaint be in writing. It does not allow for a live hearing, in front of the fact finder(s), attended by both the accuser and the accused, or the ability to cross-examine the accuser or any witness. It provides that the accused will attend one private interview with an OIE investigator. Even though the accuser will have already been privately interviewed, the investigator does not provide any information to the accused with regard to the allegations made by the accuser. The accused does not learn the names of the witnesses until the investigation is

concluded. The accused is not provided with all of the evidence accumulated, only that evidence that the investigation deems important. **Ex. B**, at 23-29.

56.     No law or governmental regulation requires Defendants to maintain a different procedure, where there is no due process when sexual misconduct is alleged.

57.     If Plaintiff is found to have violated the Sexual Misconduct Policy, because "penetration" occurred during the sexual encounter, the "sanction" or penalty will be expulsion (this rule is not in writing but University documents demonstrate that this is the practice).

58.     The investigation into Plaintiff's sexual misconduct is being conducted under the procedures described in Paragraph 55, above, where no due process is provided.

59.     Plaintiff was interviewed one time by the OIE investigator, on April 3, 2018.

60.      Plaintiff was not given notice of the charges against him sufficient for him to be able to defend himself. He was advised only that he "may have engaged . . . in unwanted [sexual relations] without consent."

61.     The OIE investigator had interviewed the Claimant on March 29, four days earlier, but she did not share with that with Plaintiff or provide him with any of the very detailed allegations of the encounter she had elicited from Claimant.

Since he had no notice of the allegations against him he was unable to respond to many key issues. Had a hearing been held as set forth in the Statement, Plaintiff would have heard Claimant's allegations as she made them, been able to respond immediately and to put questions to her.

62.    Claimant made multiple allegations against Plaintiff that he was not told about or allowed to respond to during his one interview; he became aware of them at the end of the investigation, as discussed below. For example, Claimant alleged that:

- She could not leave Plaintiff's room;

- She was in fear of her life;

- Plaintiff forced her to engage in sexual acts;

- She "screamed" several times.

63.    These allegations are clearly false.

64.    Because there was no hearing or cross-examination Plaintiff was unable to show the falsity of these allegations. Because there was no cross-examination, or even pointed questions put to the Claimant by the investigator, key exculpatory evidence was completely missed, putting Plaintiff in grave danger of never receiving his degree.

65.    As only one example, the OIE investigator did not learn the Claimant, who claims she was forced to have sex, received a Black Belt in Tae

14

Kwon Do in 2015 and is an expert in martial arts and self-defense. She is an assistant instructor in Tae Kwon Do.

66.    Nor was Plaintiff provided with the names of alleged witnesses to events that occurred after the sexual encounter, which Claimant had already provided to the investigator at the time of Plaintiff's interview.

67.    The investigator subsequently interviewed witnesses on unknown dates. She did not contact Plaintiff to advise him of what these witnesses said or give him an opportunity to respond. Had a hearing been held as provided in the Statement, Plaintiff would have heard the witness statements as they were made, been able to respond immediately, and put questions to them.

68.    On May 24, 2018, 51 days after Plaintiff's only interview with the OIE investigator, he was provided with her "Executive Summary," which contained summaries of all statements and evidence she had obtained, including detailed false allegations made by Claimant.

69.    After receipt of the Executive Summary, Plaintiff had 5 days within which to provide written "feedback," which may or may not be included in the Final Report and Findings.

70.    On May 29, 2018, Plaintiff submitted his "feedback."

71.    He now awaits the findings of the OIE investigator.

72.    If there is an appeal of the OIE Investigator's findings to the External

Reviewer, that person will have no ability to see or assess the credibility and demeanor of either party or any witness. *Id.* In spite of that, the External Reviewer will have the authority to "modif[y]" the findings by setting aside the decision of the investigator. **Ex. B**, at 34-35

73.     Plaintiff's constitutional rights having been violated by the University placing a "hold" on his degree and official transcript in spite of no finding against him, and being subjected to an unconstitutional investigation and decision devoid of the basic due process provided to all other University students and required by the Sixth Circuit Court of Appeals.

74.     Plaintiff has been and continues to be irreparably harmed with each day that passes.

<u>**The University of Michigan Has Been Publicly Criticized**</u>
<u>**for Its Handling of Sexual Misconduct Complaints**</u>

75.     The Sexual Misconduct Policy was intentionally designed to deprive accused students of constitutional due process. The purpose of this is to make it easier to make findings against male students. This is due, in large part, because the University is under internal and external pressure to find in favor of female accusers.

