UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOHN DOE**, | : | |
| | : | Case No. 18-cv-11776 |
| Plaintiff, | : | |
| | : | Hon. Arthur J. Tarnow |
| v. | : | Mag. Elizabeth A. Stafford |
| | : | |
| **UNIVERSITY OF MICHIGAN**, *et al*., | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

## DECLARATION OF JOSHUA W. B. RICHARDS, ESQ.

I, JOSHUA W. B. RICHARDS, declare as follows:

1.     I am admitted to practice before this Court.

2.     I am a partner at the law firm Saul Ewing Arnstein & Lehr LLP, counsel for defendants in this proceeding.

3.     I submit this declaration in support of defendants' motion to stay pending appeal.

4.     In support of defendants' motion to stay pending appeal, I attach true and correct copies of the following exhibits:

     a.     <u>Exhibit A</u>:  The University of Michigan Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence.

b.      <u>Exhibit B</u>: The University of Michigan Statement of Student Rights and Responsibilities.

c.      <u>Exhibit C</u>: Unpublished cases cited in defendants' motion to stay pending appeal, which include:

i.      *Mayfield v. Miles*, No. 13-10341, 2014 WL 5605301 (E.D. Mich. Nov. 4, 2014); and

ii.      *Marshall v. Ohio Univ.*, No. 15-cv-775, 2015 WL 1179955 (S.D. Ohio Mar. 13, 2015).

d.      <u>Exhibit D</u>:  A table showing public colleges and universities in the United States that use a single-investigator/no live hearing model to investigate and adjudicate allegations of sexual assault on campus, including links to those schools' policies.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

July 25, 2018                    /s/*Joshua W. B. Richards*
                                SAUL EWING ARNSTEIN & LEHR LLP
                                Joshua W. B. Richards
                                *Attorneys for Defendants*
                                1500 Market Street, 38th Floor
                                Philadelphia, Pennsylvania  19102
                                (215) 972-7737
                                joshua.richards@saul.com

-2-

# Exhibit A

# The University of Michigan
# Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence

### Effective February 7, 2018



TABLE OF CONTENTS

I.     POLICY STATEMENT ..................................................................1

II.    TO WHOM THIS POLICY AND PROCEDURES APPLY ...................1

III.   OTHER POTENTIALLY RELEVANT POLICIES AND PROCEDURES ............2

       A.    WHERE THE RESPONDENT IS AN EMPLOYEE ....................2

       B.    WHERE THE RESPONDENT IS BOTH A STUDENT
             AND AN EMPLOYEE ..................................................2

       C.    WHERE THE RESPONDENT IS A THIRD PARTY .................3

       D.    WHERE THE PROHIBITED CONDUCT IS COMMITTED
             IN THE CONTEXT OF ACTIVITIES OF A RECOGNIZED
             STUDENT ORGANIZATION ...........................................3

IV.    TITLE IX COORDINATOR ...........................................................3

V.     CONFIDENTIAL AND NON-CONFIDENTIAL RESOURCES ............4

       A.    CONFIDENTIAL RESOURCES ......................................4

       B.    NON-CONFIDENTIAL RESOURCES ...............................5

VI.    SUPPORTIVE AND PROTECTIVE MEASURES
       (ALSO KNOWN COLLECTIVELY AS INTERIM MEASURES) ...........5

       A.    SUPPORTIVE MEASURES .........................................5

       B.    PROTECTIVE MEAUSRES ........................................6

VII.   REPORTING OPTIONS ...............................................................7

       A.    REPORTING TO LAW ENFORCEMENT ...........................8

       B.    REPORTING TO THE UNIVERSITY ...............................8

             1.    Anonymous Reports .........................................9

             2.    Time Frame for Reporting an Incident ................9

             3.    How the University Shares Information about Prohibited
                   Conduct with Law Enforcement ........................9

i

| | 4. | Information on Amnesty to Students when Reporting Prohibited Conduct | 10 |
| C. | | REPORTING BY UNIVERSITY EMPLOYEES | 11 |
| | 1. | Responsible Employees and Other Individuals | 11 |
| | 2. | All Other Employees | 12 |
| | 3. | Confidential Resources | 12 |
| VIII. | | PROHIBITED CONDUCT | 12 |
| A. | | SEXUAL OR GENDER-BASED HARASSMENT | 12 |
| | 1. | Sexual Harassment | 12 |
| | 2. | Gender-Based Harassment | 13 |
| B. | | SEXUAL ASSAULT | 14 |
| | 1. | Consent | 15 |
| | 2. | Incapacitation | 15 |
| | 3. | Coercion | 16 |
| | 4. | Force | 16 |
| C. | | STALKING | 16 |
| D. | | INTIMATE PARTNER VIOLENCE | 17 |
| E. | | RETALIATION | 17 |
| F. | | VIOLATION OF PROTECTIVE MEASURES | 18 |
| IX. | | UNIVERSITY RESOLUTION | 18 |
| X. | | INITIAL ASSESSMENT | 18 |
| XI. | | UNIVERSITY ACTIONS FOLLOWING AN INITIAL ASSESSEMENT | 19 |
| A. | | WHERE THE CLAIMANT WISHES TO PURSUE FORMAL RESOLUTION | 20 |

B.	WHERE THE CLAIMANT REQUESTS ANONYMITY,
	THAT AN INVESTIGATION NOT BE PURSUED,
	AND/OR THAT NO DISCIPLINARY ACTION BE TAKEN .................... 20

C.	WHERE THE CLAIMANT REQUESTS THE MATTER BE
	RESOLVED THROUGH ALTERNATIVE RESOLUTION .................... 21

XII.	REVIEW PANEL ........................................................................ 21

A.	DETERMINATION THAT A CLAIMANT'S REQUEST(S)
	CAN BE HONORED .................................................................... 22

B.	DETERMINATION THAT A CLAIMANT'S REQUEST(S)
	CANNOT BE HONORED ............................................................. 22

XIII.	FORMAL RESOLUTION ` ............................................................. 23

A.	INVESTIGATION .......................................................................... 23

	1.	Role of Investigator ............................................................. 23

	2.	Notice of the Investigation .................................................. 24

	3.	Assumption of Good Faith Reporting .................................. 24

	4.	Presumption of Non-Responsibility and Standard of Proof ...... 24

	5.	Participation by the Parties and Witnesses is Voluntary ........... 24

	6.	Expectation of Claimant, Respondent, and Witnesses
		in an Investigation .............................................................. 25

	7.	Acceptance of Responsibility ............................................... 25

	8.	Advisers .............................................................................. 25

	9.	Evidence .............................................................................. 25

	10.	Prior or Subsequent Conduct of the Respondent ................. 26

	11.	Prior Sexual Contact Between Claimant and Respondent ...... 26

	12.	Witnesses ............................................................................ 27

	13.	Coordination with Law Enforcement ................................... 27

14.    Time Frame for Completion of Investigation ..................... 27

15.    Preliminary Investigation Report ..................................... 28

16.    Final Investigation Report and Outcome of Investigation .............. 28

17.    Finding(s) of Policy Violation ....................................... 29

18    Finding(s) of No Policy Violation ................................... 29

B.    SANCTIONS ................................................................. 29

1.    Process ............................................................ 30

2.    Factors Considered in Sanctioning ................................. 31

3.    Possible Sanctions or Interventions ................................ 31

4.    Written Notice of Sanction ......................................... 33

C.    APPEALS OF FINDINGS OR SANCTIONS .......................... 33

1.    Grounds for Appeals .............................................. 34

2.    External Reviewer Will Conduct Appeal Review ................ 34

3.    Decision of External Reviewer ..................................... 35

XIV.   ALTERNATIVE RESOLUTION ................................................ 36

A.    CIRCUMSTANCES IN WHICH
ALTERNATIVE RESOLUTION MAY BE USED .................... 36

B.    ALTERNATIVE RESOLUTION OPTIONS .......................... 37

C.    ALTERNATIVE RESOLUTION AGREEMENTS .................... 38

XV.   ALTERNATIVE INTERVENTIONS OR REMEDIES
FOR THE UNIVERSITY COMMUNITY ....................................... 38

XVI.   RECORDS RETENTION ...................................................... 39

XVII.  POLICY REVIEW ............................................................ 39

XVIII. ANNUAL REPORT ........................................................... 39

**THE UNIVERSITY OF MICHIGAN POLICY AND PROCEDURES
ON STUDENT SEXUAL AND GENDER-BASED MISCONDUCT
AND OTHER FORMS OF INTERPERSONAL VIOLENCE**

## I.      POLICY STATEMENT

The University of Michigan (University) supports its educational mission by fostering a community based on civility, dignity, diversity, inclusivity, education, equality, freedom, honesty, and safety. Consistent with these values, the University is committed to providing a safe and non-discriminatory learning, living, and working environment for all members of the University community. The University does not discriminate on the basis of sex or gender in any of its education or employment programs and activities.

The University prohibits sexual assault, sexual and gender-based harassment, intimate partner violence, stalking, retaliation, and violation of interim measures (collectively Prohibited Conduct). Prohibited Conduct is expressly forbidden and will not be tolerated at the University. It may also violate federal and state law.

The University adopts this Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence (Policy or Policy and Procedures) with a commitment to: (1) eliminating, preventing, and addressing the effects of Prohibited Conduct; (2) fostering an environment where all individuals are well-informed and supported in reporting Prohibited Conduct; (3) providing a fair and impartial process for all parties; and (4) identifying the standards by which violations of this Policy will be evaluated and disciplinary action may be imposed. University students who violate this Policy may face disciplinary action up to and including expulsion.

The Policy and Procedures set forth how the University will proceed once it is made aware of possible Prohibited Conduct in keeping with our institutional values and to meet our legal obligations under Title IX of the Education Amendments of 1972 (Title IX); the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act), as amended by the Violence Against Women Reauthorization Act of 2013 (VAWA); and other applicable law.

## II.      TO WHOM THIS POLICY AND PROCEDURES APPLY

The Policy and Procedures apply to concerns of Prohibited Conduct involving one or more University students. For purposes of this Policy and throughout this document, "student" refers to a University student or a participant in any non-employment or volunteer-related University-related program or activity.

For purposes of this Policy, the individual who is reported to have experienced Prohibited Conduct, regardless of whether that individual makes a report or participates in the review of that report by the University, and regardless of whether that individual is a student is referred to as the Claimant. The individual who is reported to have committed Prohibited Conduct is referred to as the Respondent.

The University has jurisdiction over a Respondent whenever the Prohibited Conduct occurs:

- On campus, including the University of Michigan Health System; or

- Off campus, including online or electronic conduct, if the conduct:

  ➢ Occurs in connection with a University-related program or activity, including University-sponsored study abroad, research or internship programs;

  ➢ May pose a serious threat of harm to any member(s) of the University community, including where the reported conduct was not directed at any member(s) of the University community, but by its nature creates a risk that may pose a serious threat of harm to any member(s) of the University community; or

  ➢ May have the effect of creating a hostile environment for any member(s) of the University community.

The specific procedures for reporting, investigating, and resolving Prohibited Conduct are based upon the nature of the Respondent's relationship to the University (student, employee, or third party). Where the Respondent is a student, the procedures are detailed in Sections VIII-XII below of the Policy and Procedures.

## III.   <u>OTHER POTENTIALLY RELEVANT POLICIES AND PROCEDURES</u>

At all times, it is within the University's discretion to determine which policies apply and whether action will be taken under multiple policies.

### A   **WHERE THE RESPONDENT IS AN EMPLOYEE**

The policy and procedures for responding to reports of Prohibited Conduct committed by University employees or University-related volunteer programs or activities are set forth in the University's Sexual Harassment Policy (SPG 201.89-0).

### B.   **WHERE THE RESPONDENT IS BOTH A STUDENT AND AN EMPLOYEE**

If the Respondent is a student and an employee, the University's Title IX Coordinator will determine which policy and procedures apply based upon the facts and circumstances, such as whether the Respondent's status as a student or an employee is most closely related to the Prohibited Conduct. The procedures for responding to reports of Prohibited Conduct committed by student-employees, where the employment role predominates, are set forth in the University's Sexual Harassment Policy (SPG 201.89-0).

### C.    WHERE THE RESPONDENT IS A THIRD PARTY

A third party is any individual who is not a University student or employee or a participant in any University-related program or activity. The University's ability to take appropriate action against a third party will be determined by the nature of the relationship of the third party to the University. The Title IX Coordinator will determine the appropriate manner of resolution reflecting the University's commitment to a prompt and equitable process consistent with federal law, federal guidance, and this Policy.

Where the Respondent is a third party, the University's ability to take action may be limited.

Regardless of when or where the Prohibited Conduct occurred, the University will, whenever possible, offer resources and assistance to students (or members of the University community) who experienced and/or are affected by Prohibited Conduct. In those instances, when this Policy does not apply, the University will assist a Claimant in identifying and contacting external law enforcement and appropriate campus or community resources.

### D.    WHERE THE PROHIBITED CONDUCT IS COMMITTED IN THE CONTEXT OF ACTIVITIES OF A RECOGNIZED STUDENT ORGANIZATION

Recognized Student Organizations (RSOs) are registered with the Center for Campus Involvement, as either Sponsored Student Organizations or Voluntary Student Organizations. The University has jurisdiction over RSOs and may address Prohibited Conduct committed in relation to activities of RSOs through the Standards of Conduct for Recognized Student Organizations and the Student Organization Advancement and Recognition (SOAR) Accountability Procedure.

Schools or colleges within the University also have policies and honor codes, in addition to this Policy, that govern University-affiliated student organizations and that may be used, at the University's discretion, to address Prohibited Conduct committed in relation to student organization activities. Under this Policy, if the conduct alleged is a form of Prohibited Conduct, the Title IX Coordinator will be informed of, and maintain oversight over, the resolution of reports against RSOs to ensure that the University has taken appropriate action to eliminate the conduct, prevent its occurrence, and address its effects.

## IV.    TITLE IX COORDINATOR

The Title IX Coordinator is charged with monitoring the University's compliance with Title IX; ensuring appropriate education and training for students and employees; coordinating the University's investigation, response, and resolution of all reports under this Policy; and ensuring appropriate actions to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects. The Title IX Coordinator is supported by a Deputy Title IX Coordinator and other University administrators in the Office for Institutional Equity (OIE), the Office of Student Conflict Resolution (OSCR), the Dean of Students Office (DOS), and other departments.

The Title IX Coordinator and Deputy IX Coordinator can be contacted by telephone, email, or in person during regular office hours:

**Pamela Heatlie,** Title IX Coordinator
**Elizabeth Seney,** Deputy Title IX Coordinator
Institutional.equity@umich.edu

Office for Institutional Equity
2072 Administrative Services Building
1009 Greene Street
Ann Arbor, Michigan 48109
(734) 763-0235 (telephone)
(734) 647-1388 (tty)

The University encourages every student who may have experienced harm to get the support and information they need, regardless of whether they would like to move forward with a report of potential policy violations or criminal conduct to campus officials or to law enforcement. The University offers a wide range of resources to provide support and guidance in response to any incident of Prohibited Conduct.

For comprehensive information on accessing University and community resources, including emergency and ongoing assistance; health, mental health, and advocacy services; options for reporting Prohibited Conduct to the University and/or law enforcement; and available support with academics, housing, and employment, University students, faculty, and staff should refer to the Our Community Matters Resource Guide or contact the Office for Institutional Equity. Third parties should contact the Title IX Coordinator to discuss available University and/or community resources and reasonable available assistance.

## V.    CONFIDENTIAL AND NON-CONFIDENTIAL RESOURCES

There is a distinction between making a report to the University or law enforcement through designated reporting options (listed below in Section VI) and seeking confidential assistance through confidential resources (listed below in Section V(B)). Not every campus or community resource is confidential and this section explains to whom individuals who have experienced Prohibited Conduct can talk without what they share being revealed to any other person without their express permission or as required by law.

### A.    CONFIDENTIAL RESOURCES

Confidential Resources are those campus and community professionals who can maintain legally-protected confidentiality within the University for the individual who shared the information. Confidentiality means that information shared by an individual with a confidential resource cannot be revealed to any other person without express permission of the individual, or as otherwise permitted or required by law. Confidential Resources are prohibited from disclosing confidential information unless (1) given permission by the person who disclosed the information; (2) there is an imminent threat of harm to self or others; (3) the conduct involves

4

suspected abuse of a minor under the age of 18; or (4) as otherwise required or permitted by law or court order.

Confidential Resources available to individuals include the Sexual Assault Prevention and Awareness Center (SAPAC), Counseling and Psychological Services (CAPS) and the University Ombuds. SAPAC provides direct support to Claimants, including crisis intervention; advocacy; assistance in navigating academic, personal, and community impact; and assistance in connecting with other available support and resources. For more information, please see the Our Community Matters Resource Guide.

## B. NON-CONFIDENTIAL RESOURCES

University resources who are not Confidential Resources as defined above will make every effort to respect and safeguard the privacy of the individuals involved. Privacy means that concerns about Prohibited Conduct will be shared with a limited circle of University representatives who need to know only to assist in the assessment, investigation, and resolution of the report, and to the extent required by law or court order.

The Dean of Students Office (DOS) provides direct support to Claimants, Respondents, or other students who are involved in reports of Prohibited Conduct. This support includes navigating academic, personal, and community impact; advising on policy and procedures; and connecting to other available support and resources. The Respondent Support Program is housed in the DOS and has dedicated, trained staff who provide direct support to Respondents who are involved in reports of Prohibited Conduct.

Additional information about these and other resources is contained in Our Community Matters Resource Guide.

## VI. SUPPORTIVE AND PROTECTIVE MEASURES (ALSO KNOWN COLLECTIVELY AS INTERIM MEASURES)

Interim measures may be both supportive and protective measures.  Supportive and protective measures are those services, accommodations, and other assistance the University puts in place after receiving notice of Prohibited Conduct, but before any final outcomes (investigatory, disciplinary, or remedial) have been determined. The University will implement reasonably available interim measures to protect a Claimant and facilitate the Claimant's continued access to University employment or educational programs and activities.

### A. SUPPORTIVE MEASURES

Supportive measures are measures typically implemented for individual students, often Claimants, and are designed to address the student's safety, well-being, and continued access to educational opportunities. Supportive measures are available regardless of whether the person who requests a measure makes a report to the University or to law enforcement; whether the person participates in any investigation; or whether the University or law enforcement investigates a report that has been submitted. The University may also implement supportive

measures for Respondents, witnesses, and other members of the University community. Supportive measures are voluntary and may be modified or discontinued at any time at the request of the individual.

Supportive measures may, among other things, include:

- Academic support services and accommodations, including the ability to reschedule exams and assignments, transfer course sections, or withdraw from courses without penalty;

- An escort to ensure safe movement between classes and activities;

- On-campus counseling services and/or assistance in connecting to community-based counseling services;

- On-campus medical services and/or assistance in connecting to community-based medical services;

- Housing assignment or contract modifications (for University Housing) or assistance with residence modification if living off-campus;

- Work schedule or job assignment modifications (for University employment);

- Assistance with obtaining personal protective orders; or

- A combination of any of these measures.

### B. PROTECTIVE MEASURES

Protective measures are measures that typically involve action by the University involving a Respondent. Failure to comply with these measures may result in a separate violation under this Policy. Protective measures are only available following the initiation of a University investigation and prior to a determination of the final outcome. The nature of the protective measures is based upon the facts reasonably available at the time of the decision to implement the protective measures

Protective measures may include:

- No contact directives (to instruct an individual to stop all attempts at communication or other interaction with another individual);

- Limiting an individual's access to certain University facilities or activities;

- Academic schedule modifications (typically to separate Claimant and Respondent);

- Work schedule or job assignment modifications including suspending employment with or without pay (for University positions);

6

- Placing a hold on transcripts, meaning that the University may prevent a student from registering for classes or receiving a copy of their transcript or diploma;

- Withholding or delaying the conferral of a degree;

- Imposing an interim suspension; or

- A combination of any of these measures.

Protective measures may also be appropriate for witnesses and other members of the University community, following the initiation of an investigation. Implementation of supportive or protective measures should not be taken to suggest that the University has made any decision about the merits of the report.

The University will keep private any supportive or protective measures provided under this Policy to the extent practicable, and will promptly address any violation of protective measures under this Policy and Procedures.

Supportive or protective measures or both may be kept in place beyond the resolution of the matter. Claimants who wish to request supportive measures confidentially may do so through the Sexual Assault Prevention and Awareness Center. Respondents who wish to request supportive measures may do so through the Respondent Support Program.

The Title IX Coordinator or designee is available to meet with a Claimant or Respondent to address any concerns about the need for or the adequacy of supportive or protective measures.

Claimants or others should report information concerning a violation of protective measures to the Title IX Coordinator as soon as possible, and should dial 911 in situations of immediate health or safety concern.

If a Respondent's actions pose an immediate danger to any member of the University community, the Vice President for Student Life (VPSL), or designee, may immediately suspend the student pending a meeting.  Except in extraordinary circumstances that meeting will be scheduled as soon as possible, typically within two calendar days. At this meeting, the Respondent will be informed of the nature of the alleged violation, presented with available evidence, and given the opportunity to make a statement and present evidence. If the emergency suspension is continued, the Respondent will be offered a hearing option as soon as practicable, typically within ten calendar days, pursuant to the Statement of Student Rights and Responsibilities.

## VII.    REPORTING OPTIONS

The University strongly encourages prompt reporting of conduct that may violate this Policy. Prohibited Conduct may be reported to local law enforcement or the University, including the University of Michigan Police Department (UMPD), or both.

Any individual (including a student, employee, visitor, guest, or other third party) not just the Claimant may make a report under this Policy. An individual may choose to report to law enforcement, the University, to both, or not at all. Support and resources are always available regardless of the chosen reporting option.

