UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**JOHN DOE**, *an individual*,

     Plaintiff,

vs.

**UNIVERSITY OF MICHIGAN** (as to Title
IX violations), **BOARD OF REGENTS OF
THE UNIVERSITY OF MICHIGAN**, *a
constitutional corporate body* (as to Title IX
& ELCRA violations), **PAMELA HEATLIE,
ROBERT SELLERS, MARTIN
PHILBERT, ERIK WESSEL, LAURA
BLAKE JONES, E. ROYSTER HARPER,
SUZANNE MCFADDEN**, and **PAUL
ROBINSON**, *employees of the University of
Michigan*, *sued in his or her personal and
official capacities*, *jointly and severally*,

     Defendants.

Case No.: 18-cv-11776
Hon.  Arthur J. Tarnow
Mag.  Elizabeth A. Stafford

---

**DEBORAH GORDON LAW**
**Deborah L. Gordon (P27058)**
**Elizabeth A. Marzotto Taylor (P82061)**
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com

**MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.**
**Brian M. Schwartz (P69018)**
Attorneys for Defendants
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420
schwartzb@millercanfield.com

**SAUL EWING ARNSTEIN & LEHR LLP**
**Joshua W.B. Richards**
**Amy L. Piccola**
Attorneys for Defendants
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
(215) 972-7737
joshua.richards@saul.com
amy.piccola@saul.com

---

**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff John Doe, by and through his attorneys Deborah Gordon Law, complains against Defendants as follows:

## Jurisdiction and Parties

1.     This is an action for due process violations under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983; for violations of Title IX, 20 U.S.C. § 1681, *et seq.*; and for violations of the State of Michigan's Elliot-Larsen Civil Rights Act, M.C.L. § 37.2101, *et seq.*

2.     This Court has federal subject matter jurisdiction over Plaintiff's 42 U.S.C. § 1983 and Title IX claims pursuant to 28 U.S.C. § 1331 and § 1343. This Court has supplemental jurisdiction over Plaintiff's ELCRA claims pursuant to 28 U.S.C. § 1367.

3.     Plaintiff John Doe ("Plaintiff") is or was a student at the University of Michigan (the "University"). Plaintiff's claims arise out of actions taken against him by Defendants for alleged violations of the University's Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence ("Sexual Misconduct Policy"), dated February 7, 2018.

4.     Defendant Pamela Heatlie is the University's Associate Vice Provost for Academic and Faculty Affairs, Senior Director of the Office of Institutional Equity ("OIE") and serves as the University's Title IX Coordinator.

5.     Defendant Robert Sellers is the University's Vice Provost for Equity

1

and Inclusion and Chief Diversity Officer, which office is responsible for oversight of the Associate Vice Provost for Academic and Faculty Affairs, Senior Director of the OIE, and the Title IX Coordinator.

6.     Defendant Martin Philbert is the University's Provost and Executive Vice President for Academic Affairs, which office is responsible for oversight of the Vice Provost for Equity and Inclusion and Chief Diversity Officer.

7.     Defendant Erik Wessel is the University's Director of the Office of Student Conflict Resolution ("OSCR").

8.     Defendant Laura Blake Jones is the University's Dean of Students.

9.     Defendant E. Royster Harper is the Vice President for Student Life at the University, which office is responsible for oversight of OSCR and the Dean of Students.

10.     Defendant Suzanne McFadden is the OIE investigator assigned to investigate the complaint made against Plaintiff, and who carried out the investigation without due process of law.

11.     Defendant Paul Robinson is the University's Associate Vice Provost and University Registrar.

12.     The above-named individual Defendants are sued both in their personal and official capacities.

13.     Defendant University of Michigan is a public university, with its main

2

campus located in Ann Arbor, MI. Through the OIE and the OSCR, the University has a stated goal of promoting federal and state laws regarding nondiscrimination, such as Title IX and the Elliot Larsen Civil Rights Act.

14.     Defendant Board of Regents of the University of Michigan (hereinafter, "Defendant Board of Regents") is a constitutional corporate body operating and governing the University of Michigan, within this District.

15.     The events underlying this Complaint occurred in Ann Arbor, Michigan, and thus venue is proper in this District.

## A COMPLAINT IS FILED

16.     In April, 2014, Plaintiff enrolled at the University of Michigan as an undergraduate student.

17.     As of April 2018, Plaintiff had successfully achieved all the University's requirements necessary to graduate, *cum laude*, with the degree of Bachelor of Science in Engineering.

18.     The cost of the degree was approximately $260,000.

19.     On February 26, 2018, Plaintiff was admitted to the University's College of Engineering master's degree program to begin on September 4, 2018. He accepted the offer of admission and secured a research position. He registered for classes on March 30, 2018. He was admitted to other graduate engineering programs as well.

3

20.    On March 12, 2018, a complaint was filed against Plaintiff with the OIE by a female student ("Claimant") alleging that a non-consensual sexual encounter had occurred four months earlier, on November 11, 2017. There were no witnesses to the encounter, which occurred in Plaintiff's residence hall room. No alcohol or drugs were involved.

21.    The complaint is false; the sexual encounter was consensual.

22.    At the time of these events Plaintiff was in his second year as a Residence Advisor in his residence hall. He reported to University supervisors and had received extensive training on University policies, including sexual assault and consent.

