UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**JOHN DOE,**                                : Case No. 18-cv-11776
                                             :
          Plaintiff,    : Hon. Arthur J. Tarnow
                                             : Mag. Elizabeth A. Stafford
  v.                                     :
                                             : **DEFENDANTS' NOTICE OF**
**UNIVERSITY OF MICHIGAN**, *et al.*,          : **INTENT TO RELY ON**
                                             : **ADDITIONAL AUTHORITY**
         Defendants.  : **IN SUPPORT OF THEIR**
                                             : **MOTION TO DISMISS**
                                             : **PLAINTIFF'S SECOND**
                                             : **AMENDED COMPLAINT**
                                             :
                                             :

---

DEBORAH GORDON LAW
Deborah L. Gordon
Elizabeth A. Marzotto Taylor
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan  48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com

*Attorneys for Plaintiff*

SAUL EWING ARNSTEIN &
LEHR LLP
Joshua W. B. Richards
Amy L. Piccola
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania  19102
(215) 972-7737
joshua.richards@saul.com
amy.piccola@saul.com


MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
Brian M. Schwartz
150 West Jefferson, Suite 2500
Detroit, Michigan  48226
(313) 963-6420
schwartzb@millercanfield.com

*Attorneys for Defendants*

Defendants hereby give notice of their intent to rely on the December 10, 2019 Opinion issued by the Honorable Paul L. Maloney in *Doe v. Michigan State University*, No. 19-226 (W.D. Mich. Dec. 10, 2019) (attached hereto as Exhibit A) in support of their motion to dismiss plaintiff's second amended complaint (ECF No. 49).  In granting MSU's motion to dismiss a complaint alleging violations of due process and Title IX (among other claims), the court explained that while the Sixth Circuit's ruling in *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) "require[s] the accused (or his representative) a chance to examine the accuser – rather than allowing only the panel to examine the accuser – *Baum* still only requires 'some form' of cross examination," and "does not require that all submitted questions are asked, nor does it require all asked questions to be answered."  *MSU*, at 12.  This ruling lends further support to Defendants' argument that Doe has failed to state a due process claim because the 2019 Policy fully complies with *Baum*.  (*See* ECF No. 49 at 15-16.)

Additionally, the *MSU* court rejected the plaintiff's arguments that MSU violated Title IX by purportedly treating victims of sexual assault more favorably than the accused: "It is not enough that the University treat victims more favorably than the accused; a plaintiff must show that the University was specifically biased against men."  *MSU*, at 19.  The court similarly rebuffed plaintiff's argument that external pressure on the university created a bias against students accused of sexual

misconduct in violation of Title IX: "[E]xternal pressure alone is insufficient to show gender bias . . .  The Sixth Circuit clearly held in *Baum* that outside pressure 'is not enough to state a claim.'"  *MSU*, at 20 (quoting *Baum*, 903 F.3d at 586).  So too here.  (*See* ECF No 49 at 22; ECF No. 61 at 1-2, 6.)

Respectfully submitted,

December 13, 2019

/s/ *Joshua W. B. Richards*

| | |
|---|---|
| MILLER, CANFIELD, PADDOCK AND STONE, P.L.C. | SAUL EWING ARNSTEIN & LEHR LLP |
| Brian M. Schwartz | Joshua W. B. Richards |
| 150 West Jefferson, Suite 2500 | Amy L. Piccola |
| Detroit, Michigan  48226 | 1500 Market Street, 38th Floor |
| (313) 963-6420 | Philadelphia, Pennsylvania  19102 |
| schwartzb@millercanfield.com | (215) 972-7737 |
| | joshua.richards@saul.com |
| | amy.piccola@saul.com |

*Attorneys for Defendants*

# Exhibit A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:19-cv-226 |
| -v- | ) | |
| | ) | Honorable Paul L. Maloney |
| MICHIGAN STATE UNIVERSITY, et al., | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION

This matter is before the Court on Defendants', Michigan State University (MSU), Robert Kent, Rick Schafer, and Aron Sousa, M.D., motion to dismiss Plaintiff John Doe's complaint (ECF No. 34). Doe alleges that Defendants violated his due process rights, violated Title IX, and violated the Equal Protection clause during the investigation of two sexual assault claims against him. For the reasons explained below, Defendants' motion to dismiss will be granted.

## I.

This case began on April 23, 2016, at MSU's Med Ball in Grand Rapids, Michigan. Med Ball is an annual social event to celebrate the end of the school year for medicine students. At the time, Doe, Jane Roe 1, and Jane Roe 2 were all first-year medicine students. At the beginning of the night, Roe 1 was casually dating another first-year medicine student, KB, and Roe 2 was married to JM. The group—Doe, Roe 1, Roe 2, KB, and JM—all attended the Med Ball together.

At the Med Ball, Doe and Roe 1 talked and danced, at times "grinding" in a provocative manner. Early in the night, Roe 2 got in a serious fight with her husband, who threatened divorce and left the event. When Roe 1 learned of the fight, she left Doe to find Roe 2 and comfort her. But when Roe 1 located Roe 2, she saw Roe 2 kissing KB (whom Roe 1 had been casually dating). Upset, Roe 1 sent a series of text messages to Roe 2 expressing her anger and telling Roe 2 that their friendship was over.

