UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOE,

                Plaintiff,

v.

UNIVERSITY OF MICHIGAN, ET AL.,

                Defendants.

_____/

Case No. 18-11776

SENIOR UNITED STATES DISTRICT
JUDGE ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
ELIZABETH A. STAFFORD

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [49]; GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [53]; DENYING DEFENDANTS' MOTION FOR PROTECTIVE ORDER AS MOOT [66]; DENYING DEFENDANTS' MOTION TO VACATE ORDER ENJOINING STUDENT CONDUCT HEARING AS MOOT [85]**

Plaintiff John Doe, a male student accused of sexual assault at the University of Michigan, commenced this 42 U.S.C. § 1983 action claiming, *inter alia*, that Defendant University of Michigan's Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence ("2018 Policy") deprives students of due process in violation of the Fourteenth Amendment. He is suing to seek adjudication of the allegations against him through a hearing with an opportunity to cross-examine witnesses. Before the Court are four motions: Defendants' Motion to Dismiss [49], Plaintiff's Motion for Partial Summary

Judgment [53], Defendants' Motion for Protective Order [66], and Defendants' Motion to Vacate Order Enjoining Student Conduct Hearing [85].

For the reasons stated below, the Court **GRANTS IN PART and DENIES IN PART** Defendants' Motion to Dismiss [49]; **GRANTS** Plaintiff's Motion for Partial Summary Judgment [53]; **DENIES** Defendants' Motion for Protective Order as **MOOT** [66]; and **DENIES** Defendants' Motion to Vacate Order Enjoining Student Conduct Hearing as **MOOT** [85].

## FACTUAL BACKGROUND

On March 12, 2018, a female student ("Claimant") at the University of Michigan filed an Office of Institutional Equity ("OIE") complaint against Plaintiff alleging that he had a sexual encounter with her that was not consensual. Plaintiff alleges that it was consensual. (Dkt. 53, pg. 4). There were no witnesses to the encounter. (*Id.*). The University began investigating the OIE complaint using the February 7, 2018 Policy. (*Id.*).

### I.    2018 Sexual Misconduct Policy

At the start of the investigation, the University had a bifurcated system of addressing student misconduct. The Statement of Student Rights & Responsibilities provided a hearing to the accused; while the 2018 Policy, which governed sexual assault claims, did not. When a student reported sexual misconduct to the OIE, the 2018 Policy set forth two resolution processes: 1) formal resolution, involving an

investigation, and where necessary, an appeal and sanctions; and 2) alternative resolution. (Dkt. 47-1, pg. 20-21). The formal resolution process is challenged here.

Pursuant to the 2018 Policy, once a claimant files a report of an alleged violation, the accused is notified in writing of the start of an investigation. (*Id*. at 30). The accused may decline to participate in the process, but the investigation will nevertheless continue. (*Id*. at 31-32). Throughout this process, the accused may have an advisor or an attorney. (*Id*. at 31).

At the onset of the investigation, the OIE investigator meets separately with the claimant and the accused. (*Id*. at 29). After the interviews, the investigator provides the accused with a draft summary of his or her statement so he or she may comment and ensure its accuracy. (*Id*. at 33-34).

The investigator is responsible for reviewing the information provided by the parties and determining its relevance and probative value. (*Id*. at 29-32). The accused may submit suggested questions to the investigator to be asked of the claimant or other witnesses; however, it is within the investigator's discretion to determine which questions are appropriate. (*Id*. at 29).

Once the parties have had the opportunity to comment on their statements, identify witnesses, and submit suggested questions, and the investigator has completed gathering evidence, the investigator prepares a Preliminary Investigation Report. (*Id*. at 34). The Preliminary Investigation Report includes a summary of the

witness interviews, but does not contain any findings. (*Id*.). The parties are given a copy of the Report and may comment and offer feedback. (*Id*.).

Thereafter, the investigator makes a determination by a preponderance of the evidence, as to whether the accused has violated the 2018 Policy. (*Id*. at 35). No live hearing is held. The investigator then drafts a final written report ("Final Report") summarizing his or her findings and supporting rationale. (*Id*. at 34-35). The Final Report is reviewed by the Title IX Coordinator and the Office of General Counsel before it is given to the parties. (*Id*. at 35).

Either party may appeal the investigator's findings. (*Id*. at 39). An external reviewer reviews the Final Report and the parties' written submissions. (*Id*. at 39-40). Typically, within seven days of receipt of the relevant documents, the external reviewer determines whether there are any issues of concern and may affirm, set aside, or modify the investigator's decision. (*Id*.).