76.     In February 2014, the U.S. Department of Education's Office of Civil Rights (OCR) began investigating the University for failing to adequately and promptly respond to complaints of sexual misconduct. *See* Letter to University of

Michigan from U.S. Department of Education, Feb. 21, 2014, http://publicaffairs. vpcomm.umich.edu/wpcontent/uploads/sites/19/2015/01/OCRNOTIFICATIONLE TTER.pdf.

77.     As a result of the OCR Investigation, the University received substantial negative publicity. *See, e.g.*, John Lauerman, "University of Michigan Probed for Handling of Sexual Assaults," *Bloomberg News* (2/25/2014), http:// www.bloomberg.com/news/articles/2014-02-25/university-of-michigan-probed-for -handling-of-sexual-assaults. For instance, one local news station reported that a former University employee believed that the University had a policy of deterring students from filing sexual misconduct complaints. *See* Ashley Dunkak, *Feds Investigating University of Michigan over Gibbons Sex Assault Case* (2/25/2014), http://detroit.cbslocal.com/2014/02/25/feds-investigating-university-of-michigan-over-gibbons-sex-assault-case/.

78.     The University was also the subject of sharp criticism from students on campus. One student group issued a public statement saying, "[w]e are fed up with university administration's handling of sexual violence . . . We are fed up with the university hierarchy hampering transparency and safety to protect their own profit-making abilities and reputations." *See* Lauerman, "University of Michigan Probed for Handling of Sexual Assaults," *Bloomberg News* (2/25/2014), http://www.bloomberg.com/news/articles/2014-02-25/university-of-michigan-

probed-for-handling-of-sexual-assaults.

79.     Mark Schlissel took his post as University President on July 1, 2014, only a few months after the OCR began its investigation, and in the midst of the public backlash against the University. *See* "Mark Schlissel Named 14th President of the University of Michigan," *The University Record* (Jan. 24, 2014), https://record.umich.edu/articles/mark-s-schlissel-named-14th-president-university-michigan.

80.     Given the University campus's political environment when Schlissel took his post, one of Schlissel's four primary areas of focus is unsurprisingly on the "campus climate" in order to "provid[e] the safest possible environment for students at the University of Michigan, and address[] and prevent[] sexual misconduct . . . at [the] University."

81.     Schlissel has penned several statements regarding sexual misconduct on the University's campus, highlighting it as an area of special importance, and noting the need to "improve support for survivors [a term fraught with the implication that claimant is always correct]," "focus[] greater attention on groups that appear to be at greater risk," "improve [the University's] investigation procedures," and "enhance [its] processes for adjudicating incidents."

82.     One such statement the Schlissel signed is the March 25, 2016, University of Michigan Proclamation in support of the "Start by Believing" Public

Awareness Campaign. *See* University of Michigan Proclamation, available at https://storage.googleapis.com/dpss-wordpress-prod/2/2017/03/proclamation.pdf). This Campaign is part of the End Violence against Women International program, the purpose of which is to promote automatic belief in whatever a "victim" says. *Id*. This is the anthesis of true due process, where one side should not be "believed" over the other prior to a hearing.

83.    Throughout 2014, 2015, and 2016 the University made multiple efforts to avoid sanctions from the federal government and to convince the public that it was working hard to protect women on campus. *See, e.g.*, Michigan Daily Editorial Board, *Sexual Misconduct Education is Key*, Michigan Daily (9/16/2016), https://www.michigandaily.com/section/editorials/daily-mandatory-reporting-sexual-misconduct-education-online-tool-faculty.

84.    The University was under pressure from the media, as well. The *Detroit Free Press* published a story about the University facing pressure from the OCR for its failure to comply with reporting requirements. *See* David Jesse, "U-M Pushed for Delays in Feds' Sex Assault Investigation," *Detroit Free Press* (June 4, 2016), http://www.freep.com/story/news/local/michigan/2016/06/04/university-michigan-sex-assault-investigation/85340204/.