Making a report to law enforcement or the University by contacting a reporting option (as listed below) means that the report will be shared with others as appropriate.

### A.    REPORTING TO LAW ENFORCEMENT

The University encourages anyone who experiences or witnesses Prohibited Conduct to make a report to UMPD, which has a dedicated unit for responding to and investigating sexual assaults, intimate partner violence, stalking, and child abuse. Prompt reporting allows law enforcement to collect and preserve evidence.

An individual who wishes to pursue criminal action in addition to, or instead of, making a report to the University for a Policy violation may contact law enforcement directly by calling:

- 911 (for emergencies);

- University of Michigan Police Department: (734) 763-1131 (non-emergencies)

  Special Victims Unit (UMPD);

- Ann Arbor Police Department: (734) 994-2911;

- Ypsilanti Police Department: (734) 483-9510; or

- Washtenaw County Sheriff Department: (734) 971-8400.

An individual has the right to report an incident, or to decline to report an incident, to law enforcement. An individual may decline to participate in a law enforcement interview. **A report to law enforcement, even the UMPD, is separate from a report to the University.**

Upon request, University staff will help an individual make a report to law enforcement. For example, SAPAC will assist any person in making a report to law enforcement, no matter where the Prohibited Conduct occurred. For conduct occurring in the residence halls or at the University Health System, Housing Security or Hospital Security, respectively, can assist in making a report to UMPD. For reports of off-campus Prohibited Conduct, UMPD can assist in identifying the appropriate law enforcement agency to which to make the report.

### B.    REPORTING TO THE UNIVERSITY

Individuals who choose to pursue action under this Policy should make a report to the University Title IX Coordinator at OIE through either of these options:

- Contacting the Title IX Coordinator in person, by e-mail or by phone:
  **Pamela Heatlie**, Title IX Coordinator
  (734) 763-0235 or (734) 647-1388 (tty)
  Institutional.equity@umich.edu
  2072 Administrative Services Bldg.
  1009 Greene St., Ann Arbor, MI 48109

- Reporting on-line through the Policy website:
  https://studentsexualmisconductpolicy.umich.edu/report-an-incident

- Reporting on-line through the OIE website:
  https://hr.umich.edu/working-u-m/workplace-improvement/office-institutional-equity/harassment-discrimination-reporting-form

Individuals can receive help with reporting to the University from designated University staff, including but not limited to SAPAC, DOS, OSCR, UMPD, or the University Ombuds.

### 1. Anonymous Reports

Any individual may make a report of Prohibited Conduct to the University without disclosing one's name at http://studentsexualmisconductpolicy.umich.edu/report-an-incident. Depending on the level of information available about the incident or the individuals involved, the University's ability to respond to an anonymous report may be limited. The University will, however, take whatever steps it deems appropriate and in the best interests of the overall University community, consistent with the information available.

### 2. Time Frame for Reporting an Incident

Although the University does not limit the time frame for reporting Prohibited Conduct, to promote timely and effective review, the University strongly encourages individuals to report possible Prohibited Conduct within 180 calendar days of the last occurrence of the concerning conduct. A report made after 180 days may make it more difficult to gather relevant and reliable information.

If the Respondent is no longer a student or participant in any University-related program or activity at the time of the report, or if the conduct does not fall within the scope of the Policy, the University may not be able to take action against the Respondent. The University will, however, help a Claimant identify reporting options outside the University and provide support and resources.

### 3. How the University Shares Information about Prohibited Conduct with Law Enforcement

Upon learning of concerns of possible Prohibited Conduct, the Title IX Coordinator or investigator will submit a report to UMPD. The purpose of this report is to comply with the

University's federal reporting obligations, to facilitate accurate compilation of crime statistics, and to ensure that other public safety responsibilities are addressed. The report to UMPD contains all available information known to the investigator at the time, including the identities of the parties involved, a brief summary of the reported conduct, and whether the Claimant has and/or is willing to speak with law enforcement. The investigator role is described fully in Section-XII(A)(1).

After submitting the initial report, if there are significant developments in the available information or the Claimant indicates whether they wish to meet with law enforcement, the Title IX Coordinator or investigator will update UMPD accordingly. The Claimant or others may be contacted by UMPD or another law enforcement agency to follow-up on the information received from the University. An individual may decline to participate in a law enforcement interview.

### 4.    Information on Amnesty to Students when Reporting Prohibited Conduct

Sometimes students are reluctant to seek help after experiencing Prohibited Conduct, or may be reluctant to help others who may have experienced Prohibited Conduct, because they fear being held responsible by the University or law enforcement for drug use or underage alcohol consumption. To better ensure that individuals who may be at medical risk as a result of alcohol intoxication or drug consumption will receive prompt and appropriate medical attention, the State of Michigan has adopted a medical amnesty law to remove perceived barriers to seeking help.

Michigan law includes exemption from prosecution for the following:

- A minor who voluntarily accesses a health facility or agency for treatment or observation after consuming alcohol or other drugs;

- Any minor who accompanies an individual who voluntarily accesses a health facility or agency for treatment or observation after consuming alcohol or other drugs; or

- Any minor who initiates contact with law enforcement or emergency medical services personnel for the purpose of obtaining medical assistance in connection with their own personal consumption of alcohol or other drugs; or consumption by others.

Similarly, the University will not pursue University misconduct charges against any participant in an investigation under this Policy for potential violations of other University policy for personal consumption of alcohol or other drugs identified during an investigation, as long as any such violations did not and do not place the health or safety of any other person at risk. The University may, however, initiate an assessment, educational discussion or pursue other non-disciplinary options to address the alcohol or other drug use.

### C.    REPORTING BY UNIVERSITY EMPLOYEES

#### 1.    Responsible Employees

Responsible employees must immediately report any information they learn about suspected Prohibited Conduct to OIE or the Title IX Coordinator. Failure by a responsible employee to timely report a suspected Prohibited Conduct may subject them to appropriate discipline, up to and including removal from their position. Responsible employees may report to the Title IX Coordinator through any of the reporting options previously noted in Section VI(B) or by going to https://portal.dpss.umich.edu/public/reporting/.

The following individuals are, for purposes of this Policy, responsible employees:

- Regents, who are not employees but, rather, Constitutional Officers under the Michigan Constitution;

- Executive officers (including those serving in the role of Associate or Assistant Vice President/Provost, as designated by the executive officer);

- Deans, directors, department heads/chairs (including those serving in assistant or associate roles);

- Graduate and undergraduate chairs;

- Supervisors who have hiring or firing power over at least three employees who are not student or post-doc employees;

- University faculty or staff providing oversight to, or traveling with, students[1] on University related travel abroad, including University-sponsored study abroad, research, fieldwork, or internship programs;

- Faculty and staff, who serve as advisors to or coaches of University-recognized student groups;

- Any individual, whether an employee or not, who serves as a coach of a club sports team;

- All individuals, including student-employees, (such as Resident Advisors) working in Student Life, the Division of Public Safety and Security, Intercollegiate Athletics, and OIE, except those who serve in non-supervisory positions in dining services, clerical or custodial/maintenance capacities;

- Campus Security Authorities designated by the University under the Clery Act not otherwise specified in this provision; and

---

[1] "Students" means University students or students from other U.S. based institutions participating in University related travel abroad.

- Individuals serving in any of the positions described above on an acting or interim basis.

Faculty and staff who do not meet any of these criteria are not considered responsible employees. Individuals who are Confidential Resources are not responsible employees. In addition, healthcare providers while acting in their professionally licensed treatment capacity (for example, physicians, nurses, dentists, pharmacists, and mental-health professional, including psychologists and social workers) are not required under this Policy to report a violation unless otherwise required to do so by law or other professional obligation.

Any questions regarding who is a responsible employee should be directed to the Office of the Vice President and General Counsel (OGC) at (734)764-0304 or OIE at (734)763-0235.

### 2.    All Other Employees

Reporting is an important tool to address Prohibited Conduct. Thus, while all other employees who are not designated as Confidential Resources should safeguard an individual's privacy, they are also strongly encouraged to share any information about such conduct with OIE, the Title IX Coordinator, or a member of DOS.

### 3.    Confidential Resources

As explained above, Confidential Resources will not share information about an individual (including whether that individual has received services) unless (1) given permission to do so by the person who disclosed the information; (2) there is an imminent threat of harm to self or others; (3) the conduct involves suspected abuse of a minor under the age of 18; or (4) as otherwise required or permitted by law or court order.

## VIII.   PROHIBITED CONDUCT

Conduct under this Policy is prohibited regardless of the sex, sexual orientation and/or gender identity or expression of the Claimant or Respondent. Prohibited Conduct includes the following specifically defined forms of behavior: sexual or gender-based harassment, sexual assault, intimate partner violence, stalking, retaliation, and violation of interim measures.

### A.    SEXUAL OR GENDER-BASED HARASSMENT

#### 1.    Sexual Harassment

Sexual harassment is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when the conditions outlined in Section VIII(A)(2)(a) and/or (b) below are present.

### 2.   Gender-Based Harassment

Gender-based harassment includes harassment based on actual or perceived gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal, non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature, when the conditions outlined in (a) or (b) below, are present.

> (a)  Submission to or rejection of such conduct is made, either explicitly or implicitly, a term or condition of a person's employment, academic standing, or participation in any University programs and/or activities, or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment); or

> (b)  Such conduct creates a hostile environment.  A hostile environment exists when the conduct is sufficiently severe, persistent, or pervasive that it unreasonably (i) interferes with, (ii) limits, or (iii) deprives an individual from participating in or benefiting from the University's education or employment programs and/or activities. Conduct must be deemed severe, persistent, or pervasive from both a subjective and an objective perspective. In evaluating whether a hostile environment exists, the University will consider the totality of known circumstances, including the nature, frequency, intensity, location, context, and duration of the behavior.

Although a sexually harassing hostile environment is generally created through a series of incidents, a severe incident, even if isolated, can be sufficient. For example, a single instance of sexual assault may constitute sexual harassment.

Examples of conduct that may constitute sexual or gender-based harassment include:

- Unwanted touching or sexual advances;

- Unwanted written, verbal, or electronic statements of a sexual nature, directed at an individual including sexually suggestive comments, jokes, or innuendos;

- Written, verbal, or electronic statements that disparage a person based on a perceived lack of stereotypical masculinity or femininity or perceived sexual orientation;

- Causing the incapacitation of another person (through alcohol, drugs, or any other means) for the purposes of compromising that person's ability to give consent to the alleged sexual activity;

- Allowing other individuals to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., FaceTime, Snapchat, Skype or live-streaming of images) without consent of the participant(s);

- Engaging in voyeurism (e.g., watching private sexual activity without the consent of the participants or viewing another person's intimate parts (including genitalia, groin, breasts or buttocks) in a place where that person would have a reasonable expectation of privacy);

- Recording, photographing, disseminating, or transmitting intimate or sexual utterances, sounds, or images of private sexual activity and/or a person's intimate parts (including genitalia, groin, breasts or buttocks) without the consent of the participants;

- Excluding a person from a program or activity based on pregnancy;

- Touching oneself sexually for others to view without their consent;

- Excluding a person from a program, activity or facility based on sexual orientation or gender identity.

In some cases, harassment may be based on multiple protected class bases included in the University's Nondiscrimination Policy Notice. In general, harassment by a student, involving protected class bases other than actual or perceived gender, sexual orientation, gender identity, or gender expression, falls under the *Statement of Student Rights and Responsibilities* (*Statement*), and may be addressed accordingly by the Office of Student Conflict Resolution (OSCR). Where there is an indication that reported harassment may be based on both gender (including sexual orientation, gender identity, or gender expression) and another protected class basis (e.g., race, color, national origin, age, marital status, sex, sexual orientation, gender identity, gender expression, disability, religion, height, weight, or veteran status), the Title IX Coordinator and the Director of OSCR will assess the available information in order to  determine whether the matter is most appropriately addressed under this Policy, under the *Statement*, or for different aspects of the matter to be addressed separately under each.

The Title IX Coordinator will have final decision-making authority regarding whether and how a matter is addressed under this Policy, and the OSCR Director will have final decision-making authority regarding whether and how a matter is addressed under the *Statement*.

### B.    SEXUAL ASSAULT

Sexual assault is touching of a sexual nature, including: vaginal or anal intercourse; anal, oral or vaginal penetration with an object; oral-genital contact; or other sexual contact that occurs without consent. Sexual contact includes: (a) intentional touching of the breasts, buttocks, groin, or genitals, whether clothed or unclothed, or intentionally touching another with any of these body parts; or (b) making an individual touch another person or themselves with or on any of these body parts. Consent, as well as the terms force, coercion, and incapacitation are further defined below.

### 1.     Consent

Consent is a clear and unambiguous agreement, expressed outwardly through mutually understandable words or actions, to engage in a particular activity. Consent must be voluntarily given and cannot be obtained through coercion or force. For purposes of this Policy, in evaluating whether consent was freely sought and given, the issue is whether the Respondent knew, or reasonably should have known, that the activity in question was not consensual or that the Claimant was unable to consent due to incapacitation. Incapacitation, coercion, and force are defined below.

A person who initiates a specific sexual activity is responsible for obtaining consent for that activity.

Consent is not to be inferred from silence, passivity, or a lack of resistance, and relying on non-verbal communication alone may not be sufficient to ascertain consent.

Consent is not to be inferred from an existing or previous dating or sexual relationship. Even in the context of a relationship, there must be mutual consent to engage in any sexual activity each time it occurs.

Consent to engage in one sexual activity at one time is not consent to engage in a different sexual activity or to engage in the same sexual activity on a later occasion.

Consent to engage in sexual activity with one person is not consent to engage in sexual activity with any other person.

Consent can be withdrawn by any party at any point. Once consent is withdrawn, the sexual activity must cease immediately.

### 2.     Incapacitation

Incapacitation means that a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity. Consent cannot be gained by taking advantage of the incapacitation of another, where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated.

A person who is incapacitated is unable, temporarily or permanently, to give consent because of mental or physical helplessness, sleep, unconsciousness, or lack of awareness that sexual activity is taking place. A person may be incapacitated as a result of the consumption of alcohol or other drugs, or due to a temporary or permanent physical or mental health condition.

When alcohol or other drugs are involved, incapacitation is a state beyond drunkenness or intoxication. A person is not necessarily incapacitated merely as a result of drinking or using drugs; the level of impairment must be significant enough to render the person unable to give consent. The impact of alcohol and other drugs varies from person to person, and a person's level of intoxication may vary based upon the nature and quality of the substance imbibed, the

person's weight, tolerance, ingestion of food and other circumstances. A person's level of impairment may also change rapidly.

In evaluating consent in cases of alleged incapacitation, the University asks two questions: (1) *Did the person initiating sexual activity know that the other party was incapacitated? and, if not,* (2) *Should a sober, reasonable person, in the same situation, have known that the other party was incapacitated?* If the answer to either of these questions is "yes," consent was absent and the conduct is likely a violation of this Policy.

One is not expected to be a medical expert in assessing incapacitation. One must look for the common and obvious warning signs that show that a person may be incapacitated or approaching incapacitation. Although every individual may manifest signs of incapacitation differently, typical signs often include slurred or incomprehensible speech, unsteady manner of walking, combativeness, emotional volatility, vomiting, or incontinence. A person who is incapacitated may not be able to understand some or all of the following questions: Do you know where you are?  Do you know how you got here? Do you know what is happening?  Do you know whom you are with?

One should be cautious before engaging in sexual activity when either party has been drinking alcohol or using drugs. The use of alcohol or other drugs may impair either party's ability to determine whether consent has been sought or given. If one has doubt about either party's level of intoxication, the safe thing to do is to forego all sexual activity. A Respondent's intoxication will not excuse the Respondent from the obligation to obtain consent as described in this Policy.

### 3.  Coercion

Coercion is conduct, including intimidation and express or implied threats of immediate or future physical, emotional, reputational, financial, or other harm to the Claimant or others, that would reasonably place an individual in fear, and that is employed to compel someone to engage in sexual activity.

### 4.  Force

Force is the use or threat of physical violence or intimidation to overcome an individual's freedom of will to choose whether to participate in sexual activity.

## C.  STALKING

Stalking occurs when a person engages in a course of conduct toward another person under circumstances that would cause a reasonable person to fear bodily injury to themselves or to others, or experience substantial emotional distress. Stalking often involves individuals who are known to one another or who have a current or previous relationship, but may also involve individuals who are strangers. Stalking behavior generally addressed under this Policy typically includes one or more of the following elements:

- Is sexual or romantic in nature;

- Is committed by a Claimant's current or former partner of an intimate, romantic or sexual relationship; or

- Is related to the Claimant exhibiting what is perceived as a stereotypical characteristic for one's sex, or for failing to conform to stereotypical notions of masculinity and femininity, regardless of the actual or perceived sex, gender, sexual orientation, gender identity, or gender expression of the Claimant.

The Title IX Coordinator, in consultation with OSCR will determine if the reported conduct meet these criteria. Stalking behavior not addressed under this Policy may be addressed under the Statement of Student Rights and Responsibilities as harassment.

For purposes of this Policy, course of conduct means two or more unwelcome acts in which a person directly, indirectly, or through other persons, by any action, method, device, or means, follows, monitors, observes, surveys, threatens, or communicates to or about a person, or interferes with a person's property.

### D.    INTIMATE PARTNER VIOLENCE

Intimate partner violence, also referred to as dating violence, domestic violence, or relationship violence, is any act of violence or pattern of emotionally or financially abusive behavior that one person uses against a current or former partner in a sexual, dating, spousal, domestic, or other intimate relationship, to gain or maintain power and control over another.

The determination of whether any conduct constitutes intimate partner violence is whether the conduct is so severe, pervasive or persistent as to significantly interfere with an individual's ability to learn and/or work or cause substantial emotional distress, when judged both objectively (meaning that a "reasonable person" would find the behavior to be emotionally abusive) and subjectively (meaning the impacted individual felt the behavior was emotionally abusive).

Intimate partner violence may include any form of Prohibited Conduct under this Policy; physical assault; or a pattern of abusive behavior. Intimate partner violence can be a single act or a pattern of behavior within a relationship.

### E.    RETALIATION

Retaliation means any adverse action taken by individuals or groups against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this Policy. Retaliation may include intimidation, threats, coercion, harassment, or adverse employment or educational actions that would discourage a reasonable person from engaging in activity protected under this Policy. A good faith pursuit by either party of civil, criminal or other legal action, internal or external to the University, does not constitute retaliation.

F.      VIOLATION OF PROTECTIVE MEASURES

Protective measures are typically measures Respondents are required to comply with and may include: no-contact directives, work or academic schedule or housing modifications or other actions that the University may implement to protect and/or support Claimants, witnesses, or other members of our University community as appropriate. Protective measures are discussed in more detail in Section V(A) above. Failure of a Respondent to comply with protective measures as required is a separate and independent violation of this Policy.

## IX.    UNIVERSITY RESOLUTION

As set forth in more detail below, the University uses two processes to resolve reports of Prohibited Conduct under this Policy: (1) formal resolution, which involves an investigation and, if applicable, an appeal and sanctions; and (2) alternative resolution, which includes informal or restorative options for resolving reports of Prohibited Conduct. The Title IX Coordinator will determine the appropriate process for reviewing the concerns raised after making an initial assessment of the reported information, or, where the Claimant requests anonymity, that an investigation not be pursued, or that no disciplinary action be taken, after receiving input from the review panel.

The University will strive to complete resolution of any matter, meaning the period from commencement of an investigation, which begins with the notice of an investigation to the Respondent, through completion of the investigation, and sanction, if any, within seventy-five (75) calendar days. This time frame may be extended for good cause, which may exist if additional time is necessary to ensure the integrity and completeness of the investigation; comply with a request by law enforcement for temporary delay to gather evidence; accommodate the availability of witnesses; account for University breaks or vacations; account for case complexities (including the number of witnesses and volume of information provided by the parties), or for other legitimate reasons.

Best efforts will be made to complete the process in a timely manner by balancing principles of thoroughness, fairness, and promptness.

## X.     INITIAL ASSESSMENT

After receiving a report of Prohibited Conduct committed by a student, the Title IX Coordinator or designee will make an initial assessment of the reported information and respond to any immediate health or safety concerns raised by the report. As part of the initial assessment, the Title IX Coordinator will assess the Claimant's safety and well-being and offer the University's immediate support and assistance; assess the nature and circumstances of the report, including whether it provides the names and/or any other information that personally identifies the Claimant, the Respondent, any witness, and/or any other individual with knowledge of the reported incident; and ascertain the ages of the Claimant and Respondent, if known, and, if either of the parties is a minor (under 18), take all necessary actions based upon the facts and circumstances of the case, including contacting the appropriate child protective service agency, if

required by law. The Title IX Coordinator will also ensure that the Claimant receives a written explanation of all available resources and options, including the following:

- Immediate support and assistance available through University resources and the Claimant's right to supportive measures regardless of whether they choose to participate in a University or law enforcement investigation;

- The Claimant's right to seek medical treatment and information on preserving potentially key forensic and other evidence;

- The Claimant's right to seek protective measures when the University pursues an investigation;

- The University's prohibition against retaliation, that the University will take prompt action when retaliation is reported, and how to report acts of retaliation; and

- The opportunity to meet with the Title IX Coordinator in person to discuss their resources, rights, and options.

When the Title IX Coordinator decides to initiate an investigation, impose protective measures, or take any other action that impacts a Respondent, the Title IX Coordinator will also ensure that Respondent is notified and receives written information on available resources and options. The Title IX Coordinator will ensure that a Respondent is informed of:

- The nature of the investigation, including the identities of the parties (if known), a concise summary of the conduct at issue, and potential Policy violations;

- The immediate support and assistance available through University resources;

- The University's prohibition against retaliation, that the University will take prompt action when retaliation is reported, and how to report acts of retaliation; and

- The opportunity to meet with the Title IX Coordinator in person to discuss their resources and options.