23.    The parties knew one another prior to November 11, 2017. A few days prior to November 11, 2018, Claimant messaged Plaintiff, asking to come to his residence hall room.

24.    Earlier in the evening on November 11, 2018, the Claimant contacted Plaintiff and asked him to get together. In reply, Plaintiff suggested that she come to his residence hall room. She did so. They watched movies and engaged in sexual intercourse. Claimant later left the room and returned to her own residence hall two or more hours after she left Plaintiff's room.

25.    Claimant later told her roommate at her residence hall that she had sex with Plaintiff. She did not say it was without consent.

4

26.     In the next several weeks Claimant sent text and Snapchat messages to Plaintiff several times. She also ran into Plaintiff at a campus dining hall, asked to eat dinner with him, to which he obliged, and they chatted pleasantly.

27.     In one of Claimant's text messages to Plaintiff she suggested that she come to his resident hall room to have sex again. Plaintiff declined.

28.     In another one of Claimant's texts to Plaintiff she asked him what it meant to their relationship now that they had engaged in sex. Plaintiff responded that all he could offer was friendship.

29.     Four months went by before Claimant filed a report with the OIE.

30.     Plaintiff was first advised that a report against him had been filed via an email from the OIE on April 2, 2018, which was sent and received while Plaintiff attended a lecture, two weeks before his final exams began.

31.     In spite of the fact that the parties had been on campus together for four months after the sexual encounter with no problems of any kind, that Claimant had sought out Plaintiff via text and Snapchat messages during this period, and that there was no finding by the University against Plaintiff, on April 2, 2018, the OIE Senior Director and Title IX Coordinator, Defendant Pamela Heatlie, issued Plaintiff a No Contact Directive, which will last indefinitely. The list of prohibited conduct is extensive, and includes, in part:

- Placing the responsibility on Plaintiff to avoid "incidental" or "indirect" contact with Claimant;

5

- An order that if there is incidental contact Plaintiff must leave the premises, including a social or public event, immediately;

- If Plaintiff shares a class, employment, organization, activity or dining hall with Claimant, or lives in close proximity to her, he must "immediately" notify the University for further direction.

32. The directive states: "This No Contact Directive prohibits you from having contact with the Claimant **but does not restrain the Claimant's conduct**." (emphasis added).

33. The penalty for violation of the No Contact Directive "may result expulsion, suspension, or the revocation of degree."

34. The No Contact Directive improperly interferes with Plaintiff's ability to have full access to University facilities and activities and forces him to be continually on guard as to whether Claimant may be anywhere where he may have "incidental" contact with her.

35. On April 18, 2018, Claimant made a false complaint to the OIE that Plaintiff had violated the No Contact Directive while having dinner is his own dining hall (not Claimant's dining hall) when Claimant walked in.

36. Plaintiff was immediately admonished by the OIE investigator, Defendant Suzanne McFadden:

> It has come to my attention that you may be in violation of the no contact directive that was issued to you on April 2, 2018. **I understand that on April 13, 2018, [Claimant] walked into the . . . dining hall, you looked at her, did not get up to leave and**

6

**continued to sit and eat your meal.**

(emphasis added).

37.    The complaint of a "violation" had been made by Claimant only to harass Plaintiff but the OIE investigator immediately adopted it as true.

38.    Plaintiff was able to prove to the OIE investigator (through his electronic swipe card required to be used to enter a dining hall) that he was not in the dining hall that entire day. The OIE took no action against Claimant with regard to her false report of a violation of the No Contact Directive.

## THE OIE BEGINS AN INVESTIGATION

39.    After Claimant filed her sexual misconduct report with the OIE on March 12, 2018, the OIE commenced an investigation to determine if Plaintiff had violated the Sexual Misconduct Policy, dated February 7, 2018.

40.    It was the responsibility of the OIE investigator, Defendant McFadden, to investigate the Claimant's complaint and to make a determination in a final report as to whether a violation of the Sexual Misconduct Policy has occurred.

41.    The 2018 Sexual Misconduct Policy stated that the investigation process, through the final report, should not take more than 60 days.

42.    As of July 1, 2018, 84 days had passed and the investigation and report were not complete. No findings had been made.

7

43.     There are no parameters for the amount of time to complete the entire process, including a sanctioning/penalty process if a violation has occurred, and an appeal, which can be filed by either party.

## THE OIE PLACES A HOLD ON PLAINTIFF'S RECORDS; PLAINTIFF FILES A MOTION FOR A TRO/PRELIMINARY INJUNCTION

44.     On April 19, 2018, the OIE notified Plaintiff that:

> given the pending OIE investigation and your approaching graduation, an administrative hold has been placed on your student account until the OIE investigation is complete [this was later clarified to include the entire process, including any appeal, which will take an indeterminate period of time]. While the hold is in place, you will not be able to register for classes or receive an official copy of your transcript.

45.     This "hold" barred Plaintiff from receiving his official transcript or credentials that he had graduated and therefore barred him from enrolling in school elsewhere or obtaining any employment. This has occurred despite the fact that there is no finding that Plaintiff has violated any policy.

46.     On June 14, 2014, this Court granted, in part, Plaintiff's Motion for a TRO and Preliminary Injunction with regard to the hold. (Dkt. # 19).