Roe 1 then retreated to a semi-secluded area of the venue, at the top of a set of stairs. She was very upset with Roe 2, fairly drunk, and crying. At this point, Doe returned to her side. He sat with her and tried to cheer her up. The undisputed facts are as follows: the two kissed and at some point, Doe led Roe 1 into a stairwell where they attempted to have sex, but Doe could not achieve or maintain an erection. However, Doe and Roe 1 remember these events differently. Roe 1 testified that Doe demanded that she take off her dress and that she was too intoxicated to remember the event clearly, so she was too intoxicated to give consent. She testified that she never gave Doe consent; rather, she "shut down" during the encounter, felt that she could not react, and felt powerless to "do anything about" Doe's actions. She did not verbally express this to Doe.

In Doe's memory, he initiated the first kiss, but Roe 1 actively and eagerly participated in the kissing and eventually, the sex. Doe recalls Roe 1 taking off her own dress and getting down on her hands and knees of her own accord to "present herself" to him.

The stories merge again when Doe and Roe 1 returned to the main event area and left the Med Ball. The entire group (Doe, Roe 1, Roe 2, and KB) traveled to a bar. During the ride to the bar, Doe held Roe 1's hand and alleges that Roe 1 placed her head on his

2

shoulder. Again, Roe 1 remembers this drive differently: Doe grabbed her hand and she felt "powerless" to tell him to go away in the enclosed space, so she let him hold her hand.

After more drinking and dancing, the group eventually returned to KB's home. There, Roe 2 had sex with KB. Roe 1 went to bed, presumably in a guest room. Doe, apparently looking for a place to sleep, thought it prudent to join her in bed. However, Doe could not fall asleep next to Roe 1, so he relocated to the sectional couch in the living room.

At some point, Roe 2 left KB's room and decided to sleep on the couch rather than drive home. She fell asleep on the couch in her formal dress. There is no dispute that at some point, Doe laid next to Roe 2 and began to touch her. But again, the accounts differ. Doe believes that the encounter began consensually: Roe 2 moved to make room for him and initiated a kiss. At some point, she said "no" or "stop," so Doe stopped and retreated to the other leg of the sectional couch. Roe 2 maintains that she woke in the middle of the night to Doe behind her on the couch, pulling up her dress, with his hands on her hips and inside her underwear—all uninvited. She stated that Doe attempted to kiss her and became persistent. When she was fully awake, she told Doe "no," and moved to a different area of the house to sleep.

In the morning, Doe told KB that he had sex with Roe 1. Later that day, KB confronted Roe 1, who told KB that the encounter was not consensual.

About two years later, in February 2018, Doe, Roe 1, and Roe 2 were due to begin their clinical rotations. During the rotation placement process, students can request not to be placed with other students. Both Roe 1 and Roe 2 requested not to be placed with Doe. Dr. Angela Busch, the Community Assistant Dean for the MSU College of Human Medicine

in Grand Rapids, met with both women to discuss their requests. Separately, both women explained their encounters with Doe to Dr. Busch, who informed them that she would have to report the incidents to the MSU Office of Institutional Equity (OIE).[1]

In February 2018, both claims were reported to the OIE. Roe 1's claim was that she was raped at the Med Ball venue; Roe's 2 claim was that Doe performed unwanted sexual contact on her at KB's house. MSU's investigative partner, Kroll Associates, Inc., began to investigate the claims. Both Roe 1 and Roe 2 were interviewed as part of the Kroll investigation.

On April 17, 2018, Doe received notice from Kroll that he was being investigated under MSU's Relationship Violence and Sexual Misconduct Policy (RVSMP) (ECF No. 19-3). Kroll sent Doe an email and letter stating that Roe 1 "alleges that you engaged in sexual violence, and specifically raped her." Kroll sent Doe a separate letter stating that Roe 2 "alleges that you engaged in sexual harassment, and specifically made unwanted sexual contact with her."

On April 20, 2018, Doe was interviewed about Roe 2's claim. Doe alleges that he did not have time after receiving the notice to read the RVSMP, and that he had no idea he could be suspended or expelled. During the interview, Kroll provided Doe with additional details about Roe 2's allegation and allowed him to provide his side of the story. During this interview, Doe did not deny that he and both women were "drunk" or "very drunk" on April

---

[1] Doe alleges that Dr. Busch learned of these incidents long before February 2018 and held them until after the OCR opened an investigation into MSU's handling of Larry Nassar. However, Doe points to no record evidence to support this allegation, and the Court has found no evidence in the record that supports this allegation.

23, 2016. He did not deny engaging in sexual contact with both Roe 1 and Roe 2 that night; rather, he told investigators that both incidents were consensual.

On August 15, 2018, he was interviewed regarding Roe 1's claim. Again, Kroll provided Doe with additional details regarding the claim and allowed Doe to provide his side of the story. Doe alleges that he still did not have time to read the RVSMP before this interview.

As part of both investigations, Kroll invited Doe and each claimant to submit questions in writing to be asked of the other party; no one submitted questions. Kroll did review text messages provided by Roe 1 and two typed statements submitted by Roe 2. Kroll interviewed seven other people with possible knowledge of the incident, including other students and medical professionals that treated Roe 1. Doe maintains that he submitted names of witnesses to be interviewed, but Kroll did not interview his witnesses. He does not identify who these missing witnesses were or what impact they may have had on the investigation.