## II.    Doe's Investigation

Defendant Suzanne McFadden, the OIE investigator, commenced an investigation into Claimant's complaint against Doe. (Compl. ¶ 10). She interviewed Claimant on March 29, 2018. (*Id*. at ¶ 62). On April 2, 2018, Doe received an email from the OIE stating that a complaint had been filed against him. (*Id*. at ¶ 32). The complaint alleged Doe engaged in sexual activity without Claimant's consent at a residence hall on November 11, 2017. (*Id*. at ¶ 20). The OIE Senior Director and

Title IX Coordinator, Defendant Pamela Heatlie, issued a no contact directive against Doe. (*Id*. at ¶ 31). The directive required Doe to avoid all incidental contact with Claimant. (*Id*. at ¶ 31-32).

On April 3, 2018, McFadden interviewed Doe. (*Id*. at ¶ 60). Doe claims that he was not given any information as to what Claimant told McFadden in their interview. (*Id*. at ¶ 63-65). McFadden also interviewed witnesses on unknown dates. (*Id*. at ¶ 65). Doe claims he was not given a summary of their statements or an opportunity to respond. (*Id*.).

On April 19, 2018, the University informed Doe that an administrative hold had been placed on his student account, rendering him unable to register for classes or receive a copy of his transcript. (*Id*. at ¶ 44-45).

On May 24, 2018, McFadden issued an Executive Summary. (*Id*. at ¶ 67). Doe was given five days to provide written feedback. (*Id*. at ¶ 68). On May 29, 2018, Doe submitted his feedback. (*Id*. at ¶ 69). McFadden then investigated the new information and issues submitted to her. (*Id*. at ¶ 70). On June 21, 2018, McFadden sent Doe a second Executive Summary, which included additional information provided by the parties. (*Id*. at ¶ 71). The proceedings have been stayed since May 8, 2019 and no findings have been made. (*See* Dkt. 45).

### III.   *Baum* Decision and the 2019 Interim Sexual Assault Policy

Plaintiff filed this suit on June 4, 2018. On September 25, 2018, *Doe v. Baum* was decided. 903 F.3d 575 (6th Cir. 2018). Similar to here, in *Baum*, a student accused of sexual misconduct challenged the University's 2018 Policy for depriving him of a hearing with cross-examination. *Baum* held that "if a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder." *Baum*, 903 F.3d at 578.

On January 9, 2019, Defendants issued an Interim Sexual Misconduct Policy ("2019 Policy" or "Interim Policy") that is still in effect today. (*See* Dkt. 47-3). When a complaint is filed under the 2019 Policy, the Title IX Coordinator does an initial assessment and responds to any immediate health and safety concerns. (*Id*. at 26). Once the Coordinator decides to initiate an investigation, he or she will ensure that the respondent is informed of the nature of the investigations, the parties involved, and a summary of the conduct alleged. (*Id*. at 27). The Coordinator also decides whether or not to impose interim protective measures including, but not limited to: a no contact directive, placing a hold on respondent's transcript and/or degree, imposing an interim suspension. (*Id*. at 13-14).

Once an investigation begins, the Title IX Coordinator choses an investigator, who is usually a OIE staff member, to interview the parties and witnesses, gather

relevant evidence, and submit a preliminary investigation report for the parties to review and respond. (*Id*. at 34-35). If a hearing is required, parties will have ten days to review the final investigation report and provide a response to the hearing officer. (*Id*. at 38).

The hearing officer has broad discretion to determine the format of the hearing. (*Id*. at 39). Generally, the hearing provides both parties an opportunity to address the hearing officer in person and question the opposing party and witnesses. (*Id*. at 38). Attendance is voluntary; if either party or a material witness will not attend, the Title IX Coordinator decides whether the University will proceed with the hearing. (*Id*.). Following the hearing, the hearing officer decides, by a preponderance of the evidence, whether the respondent violated the 2019 Policy. (*Id*. at 41). After a finding of a violation, sanctions may be imposed. (*Id*.). Possible sanctions range from disciplinary probation to expulsion. (*Id*. at 43-44).

Either party may appeal the hearing outcome, the sanctions, or both. Appellate review is conducted by an external examiner. (*Id*. at 45). In reviewing the hearing outcome, the external examiner can affirm the hearing officer's finding, remand the matter, or order a new hearing. (*Id*. at 47). In reviewing the sanctions, the external examiner can either affirm the sanctions or alter them, if they are deemed clearly inappropriate or disproportional. (*Id*.).

Defendants are currently drafting a replacement to the Interim Policy, called the Umbrella Policy, that will apply to students, faculty and staff. (*See* Dkt. 82, pg. 7-8). They have yet to announce when it will be in effect. Defendants claim that they will use the 2019 Policy to adjudicate Plaintiff's case in the meantime. (Dkt. 60-1, pg. 60).