85.    In addition, the Michigan Daily published a piece by its Editorial Board, calling for the University to better protect victims of sexual assault. *See*

Michigan Daily Editorial Board, "Inquiry Deserved a Timely Response," *Michigan Daily* (June 8, 2016), https://www.michigandaily.com/section/editorials/daily-inquiry-deserved-timely-response. The Editorial Board reported that the steps the University had taken "to show [] support for survivors of sexual assault . . . might be forgotten . . . as the student body is once again reminded of how the University has repeatedly failed individuals who reported claims of sexual assault." *Id.* The Editorial Board further noted the University was "failing to protect its student body" by not cooperating fully with the OCR Investigation because of the University's "concern[] that negative practices may become public during the course of such an investigation, which would no doubt harm the reputation of this institution." *Id.*

86.    All of the aforementioned facts have created an environment in which decision-makers at the University are explicitly and implicitly biased against males accused of sexual misconduct.

### Irreparable Harm Suffered by Plaintiff as a Result of Defendants' Actions

87.    Plaintiff is on the verge of suffering irreparable harm. Another graduate school of engineering has given him a deadline on June 8, 2018, by which to submit his official transcript. If he is unable to comply due to the University's "hold" that educational opportunity will be lost. Without an official transcript he will be unable to be employed as a college graduate. He is now unable to tell others

that he has graduated from college, leaving a stigma with regard to why that has not occurred.

88.   If he is found to have violated the Sexual Misconduct Policy after having been deprived of due process, his record will permanently bear that imprimatur with life-long ramifications. He will not be allowed to graduate, will be unable to obtain employment commensurate with his having received a degree, and his reputation will be ruined.

89.   If Plaintiff's disciplinary record and the Appeals Board report are not vacated, he will suffer irreparable harm to his reputation, as well to his educational and career opportunities.

90.   If Plaintiff is unable to graduate from the University he will lose his significant investment of time and money in his University education.

91.   Defendants Heatlie, Sellers, Philbert, Wessel, Jones, Harper, McFadden, Robinson, the University, and the Board of Regents have the authority to grant any and all equitable relief to Plaintiff to rectify Defendants' statutory and constitutional violations.

**COUNT I**
*42 U.S.C. § 1983—Fourteenth Amendment*
*Procedural Due Process*
*Property and Liberty Interests*
*(as to Defendants Heatlie, Sellers, Philbert, Wessel,*
*Jones, Harper, McFadden, and Robinson)*

92.   Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

93.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

94.   Fourteenth Amendment due process protections are required in higher education disciplinary decisions at public institutions.

95.   Plaintiff was entitled to notice and a meaningful opportunity to be heard, including a hearing and cross-examination, once a complaint was filed against him, and prior to the deprivation of his property interest in his education. He has been deprived of due process protections and is now potentially subject to expulsion.

96.   Plaintiff was entitled to obtain his official transcript and degree upon completion of the University's requirements but he has been deprived of those credentials, and his property interest in his education, without due process of law.

97.   Plaintiff has a protected liberty interest in his good name, reputation, honor, and integrity which he cannot be deprived of by the state absent due

process.

98.   Plaintiff has a protected liberty interest in pursuing his education at a public university, which the state cannot deprive him of absent due process.

99.   Plaintiff also has a protected liberty interest in his future educational and employment opportunities, which the state cannot deprive him of absent due process.

100.   Plaintiff is entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. Here the allegations are of the utmost seriousness, have lifelong ramifications, and are quasi-criminal in nature.

101.   Plaintiff has a significant interest in avoiding an adverse decision against him based on a denial of due process protection.

102.   Defendants know that Plaintiff has a clearly established right to due process protections, and a reasonable person would know that failing to apply those standards of review would violate Plaintiff's due process rights.

103.   Providing a due process protection imposes no administrative burden on the University. It offers full due process to all students not accused of sexual misconduct.

104.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury, and damages, including but

not limited to withholding or a denial of his degree and a permanent record of misconduct; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT II
### *Title IX, 20 U.S.C. § 1681,* **et seq.—*Disparate Treatment Based on Sex***
*(as to Defendants University of Michigan and Board of Regents)*

105.   Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

106.   Title IX prohibits discrimination on the basis of sex in educational institutions, including the University of Michigan.

107.   Title IX applies to an entire school or institution if any part of that school receives federal funds.

108.   Defendants receive federal funding.

109.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to adopt and publish grievance procedures providing for the "prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. *See* 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice). Such prohibited actions include all forms of sexual harassment, including sexual misconduct. *See generally* U.S. Dep't of Ed., Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of*

*Students by School Employees, Other Students, or Third Parties – Title IX* (2001)

at 19–20, 21 & nn. 91–101.