## XI. UNIVERSITY ACTIONS FOLLOWING AN INITIAL ASSESSMENT

Upon completion of an initial assessment, the Title IX Coordinator will determine the course of action under this Policy, which may include:

- Formal resolution: includes (a) an investigation to determine, by a preponderance of the evidence, if there has been a Policy violation; (b) the imposition of sanctions and other appropriate remedies if there has been a finding; and (c) the opportunity to challenge the outcome of the investigation or the sanction through an appeal;

- Alternative resolution:  does not include an investigation or disciplinary action against a Respondent, but may include imposing appropriate and reasonable remedies, including education and training, as agreed to by the parties. Alternative resolution may be appropriate as an additional measure during sanctioning, or after a sanction has been completed and a Respondent is returning to the University community; or

- Additional remedies:  may include training and other educational measures to members of the University community.

Detailed information regarding formal resolution, alternative resolution, and additional remedies is set forth below in Sections XII, XIII, and XIV, respectively.

The Title IX Coordinator's course of action will be guided by:  (1) whether the Claimant wishes to pursue formal resolution or requests anonymity, that an investigation not be pursued, and/or that no disciplinary action be taken; (2) the availability of information or evidence suggesting that a policy violation may have occurred; and (3) the University's Title IX obligation to investigate or otherwise determine what happened and take corrective action as appropriate to eliminate, prevent and address the effects of the Prohibited Conduct.

### A.   WHERE THE CLAIMANT WISHES TO PURSUE FORMAL RESOLUTION

In every case in which the Claimant reports Prohibited Conduct and requests an investigation and the University has disciplinary authority over the alleged Respondent, the Title IX Coordinator will conduct an initial assessment to determine if formal resolution is appropriate under the Policy.  If formal resolution is deemed appropriate, the University will initiate an investigation.

In some situations, the University's actions will be limited if the reports of Prohibited Conduct are against someone who has no affiliation with the University.

Even though the University's ability to take direct action against such a person may be limited, the University will still take steps to provide the Claimant immediate support and assistance available through University resources and resources available from entities outside the University (including law enforcement).

### B.   WHERE THE CLAIMANT REQUESTS ANONYMITY, THAT AN INVESTIGATION NOT BE PURSUED, AND/OR THAT NO DISCIPLINARY ACTION BE TAKEN

A Claimant may request that their name or other personally-identifiable information not be shared with a Respondent, that no investigation be pursued, or that no disciplinary action be taken. In these instances, before taking any further investigative steps, the University will forward Claimant's requests, along with all available information about the report gathered during the initial assessment, to a review panel, described in Section XI below.

### C.   WHERE THE CLAIMANT REQUESTS THE MATTER BE RESOLVED THROUGH ALTERNATIVE RESOLUTION

A Claimant may request to the Title IX Coordinator or designee that the reported matter be resolved through an alternative resolution process. In these instances, the Title IX Coordinator will determine whether that approach is appropriate and whether the University needs to take additional actions. If the matter is appropriate to be resolved through an alternative resolution process, the Title IX Coordinator will refer the matter to OSCR as described further in this policy.

## XII.   REVIEW PANEL

The review panel is comprised of the Title IX Coordinator and additional trained faculty or staff members as determined by the Title IX Coordinator. The review panel will consider a Claimant's request for anonymity, that an investigation not be pursued, or that no disciplinary action be taken. The review panel will balance the Claimant's request against the following factors in reaching a determination on whether the request can be honored:

- The totality of the known circumstances;

- The nature and scope of the alleged conduct, including whether the reported behavior involves the use of a weapon;

- The respective ages and roles of the Claimant and Respondent;

- The risk posed to any individual or to the campus community by not proceeding, including the risk of additional violence;

- Whether there have been other reports of other Prohibited Conduct or other misconduct by the Respondent;

- Whether the report reveals a pattern of misconduct related to Prohibited Conduct (e.g., via illicit use of drugs or alcohol) at a given location or by a particular group;

- The Claimant's interest not to pursue an investigation or disciplinary action and the impact of such actions on the Claimant;

- Whether the University possesses other means to obtain relevant evidence;

- Due process considerations for both the Claimant and the Respondent;

- The University's obligation to provide a safe and non-discriminatory environment; and

- Any other available and relevant information.

The review panel will provide information and advice to the Title IX Coordinator such as:

- Their individual and collective perspectives on whether, how, and to what extent, the University should further investigate the report of Prohibited Conduct;

- What steps may be possible or appropriate when a Respondent is unknown or the Claimant requests anonymity; and

- What other measures or remedies might be considered to address any effects of the reported behavior on the campus community.

The Title IX Coordinator will make a determination regarding the appropriate manner of resolution under the Policy. The University will seek resolution consistent with the Claimant's request, if it is possible to do so, based upon the facts and circumstances, while also protecting the health and safety of the Claimant and the University community.

### A.    DETERMINATION THAT A CLAIMANT'S REQUEST(S) CAN BE HONORED

Where the review panel determines that a Claimant's request(s) can be honored, the University may nevertheless take other appropriate steps to eliminate the reported conduct, prevent its recurrence, and remedy its effects on the Claimant and the University community. Those steps may include offering appropriate remedial measures to the Claimant, providing targeted training and prevention programs, and/or providing or imposing other remedies. The Claimant may choose to pursue alternative resolution (if available) or formal resolution under this Policy. The Title IX Coordinator also may request that a report be re-opened and pursued under the Policy and Procedures if any new or additional information becomes available.

### B.    DETERMINATION THAT A CLAIMANT'S REQUEST(S) CANNOT BE HONORED

In those instances, when the Title IX Coordinator determines that the University must proceed with an investigation despite the Claimant's request that it not occur, the Title IX Coordinator will notify the Claimant that the University intends to initiate an investigation, but that the Claimant is not required to participate in the investigation or in any of the actions taken by the University.

The University's ability to fully investigate and respond to a report may be limited if the Claimant requests anonymity or declines to participate in an investigation. The University will, however, pursue other steps to limit the effects of the Prohibited Conduct and prevent its recurrence. Those steps may be taken as part of an alternative resolution.

In all cases, the final decision on whether, how, and to what extent the University will conduct an investigation, and whether other measures will be taken in connection with any allegation of Prohibited Conduct, rests solely with the Title IX Coordinator.

## XIII.   **FORMAL RESOLUTION**

A flowchart depicting the formal resolution process, including an investigation; the imposition of sanctions and other appropriate remedies if there has been a finding, and the opportunity to challenge the investigation outcome or the sanction through an appeal, can be found here.

Formal resolution typically begins when:

- A Claimant has reported one or more instances of Prohibited Conduct and requests, at any time, an investigation of the concern; or

- After receiving a report of Prohibited Conduct, the Title IX Coordinator, in consultation with the review panel, has determined, based on the totality of the circumstances and the information available that a formal resolution process is required to ensure the health and safety of the Claimant or University community members.

While the Title IX Coordinator will identify the most effective means to formally review a report, in most instances the review will involve an investigation.

### A.   **INVESTIGATION**

An investigation will afford both the Claimant and Respondent a full and fair opportunity to be heard, to submit information and other evidence, and to identify witnesses. During an investigation, the investigator typically will meet separately with the Claimant, Respondent and pertinent witnesses; offer the parties the equal opportunity to submit and/or identify related and relevant information or evidence; and gather other relevant information or evidence, including documents, photographs, communications between the parties, medical records (subject to the consent of the applicable person) and other electronic records as appropriate. Following the interview, each person will be provided with a draft summary of their statement so that they have the opportunity to comment on the summary and ensure its accuracy and completeness. During this process, the Complainant or Respondent may suggest questions to the investigator to be asked of any party or witness. The investigator will determine which questions may be relevant or appropriate and will pose any such questions in a form the investigator deems best suited to be obtaining relevant information.

The Claimant or Respondent may, under limited and extenuating circumstances, make a request to the investigator to submit a written statement instead of participating in an interview. The Claimant or Respondent also may provide other supporting materials relevant to the matter. However, it is the responsibility of the University, not the Claimant or Respondent, to gather relevant evidence to the extent reasonably available. The investigator may impose time and page limits on written documents and information presented by either person as part of the investigation. The University's review will be thorough, reliable, and impartial.

1.   **Role of Investigator.** Whenever a formal resolution is initiated, the Title IX Coordinator will designate an investigator. The investigator will typically be a

member of OIE, although the investigator may be any appropriately trained individual. The investigator must be impartial, free of any actual conflict of interest, and have specific and relevant training and experience.

A Claimant or Respondent who has concerns that the assigned investigator cannot conduct a fair and unbiased review (e.g., has a personal connection with one of the parties or witnesses, etc.), may report those concerns to the Title IX Coordinator who will assess the circumstances and determine whether a different investigator should be assigned to the matter.

Investigators do not function as advocates for Claimants or Respondents. Investigators can, however, identify campus support and other resources for Claimants and Respondents and refer them to DOS, SAPAC, or Respondent Support Program to coordinate services for students upon request.

2.   **Notice of the Investigation**. Before any interview by an investigator of the Respondent, the Respondent will be informed in writing of the initiation of the investigation. The Claimant will also be notified, in writing, unless the Claimant has requested that the University not contact them. The written information will include the identities of the parties, if known, a concise summary of the conduct at issue, and potential Policy violations. The Respondent will be informed in writing if, during the investigation, additional information is disclosed that may also constitute Prohibited Conduct under the Policy.

3.   **Assumption of Good Faith Reporting.** The University presumes that reports of Prohibited Conduct are made in good faith. A finding that the behavior at issue does not constitute a violation of this Policy or that there is insufficient evidence to conclude that the incident occurred as reported, does not mean that the report was made in bad faith. The University encourages all individuals who have experienced or witnessed behavior they believe violates this Policy to report the matter so that it may be addressed, without fear of consequences from the University, if their good faith report cannot be substantiated or the behavior does not constitute a violation of this Policy.

4.   **Presumption of Non-Responsibility and Standard of Proof.** The investigation is a neutral, fact-gathering process. The Respondent is presumed to be not responsible. This presumption may be overcome only where the investigator and/or external reviewer, as defined in Section XII(C)(2), conclude that there is sufficient evidence, by a preponderance of the evidence, to support a finding that the Respondent violated the Policy. A preponderance of the evidence means that it is more likely than not, based on all the reasonable evidence and reasonable inferences from the evidence, that the Respondent violated this Policy.

5.   **Participation by the Parties and Witnesses Is Voluntary.** Claimants, Respondents, or witnesses may choose to participate or decline to participate in the formal resolution process. However, even if a Claimant or Respondent

declines to participate, the University may continue to investigate the report and issue findings based on available information.

6. **Expectation of Claimant, Respondent, and Witnesses in an Investigation.** The Claimant, Respondent, witnesses and others sharing information with the investigator are expected to provide truthful information in any proceeding under this Policy.

7. **Acceptance of Responsibility.** The Respondent may, at any time, elect to resolve the formal resolution process by accepting responsibility for the Prohibited Conduct, in which case the Title IX Coordinator will refer the matter to OSCR to determine the appropriate sanctions.

8. **Advisers**. Throughout the formal resolution process, a Claimant, Respondent or witness may have an adviser of choice. An adviser is an individual chosen by a Claimant, Respondent, or witness to provide support and guidance during the review of a report of Prohibited Conduct under this Policy. An adviser may not be a witness or otherwise have any conflicting role in the process. An adviser may be an advocate and/or an attorney.

   Any person who serves as an adviser should plan to make themselves available for meetings throughout the process. The adviser may assist with all written submissions made by a Claimant or a Respondent, and may facilitate scheduling and other processes. During any meeting, the adviser is present to observe and provide support and counsel to the participant. The adviser may not testify or obstruct the meeting.

   The University has the right at all times to determine what constitutes appropriate behavior on the part of an adviser and to take appropriate steps to ensure compliance with the Policy.

9. **Evidence.** The investigator, not the Claimant or Respondent, is responsible for gathering relevant evidence to the extent reasonably possible. However, each person will be given the opportunity to identify witnesses, provide other relevant information, such as documents, communications, photographs, and other evidence, and suggest questions to be posed to the other party or witness. Both persons are encouraged to provide all relevant information as promptly as possible to facilitate prompt resolution.

   The investigator will review all information identified or provided by the parties and will determine the appropriateness, relevance, and probative value of the information developed or received during the investigation. All information considered relevant by the investigator will be provided to the parties for their review and comment, as described below.

25

In general, a person's medical and counseling records are confidential and not accessible to the investigator unless the person voluntarily chooses to share those records with the investigator. In those instances, the information, if relevant, will be summarized in the preliminary report for both parties' review, and the relevant portions of the medical records made available for the non-sharing party's review.

The investigator may consult experts who have no connection to the reported incident when expertise on a specific topic or submitted evidence is needed to gain a fuller understanding of the relevance or value of the evidence or the issue at hand.

10. **Prior or Subsequent Conduct of the Respondent.** Prior or subsequent conduct of the Respondent will never be used to prove character, but may be considered for other purposes, such as determining pattern, knowledge, intent, or the Respondent's reasons for taking the action. For example, evidence of a pattern of Prohibited Conduct by the Respondent, either before or after the incident in question, regardless of whether there has been a prior finding of a Policy violation, may be deemed relevant to the determination of responsibility for the Prohibited Conduct under investigation.

The determination of relevance of pattern evidence will be based on an assessment of whether the previous or subsequent conduct was substantially similar to the conduct under investigation or indicates a pattern of similar Prohibited Conduct. The investigator will determine the relevance of this information and both persons will be informed in the preliminary report if evidence of prior or subsequent conduct is deemed relevant.

11. **Prior Sexual Contact Between Claimant and Respondent.** Prior sexual contact between a Claimant and a Respondent will never be used to prove character or reputation. Moreover, evidence related to the prior sexual history between the parties is generally not relevant to the determination of a Policy violation and will be considered only in limited circumstances. For example, if the question being determined is whether consent was given through mutually understandable actions (rather than words), information about prior sexual contact, in the totality of the evidence considered, may help the investigator understand the manner and nature of sexual communication between the two persons. This information may, therefore, be relevant in determining whether consent was sought and given during the incident in question.

However, and as noted above, even in the context of a relationship, consent to one sexual act does not, by itself, constitute consent to another sexual act. Consent on one occasion does not, by itself, constitute consent on a subsequent occasion. The investigator will determine the relevance of this information and both parties will be informed in the preliminary report if evidence of prior sexual contact is deemed relevant.

In addition, and as required by applicable state and federal law, other prior sexual activity of the Claimant or Respondent may be relevant only in certain, very limited circumstances.

12. **Witnesses.** Witnesses must have observed the acts in question or have information relevant to the incident and cannot be participating solely to speak about an individual's character.

Witnesses will have the opportunity to discuss the investigation process and participate in an interview. Following the interview, a witness will be provided with a draft summary of their statement so that they have the opportunity to comment on the summary and ensure its accuracy and completeness.

Where witnesses are interviewed as part of the investigation, the investigator will produce to Claimant and the Respondent for their review and comment a written summary of the witness' interviews, which will identify the witness by name and relationship to each person and the University. This information will be provided in or with the draft investigation report.

13. **Coordination with Law Enforcement.** Where the University is made aware that there is a concurrent criminal investigation, the investigator will inform any law enforcement agency that is conducting its own investigation that a University investigation is also in progress; ascertain the status of the criminal investigation; and determine the extent to which any evidence collected by law enforcement may be available to the University in its investigation.

At the request of law enforcement, the University may agree to temporarily defer part or all of the investigation until after the initial evidence-gathering phase of the law enforcement investigation is complete. The investigator will communicate with the parties, consistent with the law enforcement request and the University's obligations, about resources and support, procedural options, anticipated timing, and the implementation of any necessary interim measures for the safety and well-being of all affected individuals.

Standards for criminal investigations are different than the standards for a violation of this Policy, and therefore, the University will not base its decisions under this Policy solely on law enforcement determinations and/or the outcomes of any criminal proceedings. The University will fulfill its legal and ethical obligation to take immediate and appropriate action in response to a report of Prohibited Conduct, even if there are other external processes or procedures pending in connection with that same report. Similarly, if the University finds Prohibited Conduct has occurred, the University will take appropriate action, regardless of external proceedings that may also be pending.

14. **Time Frame for Completion of Investigation.** The University will strive to complete the investigation, meaning the period from commencement of an

investigation, which begins with notice of the investigation to the Respondent, through resolution (finding), within sixty (60) calendar days. Additional time may be necessary to ensure the integrity and completeness of the investigation, to comply with a request by law enforcement for temporary delay to gather evidence, to accommodate the availability of parties and/or witnesses, to account for University breaks or vacations, to account for case complexities including the number of witnesses and volume of information provided by the parties, or for other legitimate reasons.

With reasonable frequency throughout the investigation, except where a party requests otherwise, the investigator will update the Claimant and Respondent as to the status of the investigation.

15. **Preliminary Investigation Report.** After each person has had the opportunity to comment on their own statement and to identify witnesses and other potential information and suggest questions, and the investigator has completed witness interviews and the gathering of evidence, the investigator will prepare a preliminary report. The preliminary report will include, as applicable, the Claimant's statement, Respondent's statement, each witness' statement and either a copy or written summary of any other relevant information collected during the investigation. The preliminary report will not contain any findings.

The Claimant and Respondent may review the preliminary report and provide feedback in response. The Claimant and Respondent must submit any comments, feedback, additional documents, evidence, requests for additional investigation, names of additional witnesses, or any other information they deem relevant to the investigator, up to twenty (20) pages, within five (5) calendar days after it is sent to them for review. The Title IX Coordinator or designee may, in their discretion, waive the page limit on the feedback the parties can provide the investigator, for good cause.

In the event that new, relevant information is provided or identified by one of the parties, the information will be incorporated into the preliminary report and the parties will be provided a second opportunity to review and provide feedback regarding the new information before the investigator proceeds with the final report.

16. **Final Investigation Report and Outcome of Investigation**. After receiving any comments submitted by either person, or after the five (5) calendar day comment period has lapsed without comment, the investigator will address any relevant issues identified by the Claimant and/or Respondent, as appropriate, pursue any additional investigative steps as needed, and make a determination, by a preponderance of the evidence, whether the Respondent has committed a violation of this Policy.

The investigator's final written report will contain all information from the preliminary report, as supplemented by the relevant feedback submitted; any additional information gathered; the investigator's findings; and a summary of the investigator's rationale in support of the findings.

The investigator's report and findings must be reviewed and approved by the Title IX Coordinator, or designee, and reviewed by OGC before it is provided to each person.  OSCR will provide the written notice of outcome of the investigation to the Claimant and Respondent simultaneously. The notice of outcome will include information about next steps, which may include the sanctioning process (in the event that there is sufficient evidence to support a Policy violation), or the appeal process (in the event that there is insufficient evidence to support a Policy violation).

If a Claimant has chosen not to participate in the investigation but requests to be notified of the outcome, the University will notify the Claimant. If a Claimant has requested not to be notified of the outcome, the University will honor that decision. In such cases, the University will not send the notification to the Claimant, but may proceed with any necessary follow-up, as appropriate, if the case proceeds to appeals phase of the process.

17. **Finding(s) of Policy Violation**. When the investigator determines that there is *sufficient* evidence, by a preponderance of the evidence, to support a finding of a Policy violation on one or more of the allegations, the Respondent will be sanctioned through OSCR as set forth below (Section XIII(B)).

18. **Finding(s) of No Policy Violation**. When the investigator determines that there is *insufficient* evidence, by a preponderance of the evidence, to support a finding of a Policy violation on one or more of the allegations, the Claimant may accept or appeal the finding by notifying OSCR in writing within seven (7) calendar days of the notice of outcome. If the Claimant accepts the finding of no Policy violation, the investigation will be closed. If the Claimant appeals one or more of the findings, further proceedings as set forth below (Section XIII(C)) will follow. The investigator may determine that the evidence does not, by a preponderance of the evidence, support a finding of a Policy violation, but does support the conclusion that conduct, while not a Policy violation, occurred that is inappropriate and must cease in order to avoid further action by the University.  In these cases, the Title IX Coordinator may require the Respondent to complete as a preventative measure, targeted training, which is not a sanction.  Failure to complete the training may result in the imposition of a registration hold on the Respondent.

## B.    SANCTIONS

If the Respondent is found responsible for Prohibited Conduct (either because of a finding of a Policy violation that is not appealed, or after an appeal of a finding of no Policy violation that is reversed on appeal and thus results in a Policy violation), the University will initiate a

sanctioning process designed to eliminate the conduct, prevent its recurrence, and remedy its effects, while supporting the University's educational mission and fulfilling its Title IX obligations. Sanctions or interventions may also serve to promote safety and/or deter students from similar future behavior. Other remedies may include targeted or broad-based educational programming or training.

OSCR will facilitate the sanctioning process outlined in this Policy upon receipt of the Investigative Report and will make a sanctioning determination within fifteen (15) calendar days after the Claimant and the Respondent are notified of the investigation outcome.   Both the Claimant and the Respondent may each offer a brief written sanctioning input statement within five (5) calendar days of receiving the notice of a Policy violation.

      **1.**     **Process**

To ensure effective transition between phases of the process the Claimant and Respondent will be provided equal opportunity to meet with an OSCR Case Manager to understand the sanctioning phase of the process, if applicable, and/or any appeals phase that may also be applicable.