## DEFENDANTS' 2018 SEXUAL MISCONDUCT POLICY INTENTIONALLY DEPRIVED PLAINTIFF OF DUE PROCESS

47.     As of January 1, 2018 Plaintiff had a property interest in his education and that he could not be deprived of that interest without due process, including a live hearing and some form of cross-examination.

48.     The issue to be determined by the University was whether the sexual encounter between Plaintiff and the Claimant was consensual. Because there are no witnesses to the encounter the findings will be based on a credibility determination.

49.     By September 26, 2017, the Sixth Circuit had clearly established that where, as here, credibility is at stake, a live hearing in front of the ultimate fact finder, with some form of cross-examination is required. *Univ. of Cincinnati*; 872 F.3d at 396 (6th Cir. 2017).

50.     On February 7, 2018, Defendants issued a new Sexual Misconduct Policy, which intentionally did not comply with *Doe v. University of Cincinnati*. **Ex. A**.

51.     Defendants refused to provide any student accused of a violation of the Sexual Misconduct Policy with the required due process protections.

52.     Rather, the 2018 Policy continued its single investigator procedure where no hearing and no cross-examination in any form was allowed.

53.     In fact, the University maintains (and continues to maintain) two separate and very unequal policies governing student misconduct and the due process that will be provided.

54.     "The Statement of Student Rights and Responsibilities" (the "Statement") applies to all University students **other** than those accused of "sexual" misconduct, including, in part, those accused of:

9

- physically harming another including killing;

- stalking;

- stealing, vandalizing or destroying property;

- possession, manufacturing or distribution of drugs.

**Ex. B**, p. 3-4.

55.    The Statement requires the following:

Each party may be accompanied at the hearing by a personal advisor, who may be an attorney; however, the advisor may not participate directly in the proceedings, but may only advise the party. For example, the advisor may not question witnesses or make presentations.

All parties may have access to all written or other information that will be considered prior to the hearing including the names of witnesses providing information. The RC will prepare and distribute this information prior to the hearing.

During the hearing, the RO, RC, respondent, complainant and student panelists (if applicable) have the right to question the complainant and the RC. These participants may also question (1) the respondent, if the student chooses to participate and (2) any witnesses who have presented information. ***Silence by the respondent will not be interpreted as evidence of responsibility for a violation***. Witnesses may be present in the hearing room only when they are presenting information. At any time during the hearing, the respondent may request a recess to consult with an advisor. The respondent and the complainant may call any witness with information that is relevant to the case, but the RO may exclude a witness if information is redundant.

The respondent, complainant, and RC may also present written reports to the panel or RO. The respondent and complainant may make statements to the panel or RO at the beginning and end of the proceeding.

An audio recording will be made of *Statement* hearings, and will be made available (in the OSCR office) to the respondent or complainant upon request during the period in which an appeal may be filed or is pending. In all cases, the RO will issue a written decision containing findings of fact, conclusions as to responsibility, and rationales for all sanctions/interventions imposed.

All arbitrated resolutions will result in findings of fact. The fact-finder will also make recommendation(s) regarding sanctions/interventions to the Dean of Students, who may accept or modify the recommendation(s). The Dean may not modify sanctions/interventions to include suspension or expulsion. However, when expulsion is recommended, the Dean may instead suspend the student. **Ex. B**, p. 7-8 (emphasis in original).

56.    In sharp contrast, the 2018 Sexual Misconduct Policy did not require that a complaint be in writing. It did not allow for a live hearing in front of the fact finder(s), attended by both the accuser and the accused, or the ability to cross-examine the accuser or any witness in any manner. It provided that the accused attend one private interview with an OIE investigator. Even though the accuser had already been privately interviewed, the investigator did not provide any information to the accused with regard to the allegations made by the accuser. The accused did not learn the names of the witnesses until the investigation is concluded. The accused is not provided with all of the evidence accumulated, only that evidence that the investigation deems important. **Ex. A**, p. 23-29.

57.    No law or governmental regulation requires Defendants to maintain a different procedure, where there is no due process when sexual misconduct is

alleged.

58.     If Plaintiff is found to have violated the Sexual Misconduct Policy the possible sanction is expulsion and a permanent record of sexual misconduct and/or sexual assault. Additional sanctions that may be imposed as well and include, but are not limited to: notification to another educational institution, such as when a Respondent elects to transfer or leaves from the University of Michigan; or restriction on involvement in specific courses or programs.

59.     Based on the University of Michigan Student Sexual Misconduct Annual Reports, in every case since at least 2014, where there was a finding of a Sexual Misconduct Policy violation and where "penetration" allegedly occurred, the sanction has been permanent expulsion, unless the student agreed to a voluntary permanent separation.  In either case, a permanent record is made of the finding against the student.

60.     Plaintiff was interviewed one time by the OIE investigator, on April 3, 2018.

61.      Plaintiff was not given notice of the charges against him sufficient for him to be able to defend himself. He was advised only that he "may have engaged . . . in unwanted [sexual relations] without consent." No other information about or summary of the details alleged by the Claimant were provided.

62.     The OIE investigator had interviewed the Claimant on March 29, four

days earlier, but she did not share that with Plaintiff or provide him with any of the very detailed allegations of the encounter she had elicited from Claimant. Since he had no notice of the allegations against him he was unable to respond to many key issues.