On November 15, 2018, Kroll issued a preliminary investigative report giving all three parties the opportunity to "provide feedback, additional information, or corrections." The preliminary report included a summary of the investigation but did not reach a conclusion. On November 20 and 21, 2018, Doe responded by identifying additional facts and denying any wrongdoing. Neither claimant responded.

On February 7, 2019, Kroll concluded its investigation and issued its final investigative report (ECF No. 35-3). Kroll concluded that Roe 1 was intoxicated and therefore could not consent to sexual conduct, and that Roe 2 did not give consent to sexual conduct. Both

5

nonconsensual encounters were violations of the RVSMP. Doe was notified of the findings the following day. Pursuant to the Kroll findings and the RVSMP, the MSU College of Human Medicine issued Doe an interim suspension on February 12, 2019.

Two days later, on February 14, 2019, Doe was given an hour-long hearing to determine whether there was enough evidence to justify continuation of the suspension. Doe and his lawyer were present, but their efforts were unsuccessful, and his suspension continued. On February 26, 2019, Doe received a notification from the Dean of Students that he would be recommending Doe's dismissal from the College of Medicine.

On March 8, 2019, Doe appealed Kroll's decision and the interim suspension. On March 13, 2019, MSU agreed that Sixth Circuit precedent[2] and agreed that Doe was entitled to an in-person hearing. MSU gave Doe until March 20, 2019 to request this hearing. He did so on March 20, 2019.

While the internal action was pending, Doe filed this action and moved for a TRO and PI, seeking to lift his suspension (ECF Nos. 1, 7). The Court denied his TRO request (ECF No. 15). The Court also denied the PI, but ordered MSU to hold a prehearing conference no later than May 7, 2019 and a *Baum* hearing on May 13, 2019 (ECF No. 29).

In preparation for the *Baum* hearing, the resolution officer (RO), Administrative Law Judge Mark D. Eyster, was provided a redacted version of Kroll's final report without conclusions. ALJ Eyster held separate prehearing conferences with Doe and Roe 2. After

___
[2] On September 7, 2018, the Sixth Circuit decided *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), which held that when a disciplinary determination depends on the credibility of the accused, due process requires that he (or his attorney) be permitted to cross examine the claimant at a live hearing. MSU brought its RVSMP in line with *Baum* on February 8, 2019 (Amended RVSMP at ECF No. 19-12).

these conferences, Doe's counsel was concerned that ALJ Eyster was biased because he was aware that MSU had made an unfavorable decision about Doe's behavior, and because he was aware of this lawsuit and had reviewed some of the filings. Counsel requested that ALJ Eyster recuse himself; ALJ Eyster considered that request and denied it.

In an email to counsel, ALJ Eyster first explained that his knowledge of a prior decision against Doe was almost inevitable once he was aware that he was operating under a federal court order to provide Doe with a *Baum* hearing—the logical inference to be drawn from the case's procedural posture was that Doe received some sort of unfavorable decision and filed suit in federal court in an attempt to correct it. ALJ Eyster noted that "the specifics of any actions by the University remain shrouded in mystery for me." Therefore, ALJ Eyster believed that his knowledge of the prior adverse decision was inevitable; it was not an error requiring recusal.

ALJ Eyster then addressed Doe's second claim: that ALJ Eyster became biased against him when ALJ Eyster reviewed pleadings in this case. ALJ Eyster noted that his review of the instant case did not cause him to become aware of the prior decision by MSU; rather, it "confirmed a conclusion he had already reached." Additionally, the purpose of that review was not to learn more facts; it was to discover the procedural posture and to ensure that he complied with this Court's order. ALJ Eyster ultimately noted that Doe's request that he remain completely ignorant of this court case and the previous decision was "untenable" and found that Doe had not identified any facts requiring his recusal. (Email Exchange at ECF Nos. 35-4, 35-5.)

The *Baum* hearing was held before ALJ Eyster on May 13-15, 2019. During the hearing, Doe testified twice. He and his counsel were permitted to, and did, cross-examine Roe 1, Roe 2, and all other witnesses. Doe was denied the opportunity to present his then-girlfriend as a witness to testify to his "good sexual morals," and he was denied the opportunity to present polygraph results. During the hearing, Roe 1 was permitted to refuse to answer questions on cross-examination, and ALJ Eyster denied Doe the opportunity to ask some questions on of her cross-examination. All other evidence Doe sought to present was allowed, including his brother-in-law's testimony as a character witness.

In a written opinion issued May 22, 2019 (ECF No. 35-2), ALJ Eyster found that Doe did not have consent in either encounter. ALJ Eyster found that Roe 1 was not incapacitated, but that she did not consent, finding that Doe "isolated a distraught [Roe 1] then made unwanted sexual contact with a her [sic], and then, after she froze from the trauma he was experiencing, he raped her." ALJ Eyster also found, with respect to Roe 2, that Doe "set out on another sexual mis-adventure by cozying up to her and engaging her in sexual contact by partially disrobing her, by placing his hands in or on her undergarments, and by kissing her; all while she was sleeping or slowly returning to consciousness from her drunken slumber." ALJ Eyster found by a preponderance of the evidence that Doe violated the RVSMP in both encounters. ALJ Eyster relied heavily on the live testimony and cross-examination presented at the *Baum* hearing, and concluded that "[w]ith the exception of [Doe], all of the witnesses testifying, including both Claimants, were credible." ALJ Eyster found some of Doe's testimony contradictory, particularly regarding how enthusiastic the Janes were that evening

and whether Roe 1 was crying at the top of the stairwell. ALJ Eyster also explained that Doe's "demeanor left this RO feeling that he was being less than fully truthful."