## PROCEDURAL HISTORY

Plaintiff brings this suit against the University of Michigan, its Board of Regents and Individual Defendants Pamela Heatlie, Robert Sellers, Martin Philbert, Erik Wessel, Laura Blake Jones, E. Royster Harper, Suzanne McFadden, and Paul Robinson. (Compl. ¶ 4-14). Plaintiff's Second Amended Complaint [47] alleges the following: (Count I) the 2018 Policy violates his right to due process under the Fourteenth Amendment;  (Count II) Title IX disparate treatment and impact based on sex; (Count III) Elliot Larsen Civil Rights Act ("ELCRA") disparate treatment on the basis of gender; (Count IV) ELCRA disparate impact on the basis of gender.

This Court granted Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction on June 14, 2018. (Dkt. 19). That ruling was vacated by the Sixth Circuit on April 10, 2019 and remanded for reconsideration in light of *Baum* and the University's Interim Policy. *Doe v. Bd. of Regents of Univ. of Michigan*, No. 18-1870, 2019 WL 3501814, at *1 (6th Cir. Apr. 10, 2019).

## ANALYSIS

### I.    Motion to Dismiss

Defendants move to dismiss the Complaint pursuant to FED. R. CIV. P. 12(b)(1) for mootness, lack of standing and lack of ripeness. Where a case is moot, the Court lacks subject-matter jurisdiction. "A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 473 (6th Cir. 2008) (internal citations omitted) (quotation marks omitted). Voluntary cessation of a challenged conduct moots a case, however, only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968).

"Standing is thought of as a 'jurisdictional' matter, and a plaintiff's lack of standing is said to deprive a court of jurisdiction." *Ward v. Alternative Health Delivery Sys., Inc.*, 261 F.3d 624, 626 (6th Cir. 2001) (internal citation omitted). "[P]laintiff has the burden of proving jurisdiction in order to survive the motion." *Mich. S. R.R. Co. v. Branch & St. Joseph Cntys. Rail Users Ass'n., Inc.*, 287 F.3d 568, 573 (6th Cir. 2002). Standing contains three elements. First, a plaintiff has standing when they have suffered an "injury in fact" which is "concrete and particularized" and "actual and imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Second, there must be a causal connection between the injury and the

challenged conduct such that the injury is "fairly traceable" to the defendant. *Id.* Third, it must be "likely" that the injury will be "redressed by a favorable decision." *Id.* at 561.

"Ripeness requires that the injury in fact be certainly impending" and "separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review." *Nat'l Rifle Assoc. of America v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997). "If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *Bigelow v. Mich. Dep't of Nat. Res.*, 970 F.2d 154, 157 (6th Cir. 1992).

In the alternative, Defendants move to dismiss Plaintiff's entire action for failing to state his claims pursuant to FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, [plaintiff] must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a Rule 12(b)(6) motion to dismiss, the Court must "assume the veracity of [the plaintiff's] well-pleaded factual allegations and determine whether the plaintiff is entitled to legal relief as a matter of law." *McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

a. <u>Justiciability</u>

On interlocutory appeal, Defendants questioned this Court's jurisdiction. (Dkt. 84, pg. 4). The Sixth Circuit declined to address jurisdiction and instead mandated the Court to "consider the impact of *Baum* and Michigan's interim policy." *Doe*, 2019 WL 3501814, at *1. Under the law-of-the-case doctrine, the Court is precluded from reconsidering Defendants' jurisdictional arguments as they were impliedly decided by the appellate court at an earlier stage of the case. *See Caldwell v. City of Louisville*, 200 F. App'x 430, 432–33 (6th Cir. 2006) (citing *United States v. Moored,* 38 F.3d 1419, 1421–22 (6th Cir.1994)); *Westside Mothers v. Olszewski,* 454 F.3d 532, 538 (6th Cir. 2006) (upon remand, the district court is bound to "proceed in accordance with the mandate and law of the case as established by the appellate court."). In the alternative, the Court will analyze each argument on the merits.

i. <u>Standing and Ripeness</u>

Courts may only adjudicate live cases and controversies. *Lujan*, 504 U.S. at 559. A case is live when the plaintiff has suffered an "injury in fact" such that it is concrete and neither hypothetically arising in the future nor resolved in the past. *Lujan*, 504 U.S. at 560-61; *Cleveland Nat. Air Show, Inc. v. U.S. Dep't of Transp.*, 430 F.3d 757, 761 (6th Cir. 2005). Defendants argue that Plaintiff has not suffered an injury, because no guilty findings or sanctions have been imposed against him.