110.   The procedures adopted by a school covered by Title IX must

"accord[] due process to both parties involved." *See id.*

111.   A school must therefore provide, at a minimum, "[a]dequate,

reliable, and impartial investigation of complaints." *See id.*

112.   A school also has the obligation under Title IX to ensure that all

employees involved in the conduct of the procedures have "adequate training as to

what conduct constitutes sexual harassment," including sexual misconduct. *See id.*

113.   Nothing in Title IX, Title IX guidance, or the Dear Colleague Letter

prohibits the University in any way from providing a student accused of sexual

misconduct with due process including a full hearing; in fact, Title IX guidance

and the Dear Colleague Letter assume that there is going to be a hearing with

some type of cross-examination.

114.   Defendants have violated Plaintiff's rights under Title IX by treating

him differently because of his sex.

115.   Based on the foregoing, an "erroneous outcome" has resulted in the

withholding of Plaintiff's degree, and an "erroneous outcome" will occur if he his

found to have violated the University's Sexual Misconduct Policy.

116.   Defendants view female claimants as "survivors" prior to any

adjudication of their claims, stigmatizing the male respondents.

117.   Defendants issued a "no-contact" order only against Plaintiff, a male, even though it was the Claimant who texted him and came to his residence hall.

118.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury, and damages, including but not limited to denial of educational opportunities; denial of the ability to receive a degree from the University, damage to his standing and associations in his community and imposition of a stigma or that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT III
### *Title IX, 20 U.S.C. § 1681,* **et seq.**—*Disparate Impact Based on Sex*
### *(as to Defendants University of Michigan and Board of Regents)*

119.   Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

120.   As described above, Defendants have maintained a policy and procedure of treating all forms of misconduct by students in the same manner with one exception: alleged violations of the Sexual Misconduct Policy.

121.   Students accused of sexual misconduct at the University are overwhelmingly male. Therefore, the Statement, which directs University

decision-makers to apply different procedures outlined in the Sexual Misconduct Policy, has a disparate impact on male students.

122.   Defendants have not provided a legally sufficient rationale for creating and applying different standards for students accused of sexual misconduct as compared to any other violation of University policies. There is no legitimate basis for such a distinction.

123.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury, and damages, including but not limited to denial of educational opportunities; denial of the ability to receive a degree from the University or even attend it again; a permanent disciplinary record which he will have to contend with and explain for the rest of his life; denial of future educational and employment opportunities including undergraduate, graduate school and career choices; false, permanent findings and discipline on his record for serious sexual misconduct which did not occur; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT IV
### *M.C.L. § 37.2101*, et seq.—*Elliott-Larsen Civil Rights Act*
### *Disparate Treatment on the Basis of Gender*
*(as to Defendants Heatlie, Sellers, Philbert, Wessel,*
*Jones, Harper, McFadden, Robinson, and Board of Regents)*

124.   Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

125.   Pursuant to the Elliot-Larsen Civil Rights Act ("ELCRA"), Defendants are an "educational institution" or an "agent of an educational institution." *See* M.C.L. § 37.2402.

126.   Pursuant to the ELCRA, Defendants were prohibited from discriminating against Plaintiff on the basis of his sex by interfering with and denying him his utilization of the University or its benefits, services, activities, or programs.

127.   In addition, Defendants were prohibited from excluding, expelling, limiting, or otherwise discriminating against Plaintiff in the terms, conditions, or privileges of his enrollment in the institution, based on his sex.

128.   As described above, Plaintiff was denied the full utilization and benefits of the institution and its services, and was excluded and limited in the terms, conditions, and privileges of the institution based on his sex.

129.   Based on his sex, Plaintiff was denied the proper and full use and implementation of the institution's Statement of Student Rights and

28

Responsibility; was denied a degree and the ability to graduate timely from the institution; was improperly issued a No Contact Directive; and was then incorrectly admonished for having violate it.

130.   The aforementioned violations of the ELCRA have denied Plaintiff, based on his sex, the terms, privileges, services and opportunities of the institution, to which he was entitled.

131.   The aforementioned violations of the ELCRA constituted intentional discrimination, motivated by Plaintiff's sex.

132.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury, and damages, including but not limited to denial of educational opportunities; denial of the ability to receive a degree from the University or even attend it again; a permanent disciplinary record which he will have to contend with and explain for the rest of his life; denial of future educational and employment opportunities including undergraduate, graduate school and career choices; false, permanent findings and discipline on his record for serious sexual misconduct which did not occur; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss

of personal and professional reputation.