Concurrently, OSCR Staff, in consultation with the Director of OSCR as necessary, will determine sanctions appropriate to fulfill the University's Title IX obligations.  The Director of OSCR will be advised of the names of the Claimant and Respondent, and will be asked to disclose any conflicts of interest that might make them unable to conduct a fair and unbiased review of the case. Likewise, the name of the assigned OSCR Staff member will be shared with both Claimant and Respondent.  The Claimant or Respondent may report any concerns that the assigned OSCR Staff member is unable to conduct a fair and unbiased review to the Director of OSCR, who will assess the circumstances and determine whether a different staff member from OSCR should be assigned to the matter.

The assigned OSCR Staff member will review the written final investigation report, any additional information from OSCR regarding the Respondent's disciplinary record, if any, and any sanctioning input statement provided to the OSCR Case Manager by the parties. In addition, the Case Manager may provide to the assigned OSCR Staff member a summary of any relevant information from the electronic case notes. The summary will be shared with the parties and the parties will have five (5) calendar days to provide any response, which will be provided to OSCR. The assigned OSCR Staff member may consult with the Title IX Coordinator as necessary. The assigned OSCR Staff member will strive to render a written sanctioning determination within five (5) calendar days of receiving the materials from the Case Manager.

The Claimant or Respondent's decision whether to provide a sanctioning input statement is completely voluntary. OSCR may use information from these statements to help determine the Respondent's sanction. The purpose of the sanctioning input statements is for the parties to explain what sanction(s) they believe the assigned OSCR Staff member should implement and why. A sanctioning input statement from the Claimant is a written statement describing the impact of the Prohibited Conduct on the Claimant and expressing the Claimant's preferences regarding appropriate sanctions. A sanctioning input statement from the Respondent is a written

statement explaining any factors that the Respondent believes should mitigate or otherwise be considered in determining the sanctions imposed.

The sanctioning input statements may not exceed five (5) pages, including attachments.  OSCR will share any sanctioning input statements with the other party. OSCR may use information from these statements to help determine the Respondent's sanction. OSCR, in consultation with the OGC, will review all information submitted in a sanctioning input statement for relevance and appropriateness and may determine that some or all of the information submitted is not appropriate to provide to the assigned OSCR Staff member.

## 2.      Factors Considered in Sanctioning

In determining the appropriate sanctions, the assigned OSCR Staff member will be guided by a number of considerations, including:

- The nature of the conduct at issue;

- The impact of the conduct on the Claimant;

- The impact of the conduct on the community or the University, including protection of the University community;

- Prior misconduct by the Respondent, including the Respondent's relevant prior discipline history, both at the University or elsewhere, and any criminal convictions, if such information is available, known and reliable;

- Whether the Respondent has accepted responsibility for the conduct, which may be considered as a factor that may lessen, not increase, the severity of the sanctions;

- Maintenance of a safe and respectful environment conducive to learning;

- The necessity of any specific action in order to eliminate the Prohibited Conduct, prevent its recurrence, and remedy its effects on the Claimant or other University community members; and

- Any other mitigating, aggravating, or compelling circumstances, including those set forth in the sanctioning input statements, to reach a just and appropriate resolution in each case.

## 3.      Possible Sanctions or Interventions

The list of potential sanctions or interventions includes one or more of the following:

- **Disciplinary Probation:** A designated period of time during which the student is not in good standing with the University. The terms of disciplinary probation may involve restrictions of student privileges and/or set specific behavioral expectations;

- **Restitution:** Reasonable and limited compensation for loss, damage, or injury to the appropriate party in the form of money or material replacement;

- **Restriction from Employment at the University:** Prohibition of or limitation on University employment;

- **Class/Workshop/Training/Program Attendance:** Enrollment in and verified completion of a class, workshop, training, on line learning, program, and/or follow up meetings with staff members any of which could help the student and/or the University community. Examples include, but not limited to, the following: Alcohol Education (BASICS), Alcohol Assessment (ASAP), Individual Marijuana Education Program (IMEP), Conflict Coaching, Wellness Coaching, Anger Management Workbook, Counseling (recommended & voluntary only), scheduled Check In Meetings with staff member, and Healthy Relationship/Consent/Wellness Education coaching;

- **Educational Project:** Completion of a project specifically designed to help the student understand why certain behavior was inappropriate and to prevent its recurrence;

- **University Housing Transfer or Removal:** Placement in another room or housing unit or removal from University housing. Housing transfers or removals may be temporary or permanent depending on the circumstances;

- **Removal from Specific Courses or Activities:** Suspension or transfer from courses or activities at the University for a specified period of time;

- **No Contact:** Restriction from entering specific University areas and/or from all forms of contact with certain persons;

- **Suspension:** Separation from the University for a specified period of time or until certain conditions are met;

- **Expulsion:** Termination of student status for an indefinite period;

- **Transcript notation, hold, and/or notification to other institutions:** A notation of non-academic disciplinary action may be made on a transcript and/or the University may notify other institutions of non-academic disciplinary action. In addition, the University may place a hold on transcripts, meaning that the University may prevent a student from registering for classes, receiving a copy of their transcript /diploma, or both;

- **Withholding, delaying, or revoking the conferral of the degree:** The University may delay the conferral of the degree pending the outcome of an investigation or

withhold the conferral of the degree due to a finding of Prohibited Conduct. In extraordinary circumstances, the University may revoke the conferral of the degree.

Student-employees who are reported to have engaged in Prohibited Conduct in their employment capacity will continue to be subject to review under the University's Sexual Harassment Policy (SPG 201.89-0) rather than under this Policy. If a student-employee is found to have engaged in Prohibited Conduct, the student-employee may be subject to sanctions both in connection with their employment and in connection with their student status (as listed here), as appropriate under applicable processes.

### 4.      Written Notice of Sanction

OSCR will provide the written notice of the sanction(s) to the Claimant and Respondent simultaneously. The notice will include the sanction(s), a summary of the assigned OSCR Staff member's rationale in support of the sanction(s), and the appeal process. The sanction must be reviewed and approved by the Title IX Coordinator before it is provided to each person.  As described in more detail below, if the Title IX Coordinator does not approve of the sanctions, and the sanctions are not appealed to the External Reviewer, the Title IX Coordinator may appeal the sanctions to the External Reviewer.

### C.      APPEALS OF FINDINGS OR SANCTIONS

Both a Claimant and Respondent may appeal the investigator's finding, the sanctions, or both.  If the Title IX Coordinator does not approve the sanctions determined by OSCR and one party appeals the sanctions, the Title IX Coordinator may submit information to the External Reviewer about the appropriateness of the sanctions if one party appeals the sanctions.  If neither party appeals the sanctions, the Title IX Coordinator may appeal the sanctions. The appeal will be conducted in an impartial manner and equivalent rights will be provided to both parties throughout the process. The University will take appropriate measures to avoid and/or eliminate potential conflicts of interest during the sanctions appeal process.

A Claimant may appeal the investigator's finding that there is insufficient evidence to support a Policy violation within seven (7) calendar days of the date of the written notice of the investigation outcome.

A Respondent may appeal the investigator's finding that there is sufficient evidence to support a Policy violation within seven (7) calendar days of the date of the written notice of sanction.

Either party may appeal the sanction imposed by OSCR within seven (7) calendar days of the date of the written notice of sanction.  To appeal the finding or the sanctions, a party must submit a written request to OSCR within seven (7) calendar days of the date of the notice of outcome or sanctions, whichever is relevant. OSCR may deem a late submission reasonable only under extraordinary or extenuating circumstances. The appeal shall consist of a plain, concise, and complete written statement outlining the basis for appeal and all relevant information to substantiate the claim.

If the Title IX Coordinator does not approve the sanctions determined by OSCR and one party appeals the sanctions, the Title IX Coordinator may submit information within seven (7) days of receiving either party's appeal to the External Reviewer about the appropriateness of the sanctions if one party appeals the sanctions.

If neither party appeals the sanction imposed by OSCR within seven (7) calendar days of the date of the written notice of sanction, the Title IX Coordinator, or designee, will inform OSCR within seventy-two (72) hours of the intent to appeal the sanction.  If the Title IX Coordinator, or designee, does not notify OSCR within seventy-two (72) hours of an intent to appeal the sanction, the ability to appeal the sanction will be waived.  If the Title IX Coordinator, or designee, does notify OSCR of the intent to appeal, the Title IX Coordinator will have seven (7) calendar days after the deadline for either party to appeal the sanction.  The appeal shall consist of a plain, concise, and complete written statement outlining the basis for appeal and all relevant information to substantiate the claim.

Each party will be given the opportunity to review and respond in writing to an appeal submitted by the other party or the Title IX Coordinator or to any other information submitted by the Title IX Coordinator to the External Reviewer. Any response by the opposing party must be submitted to OSCR within seven (7) calendar days. All appeal documents from each party will be considered together in one submitted appeal.

### 1.      Grounds for Appeals

Claimant or Respondent may appeal on one or more of the following grounds for the finding:

- A material deviation from the procedures affected the outcome of the case;

- There is new and relevant information that was unavailable, with reasonable diligence and effort, at the time of the investigation that could reasonably affect the investigation findings; or

- A review of all available and relevant information indicates that the evidence clearly does not support the finding(s) and provides firm and definite support for modifying the original finding(s).

Claimant or Respondent may appeal the sanction on the following ground:

- The sanction was clearly inappropriate and/or disproportionate to the conduct for which the person was found responsible.

### 2.      External Reviewer Will Conduct Appeal Review

The appeal review will be conducted by an external reviewer. The external reviewer will be a neutral party, most often an attorney outside of the University with significant legal experience, knowledge, and judgment. The external reviewer will be chosen by OGC in consultation with

VPSL. The external reviewer will receive annual training regarding the University's policies and procedures, the handling of student sexual misconduct cases, and other relevant issues.

The external reviewer must also be impartial and free from bias or conflict of interest. If the external reviewer has concerns that he or she cannot conduct a fair or unbiased review, the external reviewer may report those concerns to the Title IX coordinator and a different external reviewer will be assigned to the appeal. Similarly, a Claimant or Respondent who has concerns that the assigned external reviewer cannot conduct a fair and unbiased review, may report those concerns to the Title IX Coordinator or designee who will assess the circumstances and determine whether a different external reviewer should be assigned to the appeal.

The external reviewer will review the matter based on the issues identified in the appeal(s) materials. The external reviewer may, at any time, freely consult with or request additional information from the Title IX Coordinator, OGC, and other University administrators as necessary. The external reviewer has the authority to determine the appropriateness of evidence, including whether certain evidence should be considered, and the strength and value that evidence will be given. In deciding the appeal of the finding or the sanction, the external reviewer will consider the final investigation report and any written submissions by the parties outlining any basis for altering the finding, the determination of OSCR, and any sanctioning input statements. The external reviewer also may consider any other materials the University deems relevant and that have been shared with the parties.

### 3.     Decision of External Reviewer

The external reviewer may conclude that there are no relevant issues of concern and therefore recommend that the investigator's finding or OSCR determination be affirmed. In the alternative, the external reviewer may identify issues of concern; if so, in the case of the findings, the external reviewer will provide, in writing, to the Title IX Coordinator one of the following recommended actions and any additional instructions or recommendations it deems appropriate under the circumstances:

- If there was a material deviation from procedure, remand the matter to the Title IX Coordinator and/or a new investigator with corrective instructions from the external reviewer;

- If new information appears relevant, refer the matter to the Title IX Coordinator, and the original investigator, if available, to determine whether any modifications may need to be made to the original investigative report; or

- If the evidence clearly does not support the finding(s) of a Policy violation and provides firm and definite support for modification, the external reviewer may make any necessary modifications to the report.

If the external reviewer determines the sanctions to be clearly inappropriate or disproportionate, they will alter the sanctions or interventions accordingly. In the event that the external reviewer makes any determination that ultimately results in a finding of a Policy violation when the

investigator had initially made a finding of no Policy violation, the case will be sent to OSCR for a determination of sanctions. The sanctions can then be the subject of a second appeal on the sanction only.

The external reviewer will strive to complete the appeal review within seven (7) calendar days of receipt of all documents.

The external reviewer will provide these determinations to the VPSL or their designee who may accept or modify the determinations made by the external reviewer within seventy-two (72) hours of receiving the external reviewer's decision. If the VPSL or their designee does not complete the review within seventy-two (72) hours, the review will be waived and the external reviewer's determination will be deemed final. The VPSL'S final and unreviewable decision will be made available to the participating parties, in writing, simultaneously, by OSCR.

## XIV.   ALTERNATIVE RESOLUTION

Alternative resolution is a voluntary, structured interaction between or among affected parties that is designed to allow a Respondent to accept responsibility for misconduct and acknowledge harm to the Claimant or to the University community. The University recognizes that alternative resolution options may, if implemented in concert with institutional values and legal obligations, be an appropriate means of addressing some forms of Prohibited Conduct reported under this Policy. Alternative resolution options are designed to eliminate the conduct at issue, prevent its recurrence, and remedy its effects in a manner that meets the expressed preference of the Claimant and the safety and welfare of the campus community.

### A.   CIRCUMSTANCES IN WHICH ALTERNATIVE RESOLUTION MAY BE USED

Alternative resolution is not appropriate for all forms of conduct under the Policy and the Title IX Coordinator retains the discretion to determine which cases are appropriate for alternative resolution.

In some forms of alternative resolution, the remedies imposed will focus on supporting the Claimant with no participation or involvement by the Respondent. In other forms of alternative resolution, the Respondent may agree to participate. Depending on the type of remedy used, it may be possible for a Claimant to maintain anonymity.

Alternative resolution may also include practices such as restorative justice and mediation. Practices based in restorative principles are designed to allow a Respondent to accept responsibility for misconduct and acknowledge harm to the Claimant or to the University community. Alternative resolution will be used only with the consent of both parties, under the supervision of University-sanctioned, trained professionals, and following a determination by the University that the matter at hand is appropriate for a restorative approach.

The Alternative resolution options available under this Policy recognize:

- Participation is voluntary and both a Claimant and Respondent can request to end this manner of resolution and pursue an investigation at any time;

- The University will not compel a Claimant to engage in mediation, to directly confront the Respondent, or to participate in any particular form of alternative resolution;

- Mediation, even if voluntary, will not be used in cases involving vaginal, anal or oral penetration;

- Prohibited Conduct affects Claimants, Respondents, witnesses, friends, community members, family members, and others (collectively Affected Persons);

- Affected Persons within the community often benefit when resolution processes and outcomes are tailored to meet their unique needs and interests;

- Claimants and other Affected Persons may find it useful to meet with a Respondent who acknowledges the substance of the underlying events and who acknowledges that Claimants or other Affected Persons have reported experiencing harm as a result;

- Structured interactions between Affected Parties can facilitate long-term healing and reduce recidivism; and

- Participants in alternative resolution processes must be protected from secondary victimization and other potential harms, including the pressure to proceed through alternative resolution instead of formal resolution.

### B.     ALTERNATIVE RESOLUTION OPTIONS

With approval from the Title IX Coordinator, alternative resolution options may be used during any of the following phases of the resolution process:

- The assessment phase: as a means of addressing the reported or admitted conduct, preventing its recurrence, and remedying its effects absent a formal finding of a policy violation;

- The sanctioning phase: as a means of creating appropriate sanctions or interventions after a finding of responsibility; or

- The reintegration phase: as a means of reintegrating the Respondent into the University community after a period of separation and addressing any lingering community concerns.

The following conditions must be satisfied for an alternative resolution process to be initiated:

- The Title IX Coordinator must have reviewed the matter to the extent necessary to confirm that it is of the type that would be appropriate for an alternative resolution process and must have concluded, in consultation with appropriate University employees, that use of an alternative resolution process was without pressure or compulsion from others and the parties were advised that they may withdraw from the process at any time; and

- Individuals who wish to participate in an alternative resolution process must have successfully completed preparatory meetings with an appropriate staff member(s).

Individuals may be accompanied by an adviser at any meetings related to the alternative resolution process. Information shared or obtained during alternative resolution will be treated as private to the extent permitted by law and will not result in subsequent disciplinary actions by the University, unless additional action is deemed necessary to fulfill the University's legal obligations.

### C.    ALTERNATIVE RESOLUTION AGREEMENTS

Any agreements reached in alternative resolution must be documented and approved by the Title IX Coordinator to ensure consistency with the University's Title IX obligations. An agreement will not be considered valid if the Title IX Coordinator does not approve it.

If the Title IX Coordinator approves an agreement after the parties have voluntarily reached consensus as to its terms, the Respondent will be required to comply with the agreement. Failure to comply with the agreement may result in a violation of the Statement of Student Rights and Responsibilities. If no agreement is reached, the matter may be referred to the Title IX Coordinator for further action.

To fairly assess pattern or systemic behavior, the Title IX Coordinator will maintain records of all reports and conduct referred for alternative resolution. The time frame for completion of alternative resolution may vary, but the University will seek to initiate action within thirty (30) calendar days of the initial assessment.

### XV.    ALTERNATIVE INTERVENTIONS OR REMEDIES FOR THE UNIVERSITY COMMUNITY

In addition to the sanctions/interventions applied to the Respondent, and regardless of whether the University pursues an investigation or takes other formal disciplinary action, the Title IX Coordinator may find it helpful or necessary to request or require a Respondent or others to undertake specific steps designed to eliminate the misconduct, prevent its recurrence, and/or remedy its effects. Examples include, but are not limited to, the following:

- Requesting or requiring a University entity to provide training for its staff or members;

- Continuing any of the protective and supportive measures previously established;

- Identifying the need for any additional or ongoing measures, supports and remedies; or

- Revising University policies, practices, or services.

## XVI.   RECORDS RETENTION

The University shall retain for a period of seven (7) years after the date of case closure: the official OIE and OSCR case file relating to an investigation and any sanctioning and/or appeals processes involving allegations of Prohibited Conduct. In cases in which the Respondent was found to have violated the Policy and was expelled, the University may retain such official case files indefinitely.

## XVII.  POLICY REVIEW

This Policy is maintained by the OIE, Student Life, and the Vice President and Office of the General Counsel. The University will review and update this Policy, as appropriate, each year. The University will evaluate, among other things, any changes in legal requirements, existing University resources, and the resolution of cases from the preceding year.

## XVIII.  ANNUAL REPORT

The Title IX Coordinator will issue an Annual Report to the University of Michigan community providing an overview of the number and nature of  reports of Prohibited Conduct received during the preceding fiscal year. The report will provide the community with an overview of response efforts.

# Exhibit B





# The Statement

## Statement of Student Rights & Responsibilities



UNIVERSITY OF
**MICHIGAN**

1    STATEMENT OF STUDENT RIGHTS AND RESPONSIBILITIES

## CONTENTS

Introduction                                          1

Student Rights and Responsibilities        2

Violations                                             3

Scope of the Violations                        4

Procedures                                            5

Sanctions/Interventions                       9

Related Procedures                           11

# INTRODUCTION

The University of Michigan-Ann Arbor (the University) is dedicated to supporting and maintaining a scholarly community. As its central purpose, this community promotes intellectual inquiry through vigorous discourse. Values which undergird this purpose include civility, dignity, diversity, education, equality, freedom, honesty, and safety.

When students choose to accept admission to the University, they accept the rights and responsibilities of membership in the University's academic and social community. As members of the University community, students are expected to uphold its previously stated values by maintaining a high standard of conduct. Because the University establishes high standards for membership, its standards of conduct, while falling within the limits of the law, may exceed federal, state, or local requirements.

Within the University, entities (such as schools and colleges; campus, professional, and student organizations) have developed policies that outline standards of conduct governing their constituents and that sometimes provide procedures for sanctioning violations of those standards. This *Statement of Student Rights and Responsibilities* (the *Statement*) does not replace those standards; nor does it constrain the procedures or sanctions provided by those policies. This *Statement* describes possible behaviors which are inconsistent with the values of the University community; it outlines procedures to respond to such behaviors; and it suggests possible sanctions/interventions which are intended to educate and to safeguard members of the University community.

 STUDENT RIGHTS

Students at the University have the same rights and protections under the Constitutions of the United States and the State of Michigan as other citizens. These rights include freedom of expression, press, religion, and assembly. The University has a long tradition of student activism and values freedom of expression, which includes voicing unpopular views and dissent. As members of the University community, students have the right to express their own views, but must also take responsibility for according the same right to others.

Students have the right to be treated fairly and with dignity regardless of race, color, national origin, age, marital status, sex, sexual orientation, gender identity, gender expression, disability, religion, height, weight, or veteran status, and as revised in the University of Michigan Nondiscrimination Policy. The University has a long-standing tradition of commitment to pluralistic education. Accordingly, the University, through this *Statement*, will not unlawfully discriminate on the basis of protected group status.

Students have the right to be protected from capricious decision-making by the University and to have access to University policies which affect them. The University has an enduring commitment to provide students with a balanced and fair system of dispute resolution. Accordingly, this *Statement* will not deprive students of the appropriate due process protections to which they are entitled. This *Statement* is one of the University's administrative procedures and should not be equated with procedures used in civil or criminal court.

Students also have a right to be educated about this *Statement*, and the University has a responsibility to provide education to students about the contents of this *Statement*.  Students shall be made aware of their rights as outlined in this *Statement*, in addition to their responsibilities. Specifically, beginning in Winter 2017, the Division of Student Life must inform new students of the violations of this *Statement* and potential sanctions/interventions they may face if found responsible for violating this *Statement*.

The University's commitment to providing students appropriate dispute resolution avenues means that in addition to formal conflict resolution processes the University also provides informal, adaptable conflict resolution pathways. Related procedures are outlined in VI.2.B. Adaptable Conflict Resolution (including Mediation).

 STUDENT RESPONSIBILITIES

Along with rights come certain responsibilities. Students at the University are expected to act consistently with the values of the University community and to obey local, state, and federal laws.