63.   Claimant made multiple allegations against Plaintiff that he was not told about or allowed to respond to during his one interview; he became aware of them at the end of the investigation.

64.   Nor was Plaintiff provided with the names of alleged witnesses to events that occurred after the sexual encounter, which Claimant had already provided to the investigator at the time of Plaintiff's interview.

65.   The investigator subsequently interviewed witnesses on unknown dates. She did not contact Plaintiff to advise him of what these witnesses said or give him an opportunity to respond.

66.   The OIE investigator did not record any interview in any manner. She took notes, which she advised Plaintiff were "non-verbatim."

67.   On May 24, 2018, 51 days after Plaintiff's only interview with the OIE investigator, he was provided with her first "Executive Summary," which contained summaries of all statements and evidence she had obtained, including detailed false allegations made by Claimant. This Summary was 16 pages in length.

68.     After receipt of the Executive Summary, Plaintiff had 5 days within which to provide written "feedback," which may or may not be included in the Final Report and Findings.

69.     On May 29, 2018, Plaintiff submitted his "feedback."

70.     The OIE investigator's job was to investigate the new information and issues submitted to her.

71.     On June 21, 2018, the OIE investigator sent Plaintiff her second Executive Summary, which included additional information as provided by the parties.  The second Executive Summary was 30 pages in length.

72.     The second summary purported to include answers to new questions put to Claimant; it also included many new details and allegations from Claimant.

73.     Per the 2018 Policy, the OIE investigator would issue her findings or fact and recommendation as to whether the Plaintiff violated the Policy.

74.     The Appeals process provided in the 2018 Policy also violated was unconstitutional.

75.     An Appeal of the findings would go to an "External "Reviewer" who would never hear from any party or witness. There would be no hearing, or even a private interview. **Ex. A**, p. 34-35.

76.     In spite of that, the External Reviewer had the authority to "modif[y]" the findings by setting aside the decision of the investigator in its entirety and

14

finding against the Plaintiff. **Ex. A**, p. 34-35.

77.     Plaintiff's constitutional rights were violated by the University placing a "hold" on his degree and official transcript in spite of no finding against him, and his being subjected to an unconstitutional investigation devoid of the basic due process provided to all other University students and required by the Sixth Circuit Court of Appeals.

## THIS COURT GRANTS PLAINTIFF'S MOTION FOR A TRO/ PRELIMINARY INJUNCTION; DEFENDANTS APPEAL

78.     On July 6, 2018, this Court granted Plaintiff's Motion for a TRO/Preliminary Injunction and ordered that the Defendants were required to follow the process provided in the Statement of Student Rights and Responsibilities. The Court further ordered that at the hearing Plaintiff may engage only in a form of circumscribed cross-examination. (Dkt. # 30).

79.     On July 25, 2018, Defendants filed their Notice of Appeal. (Dkt. # 32).

80.     On August 22, 2018, the Court granted Defendants' Motion to Stay. (Dkt. # 41).

81.     On April 10, 2019, this case was remanded to this Court.

## ON JANUARY 9, 2019, DEFENDANTS ISSUED ANOTHER, NEW SEXUAL MISCONDUCT POLICY

82.     The case of *Doe v. Baum* was decided on September 25, 2018. It

required a live hearing and live cross-examination.

83.   On January 9, 2019, Defendants issued another Sexual Misconduct Policy. **Ex. C**.

84.   On January 29, 2018, University President Mark Schlissel ("Schlissel") issued a public statement declaring his disagreement with *Doe v. Baum*:

> "Last semester, U-M revised it student sexual misconduct policy and procedures based on a court ruling by the U.S. Sixth Circuit Court of Appeals. The court ruled that a public university must give an accused student an in-person hearing when credibility is at issue in sexual misconduct cases and provide the opportunity for the accused student or their adviser to cross-examine the accuser and witnesses.
>
> The change was necessary to follow the law, but U-M respectfully submits that the Sixth Circuit got it wrong. In fact, even one of the three judges on the panel dissented.
>
> It is our hope that any rule changes will not nationalize the challenges presented by this case by taking a one-size-fits-all approach.
>
> Even as we comply with the current law, we continue to believe that having experienced, fair hearing officers posing questions to all parties and witnesses based on input from both sides is the best way to determine the truth and minimize harm to all students involved."

85.   President Schlissel added that he does not want the University to provide cross-examination or be required to use the same standard of proof for all students:

> "Specifically, the University of Michigan endorses the AAU's three recommendations for improving regulations:

1.    Remove requirements that institutions permit cross-examination and appoint aligned advisors.

2.    Remove the requirement that universities apply the same standard of evidence and process across all disciplinary processes."