As a result of the final report, on June 11, 2019, Doe was notified by the MSU Dean of Students Office that they recommended his dismissal from the university. On June 20, 2019, Doe appealed that decision. On July 15, 2019, the OIE denied the appeal. On July 19, 2019, Doe was dismissed from MSU's College of Human Medicine.

On July 23, 2019, Doe filed his First Amended Complaint (ECF No. 32). On August 22, 2019, Defendants filed the instant Motion to Dismiss (ECF No. 34). While that motion was pending, Doe moved to amend his complaint a second time, which this Court denied (ECF Nos. 39, 45).

## II.

A complaint must contain a short and plain statement of the claim showing how the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A defendant bringing a motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide sufficient factual allegations that, if accepted as true, are sufficient to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, and the "claim to relief must be plausible on its face." *Id.* at 570. "A claim is plausible on its face if the 'plaintiff pleads factual

9

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). If plaintiffs do not "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When considering a motion to dismiss, a court must accept as true all factual allegations, but need not accept any legal conclusions. *Ctr. For Bio-Ethical Reform*, 648 F.3d at 369. The Sixth Circuit has noted that courts "may no longer accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1050 (6th Cir. 2011). However, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"; rather, "it must assert sufficient facts to prove the defendant with 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Rhodes v. R&L Carriers, Inc.*, 491 F. App'x 579, 582 (6th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).

Finally, a "party waives opposition to a motion if the party fails to respond to arguments raised in the motion." *Schull v. CitiMortgage, Inc.*, No. 11-15643, 2012 WL 4498498 at *4 (E.D. Mich. Sept. 28 2012) (citing *Scott v. State of Tenn.*, 878 F.2d 382 (6th Cir. 1989) (unpublished table decision)).

10

## III.

Doe first argues that Defendants violated his due process rights during his disciplinary proceedings. He raised 11 alleged deficiencies in his complaint, but he failed to respond to ten of Defendants' arguments that these claims are insufficient as a matter of law and should be dismissed. Therefore, the Court deems his opposition to these arguments waived, and will dismiss most of Doe's due process claims without analysis. *See Scott*, 878 F.2d at 382; *Schull*, 2012 WL 4498498 at *4. We are left with Doe's argument that when Roe 1 was permitted to refuse to answer two questions on cross-examination, his due-process rights were violated.

Federal review of university disciplinary actions is "limited to determining whether the procedures used by [the University] were constitutional." *Flaim v. Medical College of Ohio*, 418 F.3d 629, 638 (6th Cir. 2005). Generally, what is required is that students "be given some kind of notice and afforded some kind of hearing." *Goss v. Lopez*, 419 U.S. 565, 579 (1975). "In the school-disciplinary context, an accused student must at least receive the following pre-expulsion: (1) notice of the charges; (2) and explanation of the evidence against him; and (3) an opportunity to present his side of the story before an unbiased decisionmaker." *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016). And when "a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process." *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018). The cross-examination process is valuable when credibility is at issue because it provides the factfinder the opportunity to assess the witness's demeanor. *Id.* at 585. However, *Baum* does not require unlimited cross-examination: "a

11

limited ability to cross-examine witnesses" will satisfy due process. *Cummins*, 662 F. App'x at 448. In *Cummins*, the Sixth Circuit approved a cross-examination process in which written questions were submitted to the panel, the panel did not ask all submitted questions, and follow-up questions were not permitted. *Id*. While *Baum* has expanded *Cummins* to require the accused (or his representative) a chance to examine the accuser—rather than allowing only the panel to examine the accuser—*Baum* still only requires "some form" of cross examination. *Baum*, 903 F.3d at 581. It does not require that all submitted questions are asked, nor does it require all asked questions to be answered.

Simply put, Doe does not have an absolute right to have all questions answered, as long as he is permitted to pursue some form of cross-examination that allows the factfinder to judge the witness's credibility. Doe was permitted to submit questions to be asked of Roe 1, he and his attorney cross-examined her, and he was permitted to ask questions beyond just those submitted beforehand. The testimony of Roe 1 at the *Baum* hearing was sufficient to allow ALJ Eyster to judge her credibility, and the fact that Roe 1 did not answer two questions does not destroy that opportunity; rather, it is more likely that her denial or inability to answer questions was *part* of ALJ Eyster's credibility determination. Therefore, the cross-examination process satisfies Sixth Circuit precedent. See *Baum*, 903 F.3d at 581; *Cummins*, 662 F. App'x at 448. Accordingly, it satisfied Doe's due process rights, and he has failed to state a claim upon which relief can be granted.

# IV.

Doe also sued under Title IX, which prohibits federally-funded universities from discriminating against students on the basis of sex. 20 U.S.C. § 1681(a). He argues that MSU reached an erroneous outcome in his case because of his sex.

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "A university violates Title IX when it reaches an erroneous outcome in a student's disciplinary proceeding because of the student's sex." *Baum*, 903 F.3d at 585.