However, Plaintiff's injury lies in the deprivation of one of the most basic due process rights—the hearing itself. The Supreme Court has stated that "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions." *Carey v. Piphus*, 435 U.S. 247, 266–67 (1978). There is no dispute between the parties that Defendants' 2018 Policy denied Plaintiff a right to a hearing. Defendants adjudication of the allegations against him "without process…*immediately* collides with the requirements of the Constitution." *Goss v. Lopez*, 419 U.S. 565, 574–75 (1975) (emphasis added). Accordingly, Plaintiff's injury—being withheld a hearing—is actual and not hypothetical.

## ii. <u>Mootness</u>

Defendants' 2018 Policy deprived Plaintiff of his due process right to a hearing with an opportunity for cross-examination. In the wake of *Baum* and after this lawsuit was filed, the University changed course and enacted the 2019 Interim Policy. Defendants argue that its Interim Policy, which may provide a hearing to Plaintiff, moots Plaintiff's due process claims. However, the Interim Policy is just that—interim. It will soon be replaced with an Umbrella Policy with unknown ramifications and procedural safeguards. Although the University assures it will follow the law this time, Plaintiff is entitled to clarity. The University must implement a policy that provides for administrative autonomy and constitutional

soundness. *Goss*, 419 U.S. at 574–75 ("The authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, must be exercised consistently with constitutional safeguards.").

As a preliminary matter, the Interim Policy does not moot Plaintiff's claims, because the Sixth Circuit remanded this case for the express purpose of analyzing the Interim Policy in light of recent precedent. Furthermore, Defendants' voluntary cessation through the Interim Policy does not assure Plaintiff that Defendants will not "return to [its] old ways.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).

Plaintiff's case can only be mooted "if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Concentrated Phosphate Export Assn., Inc.*, 393 U.S. at 203. The "'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc.*, 528 U.S. at 189. This burden "takes into account the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767-68 (6th Cir. 2019).

In examining the totality of circumstances, the Sixth Circuit evaluates two factors: (1) whether the process "leading to the change involved legislative-like procedures or were ad hoc, discretionary, and easily reversible actions" and (2) whether the University continues to defend its use of the challenged conduct. *Id.* at 768, 770. The University fails under both prongs.

In *Speech First, Inc*, a non-profit organization challenged the University bias response team initiative for violating students' First Amendment rights to free speech. *Id.* The University claimed that plaintiff's claims were moot, because it changed the challenged definition after the lawsuit was filed. The Sixth Circuit disagreed and found that the circumstances surrounding the University's voluntary cessation were disingenuous and fell short of its burden. *Id.* at 770 (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189). Here, the University's behavior is similar to its actions in *Speech First, Inc.*

Under the first factor, Defendants have not provided evidence showing that the enactment was a legislative like procedure or one that can be easily reversed. Accordingly, the Interim Policy should receive the degree of solicitude that an ad hoc regulation would. *Id.* at 769 (finding the same when the University did not point to evidence suggesting that a formal process would be required to change its policy).

Under the second factor, like in *Speech First, Inc.*, the University has "continue[d] to defend its use of the challenged" policy. *Speech First, Inc.*, 939 F.3d at 770. After the *Baum* decision and subsequent policy change, University President Mark Schlissel publicly declared that "the Sixth Circuit got it wrong" and expressed that he "continue[d] to believe" that their prior method of adjudicating sexual misconduct cases was "the best way to determine the truth" Compl. ¶ 84; *see also Speech First, Inc.*, 939 F.3d at 770 (finding that the University did not satisfy its burden when it argued that its practices "easily met constitutional standards."). The University, therefore, has failed to meet its burden of proving that the challenged policy will not be re-enacted. Plaintiff's due process claim is not moot.

b. <u>Qualified Immunity</u>

The Individual Defendants argue that qualified immunity shields them from personal liability. "Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (2006). To overcome this defense, Plaintiff must allege "facts sufficient to indicate that the [government official's] act in question violated clearly established law at the time the act was committed." *Russo v. City of Cincinnati,* 953 F.2d 1036, 1043 (6th Cir.1992).

These facts must satisfy two prongs. First, he must show that "based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred." *Sample v. Bailey,* 409 F.3d 689, 695 (6th Cir.2005); *see also Saucier v. Katz,* 533 U.S. 194, 201 (2001). Plaintiff has satisfied this prong by proving that, in light of *Baum*, he was deprived of due process under the 2018 Policy. Second, Plaintiff must show that "the violation involved a clearly established constitutional right of which a reasonable person would have known." *Sample,* 409 F.3d at 696; *see also Saucier,* 533 U.S. at 201.