## COUNT V
### M.C.L. § 37.2102, et seq.—*Elliott-Larsen Civil Rights Act*
### *Disparate Impact on the Basis of Gender*
*(as to Defendants Heatlie, Sellers, Philbert, Wessel,*
*Jones, Harper, McFadden, Robinson, and Board of Regents)*

133.   Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

134.   Defendants have maintained a policy and procedure of treating all forms of misconduct by students in the same manner with one exception: alleged violations of the Policy.

135.   As set forth in the University's Statement of Student Rights and Responsibilities every student other than those accused of sexual misconduct receives written notice of the charges against him, and an opportunity for a hearing which includes the right to confront or examine the accuser and witnesses.

136.   Specifically, the Statement provides that students accused of non-sexual misconduct violations are entitled to a hearing in front of a panel, the right to pose questions to the complainant and witnesses, an audio recording of the hearing, access in advance to all written and other information that will be used, the names of witnesses in advance of the hearing, access to a recess during the hearing to obtain advice and counsel, and the right to make statements to the

hearing panel or present a written report.

137.   Students accused of non-sexual misconduct violations are subject to liability under a "clear and convincing evidence" standard.

138.   Only students accused of sexual misconduct are denied the use of the hearing procedures outlined above and are subject to the lesser burdensome "preponderance of the evidence" standard.

139.   In fact, even students accused of killing, harassing, bullying, stealing, destroying property, or any other violation of the University policies are provided with the full procedures and the clear and convincing standard of proof described above.

140.   Students accused of sexual misconduct at the University are overwhelmingly male. Therefore, the Sexual Misconduct Policy, which directs University decision-makers to apply different procedures than outlined in the Statement, has a disparate impact on male students.

141.   The Sexual Misconduct Policy, although facially neutral, burdens male students more harshly than it does female students, thus creating a discriminatory preference in favor of female students.

142.   Defendants have not provided a legally sufficient rationale for creating and applying different standards for students accused of sexual misconduct as compared to any other violation of University policies. There is no

31

legitimate basis for such a distinction.

143.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury, and damages, including but not limited to denial of educational opportunities; denial of the ability to receive a degree from the University or even attend it again; a permanent disciplinary record which he will have to contend with and explain for the rest of his life; denial of future educational and employment opportunities including undergraduate, graduate school, and career choices; false, permanent findings and discipline on his record for serious sexual misconduct which did not occur; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## RELIEF REQUESTED

Plaintiff demands judgment against Defendants as follows:

**A.     Equitable Relief:**

1.     An injunction from this Court halting the investigation and decision-making process with regard to the OIE complaint against Plaintiff because the process is unconstitutional and deprives Plaintiff of due process;

2.     An injunction from this Court prohibiting all Defendants from

further use of the Sexual Misconduct Policy as to any student because it is unconstitutional and is a deprivation of due process rights;

3.    A ruling that, as a matter of law, Plaintiff's due process rights were violated.

4.    An award of interest, costs and reasonable attorney fees; and,

5.    Whatever other equitable relief appears appropriate at the time of final judgment.  of final judgment.

**B.    Legal Relief:**

1.    Compensatory damages in whatever amount Plaintiff is found to be entitled;

2.    Exemplary damages in whatever amount he is found to be entitled;

3.    Punitive damages in whatever amount he is found to be entitled; and,

4.    An award of interest, costs, reasonable attorney fees, and expert witness fees.

Dated: June 4, 2018

**DEBORAH GORDON LAW**
**Deborah L. Gordon (P27058)**
**Elizabeth A. Marzotto Taylor (P82061)**
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com

## JURY DEMAND

Plaintiff John Doe, by and through his attorneys Deborah Gordon Law, demands a trial by jury of all the issues in this cause that are so triable.

Dated: June 4, 2018                    **DEBORAH GORDON LAW**
                                       **Deborah L. Gordon (P27058)**
                                       **Elizabeth A. Marzotto Taylor (P82061)**
                                       Attorneys for Plaintiff
                                       33 Bloomfield Hills Parkway, Suite 220
                                       Bloomfield Hills, Michigan 48304
                                       (248) 258-2500
                                       dgordon@deborahgordonlaw.com
                                       emarzottotaylor@deborahgordonlaw.com