# IV VIOLATIONS

Students are expected to comply with published University policies. Furthermore, bias-motivated misconduct is listed as a separate violation of the University community's values to ensure that the *Statement* governs acts of misconduct that occur as a result of a student engaging in misconduct based upon bias or prejudice held against another group's or individual's identity. The following behaviors, for example, contradict the values of the University community and are subject to action under this *Statement*.

**A.** Physically harming another person including acts such as killing, assaulting, or battering

**B.** Engaging in sexual misconduct as defined by the University of Michigan Policy and Procedures on Student Sexual and Gender-based Misconduct and Other Forms of Interpersonal Violence. Students who are reported to have experienced or engaged in sexual misconduct are subject to the resolution procedures outlined in the University of Michigan Policy and Procedures on Student Sexual and Gender-based Misconduct and Other Forms of Interpersonal Violence

**C.** Hazing

**D.** Stalking another person as defined by the University of Michigan Policy and Procedures on Student Sexual and Gender-based Misconduct and Other Forms of Interpersonal Violence. Students who are reported to have experienced or engaged in stalking by other students are subject to the resolution procedures outlined in the University of Michigan Policy and Procedures on Student Sexual and Gender-based Misconduct and Other Forms of Interpersonal Violence

**E.** Perpetrating intimate partner violence (also known as dating or domestic violence) as defined by the University of Michigan Policy and Procedures on Student Sexual and Gender-based Misconduct and Other Forms of Interpersonal Violence. Students who are reported to have engaged in or experienced inti-mate partner violence by other students are subject to the resolution procedures outlined in the University of Michigan Policy and Procedures on Student Sexual and Gender-based Misconduct and Other Forms of Interpersonal Violence

**F.** Harassing or bullying another person–physically, verbally, or through other means

**G.** Tampering with fire or other safety equipment or setting unauthorized fires

**H.** Illegally possessing or using alcohol

**I.** Illegally distributing, manufacturing, or selling alcohol

**J.** Illegally possessing or using drugs

**K.** Illegally distributing, manufacturing, or selling drugs

**L.** Intentionally and falsely reporting bombs, fires, or other emergencies to a University official

**M.** Stealing, vandalizing, damaging, destroying, or defacing University property or the property of others

**N.** Obstructing or disrupting classes, research projects, or other activities or programs of the University; or obstructing access to University facilities, property, or programs (except for behavior that is protected by the University's policy on Freedom of Speech and Artistic Expression)

**O.** Making, possessing, or using any falsified University document or record; altering any University document or record, including identification cards and meal cards

**P.** Assuming another person's identity or role through deception or without proper authorization. Communicating or acting under the guise, name, identification, email address, signature, or indicia of another person without proper authorization, or communicating under the rubric of an organization, entity, or unit that you do not have the authority to represent

**Q.** Failing to leave University con-

trolled premises when told to do so by a police or security officer with reasonable cause

**R.** Conviction, a plea of no contest, acceptance of responsibility, or acceptance of sanctions for a crime or civil infraction (other than a minor traffic offense) in state or federal court if the underlying behavior impacts the University community

**S.** Misusing, failing to comply with, or jeopardizing *Statement* procedures, sanctions, or mediated agreements, or interfering with participants involved in the resolution process

**T.** Violating University computer policies

**U.** Possessing, using, or storing firearms, explosives, or weapons on University controlled property or at University events or programs (unless approved by the Department of Public Safety; such approval will be given only in extraordinary circumstances)

**V.** Engaging in misconduct as defined in violations 'A' through 'U' motivated by bias or prejudice. This includes behavior motivated on the basis of any person's identity as protected by the University of Michigan's Nondiscrimination Policy (race, color, national origin, age, marital status, sex, sexual orientation, gender identity, gender expression, disability, religion, height, weight, or veteran status) [201.89-1 and Regents bylaw 14.06]. Sanctions may be enhanced for any misconduct listed in sections IV of the *Statement of Student Rights and Responsibilities* that is determined to be motivated on the basis of the above classifications. This violation will be evaluated under current legal standards.

 # SCOPE OF THE VIOLATIONS

Behavior which occurs in the city of Ann Arbor, on University controlled property, or at University sponsored events/programs may violate the *Statement*. Behavior which occurs outside the city of Ann Arbor or outside University controlled property may violate the *Statement* only if the behavior poses an obvious and serious threat or harm to any member(s) of the University community. Behavior will be addressed under the *Statement* in effect at the time the behavior allegedly occurred, not at the time the complaint was filed.

The *Statement of Student Rights and Responsibilities* is intended to incorporate other specific University policies by reference. These policies are: the University Housing's Community Living at Michigan Handbook, the Student Sexual and Gender-based Misconduct and Other Forms of Interpersonal Violence, the Responsible Use of Information Resources, and related student information technology policies. The *Statement* will be used to address violations of these policies only if the violation warrants a process or a sanction/intervention beyond what is available in these policies. In such cases, policy adjudicators may take intermediate action regarding a complaint as defined by their individual policy; however, final resolution will occur under the procedures outlined in this *Statement*.

5    STATEMENT OF STUDENT RIGHTS AND RESPONSIBILITIES



# VI PROCEDURES

The University will use the following procedures to respond to behavior which goes against the values of the University community as defined in this *Statement*. The University considers the procedures for resolving disputes a part of its educational mission and is committed to a process which provides both peer review and mediation. Persons who have questions about the *Statement* should contact the Resolution Coordinator (RC) who provides support to all participants. Resolution and appeal processes are administrative functions and are not subject to the same rules of civil or criminal proceedings. Because some violations of these standards are also violations of law, students may be accountable to both the legal system and the University.

### STAGE 1: INITIATING THE RESOLUTION PROCESS

Any student, faculty member, or staff member may contact an RC to learn about available resolution options, and/or to initiate a resolution process. Resolution pathways may be accessed with or without submission of documentation, although some pathways require a written complaint to initiate the process.

Any student, faculty member, or staff member may submit a complaint alleging a violation of the *Statement*. A student, faculty member, or staff member may also submit a complaint based upon information reported to that person. All complaints must be submitted to the RC, in writing, within six months after the incident(s) alleged in the complaint. The RC may waive the six-month limitation when a late submission is reasonable. If the RC determines, based on an investigation, that the alleged behavior may be a violation of the *Statement*, the RC will notify the respondent and schedule a meeting as described below.

The RC may dismiss the complaint at any stage if the RC reasonably believes that the complaint is baseless or otherwise unsupported by the available evidence, or that the underlying grievance or problem is better resolved in a different manner.

### STAGE 2: RESOLUTION PROCESS

The RC will meet with the respondent to explain the complaint and the resolution process. The student may be accompanied by an advisor at any point in the resolution process. The student will have the opportunity to ask questions and make a statement. The RC will inform the respondent (1) that statements the student makes to the RC may be considered at any hearing, (2) that the student does not have to make a statement at the initial meeting, (3) that all Office of Student Conflict Resolution (OSCR) records are confidential to the extent permitted by law, (4) that students have a right to know the potential sanctions/interventions they may be facing and (5) that students may consult with an advisor at any point in the resolution process.



The respondent has a choice of the following methods of dispute resolution:

### A. Acceptance of Responsibility and Entering into an Agreement

If the respondent is in general agreement with the allegations in the complaint, and is in general agreement with the complainant and/or community (as represented by the RC) about how to resolve the conflict and restore the community, the respondent has the option of entering into an agreement. In resolution by agreement the respondent accepts responsibility for the alleged violation(s) of the *Statement* and agrees to fulfill sanctions/interventions that are developed with the input of the respondent, the complainant, and the RC. The respondent has the right to discuss potential sanctions/interventions before entering into an agreement. Once an agreement has been reached, it may not be appealed. The respondent also has the option of entering into an agreement by accepting responsibility for the alleged violations of the *Statement* and requesting a hearing on the sanctions/interventions under the procedures outlined in VI.2.C. "Hearing."

### B. Adaptable Conflict Resolution (including Mediation)

Informal and adaptable conflict resolution (ACR) processes such as mediation, facilitated dialogue, and restorative justice circles allow individuals involved in a conflict to have significant influence over the resolution process and complete control of any outcome.

If (1) all persons personally and directly affected by the conflict agree to attempt resolution through one of these processes, and (2) the RC believes that the process is an appropriate form of resolution, then the RC will make arrangements for the chosen ACR pathway. The nature of some conflicts, especially those involving violence, may render ACR inappropriate.

Participation in an ACR process is voluntary and may or may not result in an agreement or resolution. When a mutually satisfactory resolution is reached by the parties, the case is resolved and parties are encouraged to use the RC as a resource for future questions. Resolutions reached through ACR may not be appealed.

If resolution is not achieved through an attempt at ACR and the matter involves a pending *Statement* violation, the respondent has the choice of accepting responsibility and entering into an agreement, or proceeding to a hearing.

### C. Hearing

***The standard of review is the respondent is presumed not responsible unless clear and convincing evidence is presented that a violation of the Statement has occurred.***

The respondent may choose to have a Resolution Officer (RO) or a Student Resolution Panel arbitrate the dispute. Should the complainant disagree with the respondent's choice, an RO will determine whether an RO or a panel is most appropriate for the complaint based on explanations submitted by the parties. In cases which involve





more than one respondent, the students will have the option of choosing whether they have the same or separate hearings. If students cannot agree, the hearings will be separate.

Each party may be accompanied at the hearing by a personal advisor, who may be an attorney; however, the advisor may not participate directly in the proceedings, but may only advise the party. For example, the advisor may not question witnesses or make presentations.

All parties may have access to all written or other information that will be considered prior to the hearing including the names of witnesses providing information. The RC will prepare and distribute this information prior to the hearing.

During the hearing, the RO, RC, respondent, complainant and student panelists (if applicable) have the right to question the complainant and the RC. These participants may also question (1) the respondent, if the student chooses to participate and (2) any witnesses who have presented information. ***Silence by the respondent will not be interpreted as evidence of responsibility for a violation.*** Witnesses may be present in the hearing room only when they are presenting information. At any time during the hearing, the respondent may request a recess to consult with an advisor. The respondent and the complainant may call any witness with information that is relevant to the case, but the RO may exclude a witness if information is redundant.

The respondent, complainant, and RC may also present written reports to the panel or RO. The respondent and complainant may make statements to the panel or RO at the beginning and end of the proceeding.

To ensure the privacy of the parties and to maximize the educational potential of the process, all parties must agree to the admission of any other people (except witnesses or advisors) to the hearing. To ensure fairness and consistency, and to maximize the educational potential of the process, panelists must have access to details, rationales, and results of past cases.

An audio recording will be made of *Statement* hearings, and will be made available (in the OSCR office) to the respondent or complainant upon request during the pe-



riod in which an appeal may be filed or is pending. In all cases, the RO will issue a written decision containing findings of fact, conclusions as to responsibility, and rationales for all sanctions/interventions imposed.

All arbitrated resolutions will result in findings of fact. The fact-finder will also make recommendation(s) regarding sanctions/interventions to the Dean of Students, who may accept or modify the recommendation(s). The Dean may not modify sanctions/ interventions to include suspension or expulsion. However, when expulsion is recommended, the Dean may instead suspend the student.

### STAGE 3: APPEALING THE RESOLUTION PROCESS

An appeals process is an essential safeguard for an imperfect human process that attempts very hard to be fair. The appeals process is available to each party. Appeals may be filed for the following reasons: proper procedures were not followed, the evidence clearly does not support the finding(s), sanctions/interventions are insufficient or excessive relative to the violation, or there is new evidence not reasonably available at the time of the hearing. All appeals must be submitted in writing to the RC within ten academic calendar days after notification of the Dean of Students' decision to accept or modify the recommendations resulting from the hearing. The Vice President for Student Life (VPSL) may waive the ten-day limitation when a late submission is reasonable. The appeal will be reviewed by an Appeals Board composed of one student appointed by the Central Student Government (CSG), one faculty member appointed by the Faculty Senate, and one administrator appointed by the President. CSG, the Faculty Senate, and the President will each appoint one alternate member to the Appeals Board. The Appeals Board will recommend one of the following actions to the VPSL: (a) confirming the decision made through the hearing process, (b) altering the sanctions/interventions, (c) striking the initial finding of responsibility and/or sanctions/interventions and remanding to the original fact-finder for further consideration with corrective instructions from the Appeals Board, or (d) ordering a new hearing before a new fact-finder. The VPSL may accept or modify the recommendation(s). The VPSL may not modify sanctions/interventions to include suspension or expulsion. However, when expulsion is recommended, the VPSL may instead suspend the student.

9    STATEMENT OF STUDENT RIGHTS AND RESPONSIBILITIES

# VII  SANCTIONS/INTERVENTIONS

Sanctions/interventions are designed to promote the University's educational mission. Sanctions/Interventions may also serve to promote safety or to deter students from behavior which harms or threatens people or property or is motivated by bias because of membership in a group listed in [Section II, Paragraph 2]. Some behavior is so harmful to the University community or so deleterious to the educational process that it may require more serious sanctions/interventions such as removal from housing, removal from specific courses or activities, suspension from the University, or expulsion. Sanctions may be enhanced in instances of bias-motivated misconduct, as outlined in Section IV, Item V. Instances of bias motivated misconduct will be evaluated as two separate violations - one violation specific to the act of misconduct itself (Section IV, Items A-U), and one violation specific to the bias motivation (Section IV, Item V). Each charge will be evaluated separately in the sanctions/interventions stage of the formal conflict resolution process. No sanctions/interventions will automatically impose other sanctions/interventions following future offenses. One or more of the following sanctions/interventions may be recommended:

**A. Formal Reprimand:**
A formal notice that the *Statement* has been violated and that future violations will be dealt with more severely.

**B. Disciplinary Probation:**
A designated period of time during which the student is not in good standing with the University. The terms of probation may involve restrictions of student privileges and/or set specific behavioral expectations.

**C. Restitution:**
Reasonable compensation for loss, damage, or injury to the appropriate party in the form of community service or service learning, money, or material replacement.

**D. Restriction from Employment at the University:**
Prohibition or limitation on University employment.



**E. Class/Workshop Attendance:**
Enrollment and completion of a class or workshop that could help the student understand why certain behavior was inappropriate.

**F. Educational Project:**
Completion of a project specifically designed to help the student understand why certain behavior was inappropriate.

**G. Service:**
Performance of one or more tasks designed to benefit the community and help the student understand why certain behavior was inappropriate.

**H. University Housing Transfer or Removal:**
Placement in another room or housing unit or removal from University housing.

**I. Removal from Specific Courses or Activities:**
Suspension or transfer from courses or activities at the University for a specified period of time.

**J. No Contact:**
Restriction from entering specific University areas and/or all forms of contact with certain person(s).

**K. Suspension:**
Separation from the University for a specified period of time or until certain conditions are met.

**L. Expulsion:**
Permanent separation from the University.



11    STATEMENT OF STUDENT RIGHTS AND RESPONSIBILITIES

 RELATED PROCEDURES

**A.  Emergency Suspension**
If a student's actions pose an immediate danger to any member of the University community, the VPSL or a designee may immediately suspend the student pending a meeting. Except in extraordinary circumstances that meeting will be scheduled within two academic calendar days. At this meeting, the student will be informed of the nature of the alleged violation, presented with available evidence, and given the opportunity to make a statement and present evidence. If the emergency suspension is continued, the student will be offered a hearing option within ten academic calendar days.

**B.  Procedural and Interpretive Questions**
All procedural and interpretive questions concerning the *Statement* will be resolved by the VPSL or designee. At any time, the VPSL or RC may consult the Office of the General Counsel about a case or procedures.

**C.  Selection of Mediators, Student Panelists, and Resolution Officers**
University mediators will be selected by the VPSL or the VPSL's designee. A list of trained non-university mediation services will be maintained by the Office of the VPSL. The VPSL will try to identify non-university mediators who will serve parties at no charge or on a sliding fee scale. A pair of multipartial mediators will be selected for each mediation based on preferences expressed by the parties. Each winter term 60 students will be appointed to serve as panelists for the following academic year. The VPSL or designee will generate a random ordered list of potential student panelists using a method approved by CSG which is expected to encourage a diverse pool of students. The students will be contacted and asked if they will serve as panelists for the following year, subject to the approval by CSG and other respective student government bodies, until the designated number of student panelists has been appointed.  Resolution Officers are recommended equally by the Faculty Senate and VPSL. Each Student Resolution Panel will consist of five voting student panelists and a non-voting RO who will oversee the proceedings.

**D.  Records of Resolution Actions**
Records will be maintained by the RC with regard to any and all actions taken under the *Statement*. Accordingly, records will be maintained by the RC of complaints, agreements, hearings, findings, and sanctions/interventions. For each case in which a complaint is issued, including cases where the student accepts responsibility, the record will recite the facts of all conduct found or admitted to be in violation of the *Statement* with sufficient specificity to indicate that a violation of the *Statement* occurred. Confidentiality of records will be maintained to the extent permitted by law and the University of Michigan Student Rights and Student Records Policy: http://ro.umich.edu/ferpa/.

Records of mediations or other ACR processes are not considered a disciplinary record. ACR records will be maintained as appropriate to meet the needs of disputants and for annual reporting purposes.

If a student is suspended or expelled, a notation will be made on the student's academic record. The notation of suspension will be removed at the time the student is readmitted to the University.

**E. Student Access to Records**
Records and documents that will be considered during a hearing will be made available in advance to all parties but may be redacted to protect the privacy rights of individuals not directly involved in the resolution process.

**F. Reports of Actions**
Statistical reports of actions taken through the *Statement* will be published following each academic term. These data will cover the number of complaints and the types of violations, resolutions, and sanctions/interventions.  Periodic, regular review of records of resolution actions will be made available, in confidence, to the CSG Student General Counsel or another CSG Executive.

**G. Concurrent Legal and *Statement* Proceedings**
To ensure the educational potential of the process and in fairness to a complainant, the University should provide a prompt response to behavior which goes against the values of the University as defined by the *Statement*. In the interest of fairness to a respondent, however, a student undergoing civil or criminal action for the same behavior which forms the basis of a complaint under this *Statement* may request a reasonable delay of the *Statement* resolution process until external proceedings are resolved. In determining whether a request is reasonable, the RC will evaluate the unique circumstances of the case, including the length of the delay and the impact of delay on the complainant and community, in addition to protecting the integrity of the resolution process. In granting a request for a delay, the RC may implement conditions on continued enrollment, as appropriate. If a respondent's request for delay is denied, the student may withdraw from enrollment and may not re-enroll until authorized by the VPSL or the VPSL's designee.

**H. Respect for Medical Amnesty**
To better ensure that minors at medical risk as a result of alcohol intoxication will receive prompt and appropriate medical attention, the State of Michigan has adopted a medical amnesty law to remove perceived barriers to calling for or seeking help.

Michigan law continues to prohibit a minor from purchasing, consuming, or possessing, or attempting to purchase, consume, or possess, alcoholic liquor and from having any bodily alcohol content. Michigan law, however, includes an exemption from prosecution for the following:

- A minor who voluntarily accesses a health facility or agency for treatment or observation after consuming alcohol;

- Any minor who accompanied a minor who voluntarily accesses a health facility or agency for treatment or observation after consuming alcohol; and

- Any minor who initiated contact with law enforcement or emergency medical services personnel for the purpose of obtaining medical assistance in connection with their own personal consumption of alcohol or consumption by others.

The University of Michigan maintains the discretion to refer the individual for appropriate educational intervention(s).

13    STATEMENT OF STUDENT RIGHTS AND RESPONSIBILITIES

**I. Advisor Corps**

CSG, with the approval of General Counsel, has the option to develop a student peer advisor corps. These advisors will be available to any student party involved in *Statement* proceedings (excluding mediations). All potential peer advisors in the Advisor Corps must successfully complete training provided by OSCR. OSCR will develop and conduct training in consultation with CSG.

**J. Amending the *Statement of Student Rights and Responsibilities***

The *Statement* is a dynamic document subject to revisions by the community. The *Statement* will be open for amendments every three years.  The VPSL, SRAC Chair, and CSG President may unanimously agree to have an off-cycle amendment period if necessary. The Board of Regents has provided the Student Relations Advisory Committee (SRAC) of the Senate Assembly with primary oversight of the review.

Campus community members are encouraged to participate in the process. Amendments may be proposed by CSG, the Senate Assembly, or any Executive Officer of the University. SRAC will review the proposed amendments and consult with the Office of General Counsel. SRAC will then forward the proposed amendments and their recommendations to the VPSL. The final decision on amending the *Statement* will be the President's.

The President should communicate the decision to accept or reject each of the proposed amendments in a public and timely manner, at least two weeks before the last day of classes during the winter semester. The President's communication to the student body should state a rationale for each decision to reject or accept an amendment.

Information regarding the amendment process is available online: http://oscr.umich.edu/statement/amendment



**UNIVERSITY OF MICHIGAN NONDISCRIMINATION POLICY**
(effective April 16, 2014)

The University of Michigan, as an equal opportunity/affirmative action employer, complies with all applicable federal and state laws regarding nondiscrimination and affirmative action. The University of Michigan is committed to a policy of equal opportunity for all persons and does not discriminate on the basis of race, color, national origin, age, marital status, sex, sexual orientation, gender identity, gender expression, disability, religion, height, weight, or veteran status in employment, educational programs and activities, and admissions. Inquiries or complaints may be addressed to the Senior Director for Institutional Equity, and Title IX/Section 504/ADA Coordinator, Office for Institutional Equity, 2072 Administrative Services Building, Ann Arbor, Michigan 48109-1432, 734-763-0235, TTY 734-647-1388, institutional.equity@umich.edu. For other University of Michigan information call 734-764-1817.