86.    The January 9, 2019 Policy does not provide Plaintiff with due process, including, but not limited to the following:

a.    The 2019 Policy continues to allow the University the ability to withhold transcripts and/or a degree, to stop a student from registering for classes and to issue a suspension prior to any finding being made. **Ex. C**, p. 6-7.

b.    The 2019 Policy does not expressly state that Respondents are entitled to a live hearing with the opportunity for in-person cross-examination of parties and material witnesses. In fact, the 2019 Policy does not state anywhere that there is any guarantee to a hearing or cross-examination. *See* **Ex. C**, p. 25, "a hearing where warranted;" at 31, "if a hearing is required." Nor is there any reference to the legal requirement that       where credibility is at stake, such as in a he said/she said case, cross-examination must be provided.

c.    The 2019 Policy states that the hearing officer has absolute discretion to decide on a format for the hearing may decline to include witnesses and will directly examine parties and witnesses. Per the Policy, only "follow-up questions" by the parties will be allowed:

> The hearing officer has absolute discretion to decide upon a format for the hearing and to determine which witnesses are relevant to their outcome determination. A hearing officer may decline to hear from a witness where they conclude that the information is not necessary for their outcome determination.
>
> A typical hearing may include brief opening remarks

17

by the hearing officer; questions posed by the hearing officer to one or both of the parties; follow-up questions by one party to the other (typically with the Respondent questioning the Claimant first); questions by the hearing officer to any witness; and follow-up questions by either party to any witness (typically with the Respondent questioning the witness first). **Ex. C**, p. 33.

d.     Where an appeal is filed, it goes to an "External Reviewer." The external reviewer has final authority to alter the sanctions against the Respondent to a higher penalty than that assigned by the University the hearing, including suspension or expulsion. This would deprive a Respondent of his/her property interest without the decision maker having observed the hearing. This violates the Sixth Circuit's holding *Baum* that if the Appeals Reviewer is the decision maker with regard to depriving a student of his property interest in his education, where that decision does not comport with that of the fact finder below, the External Reviewer must be able to assess credibility. In addition, the External Reviewer has the ability to "request additional information from the Title IX Coordinator, OGC, and other University administrators …" where the "additional information" was not part of the record at the hearing and the parties have not ability to respond:

> The external reviewer will review the matter based on the issues identified in the appeal(s) materials. The external reviewer may, at any time, freely consult with or request additional information from the Title IX Coordinator, OGC, and other University administrators as necessary. The external reviewer has the authority to determine the appropriateness of evidence, including whether certain evidence should be considered, and the strength and value that evidence will be given. **Ex. C**, p. 39.

• • •

18

If the external reviewer determines the sanctions to be clearly inappropriate or disproportionate, they will alter the sanctions or interventions accordingly. The external reviewer's decision regarding sanctions is final. There will be no further opportunity for the parties to appeal the sanctions, except as set forth in the following paragraph of this Policy. **Ex. C**, p. 40.

f.    The 2019 Policy does not allow for the due process protections included in the Statement of Student Rights and Responsibilities. **Ex. B**, p. 6-8.

g.    The 2019 Policy has a standard of proof of "preponderance of the evidence." All other forms of student misconduct have a standard of "clear and convincing evidence," per the Statement of Student Rights and Responsibilities.

**THE UNIVERSITY OF MICHIGAN HAS BEEN PUBLICLY CRITICIZED FOR ITS HANDLING OF SEXUAL MISCONDUCT COMPLAINTS LEADING TO A PROCESS THAT DISADVANTAGES RESPONDENTS IN FAVOR OF CLAIMANTS**

87.    In February 2014, the U.S. Department of Education's Office of Civil Rights (OCR) began investigating the University for failing to adequately and promptly respond to complaints of sexual misconduct. *See* Letter to University of Michigan from U.S. Department of Education, Feb. 21, 2014, http://publicaffairs. vpcomm.umich.edu/wpcontent/uploads/sites/19/2015/01/OCRNOTIFICATIONLE TTER.pdf.

88.    As a result of the OCR Investigation, the University received substantial negative publicity. *See, e.g.*, John Lauerman, "University of Michigan Probed for Handling of Sexual Assaults," *Bloomberg News* (2/25/2014), http://

19

www.bloomberg.com/news/articles/2014-02-25/university-of-michigan-probed-for
-handling-of-sexual-assaults. For instance, one local news station reported that a
former University employee believed that the University had a policy of deterring
students from filing sexual misconduct complaints. *See* Ashley Dunkak, *Feds
Investigating University of Michigan over Gibbons Sex Assault Case* (2/25/2014),
http://detroit.cbslocal.com/2014/02/25/feds-investigating-university-of-michigan-
over-gibbons-sex-assault-case/.

89.   The University was also the subject of sharp criticism from students
on campus. One student group issued a public statement saying, "[w]e are fed up
with university administration's handling of sexual violence . . . We are fed up
with the university hierarchy hampering transparency and safety to protect their
own profit-making abilities and reputations." *See* Lauerman, "University of
Michigan Probed for Handling of Sexual Assaults," *Bloomberg News* (2/25/2014),
http://www.bloomberg.com/news/articles/2014-02-25/university-of-michigan-
probed-for-handling-of-sexual-assaults.

90.   Mark Schlissel took his post as University President on July 1, 2014
in the midst of the public backlash against the University. *See* "Mark Schlissel
Named 14th President of the University of Michigan," *The University Record* (Jan.
24,       2014),       https://record.umich.edu/articles/mark-s-schlissel-named-14th-
president-university-michigan.

91.     Given the University campus's political environment when Schlissel took his post, one of Schlissel's four primary areas of focus is unsurprisingly on the "campus climate" in order to "provid[e] the safest possible environment for students at the University of Michigan, and address[] and prevent[] sexual misconduct . . . at [the] University."

92.     Schlissel has penned several statements regarding sexual misconduct on the University's campus, highlighting it as an area of special importance, and noting the need to "improve support for survivors [a term fraught with the implication that claimant is always correct]," "focus[] greater attention on groups that appear to be at greater risk," "improve [the University's] investigation procedures," and "enhance [its] processes for adjudicating incidents."