To survive a motion to dismiss under the erroneous-outcome theory, Doe must plead facts sufficient to "(1) 'cast some articulable doubt' on the accuracy of the disciplinary proceeding's outcome, and (2) demonstrate a 'particularized . . . causal connection between the flawed outcome and gender bias.'" *Id.* (quoting *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018)). Importantly, "allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Cummins*, 662 F. App'x at 452 (quoting *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994)). And a plaintiff's "subjective belief that he was the victim of discrimination—however strongly felt—is insufficient to satisfy his burden at the pleading stage." *Doe v. Case W. Reserve Univ.*, No. 1:14CV2044, 2015 WL 5522001 at *6 (N.D. Ohio Sept. 16, 2015) (quoting *Doe v. Columbia Univ.*, 101 F. Supp. 3d 356, 371 (S.D.N.Y. 2015), *vacated*, 831 F.3d 46 (2d. Cir. 2016)). Rather, a plaintiff must plead facts specific to his proceeding, such as "statements by

13

members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) (quoting *Yusuf*, 35 F.3d at 715). Finally, plaintiff must be able to draw distinction between victim/perpetrator and male/female bias: "[d]emonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students." *Sahm*, 110 F. Supp. 3d at 778.

So, Doe must first cast some doubt on the accuracy of the proceeding's outcome. He first points to the "inconsistency" between Kroll's finding that Roe 1 was too intoxicated to consent and ALJ Eyster's finding that Roe 1 was not intoxicated but still did not consent. Doe cites to one case, *Doe v. Miami Univ.*, 882 F.3d 579, in support of his proposition that an inconsistency casts doubt on the accuracy of the outcome. But *Doe v. Miami Univ.* is not parallel to the case at bar: in that case, the victim's statement includes both statements "I said no" and "I never said no." *Id.* at 592. The disciplinary panel found that some of the sexual encounter was consensual and that some was not, but did not explain this finding. *Id.* Finally, a member of the panel appeared to erroneously believe that the University's policy required affirmative consent. *Id.* These inconsistencies and errors did cast "some articulable doubt" on the accuracy of the decision. *Id.* Doe does not explain how the case at bar is like *Doe v. Miami Univ.*, instead simply pleading that there is an "unresolved inconsistency" between the two findings regarding Roe 1. While the two findings are not the same, both investigations found that Roe 1 did not consent to Doe. The inconsistency may be explained by ALJ Eyster having the benefit of three days of live testimony and cross-examination, when the Kroll

investigation only performed one interview each with Doe and Roe 1. Regardless, the single inconsistency here does not rise to the level of *Doe v. Miami Univ.*'s multiple inconsistencies and errors. The difference does not cast doubt on the accuracy of the proceedings.

Doe next moves to the facts surrounding whether Roe 1 and Roe 2 consented to have sexual encounters with him, arguing that he pleaded enough facts to show that both women consented, and this casts doubt on ALJ Eyster's decision. Doe argues that the women both voluntarily went to various locations with him throughout the night; that Roe 1 danced with him and kissed him earlier in the evening; that she held hands with him in the car after they had sex; that Roe 2 kissed him earlier in the evening; and that she initiated a kiss on the couch. These facts, Doe argues, show that the women consented to have sexual relations with him. He points back to *Doe v. Miami Univ.*, which involved statements from the victim that some acts were consensual and that she never said no. *Id.* Again, there are simply no facts here that mirror *Doe v. Miami Univ.*

Moreover, Doe's pleaded facts do not evidence consent *at the time of the encounters*. Importantly, Doe points to no facts evidencing affirmative consent *during* the sexual encounters – he elicited proof of circumstances before and after for evaluation by the hearing officer. Consent to dance, to kiss, or to hold hands does not extend an open invitation to have sexual intercourse, nor does it invite sexual touching. Doe has not established that these facts, as pleaded, cast "articulable doubt" on the accuracy of the proceedings.

Doe also argues that he has pleaded facts showing that both Roe 1 and Roe 2 had motivations to make false allegations against him, which casts doubt on the accuracy of the proceedings. The Court must take the complaint and all inferences in the light most favorable

to Doe, who has pleaded the following relevant facts: Roe 1 was casually dating KB at the time, and Roe 2 was married to JM. Because the women were engaged in romantic relationships, Doe reasons, they were motivated to claim that their encounters with him were nonconsensual to protect their relationships. This may cast doubt on the accuracy of the proceedings if it were not considered by ALJ Eyster, but ALJ Eyster specifically mentions both Roe 1's relationship and Roe 2's marriage in his report (see ECF No. 35-2 at PageID.851-2). This was part of ALJ Eyster's credibility determination, and therefore, it does not cast doubt on the accuracy of the proceedings.

Doe's final argument on this point is that there were errors in the presentation of evidence. He brings five arguments here: (1) Roe 1 was permitted to cross-examine him without submitting questions beforehand; (2) Doe was not permitted to introduce the results of a polygraph test into evidence; (3) Dr. Busch testified out of order, negatively affecting Doe's credibility; (4) Doe was not permitted to amend his written testimony; and (5) Doe was not permitted to present his girlfriend as a witness to testify about his "good sexual morals." None of these errors cast doubt on the accuracy of the proceedings.[3]

First, regarding Roe 1's cross-examination: Roe 1 was permitted to cross-examine Doe without submitting her questions to ALJ Eyster ahead of time. This was a violation of the RVSMP, but Doe has not connected this violation to any prejudice to him, nor has he argued that it made a difference in the outcome of the hearing. Doe agrees that no topics of her cross-examination took him by surprise—the question was and has always been, did Roe 1

---

[3] The errors are considered individually here; the cumulative effect of the alleged errors is considered below in Doe's allegations of gender bias.