A clearly established right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 202 (internal quotation marks omitted). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition[.]" *Id.* at 201. Defining the contours of a right requires us to "look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Baker v. City of Hamilton,* 471 F.3d 601, 606 (6th Cir.2006) (internal quotation marks omitted).

Defendants argue that Plaintiff's right to a hearing with cross-examination was not clearly established until after *Baum* and after Defendants' began investigating Plaintiff for sexual assault allegations under the 2018 Policy. Defendants attempt to use *Doe v. Northern Michigan University* for support.

However, in *Northern Michigan University*, the court recognized that *Doe v. University of Cincinnati*, which was decided months before the 2018 Policy was enacted, required accused students to "be given an "opportunity to share his version of events . . . at some kind of hearing." *Doe v. N. Michigan Univ.*, 393 F. Supp. 3d 683, 696–97 (W.D. Mich. 2019) (quoting *Doe v. University of Cincinnati*, 873 F.3d 393, 400 (2017)) (internal quotations omitted). But since the plaintiff in *Northern Michigan University* affirmed the charges against him, credibility was not an issue in his case. Therefore, the court held that "the right to cross-examine an accuser after the accused affirmed the allegations was not a right that was clearly established at the time Defendants sanctioned Plaintiff" *Id.* at 697.

*Northern Michigan University* can be easily distinguished from Plaintiff's case, because the contours of the rights in question are fundamentally different. In *Northern Michigan University*, the court considered whether the right to a hearing with cross-examination when credibility *is not* at stake was clearly established. Here, the Court considers whether the right to a hearing with cross-examination when credibility *is* at stake was clearly established. This latter right was established by *Cincinnati* on September 25, 2017, months before the 2018 Policy came into effect and the investigation against Plaintiff launched. The holding of *Cincinnati* was merely reiterated by *Baum*. For support, the Court need go no further than the first paragraph of *Baum* itself:

Thirteen years ago, this court suggested that cross-examination may be required in school disciplinary proceedings where the case hinged on a question of credibility. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005). Just last year, we encountered the credibility contest that we contemplated in *Flaim* and confirmed that when credibility is at issue, the Due Process Clause mandates that a university provide accused students a hearing with the opportunity to conduct cross-examination. *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401–02 (6th Cir. 2017). Today, we reiterate that holding once again: if a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder. Because the University of Michigan failed to comply with this rule, we reverse.

*Baum*, 903 F.3d at 578. Furthermore, the district court on remand in *Doe v. Baum* stated that "[t]he Sixth Circuit, as well, recognized that the right that it 'reaffirmed' when it remanded the case to this Court was clearly established, at the earliest, only in 2017, by the decision of the court of appeals in *Doe v. University of Cincinnati*, 873 F.3d 393 (2017)." *Doe v. Baum*, No. 16-13174, 2019 WL 4809438, at *14 (E.D. Mich. Sept. 30, 2019).

From its inception to the University's appeal in *Baum*, the 2018 Policy was in violation of Circuit precedent. Five months before publishing its 2018 Policy and likely during its drafting, the Sixth Circuit held that cross-examination was "'essential to due process'" only where the finder of fact must choose "'between believing an accuser and an accused,'" and implored universities to provide a means for decision makers "to evaluate an alleged victim's credibility." *Cincinnati*, 872 F.3d at 405-06. The Court of Appeals further emphasized that deciding the plaintiff's

fate without a hearing and cross-examination was a "disturbing . . . denial of due process." *Cincinnati*, 872 F.3d at 402. Because the Individual Defendants violated this ruling and Plaintiff's clearly established constitutional rights, the Court finds that they are not entitled to qualified immunity.

c.  Title IX

Count II of Plaintiff's Complaint alleges that Defendants University of Michigan and its Board of Regents violated Title IX by discriminating against Plaintiff on the basis of his gender. Because Plaintiff has failed to show a plausible inference of intentional gender discrimination, this claim is dismissed. *See Twombly*, 550 U.S. at 570; *see also Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018).

Title IX prohibits federally funded educational institutions from discriminating based on gender. It is enforced through an implied private right of action. 20 U.S.C. § 1681(a) (1988); *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001). Our Circuit recognizes at least four theories of liability a student can pursue under Title IX: "(1) 'erroneous outcome,' (2) 'selective enforcement,' (3) 'deliberate indifference,' and (4) 'archaic assumptions.'" *Miami Univ.*, 882 F.3d at 589 (quoting *Cummins*, 662 Fed. Appx. at 451 n.9, 451–52; *Mallory v. Ohio Univ.*, 76 Fed. Appx. 634, 638–39 (6th Cir. 2003)).