**REGENTS OF THE UNIVERSITY**
(effective January 1, 2017)

Michael J. Behm, Grand Blanc
Mark J. Bernstein, Ann Arbor
Shauna Ryder Diggs, Grosse Pointe
Denise Ilitch, Bingham Farms
Andrea Fischer Newman, Ann Arbor
Andrew C. Richner, Grosse Pointe Park
Ron Weiser, Ann Arbor
Katherine E. White, Ann Arbor
Mark S. Schlissel, *ex officio*

**For more information, please contact:**

Office of Student Conflict Resolution (OSCR)
Division of Student Life
100 Student Activities Building
515 East Jefferson
Ann Arbor, MI 48109-1316
(734) 936-6308
(734) 615-8826 fax
The *Statement* is also available online at http://oscr.umich.edu
This version of the *Statement* became effective on July 1, 2018.





# Exhibit C

Case 2:18-cv-11776-AJT-EAS ECF No. 33-1 filed 07/25/18 PageID.912 Page 66 of 87
Mayfield v. Miles, Not Reported in F.Supp.3d (2014)
2014 WL 5605301

2014 WL 5605301
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Charles MAYFIELD, Plaintiff,
v.
Richard MILES, et al., Defendants.

No. 13–10341.
|
Signed Nov. 4, 2014.

**Attorneys and Law Firms**

Charles Mayfield, Muskegon Heights, MI, pro se.

Kimberley A. Koester, Ronald W. Chapman, Chapman Law Group, Bloomfield Hills, MI, for Defendants.

***OPINION AND ORDER (1) ADOPTING MAGISTRATE JUDGE'S SEPTEMBER 3, 2014 REPORT AND RECOMMENDATION [ECF NO. 76] AND (2) DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER [ECF NO. 52]***

LINDA V. PARKER, District Judge.

**\*1** On January 29, 2013, Plaintiff Charles Mayfield commenced this civil rights action against several defendants, including Dr. Richard Miles ("Dr.Miles"), alleging a violation of his rights under the Eighth Amendment. On February 6, 2014, Plaintiff filed an amended complaint against the only defendant remaining at that time, Dr. Miles; and on April 14, 2014, Plaintiff filed a motion for temporary restraining order. This matter has been referred for all pretrial matters to Magistrate Judge Michael Hluchaniuk.

On September 3, 2014, Magistrate Judge Hluchaniuk issued a Report and Recommendation (R & R) in which he recommends that this Court deny Plaintiff's motion for temporary restraining order. (ECF No. 76.) Based on the evidence submitted by the parties, Magistrate Judge Hluchaniuk concludes that Plaintiff is not likely to succeed in establishing a violation of his Eighth Amendment rights. (*Id.* at 10–13.) Specifically, the magistrate judge

concludes that neither Dr. Miles nor medical staff at the prison where Plaintiff is now incarcerated have been deliberately indifferent to Plaintiff's medical needs. (*Id.*) Magistrate Judge Hluchaniuk addresses the additional factors relevant to deciding whether a preliminary injunction should issue and finds that those factors also do not warrant the issuance of an injunction. (*Id.* at 13–14 .)

At the conclusion of his R & R, Magistrate Judge Hluchaniuk informs the parties that they must file any objections to the R & R within fourteen days. (*Id.* at 15–16.) He further advises that the "[f]ailure to file specific objections constitutes a waiver of any further right of appeal." (*Id.,* citations omitted). No objections were filed.

The Court has carefully reviewed the R & R and concurs with the conclusions reached by Magistrate Judge Hluchaniuk. Plaintiff has received medical treatment while incarcerated. He simply disagrees with the doctor's diagnosis and chosen methods of treatment. Thus the Court concurs with Magistrate Judge Hluchaniuk's finding that Plaintiff is not likely to succeed on his deliberate indifference claim and adopts the September 3, 2014 Report and Recommendation.

Accordingly,

**IT IS ORDERED,** that Plaintiff's motion for temporary restraining order (ECF No. 52) is **DENIED.**

***REPORT AND RECOMMENDATION PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER (Dkt.52)***

MICHAEL HLUCHANIUK, United States Magistrate Judge.

**I. PROCEDURAL HISTORY**
On January 29, 2013, plaintiff Charles Mayfield, an inmate currently in the custody of the Michigan Department of Corrections, brought this action under 42 U.S.C. § 1983 against several defendants, claiming a violation of his rights under the United States Constitution. (Dkt.1). Following the Court's rulings regarding the dismissal of several named defendants (Dkt.21, 33, 45), plaintiff filed an amended verified complaint against the only remaining defendant, Dr. Richard Miles, on February 6, 2014, alleging a claim

Mayfield v. Miles, Not Reported in F.Supp.3d (2014)
2014 WL 5605301

for deliberate indifference to his serious medical needs. (Dkt.34, 40). On April 16, 2014, this case was referred to the undersigned for all pretrial purposes by District Judge Thomas L. Ludington. (Dkt.53). Plaintiff filed a motion for temporary restraining order on April 14, 2014. (Dkt.52). Defendant Dr. Miles filed a response to plaintiff's motion on May 5, 2014. (Dkt.55). This motion is now ready for report and recommendation.

**\*2** For the reasons set forth below, the undersigned **RECOMMENDS** that plaintiff's motion for a temporary restraining order be **DENIED.**

## II. FACTUAL BACKGROUND

### A. Plaintiff's Claims

Plaintiff, an inmate currently in the custody of the Michigan Department of Corrections, brings this action under 42 U.S.C. § 1983 against Dr. Miles, claiming a violation of his rights under the United States Constitution. (Dkt.34, 40). Plaintiff claims that Dr. Miles was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, based on medical treatment he received for alleged multiple myeloma in 2011 and 2012. (Dkt.34). Plaintiff alleges that he was diagnosed with multiple myeloma in November 2010 by Dr. Shan Ansari, and that he was discharged with instructions to Dr. Miles to pursue follow-up and preventive care, including chemotherapy, a cancer specialist consultation, and a therapeutic diet. (*Id.*, ¶ 2). Plaintiff claims that he saw Dr. Miles numerous times between 2011 and 2012, asserting written and verbal complaints of continued pain, but that Dr. Miles refused to provide the recommended follow-up care and denied plaintiff any preventive care or treatment. (*Id.* ¶¶ 3–22). Plaintiff alleges that his quality of life has been compromised by the lack of medical care, and that if Dr. Miles would have addressed plaintiff's serious health issues when brought to his attention, plaintiff's cancer would have been contained and treated. (*Id.* ¶ 23). Plaintiff contends that Dr. Miles denied him adequate treatment for his serious medical issues in violation of the United States Constitution and he seeks declaratory and injunctive relief and an award of compensatory and punitive damages. (*Id.* ¶ 29).

### B. Plaintiff's Motion for Temporary Restraining Order (Dkt.52)

Plaintiff filed a Motion for Temporary Restraining Order claiming that he is not receiving medical care for multiple myeloma or Hepatitis C, asserting that he requires physical therapy and requesting a transfer back to a prior correctional facility for "medically appropriate" care. (Dkt.52). [1] Plaintiff argues that he is suffering irreparable harm in the form of continued physical and emotional pain and suffering, and that if he does not receive proper treatment at the proper time, he may die. Plaintiff further argues that the balance of hardships favor plaintiff, as his suffering is enormous and the defendant's hardship if the motion is granted, which consists of taking plaintiff to a suitable doctor and then carrying out the doctor's order, "amounts to no more than business as usual." Plaintiff also argues that he is likely to succeed on the merits of his claims because defendant has intentionally interfered with medical treatment once prescribed, in violation of the Constitution. Plaintiff requests a transfer from the Chippewa Correctional Facility back to the G. Robert Cotton Correctional Facility, and that he be placed in a single person cell. Finally, plaintiff contends that the relief sought will serve the public interest because it is always in the public interest for prison officials to obey the law.

### C. Defendant's Response to Plaintiff's Motion (Dkt.55)

**\*3** Defendant Dr. Miles argues that plaintiff's motion should be denied because he continues to receive care for his medical conditions. Dr. Miles supports his arguments with an affidavit by Michael Brostoski, D.O., the doctor who currently provides care for plaintiff at the Chippewa Correctional Facility ("URF"), and with selected medical records. (Dkt.55, 55–2, 57, 57–1). According to Dr. Miles, Dr. Brostoski first reviewed plaintiff's medical chart on March 7, 2014, when plaintiff was transferred to URF. (Dkt.55–2, ¶ 6). Among other medical issues and conditions, Dr. Brostoski reviewed the status of plaintiff's recent care and treatment related to multiple myeloma and Hepatitis C, and he attests that there is no objective evidence that a multiple myeloma diagnosis had actually been assigned to plaintiff at any time, that amyloidosis had been questioned, and that plaintiff was being monitored. (*Id.*). Dr. Brostoski further avers that plaintiff had also been approved for consultation with the infectious disease specialist who had determined that plaintiff was not a current candidate for the available antiviral therapy for Hepatitis C based on his current medical conditions and plan of care. (*Id.*)

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Dr. Brostoski had a chronic care visit with plaintiff on March 12, 2014, during which time his medical conditions were addressed at length. (*Id.,* ¶ 7). At that time, Dr. Brostoski noted the ongoing efforts to clarify plaintiff's diagnoses and ordered further follow up care and evaluation, which has continued to be provided to him, including medical appointments on March 19 and 27, 2014. (*Id* .). On April 2, 2014, Dr. Brostoski saw plaintiff to assess the origin and disposition of his alleged multiple myeloma diagnosis. (*Id.,* ¶ 8). Plaintiff reported a diagnosis in 2010, and claimed that he had not been provided treatment. (*Id.*). Following this appointment, Dr. Brostoski ordered additional follow up, including lab work and a referral to an oncologist to further assess plaintiff's unresolved past diagnosis of multiple myeloma, which was approved and scheduled on plaintiff's behalf for April 18, 2014. (*Id.*). In the interim, Dr. Brostoski saw plaintiff on April 9 and 16, 2014 for scheduled appointments. (*Id.*). Plaintiff then refused to attend the April 18, 2014 appointment with the oncologist, but follow up care is still being provided. (*Id.,* ¶¶ 5, 9).

Dr. Miles contends that Dr. Brostoski has reviewed plaintiff's past medical records at length, particularly those concerning the alleged multiple myeloma diagnosis in 2010, and opined that contrary to plaintiff's belief, the testing done in 2010 did not indicate multiple myeloma. (*Id.* ¶ 10). Dr. Miles asserts that there was an abnormality revealed by the bone marrow biopsy that appeared to be benign; but there was no diagnosis of multiple myeloma. (*Id.*). In addition, the oncologist in 2010 indicated that even if the abnormality was multiple myeloma, in light of plaintiff's multiple comorbidities, a "wait and see" approach was recommended. (*Id.*). Plaintiff has been monitored since that time. (*Id.*). Dr. Miles continues that although plaintiff's medical records suggest that after he returned to the hospital for unrelated issues later in 2010, he may have received some limited treatment for multiple myeloma and an oncology follow up was requested by his provider after he returned to his facility, an alternative treatment was directed at the regional level based on plaintiff's negative bone marrow biopsy and poor cardiac function. (*Id.*). Dr. Brostoski has relayed this information to plaintiff. (*Id.*). Dr. Miles asserts that plaintiff is not being denied care for multiple myeloma as he has not been diagnosed with multiple myeloma and thus requires no treatment, and that he is not being denied care for Hepatitis C. (*Id.* ¶ 12). Plaintiff was scheduled for a consultation with the infectious disease specialist on April 23, 2014 to discuss management options for plaintiff's condition, but plaintiff refused to attend the appointment. (*Id.* ¶¶ 6, 12). Following this refusal, plaintiff was directed to follow up as previously scheduled and advised to contact medical with any questions as needed. (*Id.* ¶ 12). Finally, Dr. Brostoski avers that plaintiff has not complained of a need for physical therapy, nor is any such treatment medically indicated for him at this time. (*Id.* ¶ 13).

**\*4** Dr. Miles argues that the Court should not issue any immediate injunctive relief to plaintiff as the evidence does not show that plaintiff is at risk of suffering irreparable injury; plaintiff is unlikely to succeed on the merits of his constitutional claims; and it is contrary to the interests of the public, as well as detrimental to the practice of medicine within the constitutional system, for the court to second guess the medical judgment of medical providers. Dr. Miles therefore requests that the Court deny plaintiff's motion for a temporary restraining order.

## III. ANALYSIS AND CONCLUSION

### A. Governing Law

Plaintiff seeks an injunction compelling defendant to provide him with a medically appropriate course of medications and treatment for his medical issues, including physical therapy. In determining whether a TRO is proper, the court considers four factors: (1) whether plaintiff has a strong likelihood of success on the merits; (2) whether plaintiff has shown irreparable injury; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *See Tumblebus Inc. v. Cranmer,* 399 F.3d 754, 760 (6th Cir.2005). Although no single factor is controlling when determining whether a preliminary injunction should issue, the likelihood of success on the merits is often the predominant consideration. *Gonzales v. National Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir.2000) ("[A] finding that there is simply no likelihood of success on the merits is usually fatal."). Plaintiff bears the burden of demonstrating his entitlement to a preliminary injunction, and his burden is a heavy one because injunctive relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban Cnty. Gov't,* 305 F.3d 566, 573 (6th Cir.2002). Indeed, the "proof required for the

plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir.2000); *see also McNeilly v. Land,* 684 F.3d 611, 615 (6th Cir.2012) ("The proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion because a preliminary injunction is an extraordinary remedy."). "Further, where a prison inmate seeks an order enjoining state prison officials, this Court is required to proceed with the utmost care and must be cognizant of the unique nature of the prison setting." *See Christian v. Michigan Dep't of Corrs.-Health Servs.,* 2013 WL 607783, at *2 (E.D.Mich. Jan.28, 2013) (citing *Kendrick v. Bland,* 740 F.2d 432, 438 n. 3 (6th Cir.1984)), *adopted by* 2013 WL 607779 (E.D.Mich. Feb.19, 2013). Indeed, the Prison Litigation Reform Act requires that "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).

**\*5** "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Because of this, courts have identified three types of particularly disfavored preliminary injunctions: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that [he] could recover at the conclusion of a full trial on the merits." *See Schrier v. Univ. of Colorado,* 427 F.3d 1253, 1259 (10th Cir.2005). Motions seeking such preliminary injunctive relief must be more closely scrutinized than the already-disfavored motion for preliminary injunction which seeks to maintain the status quo. *See id.*

### B. Analysis of the Preliminary Injunction Factors

Under controlling Sixth Circuit authority, plaintiff's "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his action. *NAACP v. City of Mansfield, Ohio,* 866 F.2d 162, 167 (6th Cir.1989). Plaintiff here alleges an Eighth Amendment claim for deliberate indifference to his medical needs. (Dkt.34). In the context of medical care, a prisoner's Eighth Amendment right to be free from

cruel and unusual punishment is violated only when the prisoner can demonstrate a "deliberate indifference" to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Westlake v. Lucas,* 537 F.2d 857, 860 n. 5 (6th Cir.1976) (citations omitted). Moreover, mere negligence in identifying or treating a medical need does not rise to the level of a valid mistreatment claim under the Eighth Amendment. *Estelle,* 429 U.S. at 106.

The undersigned finds that, based on the evidence in the record, plaintiff has failed to meet his "initial burden" of showing a strong or substantial likelihood of success on the merits. Rather, the essence of plaintiff's allegations reflect plaintiff's disagreement with defendants over proper medical treatment and the necessity for different treatment, which is insufficient to support a claim under the Eighth Amendment. *See Saadeh v. Hemingway,* 37 Fed. Appx. 194, 195 (6th Cir.2002) (holding plaintiff's motion for injunctive relief was properly denied because his complaint-that he was not being properly treated for back pain-failed to state a claim of an Eighth Amendment violation); *Chapman v. Parke,* 1991 WL 203080, at *2 (6th Cir. Oct.4, 1991) ("[A] difference of opinion regarding treatment or his need for surgery is insufficient to state a claim under the Eighth Amendment.").

**\*6** The record shows that plaintiff has received continuous medical evaluations, tests, treatment and medication while under the care of Dr. Miles, and that he continues to receive treatment while under the care of Dr. Brostoski. (Dkt.55, 55–1, 55–2). Plaintiff acknowledges that he received treatment (Dkt.34), but contends that the evaluations were not adequate and that he did not receive proper treatment. The record shows that plaintiff's requests for treatment were not ignored. Rather, plaintiff was prescribed alternative courses of treatment based on the doctors' exercise of their professional medical judgment regarding the appropriate course of treatment. Even if these decisions were wrong or negligent, they do not show deliberate indifference to plaintiff's serious medical needs. Dr. Miles and Dr. Brostoski provided medical attention and provided diagnostic tests and medication, just not the medication or treatment plaintiff wanted. That plaintiff

disagrees with this course of treatment does not amount to deliberate indifference because it is well settled that "differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim." *Christian,* 2013 WL 607783, at *5 (citation omitted); *see also Greenman v. Prison Health Servs.,* 2011 WL 6130410, at *10 (W.D.Mich. Dec.8, 2011) (granting summary judgment where "the record shows that defendant treated plaintiff's condition on an ongoing basis with appropriate medications. Further, plaintiff's preference for narcotics and his dissatisfaction with the non-narcotic pain medications prescribed by [defendant] falls far short of supporting an Eighth Amendment claim.").

In sum, plaintiff's disagreement with particular medical decisions made by Dr. Miles and Dr. Brostoski and his conclusory allegations of deliberate indifference do not negate Dr. Miles' allegations that plaintiff's medical needs were reasonably and diligently addressed over an extended period of time, and continue to be addressed. Moreover, even if plaintiff is able to show a disputed issue of fact as to whether his medical treatment is appropriate, such a showing is not sufficient for equitable relief. *See Leary,* 228 F.3d at 739 (noting that the proof required to obtain a preliminary injunction is much more stringent thatn the proof required to survive a summary judgment motion). This Court is ill-equipped to micro-manage prison medical treatment. *See Westlake,* 537 F.2d at 860 n. 5. Although the undersigned makes no final determination on the merits of plaintiff's claim, it appears at this stage that plaintiff has not made a substantial showing of deliberate indifference to a serious medical need. Plaintiff, therefore, fails to demonstrate a strong likelihood of success on the merits of his claims, based on the evidence in the record to date, and his motion for injunctive relief should be denied.

**\*7** Given plaintiff's lack of likelihood of success on the merits, it is not necessary to discuss the other injunction factors in great detail. *See Gonzales,* 225 F.3d at 625 ("Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."). The presence of irreparable harm is not evident. First, because it appears unlikely, on the current record, that plaintiff will be able to demonstrate that he has a cognizable constitutional claim, he is not entitled to a presumption of irreparable harm based on the alleged constitutional violation. *See, e.g., Overstreet,* 305 F.3d at

578. Plaintiff requires no treatment for multiple myeloma because he has no diagnosis of multiple myeloma, nor does he show any signs or symptoms of multiple myeloma, and he continues to receive treatment for his claimed serious medical needs. (Dkt.55–1, ¶¶ 5, 7–11). Dr. Brostoski avers that plaintiff's blood cell count remains stable and he has suffered no infections related to his white blood cell count. (*Id.* ¶ 11). Moreover, plaintiff was recently referred to an oncologist for further review, but he refused to attend the appointment. (*Id.* ¶ 9). Similarly, plaintiff was recently scheduled for follow up with the infectious disease specialist concerning his Hepatitis C, but he refused to attend the appointment. (*Id.* ¶¶ 6, 12). In short, plaintiff has not set forth specific facts showing an immediate, concrete and irreparable harm in the absence of an injunction.

Finally, the interests of the identifiable third parties and the public at large weigh against an injunction. "The MDOC has an interest in promulgating and enforcing prison regulations, including reasonable rules involving prisoner health care, and in contracting with licensed medical providers such as PHS. The public has an interest both in ensuring that prison inmates receive medical care, and also in having a well-regulated and operated prison system. PHS and its medical personnel have an interest in practicing medicine based on their best medical judgment and on the needs of their patients." *Robbins v. Payne,* 2012 WL 3584235, at *3 (E.D.Mich. July 9, 2012) (denying plaintiff's motion for preliminary injunctive relief), *adopted by* 2012 WL 3587631 (E.D.Mich. Aug.20, 2012). Decisions concerning the administration of prisons are vested in prison officials, in the absence of a constitutional violation, and any interference by the federal courts in that activity is necessarily disruptive. The public welfare therefore militates against the issuance of preliminary injunctive relief in the prison context, absent a sufficient showing of a violation of constitutional rights. *See Glover v. Johnson,* 855 F.2d 277, 286–87 (6th Cir.1988). And, plaintiff is, in effect, seeking relief as if he has already prevailed on the merits and demonstrated inadequate care. But the purpose of a preliminary injunction is to maintain the relative positions of the parties until proceedings on the merits can be conducted. *Camenisch,* 451 U.S. at 395. Because plaintiff's requested relief would alter the status quo, the public interest is not served by granting the motion for a preliminary injunction. Therefore, a balancing of the

above factors weighs substantially against a grant of preliminary injunctive relief.

## IV. RECOMMENDATION

**\*8** For the reasons set forth above, the undersigned **RECOMMENDS** that plaintiff's motion for temporary restraining order be **DENIED.**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Sec'y of Health and Human Servs.,* 932 F.2d 505 (6th Cir.1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987).* Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Filed Sept. 3, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5605301

Footnotes

1    Plaintiff directs his motion at "defendants Randall Haas and F. Artis" to arrange for his transfer back to the Cotton Correctional Facility and for an examination and plan of treatment by a qualified specialist. (Dkt.52). However, neither Hass nor Artis are, or were, defendants in this action, and Dr. Miles is the only named defendant in plaintiff's amended complaint.

**End of Document**      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

📌 KeyCite Yellow Flag - Negative Treatment

Distinguished by Faulkner v. University of Cincinnati, S.D.Ohio, March 23, 2016

2015 WL 1179955
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Eastern Division.

Michael MARSHALL, Plaintiff,

v.