93.     One such statement Schlissel signed is the March 25, 2016, University of Michigan Proclamation in support of the "Start by Believing" Public Awareness Campaign. *See* University of Michigan Proclamation, available at https://storage.googleapis.com/dpss-wordpress-prod/2/2017/03/proclamation.pdf). This Campaign is part of the End Violence against Women International program, the purpose of which is to promote automatic belief in whatever a "victim" says. *Id*. This is the anthesis of true due process, where one side should not be "believed" over the other prior to a hearing.

94.     Throughout 2014, 2015, and 2016 and 2017, the University made

multiple efforts to avoid sanctions from the federal government and to convince the public that it was working hard to protect women on campus. *See, e.g.*, Michigan Daily Editorial Board, *Sexual Misconduct Education is Key*, Michigan Daily (9/16/2016), https://www.michigandaily.com/section/editorials/daily-mandatory-reporting-sexual-misconduct-education-online-tool-faculty.

95.   The University was under pressure from the media, as well. The *Detroit Free Press* published a story about the University facing pressure from the OCR for its failure to comply with reporting requirements. *See* David Jesse, "U-M Pushed for Delays in Feds' Sex Assault Investigation," *Detroit Free Press* (June 4, 2016), http://www.freep.com/story/news/local/michigan/2016/06/04/university-michigan-sex-assault-investigation/85340204/.

96.   In addition, the Michigan Daily published a piece by its Editorial Board, calling for the University to better protect victims of sexual assault. *See* Michigan Daily Editorial Board, "Inquiry Deserved a Timely Response," *Michigan Daily* (June 8, 2016), https://www.michigandaily.com/section/editorials/daily-inquiry-deserved-timely-response. The Editorial Board reported that the steps the University had taken "to show [] support for survivors of sexual assault . . . might be forgotten . . . as the student body is once again reminded of how the University has repeatedly failed individuals who reported claims of sexual assault." *Id.* The Editorial Board further noted the University was "failing to protect its student

body" by not cooperating fully with the OCR Investigation because of the University's "concern[] that negative practices may become public during the course of such an investigation, which would no doubt harm the reputation of this institution." *Id.*

97.     All of the aforementioned facts have created an environment in which decision-makers at the University are explicitly and implicitly biased against males accused of sexual misconduct.

**COUNT I**
*42 U.S.C. § 1983—Fourteenth Amendment*
*Procedural Due Process*
*Property and Liberty Interests*
*(as to Defendants Heatlie, Sellers, Philbert, Wessel,*
*Jones, Harper, McFadden, and Robinson)*

98.     Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

99.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

100.   Plaintiff has a well-established property and liberty interest in his education.

101.   Fourteenth Amendment due process protections are required in higher education disciplinary decisions at public institutions.

102.   Plaintiff was entitled to notice and a meaningful opportunity to be

heard, including a hearing and cross-examination, once a complaint was filed against him, and prior to the deprivation of his property interest in his education. He has been deprived of due process protections and is now potentially subject to expulsion.

103.   With no finding against him, Plaintiff was deprived of his diploma.

104.   Plaintiff was entitled to obtain his official transcript and degree upon completion of the University's requirements but he was deprived of those credentials, and his property interest in his education, without due process of law.

105.   Plaintiff has a protected liberty interest in his good name, reputation, honor, and integrity which he cannot be deprived of by the state absent due process.

106.   Plaintiff has a protected liberty interest in pursuing his education at a public university, which the state cannot deprive him of absent due process.

107.   Plaintiff also has a protected liberty interest in his future educational and employment opportunities, which the state cannot deprive him of absent due process.

108.   Plaintiff is entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. Here the allegations are of the utmost seriousness, have lifelong ramifications, and are quasi-criminal in nature.

109.   Plaintiff has a significant interest in avoiding an adverse decision against him based on a denial of due process protections.

110.   Defendants know that Plaintiff has a clearly established right to due process protections, and a reasonable person would know that failing to apply those standards of review would violate Plaintiff's due process rights.

111.   Providing due process protections imposes no administrative burden on the University. It offers full due process to all students not accused of sexual misconduct. **Ex. B**, p. 6-8.

112.   Defendants have refused to provide Plaintiff with the due process protections contained in the University Statement of Student Rights and Responsibilities.

113.   Defendants refused to guarantee a hearing where credibility is at stake.

114.   Defendants refused to allow for "cross-examination," allowing only questions to "follow-up" on the questions from the hearing officer.

115.   Defendants allow an "External Reviewer," on appeal, to impose a sanction of expulsion on a student where the University decided on lower level penalty and where the "External Reviewer" has not seen or heard directly from any party or witnesses, and is unable to access credibility.

116.   As a direct and proximate result of Defendants' unlawful actions,

Plaintiff has and will suffer irreparable harm, injury, and damages, including but not limited to withholding or a denial of his degree and a permanent record of misconduct; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT II
### *Title IX, 20 U.S.C. § 1681, et seq.—Disparate Treatment Based on Sex –*
### *(as to Defendants University of Michigan and Board of Regents)*

117.   Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

118.   Title IX prohibits discrimination on the basis of sex in educational institutions, including the University of Michigan.