16

consent to have sex with Doe? Doe was on notice that her claim was that he raped Roe 1 at the Med Ball, and accordingly, he could reasonably expect cross-examination on the issue of consent. The Court does not find that this technical procedural violation casts doubt on the accuracy of the proceedings.

Second, regarding the polygraph: Doe underwent a polygraph that contained questions about the encounters with Roe 1 and Roe 2. He sought to introduce it as evidence, but ALJ Eyster declined to allow it. This exclusion of evidence does not cast doubt on the accuracy of the proceedings, primarily because polygraph results are generally not admissible evidence. *See United States v. Sherlin*, 67 F.3d 1208, 1216 (6th Cir. 1995). While due process does not require decisionmakers apply the federal rules of evidence or the rules of civil or criminal procedure (*see Cummins*, 662 F. App'x at 447), they are certainly useful guideposts. The Court finds that ALJ Eyster exercised his discretion when he denied admission of the polygraph, and that denial was appropriate given that polygraphs are generally not considered reliable evidence. Accordingly, this decision does not cast doubt on the accuracy of the proceedings.

Third, regarding the order of the testimony of witnesses: Doe alleges that Dr. Busch testified out of order, negatively impacting his credibility without providing him the opportunity to rebut her testimony and repair his credibility. This is plainly contradicted by ALJ Eyster's credibility determination, which makes no mention of Dr. Busch's testimony:

> With the exception of [Doe], all of the witnesses testifying, including both
> [Roe 1 and Roe 2], were credible. Given their clouded memories, caused by
> the passage of time and the consumption of alcohol, their individual
> testimony appears consistent over time and consistent with one another.
> Their demeanors at hearing suggested they were testifying truthfully. The

17

same cannot be said for [Doe]. At hearing, [Doe]'s demeanor left this RO feeling that he was being less than fully truthful. Most problematic for [Doe]'s credibility, however, was his contradictory claims regarding what took place in [KB's] bedroom and whether [Roe 1] was crying at the top of the stairs at the ball. Other instances of contradictory testimony were noticed, but will not be recounted. In short, were conflicting evidence was presented on critical issues, [Doe] is not to be believed.

(ECF No. 35-2 at PageID.857-6.) ALJ Eyster cites Doe's own conflicting testimony, not Dr. Busch's testimony about his demeanor, to determine that Doe was not credible. Thus, this argument does not cast doubt on the accuracy of the proceedings.

Fourth, Doe alleges that he was not permitted to amend his written testimony at the *Baum* hearing. This argument is again plainly contradicted by ALJ Eyster's report, which notes that each witness was given the opportunity to amend or expand upon their written statement at the beginning of their testimony (ECF No. 35-2 at PageID.848-9). Further, Doe gave live testimony not once but twice during the *Baum* hearing. Doe was provided ample opportunity to amend, correct, or otherwise modify his written statement. Therefore, this argument is unpersuasive and does not cast doubt on the accuracy of the proceedings.

Fifth and finally, ALJ Eyster did not allow Doe to present his girlfriend to testify about his "good sexual morals." This proposed evidence would have no bearing on whether Doe had consent from Roe 1 or Roe 2 on the night in question, so it cannot cast doubt on the accuracy of the proceedings.

In sum, Doe has failed to plead any facts that cast doubt on the accuracy of the proceedings. However, even if he had successfully pleaded facts that did cast such doubt, he has failed to show the requisite causal connection between the outcome and gender bias.

The Court first notes that much of Doe's claim here is based on the allegation that Michigan State has been "biased in favor of students who accuse other students of sexual misconduct" (First Amended Complaint at ¶ 343, ECF No. 32). Absent a specific showing that MSU was biased against men, rather than perpetrators, this is irrelevant. "Evidence of bias against the accused in sexual misconduct hearings does not equate to bias against men." *Doe v. Case W. Reserve Univ.*, Case No. 1:17 CV 414, 2019 WL 1982266 at *9 (N.D. Ohio May 2, 2019) (collecting cases) (appeal taken). "Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students." *Sahm*, 110 F. Supp. 3d at 778. It is not enough that the University treat victims more favorably than the accused; a plaintiff must show that the University was specifically biased against men. *Id.*

Doe's complaint does not make any such allegations; his complaint is conclusory at best. He alleges that the training of OIE investigators was inappropriate but does not explain how that training was insufficient or how it impacted his case (First Amended Complaint at ¶ 345(b), ECF No. 32). He alleges that MSU ignored significant exonerating evidence but does not explain what that evidence was or what impact it might have on his case (*Id.* at ¶ 345(c)). He alleges that there was improper pressure on investigators to find against male students accused of sexual misconduct but does not identify any proof of this pressure, let alone its effect on Kroll or ALJ Eyster (*Id.* at ¶ 345(d)). Doe has simply failed to connect these allegations of bias against perpetrators with his specific proceedings. There is no record evidence showing that the OCR investigation affected this case in any way. And the allegations

19

that MSU was biased against alleged perpetrators of sexual assault, without a showing that MSU was biased against men, are insufficient to survive the motion to dismiss. *See id.*