Plaintiff is pursuing an erroneous outcome theory of liability. A plausible claim under this theory alleges: (1) "facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) a "particularized . . . causal connection between the flawed outcome and gender bias." *Cummins*, 662 Fed. Appx. at 452 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994)).

Although Plaintiff has shown that the University did not provide him a hearing with an opportunity for cross-examination when it began adjudicating his case, because Plaintiff's proceedings at the University are still pending, no outcome has occurred. Plaintiff points to a preliminary hold on his transcript as an erroneous outcome, but a preliminary hold is by definition preliminary and before a finding or final sanction has been imposed. *See Peloe v. Univ. of Cincinnati*, No. 1:14-CV-404, 2015 WL 728309, at *14 (S.D. Ohio Feb. 19, 2015) (finding no erroneous outcome when plaintiff sued before his university could make an enforceable decision).

> [A]llegations of a procedurally or otherwise flawed proceeding that *has* led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss… plaintiff must thus also allege particular circumstances suggesting that gender bias *was* a motivating factor behind the erroneous finding.

*Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (emphasis added).

Even if Plaintiff has shown an erroneous outcome with procedural flaws, he has not alleged "particular circumstances suggesting that gender bias was a

motivating factor behind the erroneous finding." *Id*; *Baum*, 903 F.3d at 586. These circumstances could be, *inter alia*, "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715.

Here, Plaintiff makes two allegations to point to gender bias at the University: the University's response to public criticism and imposing an allegedly gendered no contact order on Plaintiff. The University has received criticism from the public, the media, and its own students alike in the wake of the federal government's investigation into the University's response to sexual misconduct complaints. Compl. ¶ 87-97; *see also Baum*, 903 F.3d at 13. In response to outside pressure, the University released a proclamation in support of the "Start by Believing" Public Awareness Campaign and established student resources like Sexual Assault Prevention and Awareness Center ("SAPAC"). Plaintiff claims that this response was laced with gender bias. This is unfounded. Although a hard look at the University's response system may reveal favor towards survivors over the accused, "this does not equate to gender bias because sexual-assault victims can be both male and female" *Cummins*, 662 F. App'x at 453.

Furthermore, Plaintiff's fixation on one phrase ("feminist approach to services") is taken out of context from a broader vision and philosophy of empowering survivors of both genders through professional services and student

leadership development. *Our Vision & Philosophy*, SEXUAL ASSAULT PREVENTION AND AWARENESS CENTER, https://sapac.umich.edu/article/9 (last visited Mar. 23, 2020). It is no secret that the majority of reported sexual assault survivors are female. David Cantor et al., *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct–The University of Michigan* 29 (2019) ("Among undergraduates, 34.3 percent of women and 7.1 percent of men reported some type of nonconsensual sexual contact."). Universities can and do serve target populations without disserving others. *Male Survivors of Sexual Assault*, SEXUAL ASSAULT PREVENTION AND AWARENESS CENTER, https://sapac.umich.edu/article/53 (last visited Mar. 23, 2020) (detailing services for male survivors). Accordingly, the University is well within in its right as an educational institution to enact an approach that best serves its student body.

However, "all of this external pressure alone is not enough to state a claim that the university acted with bias in this particular case. Rather, it provides a backdrop that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim." *Baum*, 903 F.3d at 586. Under Title IX, gender bias requires specific allegations of bias against Plaintiff, because he is a man. *Id*. For example, in *Baum* the Sixth Circuit found gender bias when the Board "credited exclusively female testimony (from the claimant and her witnesses) and rejected all of the male testimony (from Doe and his witnesses). In doing so, the

Board explained that Doe's witnesses lacked credibility, because 'many of them were fraternity brothers of [Doe].' But the Board did not similarly note that several of [the claimant's] witnesses were her sorority sisters, nor did it note that they were female." *Id*.

Plaintiff's only specific allegation of bias is the University's no contact directive against him. Plaintiff claims that the University exhibited gender bias by only placing a no contact directive on him and not the Claimant. However, there is no evidence that the directive is gender biased. The 2019 Policy places responsibility on the accused to prevent contact with his or her accuser. There is no indication that if the genders were reversed, the responsibility would follow. Short of allegations that indicate that the University treats female and male students differently solely, because of their gender, Plaintiff has not shown enough to prove plausible gender bias.