OHIO UNIVERSITY, et al., Defendants.

No. 2:15–cv–775.
|
Filed March 13, 2015.

**Attorneys and Law Firms**

Michael Kurt Allen, Cincinnati, OH, Joshua A. Engel, Joshua A. Engel, LLC, Michael K. Allen & Assoc., Mason, OH, for Plaintiff.

***OPINION AND ORDER***

GEORGE C. SMITH, District Judge.

**\*1** Plaintiff Michael Marshall initiated this case against Defendants Ohio University, Ryan Lombardi, and Diane Bouvier alleging a violation of his First Amendment right to free speech, a violation of his civil rights under 42 U.S.C. § 1983, and violations under Title IX of the Education Amendments of 1972. (*See* Doc. 1, Compl.). Plaintiff has been suspended from the University, and this matter is currently before the Court on Plaintiff's Motion for Temporary Restraining Order (Doc. 2), seeking reinstatement. Defendants filed a Response in opposition to Plaintiff's motion (Doc. 10). The issue is now ripe as Plaintiff has waived the opportunity to file a reply brief and both parties have agreed to forego an oral hearing on the matter. (*See* Doc. 9, Sch. Order). For the reasons that follow, Plaintiff's Motion for Temporary Restraining Order is **DENIED.**

### I. BACKGROUND

The following facts are set forth for the limited purpose of addressing the immediate motion before the Court. It should be noted that any findings of fact and conclusions of law made by a district court in addressing a request for injunctive relief are not binding at a trial on the merits. *See United States v. Edward Rose & Sons,* 384 F.3d 258, 261 (6th Cir.2004) (citing *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)).

#### A. The Parties

Plaintiff Michael Marshall is a student at Ohio University ("OU") in Athens, Ohio. He has completed three full semesters of courses at OU and has five semesters remaining before he can graduate. Prior to the incidents giving rise to this case, Marshall had no history of misconduct at the school. (*See* Doc. 1, Compl. at ¶ 3).

Defendant OU is a public university. OU voluntarily participates in federal spending programs. Accordingly, OU has waived its Eleventh Amendment immunity for Title IX purposes, pursuant to 42 U.S.C. § 2000d–7. Defendant Ryan Lombardi is the Assistant President for Student Affairs at OU. Defendant Diane Bouvier is the Interim Executive Director at the OU Office for Institutional Equity and the OU Title IX Coordinator. The OU Office for Institutional Equity is charged with enforcing OU's Sexual Misconduct Policy. (*Id.* at ¶¶ 4–6).

#### B. Ohio University's Sexual Misconduct Policy

OU adopted its current Sexual Misconduct Policy ("Policy") on August 3, 2012. (*Id.* at ¶ 14). The Policy applies to all students, employees, volunteers, and agents of OU. The Policy is intended to prohibit "sexual misconduct in any of its employment situations or educational programs and activities." (*See* Policy at 1, attached as Exhibit A to Plaintiff's Compl.). The purpose of the Policy is "to provide a fair process for determining if a violation of this policy occurred, to remediate the effects of conduct that violates this policy, and to provide information to prevent sexual misconduct." (*Id.*).

The Policy defines six types of sexual misconduct offenses: sexual harassment by *quid pro quo,* sexual harassment by hostile environment, non-consensual sexual intercourse, nonconsensual sexual conduct, sexual exploitation, and retaliatory harassment. Of relevance to this case is the Policy's provisions regarding sexual harassment by hostile work environment. The Policy states in pertinent part:

**\*2** **§ 03.004: Sexual Misconduct**

Case 2:18-cv-11776-AJT-EAS ECF No. 33-1 filed 07/25/18 PageID.919 Page 73 of 87
Marshall v. Ohio University, Not Reported in F.Supp.3d (2015)
2015 WL 1179955

....

### V. Definitions of Sexual Misconduct Offenses

Sexual harassment includes sexual advances, requests for sexual favors, and other physical or verbal conduct of a sexual nature that is unwelcome and is sufficiently severe or pervasive from both a subjective (the complainant's) and an objective (reasonable person's) viewpoint. Sexual harassment occurs under either of two circumstances, as discussed in Subsections A and B, immediately below.

....

### B. Sexual Harassment by Hostile Environment

1. Such conduct has the purpose or effect of unreasonably interfering with a person's work or academic performance or creating an intimidating, hostile, or offensive environment for working, learning, or living on campus.

2. The determination of whether an environment is "hostile" is often contextual and must be based on the circumstances. These circumstances could include:

• The frequency of the conduct;

• The nature and severity of the conduct;

• Relationship between alleged harasser and subject of the alleged harassment;

• Location and context in which the alleged conduct occurs;

• Whether the conduct was physically threatening;

• Whether the conduct was humiliating;

• Whether the conduct arose in the context of other discriminatory conduct.

3. A hostile environment could be created by repeated, unwanted, sexually oriented stares (maintaining eye contact is, of course, acceptable).

The Office for Institutional Equity is responsible for investigating complaints of sexual misconduct under the Policy. The OU Code of Conduct states that OU provides the following rights to students:

a. The right to remain silent;

b. The right to cross-examine the complainant and witnesses;

c. The right to examine all written materials;

d. The right to present evidence, including character witnesses;

e. The right to request the removal of any University Hearing Board member by showing written or verbal evidence of bias against the accused;

f. The right to be accompanied by an advisor who must be a member of the University community;

g. The right to be accompanied by an attorney in cases where criminal charges are pending or likely to be pending. The policy "Hearing Board Guidelines for Lawyers" is available from the Office of Community Standards; and

h. The right to file an appeal

(Compl.¶ 21).

If a person is found to have violated the Policy following an investigation, he/she will be subject to disciplinary action which may include "sanctions up to and including, termination of employment or expulsion from the university." (Policy at 7). Additionally, OU has adopted "sanctioning guidelines" for certain violations of the Policy, informing students to "expect a minimum of 1 semester suspension" for any sexual misconduct violations of the Policy. (*See* Compl. ¶ 19).

### C. The Alleged Conduct

**\*3** In the case at bar, Plaintiff Marshall met a fellow OU student, A .H., in 2013 when A.H. transferred into the Honors Tutorial College. (*Id.* at ¶ 24). Plaintiff and A.H. became friendly and would often exchange text messages about both academic assignments and social events. (*Id.*). In Fall 2014, both students lived in the same honors residence hall complex. (Doc. 10, Ex. A, Frith Aff. ¶ 7). They also were scheduled to take a small group "tutorial class," in which they were the only two students enrolled. (*Id.* at ¶¶ 4–6). During the fall semester, Plaintiff began

sending A.H. several text messages in an attempt to engage in a romantic relationship with her. Examples of these texts from early October include:

"I'm very drunk right now, and I've tried to compose something to send to you but I cannot. Therefore I say to you:



"I heard that you made out with the girl with the eyebrow piercing. I agree. Goddamn. That's my goal tonight, although I have serious doubts about whether or not I will be successful, because I can no longer conduct myself in a comely fashion"

"I don't know what you think or feel. What I do know is that you are fabulously attractive and fabulously intelligent in that I know that I can tell you all this and that nothing will change between us"

(Compl. ¶ 26).

A.H. responded to Plaintiff's texts by writing: "it might take me a while to give you a proper response but I don't want to leave you hanging in the meantime." She later responded, "I like you a lot, but in a platonic way." Marshall texted back, "there is nothing I can say to change your mind. I know that.... Like I really like you and I don't know why. Well, life goes on." (Id. at ¶ 27).

Despite A.H.'s polite declinations, Plaintiff continued his pursuit. On October 12, 2014, Marshall again tried to convince A.H. to enter into a romantic relationship, and the following texts were exchanged:

Marshall: "just come, I'm not asking for any commitment here. Or, and I want to be clear, you do have the less amicable option of politely, but plainly, tell me to fuck off and general and I will respect it and not hold it against you."

A.H.: "I'm not interested in getting dinner with you. I been very patient with you because I know you're a good guy, but you being a good guy is not enough to

make me interested in dating you. I do not want to fuel the fire by going to dinner with you. I'm also not going to apologize. You presented me with multiple opportunities to go out with you and I'm politely declining."

Marshall: "I know and I understand. I've been out of hand and I am the one who should apologize. I hope we can maintain a courteous friendship."

(Id. at ¶ 29).

Plaintiff continued to send additional text messages to A.H., to which she ultimately responded: "I'm going to tell you honestly that you need to leave me alone, let it be, it's not going to happen ." Marshall said, "I know." He added, "however, since I'm still drunk enough to make a fool out of myself, Let me propose to you that if you ever need a friends with benefits, or anything of that sort I am available and I will still be totally willing to leave you alone." She responded, "I'm not interested." (Id. at ¶ 30).

**\*4** On November 14, 2014, following a party attended by both Marshall and A.H., Marshall again texted A.H. and stated: "use that perfect ass so no one else has to." A.H. responded, "Actually fuck you. I have serious problem. With you." (Id. at ¶ 31).

A.H. notified one of her professors at the Honors Tutorial College about Plaintiff's behavior. (Frith Aff. ¶ 8). A.H. acknowledged that she did not feel unsafe, but claimed that her "academic environment has been disrupted." (Compl. ¶ 36). She further complained that "Marshall had touched her shoulders while intoxicated at a party, but also indicated that Marshall did not continue to touch her after she told him that this made her uncomfortable." (Id.). On November 18, 2014, a formal complaint was filed with the OU Office for Institutional Equality. (Id. ¶ 36).

On December 12, 2014, Plaintiff was notified that the Office for Institutional Equality had begun an investigation into A.H.'s complaint. (Id. at ¶ 37). In addition to Plaintiff, five other witnesses were interviewed. (Id. at ¶ 38). OU held a hearing on the complaint on January 29, 2015. The hearing panel found that Plaintiff's conduct met the criteria for the definition of sexual harassment, stating that Marshall "repeatedly continue [sic] to communicate with [A.H.] in a manner that made her feel uncomfortable and disrupted our [sic] ability to

focus in the academic environment, due to their classroom requirements and future frequent interactions." (*Id.* at ¶ 39). The hearing panel recommended that Marshall be suspended for a semester, but that he could petition for readmittance after completing certain tasks, including a research paper and an alcohol and drug assessment. (*Id.* at ¶ 40). Plaintiff appealed the decision. On February 24, 2015, Lombardi completed his review of Marshall's appeal and upheld the decision and sanction of the hearing panel. (*Id.* at ¶ 42).

Plaintiff then initiated this case on March 4, 2015 seeking injunctive relief to be reinstated as a student for the current semester.

## II. STANDARD OF REVIEW

Rule 65(b) of the Federal Rules of Civil Procedure permits a party to seek injunctive relief to prevent immediate and irreparable injury. A temporary restraining order is an extraordinary remedy whose purpose is to preserve the status quo. *Proctor & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 226 (6th Cir.1996). The burden of proving that the circumstances "clearly demand" such an extraordinary remedy is a heavy one: "[t]he party seeking the injunction must establish its case by clear and convincing evidence." *Overstreet v. Lexington–Fayette UrbanCnty. Gov't,* 305 F.3d 566, 573 (6th Cir.2002); *Honeywell, Inc. v. Brewer–Garrett Co.,* 145 F.3d 1331 (6th Cir.1998).

The factors considered in granting a temporary restraining order or a preliminary injunction are similar in nature. In the Sixth Circuit, it is well-settled that the following factors are to be considered in determining whether a temporary restraining order is necessary:

> **\*5** (1) whether the movant has a strong or substantial likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the relief requested; (3) whether issuance of the injunction will cause substantial harm to others; and (4) whether the public interest will be served by issuance of the injunction.

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati,* 363 F.3d 427, 432 (6th Cir.2004). The factors are not prerequisites; rather, they must be balanced. *Capobianco, D.C. v. Summers,* 377 F.3d 559, 561 (6th Cir.2004); *see also Michigan Bell Tel. Co. v. Engler,* 257 F.3d 587, 592 (6th Cir.2001) (no single factor is determinative).

The decision whether to issue a temporary restraining order or preliminary injunction falls within the sound discretion of the district court. *See Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102 (6th Cir.1982). Ultimately, "[t]he purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.,* 163 F.3d 341, 348 (6th Cir.1998) (*citing Stenberg v. Checker Oil Co.,* 573 F.2d 921, 925 (6th Cir.1978)).

## III. DISCUSSION

Plaintiff Michael Marshall initiated this case against Defendants asserting claims for violation of his First Amendment right to free speech, a violation of his civil rights under 42 U.S.C. § 1983, and violations under Title IX of the Education Amendments of 1972. Plaintiff seeks a temporary restraining order, reinstating him to OU, on his claims for violation of his First Amendment rights and violation of Title IX, asserting that he has a strong likelihood of success on the merits of his claims, and that he has sufficiently set forth the other requirements justifying a temporary restraining order. The Court will consider each of Plaintiff's claims in the context of the four factors listed above to determine whether a temporary restraining order is warranted in this case.

### A. Likelihood of Success on the Merits

#### 1. First Amendment Claims
Plaintiff argues that there is a substantial likelihood that he will succeed on the merits of his First Amendment claim because the Policy (1) is overbroad, and (2) "lacks any relationship to the intent of the speaker to cause harm." (Doc. 2, Pl.'s Mot. at 7). To the contrary, OU asserts Plaintiff's free speech arguments are devoid of any

merit, as the Policy is narrowly tailored to fully comport with the First Amendment.

### a. Overbreadth

Plaintiff first argues that the "sweeping" language of the Policy, specifically § 3.004, is overbroad, and thus constitutionally invalid. In considering whether a statute or policy violates the First Amendment on overbreadth grounds, the Court must resolve two issues. First, the Court must "determine whether the regulation reaches a substantial amount of constitutionally protected speech." *Leonardson v. City of E. Lansing,* 896 F.2d 190, 195 (6th Cir.1990). Second, the Court must address whether the policy is constitutionally invalid under the void for vagueness doctrine. *See id.; Dambrot v. Cent. Michigan Univ.,* 55 F.3d 1177, 1183–84 (6th Cir.1995). A policy will be considered "void for vagueness" if it (1) "denies fair notice of the standard of conduct to which a citizen is held accountable" or (2) constitutes "an unrestricted delegation of power," inviting "arbitrary, discriminatory and overzealous enforcement." *Leonardson,* 896 F.2d at 196 (quoting *Washington Mobilization Committee v. Cullinane,* 566 F.2d 107 (D.C.Cir.1977)).

**\*6** The Court finds that Plaintiff has failed to demonstrate he is likely to prevail on his allegations that the Policy, set forth above in Section I.B., reaches a substantial amount of constitutionally protected speech and/or implicates the void for vagueness doctrine. OU's policy is carefully drafted and narrowly tailored, balancing the need to prohibit certain types of harassing behavior with a student's free speech rights. Plaintiff argues that the Policy "seems to reach a substantial amount of constitutionally protected speech-including any effort by any student to ask another student out on a date." (Doc. 2, Pl.'s Mot. at 8). But the Court finds Plaintiff overstates the Policy's reach: to be actionable, § 3 .004 requires an individual's actions to be objectively and subjectively severe or pervasive so as to cause, or be intended to cause, an intimidating, hostile, or offensive work, academic, or living environment. Ordinarily, asking someone on a date in a reasonable manner does not require or entail severe and pervasive behavior that rises to a level of intimidation, hostility, or offensiveness (even if the offer is unwelcome or rejected).

Further, despite Plaintiff's contentions, the Policy explicitly considers the situation not only from a complainant's point of view, but also from "an objective

(reasonable person's) viewpoint." (Policy at 2–3). This safeguard effectively protects individuals from the danger oversensitive complainants may pose in punishing or restricting otherwise reasonable protected speech. Finally, the Policy does not merely define "Sexual Harassment by Hostile Environment" in a general sense: it also puts individuals on notice as to what specific circumstances OU will consider in reviewing their behavior, such as the frequency, nature, and severity of the harassment, whether the harassment was physically threatening or humiliating, and other contextual issues such as the relationship between the parties.

Plaintiff relies predominately on two cases in his motion: *Dambrot v. Central Michigan University,* 55 F.3d 1177 (6th Cir.1995) and *DeJohn v. Temple University,* 537 F.3d 301 (3d Cir.2008). In both of these cases, the Courts of Appeals found that each university's respective policy violated the First Amendment on overbreadth grounds. But the policies underlying both of those decisions were significantly less detailed and narrowly tailored than the one at issue here. For instance, in *Dambrot,* the Court criticized the university's policy for its overinclusiveness and for its failure to include any objective viewpoint. *Dambrot,* 55 F.3d at 1182–84. The Third Circuit shared similar concerns about Temple University's sexual harassment policy in *DeJohn. See DeJohn,* 537 F.3d at 316–19. But Plaintiff has not clearly explained how OU's policy shares these deficiencies. Section 3.004 appears to be narrowly tailored to only proscribe conduct that, when viewed both subjectively *and* objectively, (1) is unwelcome, (2) is of a sexual nature, (3) is severe or pervasive, and (4) has the purpose or effect of unreasonably interfering with the complainant's work or studies or otherwise creating a hostile environment. These requirements not only provide significantly more detail and notice than the policies reviewed by the *Dambrot* and *DeJohn* courts, they specifically track Title VII's definition of "sexual harassment" as well as the language used by the U.S. Supreme Court in reviewing sexual harassment cases. *See* 29 C.F.R. § 1604.11 ("Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when ... such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."); *see also, e.g., Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[A] sexually objectionable

environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."); *Wilkie v. Robbins,* 551 U.S. 537, 582, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)) ("For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ."); *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 631, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (for plaintiff to succeed on Title IX sexual harassment claim, he or she must demonstrate harassment that is "severe, pervasive, and objectively offensive").

**\*7** Based on the foregoing, the Court finds that Plaintiff has not demonstrated a likelihood of success on the merits of his claim that the Policy is overbroad and encompasses or punishes constitutionally protected speech. Additionally, the Court finds Plaintiff has ignored the fact that § 3.004 contains both a subjective and objective component, which seemingly protects individuals from arbitrary and unreasonable outcomes.

### b. Lack of Intent

Plaintiff next argues that the First Amendment requires OU "to demonstrate that he had a subjective intent to cause harm to A.H. before he can be suspended from school." (Doc. 2, Pl.'s Mot. at 10). OU contends that a *mens rea* requirement is not necessary to regulate the kind of harassing speech at issue here.

The Court finds Plaintiff's second argument not well-taken for many of the same reasons set forth above. OU's Sexual Misconduct Policy is narrowly tailored and mirrors federal regulations and case law. That it does not require malicious intent on behalf of the speaker does not render the provision unconstitutional; it is the *effect* on the school/working environment that allows schools to regulate disruptive speech, not the intent behind it. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 512–14, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Finally, the Court notes that Plaintiff has provided the Court with no precedent in which a court has deemed a harassment policy void for "lack of intent."

For these reasons, the Court finds both of Plaintiff's free speech arguments unavailing. Thus, the Court finds

Plaintiff has failed to show that he has a substantial likelihood of succeeding on the merits as to his First Amendment cause of action.

### 2. Title IX Claim

Title IX of the Education Amendments of 1972 is a federal statute designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding. Title IX specifically provides: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX is enforceable through an implied right of action for monetary damages, as well as injunctive relief. *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

Plaintiff asserts violation of Title IX under two separate theories of relief: erroneous outcome and deliberate indifference.

### a. Erroneous Outcome

To prevail on an erroneous outcome theory Plaintiff would ultimately need to prove the hearing was flawed due to his gender. *Yusuf v. Vassar College,* 35 F.3d 709, 715 (2d Cir.1994) (reversed on other grounds). Specifically, a plaintiff must allege "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary hearing" as well as "a causal connection between the flawed outcome and gender bias." *Yusuf,* 35 F.3d at 715. The Second Circuit explained:

> **\*8** If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail. We do not believe that Congress meant Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming, absent a claim of selective enforcement.

*Id.* Further, "a plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.*

Examples of these circumstances include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

Plaintiff does not dispute that he sent A.H. a series of inappropriate text messages as set forth above. However, he argues that his "suspension for sending text messages without any suggestion of a threat of violence—are sufficient to raise an inference of gender bias." (Pl.'s Mot. at 11). But allegations of an erroneous outcome "combined with a conclusory allegation of gender discrimination" cannot form the basis of Plaintiff's TRO request. *See Yusuf, 35 F.3d at 715* (noting that a conclusory statement of gender bias is not sufficient to survive a motion to dismiss). As OU points out, Plaintiff has not pled any facts to support his contention that gender bias was "a motivating factor" of his suspension. He has not provided any gender-biased statements or questions posed by university officials during the disciplinary hearing, nor has he alleged that OU has had any issues with the Department of Education, in the past, or currently, that would require them to issue a harsh sanction. Further, the sanctions were clearly set forth by OU in its "sanctioning guidelines" and were not arbitrarily determined by the panel. The sanctioning guidelines explicitly state that any violation of the Policy will likely result in a minimum of one semester suspension. [1]

The Court notes that Plaintiff seeks to conduct expedited discovery "aimed at determining whether OU has a pattern of decision-making based on gender," which may ultimately provide Plaintiff with support for his claim. (Pl.'s Mot. at 13). But Plaintiff has the burden of proving that a TRO is warranted, and that he is substantially likely to succeed on the merits of his claim, *now.* Plaintiff may use evidence obtained in discovery to support his request for a preliminary injunction down the road, but at this juncture the Court cannot find that his unsupported speculations and inferences rise to the level of "a substantial likelihood of success." [2]

For these reasons the Court finds Plaintiff has failed to show that he has a substantial likelihood of succeeding on the merits of his Title IX "erroneous outcome" cause of action.