119.   Title IX applies to an entire school or institution if any part of that school receives federal funds.

120.   Defendants receive federal funding.

121.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to adopt and publish grievance procedures providing for the "prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. *See* 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice).

122.   The procedures adopted by a school covered by Title IX must

"accord[] due process to both parties involved." *See id.*

123.  Defendants have violated Plaintiff's rights under Title IX by treating him differently because of his sex.

124.  Defendants have limited his due process rights in pertinent part, because of his gender.

125.  Defendants have intentionally deprived Plaintiff of the due process rights provided to all students accused of something other than sexual misconduct – full notice of the charges against him and a hearing with cross examination.

126.  Defendants have intentionally created a lower standard of proof, "preponderance of the evidence" for all students, the vast majority of whom are male to make it easier for accusers to prevail. In all other situations, under the Statement of Student Rights and Responsibilities the University uses a "clear and convincing" standard.

127.  Defendant University has created the The University of Michigan Sexual Assault Awareness and Prevention Center (SAPAC).  This organization reports to Defendant Vice President E. Royster Harper and is a resource center for students.

128.  SAPAC's "Vision and Philosophy" statement declares that they use "a feminist approach to service," a clear statement that females are given special status and have services directed to their needs. http://sapac.umich.edu/article/9.

129.    SAPAC and the OIE use one another as "resources."

130.    Plaintiff was directed to SAPAC by OIE investigator Suzanne McFadden if he needed a resource during the disciplinary process.

131.    Based on the ongoing denial of his due process rights during the disciplinary process to date there is a high likelihood that Defendants will reach an erroneous outcome. Plaintiff was presumed to have not engaged in misconduct pursuant to the University Policy but Defendants undertook to deprive him of his degree anyway, based on an allegation against him when there was no finding.

132.    Defendants actions in were based, in part, on the statements of University officials, the political climate, the government investigations and the media coverage described in the paragraphs above.

133.    Defendants' actions were also based on patterns of decision making with regard to no contact orders and withholding of academic credentials influenced by gender.

134.    Male students are routinely issued no contact orders.  Here, the alleged misconduct had occurred approximately five months earlier during which there was no request by Claimant for any such order and where there had been no issue with "contact" between the parties.

135.    In fact, Claimant has admitted to Defendants that she contacted Plaintiff.

136.   Not only was no such order issued as to Claimant; she was freely allowed to come into Plaintiff's private residence hall dining room while he was dining.  He was thereafter warned by the OIE investigator that he should have immediately left his own dining room during his meal when Claimant walked in, and that he would be disciplined if any such thing occurred in the future.

137.   Defendants took the actions against Plaintiff described above.

138.   There has been no showing of any kind that Claimant has been "excluded from participation in, denied the benefits of or subjected to discrimination in any educational program or activity." This is the threshold requirement for implicating Title IX protections or commencing an investigation. 20 U.S.C. § 1681.

139.   To the contrary, Claimant has not been excluded from any benefit of her education.

140.   Nonetheless, Defendants have undertaken a process to potentially remove Respondent from the University.

141.   Based on the foregoing, an "erroneous outcome" has resulted in the withholding of Plaintiff's degree, and an "erroneous outcome" will occur if he is found to have violated the University's Sexual Misconduct Policy.

142.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury, and damages, including but

29

not limited to denial of educational opportunities; denial of the ability to receive a degree from the University, damage to his standing and associations in his community and imposition of a stigma or that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

**COUNT III**
*M.C.L. § 37.2101, et seq.—Elliott-Larsen Civil Rights Act*
*Disparate Treatment on the Basis of Gender*
*(as to Defendants Heatlie, Sellers, Philbert, Wessel,*
*Jones, Harper, McFadden, Robinson, and Board of Regents)*

143. Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

144. Pursuant to the Elliot-Larsen Civil Rights Act ("ELCRA"), Defendants are an "educational institution" or an "agent of an educational institution." *See* M.C.L. § 37.2402.

145. Pursuant to the ELCRA, Defendants were prohibited from discriminating against Plaintiff on the basis of his sex by interfering with and denying him his utilization of the University or its benefits, services, activities, or programs.

146. In addition, Defendants were prohibited from excluding, expelling, limiting, or otherwise discriminating against Plaintiff in the terms, conditions, or

30

privileges of his enrollment in the institution, based on his sex.

147.  As described above, Plaintiff was denied the full utilization and benefits of the institution and its services, and was excluded and limited in the terms, conditions, and privileges of the institution based on his sex.

148.  Based on his sex, Plaintiff was denied the proper and full use and implementation of the institution's Statement of Student Rights and Responsibility; was denied a degree and the ability to graduate timely from the institution; was improperly issued a No Contact Directive; and was then incorrectly admonished for having violated it.

149.  Defendant has taken the position in its SAPAC office that it takes a "feminist" approach to sexual assault.

150.  The aforementioned violations of the ELCRA have denied Plaintiff, based on his sex, the terms, privileges, services and opportunities of the institution, to which he was entitled.