Doe also spends much of his complaint focusing on the Larry Nassar scandal and the outside pressure it created on MSU to aggressively investigate claims of sexual assault and to revise its policies and procedures surrounding the investigations. Again, this external pressure alone is insufficient to show gender bias: "when courts consider allegations of external pressure, they look to see if a plaintiff has alleged facts demonstrating that it was pressure not only to 'aggressively pursue sexual assault cases, but to do so in a manner biased against males.'" *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 682 (M.D. Tenn. 2018) (quoting *Ruff v. Bd. of Regents of Univ. of New Mexico*, 272 F. Supp. 3d 1289, 1308 (D.N.M. 2017)). The Sixth Circuit clearly held in *Baum* that outside pressure "is not enough to state a claim," but that it "provides a backdrop" to consider evidence of discrimination that occurred in the plaintiff's specific case. *Baum*, 903 F.3d at 586. Doe has failed to make this connection. He makes no allegations that there was specific evidence of gender bias in his proceeding; rather, he relies on the Larry Nassar scandal and the Department of Education's Office of Civil Rights (OCR) investigation into MSU to allege bias on behalf of MSU against men (First Amended Complaint at ¶ 346, ECF No. 32). This is insufficient. Again, without showing that MSU was biased against men and that this bias affected him, Doe's allegations cannot survive a motion to dismiss.

Doe also points to a number of alleged defects in the Kroll investigation as evidence of gender bias: the number of witnesses interviewed, the time he had to prepare for his interviews, and the "downplaying" of possible consequences before the interviews (See ECF

20

No. 42 at pages 22-23). However, these arguments fail for two reasons. First, Doe makes no showing of how these affected the outcome of his case. He does not allege that he requested Kroll interview any witnesses that Kroll refused to interview. Regardless of how much notice he had before the interviews, he had the same amount of time as both claimants to prepare for the live hearing. And, Doe has always been allowed to read the RVSMP and discover the possible consequences for himself; the RVSMP was specifically cited in each notice that was sent to him. Therefore, Doe has failed to show that any of these alleged errors affected the outcome of his case or deprived him of any rights. Second, to the extent that these alleged procedural deficiencies occurred, they were cured by the *Baum* hearing. *See Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 604 (S.D. Ohio 2016) ("Even if Plaintiffs' first hearings were riddled with procedural errors as they claim, they both appealed and were granted new hearings. Thus, any due process violations from the first hearings were cured."). Therefore, any alleged defects in the Kroll investigation have been cured, so they are not evidence of bias against men or bias against Doe in the eventual outcome.

Doe also argues that the *Baum* hearing was ruined before it began because ALJ Eyster became biased against him when he became aware of the Kroll investigation's unfavorable decision and when he reviewed pleadings from this Court. Neither of these facts evidence bias. ALJ Eyster reviewed a version of the Kroll report with no analysis or conclusions—just the record evidence. And, ALJ Eyster reviewed pleadings filed in this Court to understand the procedural posture of the case and to ensure that he did not violate this Court's order. The Court declines to find that simply reading the record evidence shows bias: Doe is entitled to a neutral factfinder, not an ignorant one. As ALJ Eyster explained, the inevitable

inference to be drawn is that Kroll came to some unfavorable conclusion. Otherwise, Doe would not seek a *Baum* hearing or file a federal suit. Again, there is no requirement, nor would it be wise, that Doe be provided with a completely ignorant RO; this Court declines to hold ALJ Eyster's ability to understand an inevitable inference against him. Finally, the Court notes that ALJ Eyster made no statements and took no actions indicating bias as a result of reviewing these things; to the contrary, in a detailed email sent before the *Baum* hearing, ALJ Eyster explained to Doe's counsel that he was not biased. Doe's attempt to construe ALJ Eyster as biased fails.

Doe next alleges that the *Baum* hearing was tainted by bias because ALJ Eyster made a number of decisions unfavorable to him but favorable to the claimants: denying Doe the opportunity to present testimony regarding his "good sexual morals," denying him the opportunity to present the polygraph results, and denying him the opportunity to ask relevant cross-examination questions. The cumulative effect of these decisions, Doe argues, is bias against him because he is male. He compares his case to *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019). However, the cases are dissimilar. In *Purdue*, the plaintiff had no opportunity to cross-examine his accuser, two members of the panel had not read the investigative report, and the one who did questioned plaintiff in a plainly accusatory manner. *Id.* at 663. The panel also denied plaintiff the opportunity to present *any* witnesses, including one who would testify that he was in the room at the time of the alleged assault and that the claimant's version was false. *Id.* at 664. After the hearing, the plaintiff received a letter stating that the complainant was credible and that he was not credible, despite the decision-maker never speaking to the complainant. *Id.* at 663. These facts led the appellate court to conclude that

22

the plaintiff overcame the resolution panel's presumption of impartiality, and the Court found he pleaded a plausible erroneous outcome claim. *Id.* at 664.