### d. ELCRA

Plaintiff claims that the Individual Defendants, in their personal capacities, enacted a policy that disparately treated and impacted him in violation of the ELCRA[1]. Defendants argue that, because Article 4 of the ELCRA only allows claims

---

[1] Claims against the University of Michigan Board of Regents and Individual Defendants in their official capacity are barred by sovereign immunity and have been withdrawn by Plaintiff. (*See* Dkt. #49-2.).

against educational institutions and its agents, Plaintiff's claims against Individual Defendants in their personal capacities should be dismissed. As defined in the Act, an educational institution also includes its agents. MICH. COMP. LAWS § 37.2401 ("As used in this article, 'educational institution'… includes an agent of an educational institution."); *see also Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 26 F. Supp. 2d 1001, 1010–11 (W.D. Mich. 1998).

But while individual defendants as employers are liable in their personal capacities under Article 2, it is not clear that individual defendants as agents of educational institutions are similarly liable in their personal capacities under Article 4. *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 863 (Mich. 2005); *see also Hall v. State Farm Ins. Co.*, 18 F. Supp. 2d 751, 764 (E.D. Mich. 1998), *aff'd,* 1 F. App'x 438 (6th Cir. 2001). Finding that this claim raises a novel issue of State law, the Court declines to exercise supplemental jurisdiction over Plaintiff's ELCRA claims. *See* 28 U.S.C.A. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if the claim raises a novel or complex issue of State law.").

## II.    Plaintiff's Motion for Partial Summary Judgment

Plaintiff argues that he is entitled to summary judgment on his due process claim, because, under the 2018 Policy, Defendants denied him a live hearing with cross-examination when credibility was at stake in his case. Further, Plaintiff asks

this Court to enjoin Defendants from imposing the following disciplinary measures: (1) pre-hearing sanctions and (2) credibility findings and sanction increases on appellate review. (Dkt. 53, pg. 2). Defendants' response mirrors their Motion to Dismiss; they claim Plaintiff is not entitled to summary judgment, because his claims are not justiciable. (*See* Dkt. 60). In accordance with the Sixth Circuit's mandate, the Court will analyze both the 2018 and the 2019 policies in turn. *Doe*, 2019 WL 3501814, at *1.

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Additionally, the Court views all of the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 255.

On March 12, 2018, Plaintiff was accused of sexual misconduct by a female student. In the wake of this accusation, the University placed a hold on his transcript and his degree, and subject him to an investigation that could have (and still could) lead to his expulsion. In doing so, the University placed Plaintiff's property interest in jeopardy. *Cincinnati*, 872 F.3d at 393. When an individual is at risk of being

deprived of a protected property interest, Fourteenth Amendment Procedural Due Process requires that the individual be provided with fair procedural safeguards. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), *Cincinnati*, 872 F.3d at 399; *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005). ("[t]he Due Process Clause, however, sets only the floor or lowest level of procedures acceptable"); *Goss*, 419 U.S. at 579 ("[a]t the very minimum, therefore, students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing.").

Due process safeguards apply to disciplinary proceedings in higher education. *Flaim*, 418 F.3d at 633; *Miami Univ.*, 882 F.3d at 599; *Cincinnati*, 872 F.3d at 399. Those safeguards must comply with two fundamental parameters: notice and an opportunity to be heard. *Flaim*, 418 F.3d at 634; *Cincinnati*, 872 F.3d at 399.

"To state [a] procedural due process claim, [Plaintiff] must establish three elements: (1) that [he has] a property interest protected by the Due Process Clause; (2) that [he was] deprived of this property interest; and (3) that the state did not afford [him] adequate pre-deprivation procedural rights." *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 900 (6th Cir. 2019). The Sixth Circuit's holding in *Doe v. Baum* informs the third element: (1) a hearing is required when a student is facing a serious sanction such as suspension or expulsion, and (2) such a hearing must provide an opportunity for cross-examination when the University's determination turns on the

credibility of the accuser, accused or witnesses. *Baum*, 903 F.3d at 582; *Cincinnati*, 872 F.3d at 399-400. This means that a he said/she said tale of events, requires the hearing officer to evaluate the veracity of each witness' story and demeanor live. *Cincinnati*, 872 F.3d at 402.

This truth-seeking process is greatly aided by cross-examination. *Cincinnati*, 872 F.3d at 401 ("Few procedures safeguard accuracy better than adversarial questioning. In the case of competing narratives, 'cross-examination has always been considered a most effective way to ascertain truth.'… Cross-examination takes aim at credibility like no other procedural device); *Baum*, 903 F.3d at 581-82 ("Due process requires cross-examination in circumstances like these because it is 'the greatest legal engine ever invented' for uncovering the truth . . . Cross-examination is essential in credibility cases and cannot be substituted with written statements.") (internal quotation omitted).