**b. Deliberate Indifference**

To maintain a deliberate indifference claim under Title IX, Plaintiff must establish that an official of the institution who had the authority to institute corrective measures had actual notice of, and failed to correct, the alleged misconduct. *Mallory v. Ohio University,* 76 Fed. App'x. 634, 640 (6th Cir.2003). It is unclear as to how exactly this claim applies to the facts of this case, as usually, this claim is asserted by a victim against a school or university official who *failed* to protect him or her from harassment or otherwise address the alleged misconduct-actions that OU officials undisputedly took, to *protect* the alleged victim *from* Marshall. Even if the Court construed Plaintiff's claim liberally as alleging that the university was deliberately indifferent towards the panel's gender discrimination against Plaintiff, the Court finds it would still fail for many of the same reasons articulated above. Plaintiff admits to persistently sending unwelcome sexual text messages to A.H. OU became aware of the situation, and-so as *not* to be deliberately indifferent to student harassment-initiated an investigation of the matter. After a hearing, the panel found Plaintiff violated the Policy and issued a one-semester suspension, pursuant to its sentencing guidelines. Without being presented with any facts or evidence to the contrary, the Court cannot find that OU's decision was the result of gender discrimination or anything other than Plaintiff's inappropriate behavior towards A.H.

**\*9** For these reasons, the Court finds Plaintiff has failed to establish that he has a substantial likelihood of success on the merits of both his First Amendment and Title IX claims.

**B. Irreparable Harm**

After examining a plaintiff's likelihood of success on the merits of their claims, a court must balance those conclusions and findings with other factors, including the possibility that the denial of a temporary restraining order will cause irreparable harm to the plaintiff.

Plaintiff asserts that his dismissal from OU would "deny him the benefits of education at his chosen school, would damage his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career." (Pl.'s Mot. at 14). Further, even if readmitted to OU, he faces the possibility of permanent exclusion from the Honors Tutorial College, although he can appeal for reinstatement. (*See* Frith Aff. ¶ 9).

Other courts have found that a student's suspension from school can cause irreparable harm. *See Boman v. Bluestem Unified Sch. Dist.,* 2000 U.S. Dist. LEXIS 5389, 2000 WL 297167 (D.Kan. Jan. 28, 2000); *see also Bhandari v. Trustees of Columbia Univ. in N.Y.,* 2000 U.S. Dist. LEXIS 3720, at *15–16, 2000 WL 310344 (S.D.N.Y.2000). The Court agrees that the denial of a temporary restraining order here will likely cause Plaintiff irreparable harm. His suspension effectively denied him the benefit of the work already performed in the classes this semester and delayed the completion of his degree. Finally, Plaintiff will forever have this disciplinary action on his academic record, which may impact his ability to enroll at another institution, or affect his future career possibilities. Thus, the Court finds this factor weighs in favor of Plaintiff.

## C. Harm to Others

Plaintiff asserts that a temporary restraining order in this case will not cause any harm to third parties. Defendants, however, point to the basic (and obvious) fact that the reason Plaintiff has been suspended is that his admitted actions disrupted A.H.'s learning and living environment. The Court accordingly finds that issuance of a temporary restraining order would potentially cause harm to A.H. In this regard, both Plaintiff and A.H. are students in OU's honors tutorial program. A review of the record reveals that their presence in the program necessarily places them in potentially close proximity with each other given the program's dynamics-small class sizes and small number of students-and the fact that they lived in the same dorm. (*See* Frith Aff. ¶¶ 3–6). For instance, during the fall of 2014 (when the harassment occurred) they were the only two students in their required tutorial class. (*Id.* ¶ 6). Over the course of several weeks during that semester, Plaintiff repeatedly sent text messages (some of a suggestive or sexual nature) to A.H. seeking a romantic relationship even after his advances were clearly and definitively rebuffed by A.H. While Plaintiff's actions did not make A.H. feel physically unsafe, they did cause interference with her academic environment to the point where she finally strongly informed Plaintiff of her "serious problem" with his actions and reported his unwelcome advances.

**\*10** A.H. can rightfully expect to pursue her education in an environment free from the harassing behavior of a fellow student. From the record before it, the Court concludes that issuance of a temporary restraining order

reinstating Plaintiff to the honors tutorial program and thus placing Plaintiff and A.H. into close proximity, could potentially interfere with that right, thereby causing significant harm to A.H.

## D. Public Interest

Turning to the final factor, Plaintiff asserts that the public interest also favors the granting of a temporary restraining order. There is no question that there is a strong public interest in protection of our constitutional rights. *See Am. Freedom Def. Initiative v. Suburban Mobility for Reg. Transp.,* 698 F.3d 885, 896 (6th Cir.2012) ("the public interest is promoted by the robust enforcement of constitutional rights"). However, as set forth above, Plaintiff has not established a strong likelihood of succeeding on his constitutional claims and the Court accordingly cannot reach the conclusion that the Policy in fact violates constitutional rights. As such, Plaintiff cannot show that issuance of a temporary restraining order is in the public interest.

The Court also agrees with Defendant's argument that university officials should be afforded some level of deference in their disciplinary decisions and processes. *See Woodis v. Westark Cmty. Coll.,* 160 F.3d 435, 438 (8th Cir.1998). Issuing a temporary restraining order in this case, and in others similar to it, would likely interfere with OU's ability to enforce its disciplinary standards. Absent facts or evidence evincing a substantial likelihood of success on the merits, the Court is reluctant to interfere with OU's disciplinary processes, which are specifically designed to "provide an environment that facilitates learning." (Defs.' Resp. Br. at 13).

For these reasons, the Court finds the "public interest" factor weighs in favor of OU.

## E. Balance of Factors

In summary, the Court finds that Plaintiff has not demonstrated a substantial likelihood of success on the merits of his First Amendment and Title IX claims-the factor often deemed "most important" to the Court's analysis. *See H & H Indus., Inc. v. Miller,* No. 2:13–CV–907, 2013 WL 6858760, at *5 (S.D.Ohio Dec.27, 2013) (Graham, J.) ("Though no one factor is controlling, likelihood of success on the merits is often the most important factor in evaluating a motion for preliminary injunctive relief."); *see also Connection Distrib. Co. v.*

*Reno,* 154 F.3d 281, 288 (6th Cir.1998) (noting that the likelihood of success on the merits will "often be the determinative factor" especially in First Amendment cases). The Court also finds that the "harm to others" and "public interest" factors weigh against the issuance of a TRO at this juncture. Therefore, although Plaintiff may indeed suffer irreparable harm if OU's suspension is allowed to stand, the Court cannot find that the factors, when balanced against each other, weigh in his favor. Accordingly, the Court concludes that the issuance of a temporary restraining order is not warranted in this instance.

### IV. CONCLUSION

**\*11** Based on the foregoing reasons, Plaintiff's Motion for Temporary Restraining Order is **DENIED.**

The Clerk shall remove Documents 2 and 3 from the Court's pending motions list.

The telephone conference on Plaintiff's Motion for Preliminary Injunction remains scheduled for Tuesday, March 17, 2015 at 10 a.m.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1179955

---

Footnotes

1   It seems that the guidelines could allow for a warning and/or probation in some instances, like the case at bar. But even if this Court agrees with Plaintiff that the punishment does not seem to fit the crime here, that sentiment alone does not equate to a "substantial likelihood of success on the merits." The Court is not tasked with rewriting OU's sanctioning guidelines; it is tasked only with determining whether there was some gender bias behind an erroneous outcome. Considering that Plaintiff does not contest that he actually sent the inappropriate texts, there does not appear to be any allegation of an erroneous finding by the panel. Nor has Plaintiff made sufficient allegations or suggestions that there is evidence of gender bias with respect to his case.

2   The Court has reviewed the case of *Wells v. Xavier University,* 7 F.Supp.3d 746 (S.D.Ohio 2014), which Plaintiff relies on in support of his arguments, but finds that it does not affect the Court's conclusion. In *Wells,* the case was before the court on a motion to dismiss. Therefore, the court only had to consider whether the plaintiffs had *plausibly* pled a claim for violation of Title IX. In the case at bar, Plaintiff must establish that he has a substantial likelihood of success on the merits of his claim, a standard much more demanding than that required to survive a motion to dismiss or even summary judgment. *See Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir.2000) ("[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion.").

---

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit D

| Institution | State | Source |
|---|---|---|
| **SINGLE INVESTIGATOR MODEL** | | |
| **6th Circuit** | | |
| **University of Louisville** | KY | http://louisville.edu/dos/students/studentpoliciesandprocedures/student-sexual-misconduct-policy |
| **Kentucky State University** | KY | http://kysu.edu/wp-content/uploads/2014/04/Student-Title-IX-Policy-3-31-17-final.pdf |
| **Western Kentucky University** | KY | https://www.wku.edu/policies/docs/251.pdf |
| **Central Michigan University** | MI | https://www.cmich.edu/office_president/general_counsel/Documents/p03039.pdf |
| **Eastern Michigan University** | MI | https://www.emich.edu/title-nine/documents/student-procedures.pdf?v=2018-06-14T14:54:49Z |
| **Ferris State University** | MI | https://ferris.edu/HTMLS/administration/studentaffairs/judicial/student-code.pdf |
| **Grand Valley State University** | MI | https://www.gvsu.edu/titleix/title-ix-procedures-investigation-26.htm |
| **Michigan State University** | MI | https://www.hr.msu.edu/policies-procedures/university-wide/documents/RVSMPolicy.pdf |
| **Lake Superior State University** | MI | https://www.lssu.edu/wp-content/uploads/2017/01/1.5.3.pdf |
| **Saginaw Valley State University** | MI | http://www.svsu.edu/operationsmanual/generaloperations/generaloperationsi/36-1sexualmisconductpolicy/ - procedures |
| **Western Michigan University** | MI | https://wmich.edu/sites/default/files/attachments/u102/2018/WMU Sexual Misconduct Policy BOT Approved 7.8.15 Updated 9.19.16.pdf |
| **Ohio State University** | OH | https://hr.osu.edu/wp-content/uploads/policy115.pdf |
| **Youngstown State University** | OH | https://ysu.edu/title-ix/grievance |
| **Middle Tennessee State University** | TN | https://www.mtsu.edu/policies/governance-and-compliance/027.php#VII.%20Investigation%20Requirements%20and%20Procedures |
| **Tennessee State University** | TN | www.tnstate.edu/eeoaa/TSU%20Sexual%20Misconduct%20Policy%2082415.pdf |
| **University of Memphis** | TN | https://umwa.memphis.edu/umpolicies/UM1786.htm |
| **East Tennessee State University** | TN | https://policies.tbr.edu/guidelines/discrimination-harassment-complaint-investigation-procedure |
| **Tennessee Technical University** | TN | https://www.tntech.edu/assets/usermedia/student-affairs/titleix/Policy-143.pdf |

| Institution | State | Source |
|---|---|---|
| Austin Peay State University | TN | https://www.apsu.edu/policy/6s_nondiscrimination_harassment_and_sexual_misconduct_policies/6004-discrimination-and-harassment-complaints-other-complaints-sexual-violence-and-stalking-compla.php |
| | Other Jurisdictions | |
| University of Alaska | AK | www.alaska.edu/bor/policy/01-04.pdf |
| Auburn University | AL | https://sites.auburn.edu/admin/universitypolicies/Policies/PolicyonSexualandGender-BasedMisconductandOtherFormsofInterpersonalViolence.pdf |
| Arizona State University | AZ | https://provost.asu.edu/policies/procedures/p20 |
| University of Arizona | AZ | https://deanofstudents.arizona.edu/title-ix |
| University of Arkansas | AR | https://vcfa.uark.edu/policies/fayetteville/oeoc/4181.php |
| Arkansas State University | AR | http://www.astate.edu/a/affirmative-action/sexual-discrimination/discrimination-grievance.dot |
| University of California Santa Barbara | CA | http://sexualviolence.ucsb.edu/policies/UCSB.SVSH.Local.Procedures.for.Students.pdf |
| University of Central Arkansas | AR | http://uca.edu/titleix/files/2015/04/sexual-misconduct-grievance-procedures.pdf |
| Henderson State University | AR | http://www.hsu.edu/TitleIX/index.html |
| University of California | CA | https://policy.ucop.edu/doc/4000385/SVSH |
| University of California Berkley | CA | https://ophd.berkeley.edu/sites/default/files/local_student_adjudication_model.pdf |
| University of California Irvine | CA | https://aisc.uci.edu/policies/svsh/UCI_local_procedures_2-9-16.pdf |
| University of California Merced | CA | http://policies.ucmerced.edu/sites/policies.ucmerced.edu/files/page/documents/ucm_svsh_procedures_final_2-05-2016.pdf |
| University of California Riverside | CA | http://conduct.ucr.edu/docs/UCR-SVSH-Student-Adjudication%20Procedures%20Dec%202015%20FINAL.pdf |
| University of California San Diego | CA | https://students.ucsd.edu/_files/student-conduct/ucsandiego-svsh-student-adjudication-model_interim-revisions1-16-18.pdf |
| University of California San Francisco | CA | https://studentlife.ucsf.edu/appendix-e-sexual-violence-and-sexual-harassment-student-adjudication-procedures |
| University of California Santa Barbara | CA | http://sexualviolence.ucsb.edu/policies/UCSB.SVSH.Local.Procedures.for.Students.pdf |

| Institution | State | Source |
|---|---|---|
| University of California Santa Cruz | CA | https://titleix.ucsc.edu/_content-blocks/home-page/bottom-row/ucsc-title-ix-procedures-april-2017-5.pdf |
| California State University | CA | http://calstate.edu/eo/EO-1097-rev-10-5-16.html |
| California State University - Channel Islands | CA | http://calstate.edu/eo/EO-1097-rev-10-5-16.html |
| California State University - San Bernadino | CA | http://calstate.edu/eo/EO-1097-rev-10-5-16.html |
| Fresno State | CA | http://calstate.edu/eo/EO-1097-rev-10-5-16.html |
| San Diego State University | CA | http://calstate.edu/eo/EO-1097-rev-10-5-16.html |
| San Jose University | CA | http://calstate.edu/eo/EO-1097-rev-10-5-16.html |
| Sonoma State University | CA | http://calstate.edu/eo/EO-1097-rev-10-5-16.html |
| Sacramento State Univeristy | CA | http://calstate.edu/eo/EO-1097-rev-10-5-16.html |
| UCLA | CA | https://equity.ucla.edu/wp-content/uploads/2017/01/UCLA-SVSA-Procedures-Jan-2016.pdf |
| Adams State University | CO | https://www.adams.edu/sa/student-handbook.pdf |
| University of Colorado - Boulder | CO | https://www.colorado.edu/institutionalequity/process-procedures |
| Fort Lewis College | CO | https://wiki.fortlewis.edu/display/POL/Grievance+Procedure |
| Metropolitan State University of Denver | CO | https://msudenver.edu/media/content/deanofstudents/01.22.18_ResourceGuideforStudentsRespondingtoAllegationsofSexualMisconductRelatedtoTitleIX.pdf |
| Florida Gulf Coast University | FL | https://www.fgcu.edu/generalcounsel/files/policies/Policy1_006_NonDiscAntiHaraSexualMisc_12192016_ada.pdf. |
| Georgia Southern University | GA | http://president.georgiasouthern.edu/eeo-titleix/policy-and-procedures/complaints/ |
| University of Idaho | ID | https://www.uidaho.edu/ocri/policy-procedure/complaint-resolution-procedure |
| Lewis-Clark State College | ID | and-support-policy#eight |
| Northern Illinois University | IL | Title IX/Sexual Misconduct Policy and Complaint Procedures for Employees and Students |
| Purdue University | IN | Procedures for Resolving Complaints of Discrimination and Harassment |

| Institution | State | Source |
|---|---|---|
| Kansas State University | KS | http://www.k-state.edu/policies/ppm/3000/3010.html |
| University of Kansas | KS | http://policy.ku.edu/IOA/sexual-harassment-sexual-violence-procedures |
| Wichita State University | KS | https://www.wichita.edu/student_life/sga/studentadvocate/SexualViolence/Sexual_Misconduct_Policies.php |
| University of Louisiana | LA | https://policies.louisiana.edu/node/176 |
| University of Baltimore | MD | https://www.ubalt.edu/policies/administrative/II-7.1.pdf |
| Frostburg State University | MD | https://www.frostburg.edu/titleix/_files/pdfs/procedures-for-investigating-and-resolving-reports-of-prohibited-conduct---updated-july-28,-2017.pdf. |
| Missouri State University | MS | https://www.missouristate.edu/policy/Op1_02_11-sex-discrimination-and-vawa-policy-and-investigation-procedures.htm#investigation |
| Missouri Southern State University | MS | https://www.mssu.edu/student-affairs/sexual-misconduct-title-ix-policy-procedure.php |
| Lincoln University of Missouri | MS | https://bluetigerportal.lincolnu.edu/web/police-department/title-ix-grievance-proceedures |
| Montana State University | MT | http://www.montana.edu/policy/discrimination/procedures/ |
| University of Montana Western | MR | http://www.umt.edu/eo/documents/discrimination-procedures.pdf |
| Nebraska State College | NE | https://www.nscs.edu/downloads/file/25/3020_sexual_violence_or_sex_harassment_reporting_policies_and_procedures |
| Peru State College | NE | https://www.nscs.edu/downloads/file/25/3020_sexual_violence_or_sex_harassment_reporting_policies_and_procedures |
| Chadron State College | NE | https://www.nscs.edu/downloads/file/25/3020_sexual_violence_or_sex_harassment_reporting_policies_and_procedures |
| Wayne State College | NE | https://www.nscs.edu/downloads/file/25/3020_sexual_violence_or_sex_harassment_reporting_policies_and_procedures |
| University of Nevada | NV | https://www.unr.edu/Documents/provost/eoaa/sh-policy-032316.pdf |
| Rutgers University | NJ | Student Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking and Related Misconduct |
| New Jersey Institute of Technology | NJ | https://www.njit.edu/policies/sites/policies/files/lcms/pdf/Sexual-Misconduct-for-Students07222015104532.pdf. |
| City University of New York | NY | http://www2.cuny.edu/wp-content/uploads/sites/4/page-assets/about/administration/offices/legal-affairs/POLICY-ON-SEXUAL-MISCONDUCT-10.1.2015-with-links.pdf |
| Hunter College | NY | http://catalog.hunter.cuny.edu/content.php?catoid=28&navoid=5528#investigation |

| Institution | State | Source |
|---|---|---|
| **Queens College** | NY | http://www.qc.cuny.edu/about/administration/AffirmativeAction/Documents/CUNY%20Policy%20on%20Sexual%20Misconduct%20-%20October%202015.pdf |
| **University of Oklahoma** | OK | http://www.ou.edu/content/dam/eoo/documents/Investigative%20Policy.pdf |
| **Cameron University** | OK | http://www.cameron.edu/studentservices/handbook/gender-based-misconduct-policy-for-students#investigation |
| **Portland State University** | OR | https://www.pdx.edu/ogc/sites/www.pdx.edu.ogc/files/Policy_on_Prohibited_Discrimination_and_Harassment.Final_.pdf |
| **University of Pittsburgh** | PA | University of Pittsburgh Student Code of Conduct: Sexual Misconduct Process and Procedures |
| **Clemson University** | SC | https://www.clemson.edu/campus-life/campus-services/access/documents/policies/procedures.pdf |
| **University of Houston** | TX | http://www.uhsystem.edu/students/salutations/policy/index.php |
| **Texas State University** | TX | http://www.txstate.edu/oea/Sexual-Misconduct--Title-IX-.html |
| **Midwestern State University** | TX | https://mwsu.edu/titleix/sexual-misconduct-policy-student.pdf |
| **University of North Texas** | TX | http://deanofstudents.unt.edu/sexual-misconduct |
| **University of Texas** | TX | http://catalog.utexas.edu/general-information/appendices/appendix-c/student-discipline-and-conduct/ |
| **Texas's Women's University** | TX | https://servicecenter.twu.edu/TDClient/KB/ArticleDet?ID=40224 |
| **Lamar University** | TX | https://www.lamar.edu/titleix/index.html |
| **University of Virginia** | VA | Procedures for Reports Against Students |
| **Radford University** | VA | https://www.radford.edu/content/dam/departments/administrative/policies/GeneralPoliciesandProcedures/Discrimination-Harassment-Sexual-Misconduct-and-Retaliation-Policy-10-14-14 Cabinet-approved-hr.pdf. |
| **William and Mary University** | VA | https://www.wm.edu/offices/compliance/policies/sexual_misconduct/procedure/index.php#vi |
| **Christopher Newport University** | VA | http://cnu.edu/titleixeo/_pdf/cnu-policy-discrimination_harassment_sexual_misconduct_and_retaliation.pdf. |
| **University of Utah** | UT | https://regulations.utah.edu/general/rules/R1-012B.php |
| **Utah State University** | UT | http://www.usu.edu/policies/305/ |

| Institution | State | Source |
|---|---|---|
| **Southern Utah University** | UT | https://help.suu.edu/uploads/attachments/PP560Sexual.pdf |
| **Weber State University** | UT | https://www.weber.edu/ppm/Policies/3-32_DiscriminationHarassment.html |
| **Washington State University** | WA | https://oeo.wsu.edu/oeo-procedural-guidelines-2/ |
| **Western Washington State University** | WA | https://policy.wwu.edu/POL-U1600.04-Preventing-and-Responding-to-Sex-Discrimination-Including-Sexual-Misconduct |
| **University of Wyoming** | WY | http://www.uwyo.edu/dos/_files/docs/2015-2016%20student%20code%20of%20conduct.pdf<br>http://www.uwyo.edu/dos/_files/docs/2015-2016%20student%20code%20of%20conduct.pdf |