151.  The aforementioned violations of the ELCRA constituted intentional discrimination, motivated by Plaintiff's sex.

152.  As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury, and damages, including but not limited to denial of educational opportunities; denial of the ability to receive a degree from the University or even attend it again; a permanent disciplinary

record which he will have to contend with and explain for the rest of his life; denial of future educational and employment opportunities including undergraduate, graduate school and career choices; false, permanent findings and discipline on his record for serious sexual misconduct which did not occur; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

**COUNT IV**
*M.C.L. § 37.2102,* **et seq.**—*Elliott-Larsen Civil Rights Act*
*Disparate Impact on the Basis of Gender*
*(as to Defendants Heatlie, Sellers, Philbert, Wessel,*
*Jones, Harper, McFadden, Robinson, and Board of Regents)*

153. Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

154. Defendants have maintained a policy and procedure of treating all forms of misconduct by students in the same manner with one exception: alleged violations of the Policy.

155. As set forth in the University's Statement of Student Rights and Responsibilities every student other than those accused of sexual misconduct receives written notice of the charges against him, and an opportunity for a

hearing which includes the right to confront or examine the accuser and witnesses.

156.   Specifically, the Statement provides that students accused of non-sexual misconduct violations are entitled to a hearing in front of a panel, the right to pose questions to the complainant and witnesses, an audio recording of the hearing, access in advance to all written and other information that will be used, the names of witnesses in advance of the hearing, access to a recess during the hearing to obtain advice and counsel, and the right to make statements to the hearing panel or present a written report.

157.   Students accused of non-sexual misconduct violations are subject to liability under a "clear and convincing evidence" standard.

158.   Only students accused of sexual misconduct are denied the use of the hearing procedures outlined above and are subject to the lesser burdensome "preponderance of the evidence" standard.

159.   In fact, even students accused of killing, harassing, bullying, stealing, destroying property, or any other violation of the University policies are provided with the full procedures and the clear and convincing standard of proof described above.

160.   Students accused of sexual misconduct at the University are overwhelmingly male. Therefore, the Sexual Misconduct Policy, which directs

University decision-makers to apply different procedures than outlined in the Statement, has a disparate impact on male students.

161.  The Sexual Misconduct Policy, although facially neutral, burdens male students more harshly than it does female students, thus creating a discriminatory preference in favor of female students.

162.  Defendants have not provided a legally sufficient rationale for creating and applying different standards for students accused of sexual misconduct as compared to any other violation of University policies. There is no legitimate basis for such a distinction.

163.  As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury, and damages, including but not limited to denial of educational opportunities; denial of the ability to receive a degree from the University or even attend it again; a permanent disciplinary record which he will have to contend with and explain for the rest of his life; denial of future educational and employment opportunities including undergraduate, graduate school, and career choices; false, permanent findings and discipline on his record for serious sexual misconduct which did not occur; damage to his standing and associations in his community and imposition of a stigma or other disability that forecloses his freedom to take advantage of other educational or employment opportunities; loss of career opportunities and earning

capacity; mental and emotional distress; humiliation and embarrassment; and loss

of personal and professional reputation.

## RELIEF REQUESTED

Plaintiff demands judgment against Defendants as follows:

**A.    Equitable Relief:**

1.    An injunction from this Court halting the investigation and decision-making process with regard to the OIE complaint against Plaintiff because the process is unconstitutional and deprives Plaintiff of due process pursuant to the 2018 and/or 2019 Policy;

2.    An injunction from this Court prohibiting all Defendants from further use of the Sexual Misconduct Policy as to any student because it is unconstitutional and is a deprivation of due process rights, and an order to use the Statement of Student Rights and Responsibilities;

3.    A ruling that, as a matter of law, Plaintiff's due process rights were violated.

4.    An award of interest, costs and reasonable attorney fees; and,

5.    Whatever other equitable relief appears appropriate at the time of final judgment.

**B.    Legal Relief:**

1.    Compensatory damages in whatever amount Plaintiff is found to be entitled;

2.    Exemplary damages in whatever amount he is found to be entitled;

3.    Punitive damages in whatever amount he is found to be entitled; and,

4.    An award of interest, costs, reasonable attorney fees, and expert witness fees.

Dated:  May 22, 2019                    **DEBORAH GORDON LAW**
                                        **/s/Deborah L. Gordon (P27058)**
                                        **Elizabeth A. Marzotto Taylor (P82061)**
                                        Attorneys for Plaintiff
                                        33 Bloomfield Hills Parkway, Suite 220
                                        Bloomfield Hills, Michigan 48304
                                        (248) 258-2500
                                        dgordon@deborahgordonlaw.com
                                        emarzottotaylor@deborahgordonlaw.com

## JURY DEMAND

Plaintiff John Doe, by and through his attorneys Deborah Gordon Law, demands a trial by jury of all the issues in this cause that are so triable.

Dated:  May 22, 2019                    **DEBORAH GORDON LAW**
                                        **/s/Deborah L. Gordon (P27058)**
                                        **Elizabeth A. Marzotto Taylor (P82061)**
                                        Attorneys for Plaintiff
                                        33 Bloomfield Hills Parkway, Suite 220
                                        Bloomfield Hills, Michigan 48304
                                        (248) 258-2500
                                        dgordon@deborahgordonlaw.com
                                        emarzottotaylor@deborahgordonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2019, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing and service of said documents to all parties through their counsel of record.

                                        **DEBORAH GORDON LAW**
                                        **/s/Deborah L. Gordon (P27058)**
                                        **Elizabeth A. Marzotto Taylor (P82061)**

Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com