No similar facts exist here. Plaintiff was provided with a live hearing with the benefit of counsel. He could present witnesses, provide mitigation evidence, and cross-examine witnesses before a neutral third-party RO, who also happened to be an experienced ALJ. ALJ Eyster held a three-day hearing with testimony from several witnesses, including Doe's own character witness. Doe was given two separate opportunities to testify in his own defense. ALJ Eyster allowed Doe to present all the reliable, relevant evidence he wanted to. ALJ Eyster's decisions to exclude testimony about Doe's "good sexual morals," and the results of a polygraph, as well as his decision to allow Roe 1 to decline to answer two questions on cross-examination, do not overcome the presumption of impartiality afforded to ALJ Eyster, nor do they draw parallels to *Purdue.*

Doe makes one final argument against Defendants' motion on this count: that he should be allowed to engage in discovery to uncover evidence of gender bias, so dismissal now would be premature. His argument here is unpersuasive. *Iqbal* requires plaintiff to plead plausible facts, and he may not use discovery to obtain these facts after filing suit. *New Albany Tractor, Inc.*, 650 F.3d at 1051. The Title IX cases Doe cites support this standard. *See Doe v. Miami Univ.*, 882 F.3d at 588-89 (denying a motion to dismiss and allowing discovery where plaintiff pleaded plausible facts identifying gender bias, including the allegation that every male accused of sexual assault was found responsible for the alleged violation); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 586 (E.D. Va. 2018) (denying a motion to dismiss where plaintiff pleaded plausible facts identifying gender bias, including that he was not

allowed to present his case, present mitigating evidence, and where he showed that the investigator harbored "discriminatory views of gender and sexuality"). Doe has identified no plausible evidence of gender bias that would entitle him to discovery.

In sum: Doe makes sweeping arguments that defendants were biased against perpetrators, that MSU was under external pressure, and that ALJ Eyster was biased against him. None of these allegations are sufficient to overcome the presumption that ALJ Eyster was an impartial adjudicator, and therefore, Doe's Title IX claim cannot survive a motion to dismiss.

## V.

Doe also alleges that Defendants violated the Equal Protection clause based on gender discrimination. To prove such a claim, he must show "that he was treated differently—under the same facts and circumstances—than a member of the opposite gender." *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1082-83 (S.D. Ohio 2017). "The Sixth Circuit has held that this is an 'absolute requirement' to state an equal protection claim that the plaintiff provide evidence 'that a similarly situated person outside [his] category' was either not charged with misconduct or not dismissed from the university under the same set of operative facts." *Id.* at 1083 (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)). Doe has not met this absolute requirement: his first amended complaint contains no allegations that a woman who engaged in the same type of conduct was treated differently. Therefore, Doe has failed to adequately plead an equal protection claim,[4] so this claim is dismissed.

---

[4] Doe spends much of his response to the motion to dismiss relying on allegations of disparate treatment contained in his second amended complaint. This is irrelevant, as the Court denied his motion to file the second amended complaint (ECF No. 45).

## VI.

Finally, Doe argues that Defendants have violated the Equal Protection clause by holding students facing sexual misconduct allegations to a different, lower burden of proof than students facing allegations of other types of misconduct. Because Doe does not assert that the rights of any "suspect class" were violated, rational basis review applies to the use of a "preponderance of the evidence" standard, as opposed to "clear and convincing" evidence. *See E. Brooks Books, Inc. v. Shelby County, Tenn.*, 588 F.3d 360, 364 (6th Cir. 2009). Under this standard, a classification must be upheld against the challenge if there is any "reasonably conceivable" set of facts that could provide a rational basis for the clarification. *Id.* (quoting *Richland Bookmart v. Nichols*, 278 F.3d 570, 576 (6th Cir. 2002)). Doe agrees that rational basis standard applies but argues that there are no rational set of facts that could uphold the different burdens of proof.

His argument is not persuasive. He relies on proposed amendments to Title IX and the similarities between disciplinary hearings and civil adjudication, but he fails to counter the rational facts set forward by the Defendants in their motion to dismiss: the 2011 "Dear Colleague Letter." This letter, issued by the OCR, instructs academic institutions to use a preponderance of the evidence standard in sexual assault investigations, rather than higher standards that had been used by academic institutions in the past. *See, e.g., Doe v. College of Wooster*, 243 F. Supp. 3d 875, 882 (N.D. Ohio 2017). This letter did not request that universities modify the burden of proof used in other misconduct settings. The letter has since been rescinded, but the OCR has not issued any new guidance regarding the applicable standard for sexual misconduct investigations. Defendants assert that following the 2011

Dear Colleague Letter is a rational basis for applying the preponderance of the evidence standard to sexual misconduct hearings, and this Court agrees. Doe's complaint is void of a showing that relying on the Dear Colleague Letter's guidance is irrational. Therefore, he has failed to plead a violation of the Equal Protection clause.

## VII.

To the extent that Doe's complaint raises any other claims, he has waived opposition to those claims by failing to respond to them and they are dismissed without analysis. *See Scott*, 878 F.2d at 382; *Schull*, 2012 WL 4498498 at *4. Because Doe's complaint is insufficient as a matter of law, the Court has not reached the question of whether any Defendants have qualified or sovereign immunity and passes no judgment on those defenses.

## <u>ORDER</u>

Based on the forgoing, Doe's complaint has failed to state any claims upon which relief can be granted. Accordingly, Defendants' motion to dismiss (ECF No. 34) is **GRANTED**.

Judgment to follow.

**IT IS SO ORDERED.**

Date:  December 10, 2019                         /s/ Paul L. Maloney
                                                 Paul L. Maloney
                                                 United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 13, 2019, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to:

Deborah L. Gordon
dgordon@deborahgordonlaw.com

/s/ *Joshua W. B. Richards*
SAUL EWING ARNSTEIN & LEHR LLP
Joshua W. B. Richards
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania  19102
(215) 972-7737
joshua.richards@saul.com

*Attorney for Defendants*