The Sixth Circuit is also sensitive to the legitimate concerns that cross-examination could at minimum cause a claimant grave discomfort. Therefore, an accused student's right to a live hearing does not extend to a right to come physically face-to-face with his or her accuser or any other witness. *Cincinnati*, 872 F.3d at 406; *Baum*, 903 F.3d at 583. The University can and should allow questioning to be conducted through a representative and/or live video streaming. *Id*. Cumulatively,

these rules set merely "the floor or lowest level of procedures acceptable" to the Fourteenth Amendment. *Flaim*, 418 F.3d at 636.

    a. <u>2018 Policy</u>

To be entitled to summary judgment on his Due Process claim, Plaintiff has to prove that there is no genuine dispute as to the following material facts: (1) he was accused of misconduct; (2) a finding of guilt would have lead to the deprivation of a protected Due Process interest; (3) the facts of his case placed credibility at stake; (4) he was deprived of a live hearing with an opportunity to cross-examine witnesses.

There is no dispute that (1) on March 20, 2018, a female student accused Plaintiff of sexual assault in violation of the University's sexual misconduct policy; (2) a finding of guilt could have resulted in a serious sanction such as suspension or expulsion (Dkt. 47-1, pg. 38); (3) since there were no witnesses to the incident in question, a finding would have to be based on a credibility determination (Compl. ¶ 48; *see* Dkt. 49 & 50); (4) Defendants subjected Plaintiff to an investigation under the 2018 Policy that did not afford him a live hearing with cross-examination. (*See* Dkt. 47-1). Accordingly, Plaintiff is entitled to judgment as a matter of law on his due process claim.

b. <u>Interim Policy</u>

The Sixth Circuit mandated this Court to consider the Interim Policy in light of *Baum*. By providing accused students with an opportunity for a hearing and cross-examination in front of a neutral officer, the University's Interim Policy is closer to complying with the requirements of due process than the 2018 Policy. However, some aspects are still in need of revision for full compliance.

First, the condition under which a hearing is required under the policy is vague. It merely states that a hearing will be provided "where warranted," without further explanation. (Dkt. 47-3, pg. 32). The Sixth Circuit is clear that a hearing is warranted when a fact finder "has to choose between competing narratives to resolve a case." *Baum*, 903 F.3d at 578. The University's Interim Policy should be similarly clear in order to dispel confusion and hold their administration accountable to provide a fair process in every case. An accused student's rights must be guaranteed—not left open for interpretation.

Second, the Interim Policy allows the University to impose serious interim sanctions without a hearing. These sanctions can be imposed after a complaint is filed, but before any determination of responsibility has been made. (Dkt. 47-3, pg. 12). They range from a no contact directive to a suspension. (Dkt. 47-3, pg. 13-14). Imposing a suspension, prior to a hearing and adjudication is unconstitutional. "[I]f a student is accused of misconduct, the university must hold some sort of hearing

before imposing a sanction as serious as expulsion or suspension." *Baum*, 903 F.3d at 581. The University may not include suspension as an available interim measure against an accused student.

Plaintiff argues that two other aspects of the Interim Policy's appellate review do not comport with due process. First, Plaintiff urges this Court to prohibit the University from allowing an appellate reviewer to increase sanctions. Such a mandate would have no basis in case law. The Interim Policy allows an external examiner to either remand a case, order a new hearing or alter sanctions. (Dkt. 47-3, pg. 46). It does not allow an external examiner to overturn the findings of a hearing officer and make "credibility findings on a cold record" as prohibited by *Doe v. Baum*. 903 F.3d at 586. The Sixth Circuit's case law does not dictate further restrictions on the external examiner's power—and neither does this Court. The decision to alter sanctions only requires considering whether the original sanctions were disproportionate or inappropriate *based* on the hearing officer's findings, not *in spite of* them. Therefore, the Interim Policy's appellate review currently complies with due process.

## CONCLUSION

Defendants' 2018 Policy is unconstitutional. The possibility of a pre-hearing suspension under Defendants' 2019 Policy is also unconstitutional. The University may proceed with its disciplinary proceedings against Plaintiff. Because the outcome

of his disciplinary action rests on competing narratives, Plaintiff is entitled to a live hearing, in person or via video communication, with the opportunity to cross-examine witnesses and the Claimant.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss [49] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** Plaintiff's Motion for Partial Summary Judgment [53] is **GRANTED.**

**IT IS FURTHER ORDERED** Defendants' Motion for Protective Order [66] is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** Defendants' Motion to Vacate Order Enjoining Student Conduct Hearing [85] is **DENIED AS MOOT**.

**SO ORDERED.**

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: March 23, 2020                    Senior United States District Judge