## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | : | |
| | : | Case No. 18-cv-11776 |
| Plaintiff, | : | |
| | : | Hon. Arthur J. Tarnow |
| **v.** | : | Mag. Elizabeth A. Stafford |
| | : | |
| **UNIVERSITY OF MICHIGAN,** *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |
| | : | |

---

### DECLARATION OF JOSHUA W. B. RICHARDS, ESQ.

I, JOSHUA W. B. RICHARDS, declare as follows:

1.      I am admitted to practice before this Court.

2.      I am a partner at the law firm Saul Ewing Arnstein & Lehr LLP, counsel for defendants in this proceeding.

3.      I submit this declaration in support of Defendants' Objections [ECF No. 179] to Report and Recommendation on Post-Judgment Motions [ECF No. 178].

4.      In support of Defendants' Objections, I attach true and correct copies of the following exhibits:

    a.    <u>Exhibit A</u>: June 12, 2018 e-mail correspondence with Deborah Gordon.

    b.    <u>Exhibit B</u>: Unpublished cases cited in Defendants' Objections, which include:

    i.    *Beard v. Hawkins*, No. 14-13465, 2017 WL 2590344 (E.D. Mich. May 22, 2017);

    ii.    *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, No. 1:98-CV-479, 2008 WL 906031 (W.D. Mich. Mar. 31, 2008);

    iii.    *Ford Motor Co. v. United States*, No. 08-12960, 2009 WL 2922875 (E.D. Mich. Sept. 9, 2009);

    iv.    *Huguley v. Gen. Motors Corp.*, No. CIV. A. 83-2864, 1991 WL 88413 (E.D. Mich. May 26, 1991);

    v.    *In re Ctr. for Mil. Readiness*, No. MC 18-51013, 2019 WL 4733602 (E.D. Mich. Sept. 28, 2019);

    vi.    *Kotyk v. Ford Motor Co.*, No. 09-14604, 2011 WL 6780643 (E.D. Mich. Dec. 27, 2011); and

    vii.    *Michigan Bldg. v. Snyder*, No. 11-13520, 2012 WL 1893516 (E.D. Mich. May 23, 2012).

I declare that the foregoing is true and correct.

Respectfully submitted,

December 3, 2021

/s/*Joshua W. B. Richards*
SAUL EWING ARNSTEIN & LEHR LLP
Joshua W. B. Richards
*Attorneys for Defendants*
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania  19102
(215) 972-7737
joshua.richards@saul.com

# Exhibit A

| | |
|---|---|
| **From:** | Deborah Gordon <dgordon@deborahgordonlaw.com> |
| **Sent:** | Tuesday, June 12, 2018 2:16 PM |
| **To:** | Richards, Joshua W. B. |
| **Cc:** | Piccola, Amy L.; ppetrows@umich.edu |
| **Subject:** | RE: Doe v. University of Michigan (18-11776) |

Yes, it is now available.
Thanks for your assistance.

**From:** Richards, Joshua W. B. <Joshua.Richards@saul.com>
**Sent:** Tuesday, June 12, 2018 2:05 PM
**To:** Deborah Gordon <dgordon@deborahgordonlaw.com>
**Cc:** Piccola, Amy L. <Amy.Piccola@saul.com>; ppetrows@umich.edu
**Subject:** RE: Doe v. University of Michigan (18-11776)

Deb,

I believe this issue should now be resolved on Wolverine Access.  Please advise if it is not.

> **Joshua W. B. Richards**
> **Saul Ewing Arnstein & Lehr LLP**
> Centre Square West
> 1500 Market Street, 38th Floor | Philadelphia, PA 19102-2186
> Tel: 215.972.7737 | Fax: 215.972.1831
> joshua.richards@saul.com | bio | www.saul.com

**From:** Deborah Gordon [mailto:dgordon@deborahgordonlaw.com]
**Sent:** Tuesday, June 12, 2018 1:43 PM
**To:** Richards, Joshua W. B.
**Cc:** Piccola, Amy L.; Brittani Schwartz; ppetrows@umich.edu
**Subject:** RE: Doe v. University of Michigan (18-11776)

Josh,
My client is trying to access his transcript on line in the usual manner on Wolverine Access but it continues to show a hold.  I would appreciate it if someone could electronically remove that as soon as possible.
Thank you.

**From:** Richards, Joshua W. B. <Joshua.Richards@saul.com>
**Sent:** Tuesday, June 12, 2018 12:56 PM
**To:** Deborah Gordon <dgordon@deborahgordonlaw.com>
**Cc:** ppetrows@umich.edu; 'Brian M. Schwartz' <schwartzb@millercanfield.com>; Piccola, Amy L.
<Amy.Piccola@saul.com>
**Subject:** RE: Doe v. University of Michigan (18-11776)

I will inquire and advise, Deb.

1

**Joshua W. B. Richards**
**Saul Ewing Arnstein & Lehr LLP**
Centre Square West
1500 Market Street, 38th Floor | Philadelphia, PA 19102-2186
Tel: 215.972.7737 | Fax: 215.972.1831
joshua.richards@saul.com | bio | www.saul.com

---

**From:** Deborah Gordon [mailto:dgordon@deborahgordonlaw.com]
**Sent:** Tuesday, June 12, 2018 12:12 PM
**To:** Richards, Joshua W. B.
**Cc:** ppetrows@umich.edu; 'Brian M. Schwartz'; Piccola, Amy L.
**Subject:** RE: Doe v. University of Michigan (18-11776)

Thank you, Josh.

My client will request the transcript today.  Is there someone I should direct him to?

Deb Gordon

Deborah Gordon
**DEBORAH GORDON LAW**
33 Bloomfield Hills Parkway
Bloomfield Hills, Michigan 48304
Suite 220
248.258.2500
248.258.7881 (fax)
dgordon@deborahgordonlaw.com
www.deborahgordonlaw.com

---

**From:** Richards, Joshua W. B. <Joshua.Richards@saul.com>
**Sent:** Tuesday, June 12, 2018 12:08 PM
**To:** Deborah Gordon <dgordon@deborahgordonlaw.com>
**Cc:** ppetrows@umich.edu; 'Brian M. Schwartz' <schwartzb@millercanfield.com>; Piccola, Amy L.
<Amy.Piccola@saul.com>
**Subject:** Doe v. University of Michigan (18-11776)

Dear Deb,
I am writing to advise that consistent with our conference yesterday with the Court, the University will upon request
provide a transcript without notation to the graduate program to which ▉▉▉▉ has applied.

Please let me know if you have any further questions,

**Joshua W. B. Richards**
 **Saul Ewing Arnstein & Lehr LLP**
Centre Square West
1500 Market Street, 38th Floor | Philadelphia, PA 19102-2186
Tel: 215.972.7737 | Fax: 215.972.1831
joshua.richards@saul.com | bio | www.saul.com

"Saul Ewing Arnstein & Lehr LLP (saul.com)" has made the following annotations:
+~~~~~~~~~~~~~~~~~~~~~~~~~+

This e-mail may contain privileged, confidential, copyrighted, or other legally protected information. If you are not the intended recipient (even if the e-mail address is yours), you may not use, copy, or retransmit it. If you have received this by mistake please notify us by return e-mail, then delete.
+~~~~~~~~~~~~~~~~~~~~~~~~~+

# Exhibit B

Beard v. Hawkins, Not Reported in Fed. Supp. (2017)

2017 WL 2590344

2017 WL 2590344
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Tony DeWayne BEARD, Jr., a legally
incapacitated person, by and through
Johnette Ford, his legal guardian, Plaintiff,
v.
Eric HAWKINS, et al., Defendants.

Civil Action No. 14-13465
|
Signed 05/22/2017

**Attorneys and Law Firms**

Johnny L. Hawkins, Law Office of J.L. Hawkins PLLC,
Southfield, MI, for Plaintiff.

Kali M. L. Henderson, Lindsey A. Peck, T. Joseph Seward,
Seward Peck & Henderson PLLC, Royal Oak, MI, for
Defendants.

## REPORT AND RECOMMENDATION
## TO ORDER ATTORNEY HAWKINS
## TO PAY $18,455.48 IN SANCTIONS

ELIZABETH A. STAFFORD, United States Magistrate
Judge

### I. INTRODUCTION

**\*1** In a November 2016 opinion and order, the Honorable
Nancy G. Edmunds granted in part defendants' motion
for sanctions, [ECF No. 99], and ordered attorney Johnny
Hawkins to reimburse defendants for half the reasonable
expenses they incurred in litigating their motion for sanctions.
[ECF No. 155]. Defendants thereafter filed a bill of costs and
requested that Hawkins be ordered to pay them $40,582.79.
[ECF No. 159]. Hawkins filed a response, defendants filed a
reply, and the Court held a hearing on May 11, 2017. [ECF
Nos. 166, 169]. For the reasons stated below, Hawkins should
be ordered to reimburse defendants $18,455.48.

### II. AUTHORITY

Judge Edmunds found Hawkins' conduct to be sanctionable
under Federal Rules of Civil Procedure 26, 37 and the Court's

inherent authority. [ECF No. 155]. These violations entitle
defendants to an award of reasonable attorney's fees, using
the "lodestar method." *See Naji v. Lincoln*, No. 13-10738,
2014 WL 6669278, at \*1–2 (E.D. Mich. Nov. 24, 2014)
(using lodestar method for Rule 37 sanctions); *Farmer v.
Banco Popular of N. Am.*, 791 F.3d 1246, 1259 (10th
Cir. 2015) (using lodestar method for sanctions under the
court's inherent authority). Under the lodestar method, courts
calculate reasonable attorney's fee awards by "multiplying
the proven number of hours worked by a court-ascertained
reasonable hourly rate." *Ellison v. Balinski*, 625 F.3d 953, 960
(6th Cir. 2010).

Courts have held that, once the lodestar figure is derived,
an upward or downward adjustment is permitted based upon
twelve factors first listed in *Johnson v. Georgia Highway
Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). [1] *Geier v.
Sundquist*, 372 F.3d 784, 792 (6th Cir. 2004) (citing *Hensley
v. Eckerhart*, 461 U.S. 424 (1983)). But many of the *Johnson*
"factors usually are subsumed within the initial calculation
of hours reasonably expended at a reasonable hourly rate."
*Hensley*, 461 U.S. at 434, n. 9. And more recently, the
Supreme Court discouraged use of the *Johnson* factors except
in rare or exceptional circumstances, deeming the lodestar
method more objective and reiterating that "the lodestar figure
includes most, if not all, of the relevant factors constituting a
reasonable attorney's fee." *Perdue v. Kenny A. ex rel. Winn*,
559 U.S. 542, 553 (2010) (citation and internal quotation
marks omitted). There is a "strong presumption" that the
lodestar figure is reasonable, and there are few circumstances
in which it should be deemed inadequate. *Id.* at 554.

[1]
> Those factors are: "(1) the time and labor required;
> (2) the novelty and difficulty of the question; (3)
> the skill requisite to perform the legal service
> properly; (4) the preclusion of other employment
> by the attorney due to acceptance of the case;
> (5) the customary fee; (6) whether the fee is
> fixed or contingent; (7) time limitations imposed
> by the client or the circumstances; (8) the
> amount involved and the results obtained; (9) the
> experience, reputation, and ability of the attorney;
> (10) the 'undesirability' of the case; (11) the nature
> and length of the professional relationship with the
> client; and (12) awards in similar cases." *Johnson*,
> 488 F.2d at 717–19.

**\*2** "[T]he fee applicant bears the burden of establishing
entitlement to an award and documenting the appropriate

Case 2:18-cv-11776-AJT-EAS   ECF No. 179-1, PageID.4985   Filed 12/03/21   Page 10 of 59

Beard v. Hawkins, Not Reported in Fed. Supp. (2017)
2017 WL 2590344

hours expended and hourly rates." *Hensley*, 461 U.S. at 437. For the reasons that follow, the Court finds that defendants' bill of costs includes excessive rates and hours, and recommends a reduced award of costs.

## III. ANALYSIS

### A.

"A district court has broad discretion to determine what constitutes a reasonable hourly rate for an attorney." *Wayne v. Vill. of Sebring*, 36 F.3d 517, 533 (6th Cir. 1994). A primary concern is that attorney's fees be reasonable, and not result in a windfall. *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 616–19 (6th Cir. 2007). "It is essential that the judge provide a reasonably specific explanation for all aspects of a fee determination, including any award of an enhancement." *Perdue*, 559 U.S. at 558.

Defendants attach invoices for the work they assert they should be reimbursed for, but the amounts of fees billed to them are redacted. [ECF No. 159-3]. They argue that they should be awarded attorney's fees based upon the local market rate, with enhancements. [ECF No. 159, PageID 6226-32]. Relying on the 2014 Economics of Law Practice Attorney Income and Billing Rate Summary Report prepared by the State Bar of Michigan, defendants state that because of their attorneys' office location and firm size, and the fact that this is a civil rights case, the local market rate should be calculated at $276 per hour. [*Id.*, PageID 6227; ECF No. 159-7]. They contend that this amount should be upwardly adjusted because of: the litigation involved skilled legal analysis; the obstructive tactics underlying the motion for sanctions; the favorable result; the fact that the attorneys were diverted from other areas because of the prolonged litigation of the motion; the attorneys' exceptional accomplishments; and the attorneys' long-term relationship with their client, the city of Southfield. [ECF No. 159, PageID 6227-32; ECF Nos. 159-4, 159-5, 159-8, 159-9]. Defendants argue that, with these adjustments, their attorneys should be found to have the following hourly billable rates: Kali Henderson, $339.86; T. Joseph Seward, $493.57; Lindsey Peck, $347.43; and Michael Berger, $276.00. [*Id.*].

At the hearing, the Court inquired into the actual rates that defendants' attorneys charged Southfield and other clients. Defense counsel objected and argued that the actual rates are not material. She asserted that relying upon actual rates rather

than market rates would cause an unfair disadvantage to the attorneys.[2] Over those objections, she testified under oath that the attorneys bill Southfield $150 per hour,[3] and charge new clients up to $275 per hour. Defense counsel noted that Southfield pays all attorneys with which it contracts $150 per hour. So defendants are asserting that their reasonable hourly rates are more than twice as much as they actually bill Southfield. This cannot be justified under the law.

[2]    Attorney Kali Henderson also suggested that the Court was improperly developing Hawkins' claims for him, citing *Magnum Towing & Recovery v. City of Toledo*, 287 Fed.Appx. 442, 449 (6th Cir. 2008). In that opinion, the court noted that it is not its job to search through the record to develop a party's claims. But the Court's inquiry into the actual amounts that the attorneys charge did not pertain to an evidentiary burden carried by Hawkins. Rather it pertained to Southfield's burden of showing that the amounts of hourly rates it claims are legally reasonable and would not amount to a windfall. *Hensley*, 461 U.S. at 437; *Gonter* 510 F.3d at 616–19 (6th Cir. 2007). In exercising its broad discretion, the Court is not a rubberstamp for defendants' fee request, but instead is required to "provide reasonably specific explanation for all aspects of a fee determination, including any award of an enhancement." *Perdue*, 559 U.S. at 558.

[3]    Hawkins requested an evidentiary hearing to determine the actual amount that was billed to Southfield, but the Court finds that Henderson's statement under oath that Southfield was billed $150 per hour and the invoices that detail the time billed are sufficient, and that devoting more time and resources to this matter is not warranted. "Evidentiary hearings are not required in attorney's fees determinations. An evidentiary hearing is only one of several possible methods of determining a reasonable fee." *Trustees for Michigan Laborers Health Care Fund v. E. Concrete Paving Co.*, 948 F.2d 1290 (6th Cir. 1991).

*3    When attorney's fees are awarded to the prevailing party under fee-shifting statutes, such as 42 U.S.C. § 1988, the hourly rate is often derived by calculating the "prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). In those cases, a reasonable attorney's fee is considered to be " 'adequate to attract competent

Beard v. Hawkins, Not Reported in Fed. Supp. (2017)

2017 WL 2590344

Case 2:18-cv-11776-AJT-EAS ECF No. 179-1, PageID.4986 Filed 12/03/21 Page 11 of 59

counsel, but ... [that does] not produce windfalls to attorneys.' " *Id.* at 897 (quoting S.Rep. No. 94–10011, p. 6 (1976)) (modifications supplied in Blum). Using the market rate "produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue,* 559 U.S. at 551 (emphasis in original).

But when the attorneys represent prevailing parties who have been billed by the hour, courts have looked to the actual hourly rate that they billed and/or the rates that those attorneys charge in general. *Kelley v. Metro. Cty. Bd. of Educ.,* 773 F.2d 677, 683 (6th Cir. 1985) ("[T]he attorney's normal hourly billing rate should be a key focal point in award determinations."); *Scales v. J.C. Bradford & Co.,* 925 F.2d 901, 909–10 (6th Cir. 1991) (district court did not abuse its discretion in relying upon attorney's hourly rates rather than market rates in the community); *Gascho v. Glob. Fitness Holdings, LLC,* 822 F.3d 269, 280 (6th Cir. 2016) (lodestar figure based upon attorney's billed rates); *United States v. One Star Class Sloop Sailboat built in 1930 with hull no. 721, named "Flash II",* 546 F.3d 26, 40–41 (1st Cir. 2008) ("[T]he rate that private counsel actually charges for her services, while not conclusive, is a reliable indicium of market value."); *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205,* 90 F.3d 1307, 1310–11 (7th Cir. 1996) ("The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate."); *Crescent Publ'g Grp., Inc. v. Playboy Enterprises, Inc.,* 246 F.3d 142, 151 (2d Cir. 2001) ("[F]or prevailing parties with private counsel, the actual billing arrangement is a significant, though not necessarily controlling, factor in determining what fee is 'reasonable.' ").

And a review of prior cases applying the lodestar method reveals that private attorneys requesting an award of attorney's fees generally include their normal hourly rates and/or hourly rates for the litigation at issue within their proofs. *See, e.g., Gascho,* 822 F.3d at 280 (declarations included billing rates for each counsel); *Pogue v. Nw. Mut. Life Ins. Co.,* No. 3:14-CV-598-CRS, 2017 WL 1520432, at *3 (W.D. Ky. Apr. 25, 2017) (attorney presented the range of hourly rates at his firm, his usual hourly rate and the rate he charged for that action.). Defendants cited no opinions in which the billing amounts were redacted or any authority to support a privilege to redact those amounts.

The nature of the fee award is also relevant here, as attorney's fee awards in favor of prevailing plaintiffs in civil rights cases serve a different purpose than discovery sanctions. In *Blanchard v. Bergeron,* 489 U.S. 87, 93 (1989), the court found that "a contingent-fee contract does not impose an automatic ceiling on an award of attorney's fees," but that was because "hold[ing] otherwise would be inconsistent with [Section 1988] and its policy and purpose." *Id.* "The purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Id.* at 95 (citation and internal quotation marks omitted). Congress intended that all defendants in civil rights cases covered by Section 1988 pay a reasonable fee to all prevailing plaintiffs without regard to what the plaintiff must pay his or her counsel. *Id.* at 94.

*4 In contrast, the language of Rule 37(a)(5) indicates that the award of attorney's fees should be in the form of a reimbursement; a court may award the prevailing party "reasonable expenses *incurred* in making the motion, including attorney's fees." (Emphasis added.) Thus, sanctions orders under Rule 37(a)(5) often use terminology that requires the losing party to "reimburse" the prevailing party. *See, e.g., Slep-Tone Entm't Corp. v. Karaoke Kandy Store, Inc.,* No. 1:10 CV 00990, 2011 WL 13131116, at *1 (N.D. Ohio July 7, 2011) ("Plaintiff is further ordered under Fed. R. Civ. P. 37(a)(5)(A) to reimburse Defendants for the reasonable costs of making the Motion to compel, including attorneys' fees."); *FedEx Corp. v. United States,* No. 08-2423 MA/ P, 2011 WL 2023297, at *11 (W.D. Tenn. Mar. 28, 2011) ("[T]he court orders Mr. Jones to reimburse the government for the attorney's fees and costs associated with filing this motion...."); *LendingTree, LLC v. Zillow, Inc.,* No. 3:10-CV-439-FDW-DCK, 2013 WL 5476605, at *1 (W.D.N.C. Oct. 1, 2013) ("Plaintiff LendingTree, LLC shall reimburse Defendant NexTag, Inc. for its fees and expenses associated with filing" the motions); *Pracht v. Greenwood Motor Lines, Inc.,* No. 3:13-CV-529-RJC-DCK, 2015 WL 1268030, at *4 (W.D.N.C. Mar. 19, 2015) ("[T]he R+L Plaintiffs shall reimburse Defendant Saga Freight for its reasonable expenses, including attorney's fees, incurred in preparing" the motions); *Edward D. Ioli Trust v. Avigilon Corp.,* No. 2:10-CV-605-JRG, 2012 WL 5830711, at *4 (E.D. Tex. Nov. 16, 2012) ("Vigilant is further ORDERED to reimburse Plaintiffs for their costs and fees in bringing the matters contained in this Motion to the Court's attention."). And, in fact, Judge Edmunds' order requires Hawkins to "reimburse Defendants half the reasonable expenses they incurred in litigating the motion." [ECF No. 155, PageID 6206].

Case 2:18-cv-11776-AJT-EAS  ECF No. 179-1, PageID.4987  Filed 12/03/21  Page 12 of 59
Beard v. Hawkins, Not Reported in Fed. Supp. (2017)
2017 WL 2590344

Of further note, the evidence in the record reveals that the hourly amount that is adequate to attract competent counsel to represent Southfield is $150 per hour, including highly skilled and accomplished attorneys like those here. It further makes no sense for defendants to receive an enhancement because they were significantly (but not completely) successful in prosecuting their motion for sanctions; their success is what deems them entitled to sanctions and a further enhancement would be redundant.

For these reasons, defendants' request to have their award of attorney's fees be based upon the local market rate with significant enhancements, and without regard to the actual amount billed, should be rejected. However, defendants do cite one factor that does merit an enhancement above the hourly rate billed to Southfield: the obstructive conduct that prolonged resolution of the motion for sanctions. In an earlier report and recommendation, the Court found:

> Hawkins' claim that the handwritten books were privileged, followed by his misrepresentation that Ford had claimed to have thrown out or destroyed them after converting them into electronic form, caused the Court and defense counsel to engage in a prolonged and needless effort to secure production of the personal journals and secure the truth about what happened to them. His actions 'wasted judicial resources and ha[ve] diminished the ready availability of those resources to deserving litigants. [He] exceed[ed] the bounds of advocacy open to counsel as [an] officer[ ] of the court.' *Maier v. Orr*, 758 F.2d 1578, 1584 (Fed. Cir. 1985).

[ECF No. 146, PageID 5884]. The time that defense counsel used in the needless efforts as described above could have been expended on other matters, including for clients who pay at a higher rate. With that in mind, the Court finds that a $50 per hour enhancement is warranted, and thus recommends a finding that $200 per hour is reasonable. Awarding more would amount to a windfall for defendants.

### B.

A court is required to review a prevailing party's claims regarding the hours it expended on the relevant matter, and "state with some particularity which of the claimed hours the court is rejecting, which it is accepting, and why. Failure to provide such an explanation requires us to remand the case for further consideration." *Sierra Club v. Hamilton Cty. Bd. of Cty. Comm'rs*, 504 F.3d 634, 645 (6th Cir. 2007) (citation and internal quotation marks omitted). Courts review billing

claims for "[e]xcessive, redundant, or otherwise unnecessary hours, or hours spent on unsuccessful claims," which are usually excluded from fee awards. *Butcher v. Bryson*, No. 3:12-00251, 2014 WL 4385876, at *3 (M.D. Tenn. Sept. 5, 2014) (citing *Hensley*, 461 U.S. at 437).

**\*5** Defendants aver that Henderson expended 182.4 hours, Seward expended 33.8 hours, Peck expended 1.7 hours, and Berger expended 2.1 hours on litigating the motion, which totals 221.8 hours. They submit their redacted invoice in support. [ECF No. 159-3]. For the reasons that follow, the number of hours defendants claim should be deemed excessive.

There are two primary constraints on the number of hours for which Hawkins should be required to pay. First, as noted, Judge Edmunds ordered Hawkins to reimburse defendants for half the reasonable expenses they incurred "in litigating" the motion for sanctions, i.e., ECF No. 99. [ECF No. 155, PageID 6206]. Second, Hawkins should not be required to pay for defendants' unsuccessful efforts associated with litigating the motion for sanctions. In *Hensley*, the Supreme Court emphasized that courts should consider whether the prevailing party achieved only partial or limited success. "If ... a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Hensley*, 461 U.S. at 436. Regardless of whether the "claims were interrelated, nonfrivolous, [or] raised in good faith ... the most critical factor is the degree of success obtained." *Id.* at 436. Rule 37(a)(5)(C) likewise instructs courts to apportion the reasonable expenses for a motion that is only partially granted.

Applying these constraints, the Court finds that the following were not preparation for or components of the sanctions motion litigation:

- Review of correspondence, and analysis of Beard's responses to discovery requests in January 2016;

- Preparation of status reports to clients in February, March, June, July, August, September, October and November 2016;

- Review of email correspondence regarding Hawkins's alleged threat of a defamation lawsuit in April 2016;

- Review of Hawkins' motion to withdraw in November 2016.

Beard v. Hawkins, Not Reported in Fed. Supp. (2017)

2017 WL 2590344

Some of the time defendants billed for related to their motion to compel, in which they sought the same documents that were the subject of the motion for sanctions. [ECF No. 62]. Specifically, defendants requested logs, journals and notebooks that Beard's guardian, Johnette Ford, claimed in a deposition to possess ("the Ford documents"). [*Id.*]. Defendants requested sanctions under the discovery rules in that motion. [*Id.*, PageID 650]. The Court took the issue regarding the Ford documents under advisement, and ordered Ford to submit to a limited deposition to address inconsistencies between her deposition testimony and Beard's answers to a request to produce and the motion to compel. [ECF No. 72]. The motion for sanctions followed the limited deposition. [ECF No. 99]. Since the motion to compel is interrelated with the motion for sanctions, defendants' inclusion of hours spent litigating the motion to compel is warranted. However, the motion to compel also sought a complete copy of Beard's Facebook profile, which the Court denied. [ECF Nos. 62, 72]. Therefore, only half of the time defense counsel spent preparing for and litigating the motion to compel should be charged to Hawkins. [See ECF No. 159-3, PageID 6250-56].

The primary aim of defendants' motion for sanctions was to have this case dismissed, and as a secondary concern, they requested reimbursement of costs and attorney's fees. [ECF No. 99, PageID 1366, 1376-81]. This Court recommended that their motion be granted in part with the imposition of nonmonetary sanctions and Hawkins being ordered to reimburse defendants for half of their reasonable expenses, but that defendants' request for dismissal be denied and that Ford not incur monetary sanctions. [ECF No. 146, PageID 5864-65]. Defendants objected, arguing that dismissal was the only appropriate sanction, that they were entitled to reimbursement in full of their expenses, and that the recommended sanctions against Ford were insufficient. [ECF No. 148]. After considering those objections and the objections filed by Hawkins and Ford, Judge Edmunds adopted this Court's recommendation with one minor exception. [4] [ECF No. 155]. Defendants' motion for sanction was, thus, only partially successful and awarding them

reimbursement based upon all of the time they spent litigating that motion would be excessive. *Hensley*, 461 U.S. at 436-37; Rule 37(a)(5)(C).

[4]
> With Ford's stipulation, the Court had recommended that she be removed as Beard's guardian, but Ford withdrew from that stipulation and Judge Edmunds found she did not have the authority to remove Ford as guardian. [ECF No. 155, PageID 6205].

**\*6** Under these circumstances, when a court exercises its discretion to make an equitable judgment of the reasonable hours, "[t]here is no precise rule or formula." *Hensley*, 461 U.S. at 436. "The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* at 437. Here, the Court recommends that defendants receive reimbursement for all of their hours litigating the motion for sanctions through the report and recommendation, and all of their hours responding to Hawkins' and Ford's objections. [ECF No. 159-3, PageID 6257-79, 6284-86]. But Hawkins should not be required to reimburse defendants for their unsuccessful objections. [*Id.*, PageID 6281-82].

This leaves for consideration the times that defendants spent preparing their bill of costs. [*Id.*, PageID 6288]. Those hours are reimbursable. *McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 488, 494 (6th Cir. 2014) (Rule 37 provisions "encompass reasonable attorney's fees and costs associated with the preparation and presentation of the fee application."); *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 910 (6th Cir. 1991) (cost of preparing fee application included in attorney's fee award).

The chart below eliminates the time described above that was not spent "in litigating" the sanctions motion and the time spent on defendants' objections to the report and recommendation. In addition, the chart halves the hours spent on the motion to compel. These modifications render a finding that defendants' fee award should be based upon 177.95 hours which, when multiplied by $200 per hour, equals $35,590.00.

| Category | Total Hours | Reasonable Hours | Reasonable Fee |
|---|---|---|---|
| Motion to Compel ECF No. 159-3, PageID 6247-53 | 27.50 | 13.75 | $2,750 |
| Motion for Sanctions *Id.*, PageID 6257-80 | 101.90 | 101.90 | $20,380 |

| | | |
|---|---|---|
| Response to Hawkins' and Ford's objections *Id.*, PageID 6280-86 | 42.70 | 42.70 | $8,540 |
| Bill of costs *Id.*, PageID 6288 | 19.60 | 19.60 | $3,920 |
| **TOTAL** | | **177.95** | **$35,590** |

Defendants incurred costs totaling $1,320.95. [*See* chart of costs, ECF No. 155, PageID 6232, and invoices, ECF No. 155-3]. Those costs plus the total reasonable attorney's fee equal $36,910.95. Pursuant to Judge Edmunds order that Hawkins reimburse defendants half of their reasonable expenses, he should be ordered to pay defendants $18,455.48.

**IV. CONCLUSION**

For the foregoing reasons, Hawkins should be ordered to reimburse defendants **$18,455.48**.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2590344

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...

2008 WL 906031

KeyCite Yellow Flag - Negative Treatment

Distinguished by Lavin v. Brunner, N.D.Ohio, February 12, 2013

2008 WL 906031
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan,
Southern Division.

COMMUNITIES FOR EQUITY, et al., Plaintiffs,

v.

MICHIGAN HIGH SCHOOL
ATHLETIC ASSOCIATION, Defendant.

No. 1:98-CV-479.
|
March 31, 2008.

**Attorneys and Law Firms**

Philip L. Cohan, Piper, Marbury, Rudnick & Wolfe LLP, Roger E. Warin, Steptoe & Johnson, Barbara A. Burr, Neena Chaudhry, Marcia D. Greenberger, Washington, DC, Kristen Galles, Equity Legal, Alexandria, VA, Robin K. Bohnenstengel, Piper, Marbury, Rudnick & Wolfe LLP, Baltimore, MD, Lindsey B. Lang, H. Rhett Pinsky, Pinsky, Smith, Fayette, Hulswit, Grand Rapids, MI, for Plaintiffs.

Edmund J. Sikorski, Ann Arbor, MI, William M. Azkoul, Law Offices of William Azkoul, P.C., Carole D. Bos, Bos & Glazier, Grand Rapids, MI, for Defendant.

*OPINION*

RICHARD ALAN ENSLEN, Senior District Judge.

**When the game is complete, the loser
should not complain about the rules.**

**\*1** This matter is before the Court on the Petition for Attorneys' Fees [1] and Costs of Plaintiffs Communities for Equity, which represents a class of more than 150,000 interscholastic female athletes in the State of Michigan. [2] The Petition, which was filed over six years ago, is adamantly opposed by Defendant Michigan High School Athletic Association ("MHSAA"). [3] The court has substantial discretion in determining whether to conduct

an evidentiary hearing on a fee petition. *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway,* 46 F.3d 1392, 1402 (6th Cir.1995). An evidentiary hearing is required only if the court is unable to resolve material factual disputes based on the affidavits and written documentation submitted. *Id.* (citing authorities). In this case, the disputes between the parties can be readily resolved based on the materials submitted, which include Plaintiffs' Petition, MHSAA's Response and Request for Limited Discovery, MHSAA's Response, MHSAA's Addendum to its Response, Plaintiffs' Reply, [4] Plaintiffs' Supplemental Petition, MHSAA's Supplemental Response, Plaintiffs' Supplemental Reply, MHSAA's Expert Report, Plaintiffs' Expert Report, MHSAA's Supplemental Expert Report, [5] and a plethora of exhibits, affidavits, and declarations comprising approximately 1,500 pages. The extensive filings have provided the parties with ample opportunity to express their views and the Court discerns no reason for oral argument. *See* W.D. Mich. LCivR 7.3(d).

[1]  As a threshold matter, the stylistic difference between "attorneys' fees," "attorney's fees," "attorneys fees," and "attorney fees" is trivial. Nevertheless, this donnish question of style and spelling was thoroughly discussed by the Sixth Circuit Court of Appeals in *Stallworth v. Greater Cleveland Reg'l Transit Auth.,* 105 F.3d 252, 253 n. 1 (6th Cir.1997). The *Stallworth* Court concluded that the proper form is that which appears in the governing statute, which in that case was "attorney fees." *Id.* The Sixth Circuit, however, has not spoken with consistency. In *Ridder v. City of Springfield,* 109 F.3d 288, 290 n. 1 (6th Cir.1997), the statutory form "attorneys' fees" was rejected, as was the reasoning in *Stallworth,* in favor of "attorney fees" based on a "survey[ ] [of] the landscape." Pursuant to Sixth Circuit Rule 206(c), since a conflict exists regarding what spelling is appropriate, *Stallworth* controls. *See Ruth v. Comcast Corp.,* No. 3:04-CV-332, 2006 WL 2792179, at \*1 n. 1 (S.D.Ohio Sept.26, 2006). Unfortunately, *Stallworth* does not resolve the issue for this Court. Federal Rule of Civil Procedure 11 speaks of "attorney's fees," 42 U.S.C. § 1988 refers to "attorneys' fees," Michigan's Elliot-Larsen Civil Rights Act inconsistently refers to both "attorney's fees" and "attorney fees," and the Consent Decree entered into by the parties

Case 2:18-cv-11776-AJT-EAS ECF No. 179-1, PageID.4991 Filed 12/03/21 Page 16 of 59

Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...

2008 WL 906031

refers to "attorneys' fees." The Court will use the form "attorneys' fees" since it is utilized in both § 1988 and the Elliot-Larsen Civil Rights Act, albeit inconsistently. Variations from this form appearing in other sources are left unchanged.

2    The class representatives are Diane Madsen, on behalf of her minor daughters, and Jay Roberts-Eveland, on behalf of her minor daughter.

3    Plaintiffs originally also sued members of MHSAA's representative council and its executive director. MHSAA is the only remaining Defendant pursuant to the Court's Order of October 2, 2001.

4    MHSAA has moved to strike 16 of the 19 exhibits submitted with Plaintiffs' Reply. (Dkt. No. 633.) MHSAA argues these exhibits do not rebut MHSAA's Response. The Court denies MHSAA's motion because all of the exhibits rebut statements made or authorities cited in MHSAA's Response. Moreover, the majority of MHSAA's objections teeter on the brink of frivolousness.

5    The Court has scrutinized the three expert reports but accords no deference to the legal conclusions contained therein. As can be expected, MHSAA's expert agrees with all of MHSAA's objections and Plaintiffs' expert agrees with all of the requested attorneys' fees and costs. To avoid unnecessary confusion, the Court seldom distinguishes between arguments advanced by a party's expert rather than the party itself since all expert conclusions have been adopted by reference.

The United States Supreme Court has repeatedly cautioned that resolution of fee petitions should not become a "second major litigation." *See, Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 609, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (citation omitted); *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 791, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989); *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). This optimistic hope has gone unfulfilled as defendants routinely oppose fee petitions brought by prevailing plaintiffs on every conceivable ground. The case *sub judice* is no exception. After laborious review, the Court concludes that Plaintiffs are entitled to the bulk of the requested attorneys' fees and costs. This is a classic case of the obdurate defendant who digs in its heels while litigating

the merits of an action, loses, and then cries "foul" when asked to pay the resulting attorneys' fees and costs.

## I. BACKGROUND

Plaintiffs filed this action in 1998 and alleged that MHSAA discriminates against female interscholastic athletics by: (1) sanctioning too few female sports; (2) scheduling female but not male sports in nontraditional seasons; (3) scheduling female sports to shorter athletic seasons than male sports; (4) assigning female sports to inferior and non-regulation facilities for MHSAA tournaments; and (5) providing female sports with less publicity and promotion than male sports during MHSAA tournaments. After three years of vigorous litigation on the merits, the parties entered into mediation.

**\*2** As a result of mediation, the parties entered into a Consent Decree settling all issues except the scheduling of interscholastic athletic seasons. Among other concessions, MHSAA agreed to sanction two more female sports, move the female basketball finals to the Breslin Center at Michigan State University, renovate the state tournament softball facility, assign female softball tournaments only to sites with regulation fastpitch fields, assign girls' volleyball tournaments only to sites that meet the standards of the National Federation of State High School Associations, equalize promotion and publicity (including equal coverage of MHSAA tournament finals on television), and promote the same number of holes of golf for both genders. The Consent Decree includes an attorneys' fees and costs provision which states:

> [E]ntitlement of plaintiffs to attorneys' fees and costs as "prevailing parties" will be determined solely upon a final judicial resolution of which "parties prevailed" on the issues actually tried. If plaintiffs are "prevailing parties," they shall be entitled to petition the Court for their attorneys' fees and costs for work on all issues in this case, whether tried or settled.

(Consent Decree 2.)

The parties thereafter went to trial on the scheduling of seasons issue. Plaintiffs alleged that MHSAA's scheduling of

Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...

2008 WL 906031

six female sports but no male sports in nontraditional seasons violates: (1) Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq.*); (2) the Equal Protection Clause of the 14th Amendment to the United States Constitution; and (3) Michigan's Elliott-Larsen Civil Rights Act (Mich. Comp. Laws § 37.2101 *et seq.*). Trial began on September 24, 2001 and lasted two weeks. The Court found in favor of Plaintiffs on all three legal theories and held that MHSAA discriminated in the scheduling of all six contested sports. *Communities for Equity v. MHSAA*, 178 F.Supp.2d 805, 862

(W.D.Mich.2001), *aff'd*, 459 F.3d 676 (6th Cir.2006), *cert. denied*, --- U.S. ----, 127 S.Ct. 1912, 167 L.Ed.2d 566 (2007).

Plaintiffs' Fee Petition, which was timely filed on January 30, 2002, seeks $5,155,136.05. This amount is comprised of $5,023,991.25 in attorneys' fees and $131,144.80 in costs. (Suppl. Reply 25.) A breakdown of the fees and costs by firm is as follows:

| Law Firm and Headquarters | Requested Fees | Requested Costs |
|---|---|---|
| Equity Legal (comprised solely of Kristen Galles) Alexandria, Virginia | $3,405,519.00 | $89,510.86 |
| National Women's Law Center ("NWLC") Washington, D.C. | $998,870.00 | $22,823.34 |
| DLA Piper (formerly known as Piper Rudnick) Decentralized | $225,912.00 | ,074.67 |
| Steptoe & Johnson Washington, D.C. | $216,815.25 | $6,127.67 |
| Pinsky, Smith, Fayette & Kennedy Grand Rapids, Michigan | $176,875.00 | $1,608.26 |

MHSAA argues Plaintiffs are entitled to $0.00 in fees and costs, but alternatively to no more than $917,955.00, which roughly equals 17% of Plaintiffs' request.[6] (Suppl.Resp.7-8.) Because MHSAA objects to almost every facet of Plaintiffs' Petition, limited judicial resources prevent discussion of each objection individually. Accordingly, the Court discusses the most significant categories of objections. Any objection not explicitly discussed is hereby denied.

[6]     MHSAA would likely agree to a slightly higher amount than $917,955.00 because this figure did not take into account the fees and costs incurred for researching and drafting Plaintiffs' Supplemental Reply.

## II. LEGAL STANDARDS

*3  Attorneys' fees are not awarded in federal civil actions except where a federal statute or court rule departs from "the American Rule that litigants in most circumstances

must bear their own costs." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.,* 498 U.S. 533, 565, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991); *see also Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 271, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Rule 54(d) of the Federal Rules of Civil Procedure provides that attorneys' fees and costs can be awarded to the prevailing party of a case in limited circumstances. To be eligible for fees, besides complying with procedural requirements, a party must file a petition for attorneys' fees and "specify the judgment and the statute, rule, or other grounds entitling the movant to the award." Fed.R.Civ.P. 54(d) (2)(B)(ii). In this case, Plaintiffs are the prevailing party under the plain terms of the Consent Decree because they prevailed "on the issue [ ] actually tried."[7] (Consent Decree 2.) Plaintiffs are also the prevailing party under Title IX, see 42 U.S.C. § 1988(b), and the Elliott-Larsen Civil Rights Act. See Mich. Comp. Laws §§ 37.2801-2802. "Unless a federal statute, these rules, or a court order provides otherwise, costs-other than attorney's fees-should be allowed

Case 2:18-cv-11776-AJT-EAS ECF No. 179-1, PageID.4993 Filed 12/03/21 Page 18 of 59

Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...

2008 WL 906031

to the prevailing party." Fed.R.Civ.P. 54(d)(1). The party claiming any item of cost or disbursement must, through an affidavit, verify the amount and indicate that the services for which fees have been charged were actually and necessarily performed. 28 U.S.C. § 1924.

7      The most important consideration at the heart of a fee request is the degree of success. *See Hensley, 461 U.S. at 435.* MHSAA argues that although Plaintiffs succeeded in getting some seasons changed, Plaintiffs did not succeed in obtaining the same schedule for both genders, monetary relief, or any relief against members of MHSAA's representative council or its executive director. (Suppl.Resp.14.) In reported decisions alone, Plaintiffs defeated MHSAA's 1998 Motions to Dismiss and for Summary Judgment, *Communities for Equity v. MHSAA,* 26 F.Supp.2d 1001 (W.D.Mich.1998); achieved class certification, *Communities for Equity v. MHSAA,* 192 F.R.D. 568 (W.D.Mich.1999); defeated MHSAA's Second Motions to Dismiss and for Summary Judgment, *Communities for Equity v. MHSAA,* 80 F.Supp.2d 729 (W.D.Mich.2000); succeeded in significant Motions in Limine, *Communities for Equity v. MHSAA,* 137 F.Supp.2d 910 (W.D.Mich.2001); and won on the liability issues tried by the Court, *Communities for Equity v. MHSAA,* 178 F.Supp.2d 805 (W.D.Mich.2001). Plaintiffs were also extremely successful at the appellate level. Accordingly, MHSAA's argument is wholly without merit.

The primary concern when awarding attorneys' fees is that the fees are reasonable. *See Blum v. Stenson,* 465 U.S. 886, 893, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Fees are calculated utilizing the "lodestar" method, which was explained by the United States Supreme Court in *Hensley:*

The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No. 94-1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall,* 205 U.S.App. D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original).

**\*4** 461 U.S. at 433-34. As an alternative to line-by-line reduction, the propriety of simple across-the-board reductions by a certain percentage has been recognized by the Sixth Circuit as an appropriate mechanism for penalizing duplication and other billing problems. *See Coulter v. Tennessee,* 805 F.2d 146, 152 (6th Cir.1986). Where fee documentation is voluminous, some courts have found it impractical to engage in a precise line-by-line analysis and favor across-the-board reductions. *See, e.g., Loranger v. Stierheim,* 10 F.3d 776, 783 (11th Cir.1994).

Reasonable hourly rates typically equate to the customary rates charged by local attorneys of comparable experience and expertise. *Hadix v. Johnson,* 65 F.3d 532, 536 (6th Cir.1995). Certain cases create an exception to this general rule and allow higher rates to be recouped by an "out-of-town specialist." *Id.* Regarding this exception, the Sixth Circuit has counseled:

When fees are sought for an out-of-town specialist, courts must determine (1) whether hiring the out-of-town specialist was reasonable in the first instance, and (2) whether the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation. *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 768-69 (7th Cir.1982); *Maceira v. Pagan,* 698 F.2d 38, 40 (1st Cir.1983). A corollary of this rule is that judges may question the reasonableness of an out-of-town

Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...
2008 WL 906031

attorney's billing rate if there is reason to believe that competent counsel was readily available locally at a lower charge or rate. *Chrapliwy,* 670 F.2d at 769.

*Id.* at 535.

Adjudication of the lodestar fee does not end the analysis mandated by the Supreme Court. While there is a "strong presumption" that the lodestar fee is reasonable, pertinent circumstances may warrant an adjustment either upward or downward. *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan,* 46 F.3d at 1401-02. Factors pertinent to setting and adjusting the lodestar fee was specified long ago by the Fifth Circuit Court of Appeals in *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir.1974). The *Johnson* factors have now become part of the settled law of lodestar analysis under both Supreme Court and Sixth Circuit decisions. These factors include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

**\*5** *Blanchard v. Bergeron,* 489 U.S. 87, 91 n. 5, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (citing Johnson); *Paschal v. Flagstar Bank,* 297 F.3d 431, 435 (6th Cir.2002). The *Johnson* factors are a "useful catalog" to consider when exercising statutory discretion, *Paschal,* 297 F.3d at 435 (citation omitted), but are not die-hard requirements.[8] *Crosby*

*v. Bowater Inc. Ret. Plan for Salaried Employees of Great N. Paper, Inc.,* 262 F.Supp.2d 804, 811 (W.D.Mich.2003), rev'd on other grounds, No. 03-1808, 2004 WL 5389834 (6th Cir.2004).

[8]  Based on MHSAA's objections, a discussion of each *Johnson* factor is implicitly integrated into the Court's analysis. The Court determines that the final award need not be adjusted upward or downward as it adequately compensates counsel while not producing a windfall.

### III. ANALYSIS

#### A. Local Counsel and Out-of-Town Specialists

MHSAA's most financially significant objection questions whether Plaintiffs' numerous out-of-town specialists were reasonably necessary to the litigation and thus deserving of non-local attorneys' rates. To resolve this issue, two questions must be answered: (1) whether competent counsel was available locally, and (2) whether the rates requested by Plaintiffs' counsel are reasonable based on the applicable market.

#### 1. Competent Counsel

Prosecuting the discrimination suffered by Plaintiffs presented challenges far more complex than those found in typical civil rights actions. To succeed in this case, Plaintiffs needed counsel with: (1) knowledge of the application of Title IX and the Equal Protection Clause to athletics programs; (2) the capability to devote significant human and capital resources for the life of the case; (3) a willingness to take on a powerful local entity with significant financial resources and widespread public support;[9] (4) a willingness to tolerate a high degree of risk with recovery contingent on success; (5) litigation experience; and (6) competency to manage a large class action lawsuit.

[9]  In 1998, MHSAA enjoyed a reputation for vehement litigation tactics. MHSAA's website formerly boasted it had "prevailed in every legal action for 20 years." MHSAA, *Local* Litigation Now National Issue (2002), http://www.mhsaa.com/news/equity.html.

A "good-faith effort to find local counsel all that is necessary, lest the meticulous generation of a comprehensive log of inquires deter plaintiffs from bringing worthy

2008 WL 906031

discrimination suits, frustrating the rationale for statutes enabling private civil rights suits." *See Mathur v. Bd. of Trs. of S. Ill. Univ.,* 317 F.3d 738, 744 (7th Cir.2003) (citation omitted). Courts must be mindful to not impose impossible burdens on potential plaintiffs in cases "of great national concern" by requiring plaintiffs to look for the proverbial needle in the haystack before retaining counsel ideally qualified to handle their case. *See Northcross v. Bd. of Educ. of Memphis City Sch.,* 611 F.2d 624, 634 (6th Cir.1979). The "representation of important national concerns [must] not depend upon the charitable instincts of a few generous attorneys." *Id.* at 638.

After the class representatives contacted Kristen Galles, she began searching for a local attorney to serve as lead counsel. [10] In early 1998, Galles spent at least 9.9 hours in furtherance of this search. After searching Martindale-Hubble entries, Galles contacted the only attorney in Michigan claiming expertise in Title IX-Jean King of Ann Arbor. [11] According to Galles, King-"a woman not known for backing down from a fight"-"refused to take the case because she believed MHSAA had too much money and power for the case to be winnable." (Galles' Suppl. Decl. ¶ 6; *see also* King's Aff. ¶¶ 11-13; Madsen's Decl. ¶¶ 32-34.) Galles also contacted, but to no avail, the American Civil Liberties Union, National Organization of Women, Grand Rapids Bar Association, Western Michigan Women's Bar Association, the American Association of University Women, and three other local attorneys. Thus, Plaintiffs argue, no competent local attorneys were willing to lead this case. [12] Galles eventually convinced Rhett Pinsky, a local attorney at a small law firm, to serve as local counsel, *see* W.D. Mich. LCivR 83.1(f), although he was unwilling to assume a lead role. (Pinsky's Suppl. Decl. ¶ 3.)

[10]    Galles' role in the beginning of the case was unknown to her, although she knew an attorney with Title IX expertise would be essential to success. "I knew that either NWLC or I would have to participate in the litigation in some way. However, at the beginning of the case, I did not know whether I would be involved as lead counsel or merely as advisory counsel." (Galles' Suppl. Decl. ¶ 91.)

[11]    A class representative had previously contacted King herself. King turned down this request for representation.

[12]    MHSAA confusingly interprets Galles' argument to mean she is "the only *competent* lawyer available to take this case." (Suppl.Resp.11.) Plaintiffs, however, have never made this argument, rather that no Michigan attorneys possessed both (1) competency and (2) amenability to taking this case.

**\*6** MHSAA protests Galles' search for "local counsel" by way of semantics. MHSAA argues Galles never actually searched for local Michigan counsel to lead the case, but rather searched only for secondary counsel in Michigan to assist her as lead counsel. MHSAA bases this argument on Galles' use of the adjective "local" in billing descriptions. "Local" has two connotations, the first of which designates close geographic proximity, *see Webster's New Universal Unabridged Dictionary* 1127 (Barnes & Noble 2003), and the second which describes counsel who has a secondary role to out-of-town lead counsel. *See* W.D. Mich. LCivR 83.1(f) ("The Court may ... require any attorney whose office is a great distance from the courthouse to retain local counsel. Local counsel ... shall have both the authority and responsibility for the conduct of the case should lead counsel be unavailable....")

Read naturally in the context of Galles' billing records and based on a review of the organizations and attorneys she actually contacted, "local" indicates that she looked for *Michigan* attorneys to spearhead the case, not attorneys to take on a secondary role. It was only after Plaintiffs concluded no competent local attorneys were willing to lead the case that Pinsky was hired as secondary counsel, as required by local rule. MHSAA's argument for a contrary interpretation is disingenuously pedantic. For example, in an affidavit submitted on behalf of MHSAA, the attorney affiant uses the word "local" to mean secondary counsel. (*See* Mackraz's Aff. ¶ 9 (stating that "plaintiffs could have retained local counsel to represent their interests had they so chosen").)

To counter the assertion that no competent Michigan attorneys were available to lead the case, MHSAA presents an affidavit from one Michigan attorney, Frederick E. Mackraz, who claims he could have served as lead counsel. *Cf. Guckenberger v. Boston Univ.,* 8 F.Supp.2d 91, 104 (D.Mass.1998) (denying out-of-state counsel rates because the plaintiffs only made a cursory search for Boston counsel and the defendants had submitted affidavits from several well-respected civil rights attorneys who averred they were competent to handle the litigation). Mackraz avers: "I was not approached by Plaintiffs .... Had I been approached, I would have certainly investigated their claims .... I would have given

Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...

2008 WL 906031

very serious consideration to representing their interests in this case pursuant to my standard fee agreement." (Mackraz's Aff. ¶ 8.)

Mackraz's affidavit, however, fails to demonstrate his competency and ability to lead this case. He has failed to demonstrate he had the requisite time or financial resources to handle such a large case. To this Court's knowledge, Mackraz has never handled, much less even worked on, a class action lawsuit. There is a significant chance that Mackraz could not have even jumped through an initial hurdle of the case-being appointed as class counsel pursuant to Federal Rule of Civil Procedure 23(g). Mackraz also did not possess any Title IX experience. Moreover, in 1998, he was an associate at Plunkett Cooney, a local firm which states that its "attorneys practice in the state and federal trial courts every day, defending lawsuits brought under Title VII, 42 U.S.C. § 1983 and state civil rights acts such as Michigan's Elliot Larsen Civil Rights Act." Plunkett Cooney, *Civil Rights,* http:// www.plunkettcooney.com/practices-67.html (last visited Mar. 24, 2008). Plaintiffs needed counsel with experience prosecuting civil rights actions, not defending them. There was thus no reason to even consider attorneys at Plunkett Cooney. Simply put, Mackraz was not competent to lead Plaintiffs' case in 1998.

**\*7** After reviewing MHSAA's acrimonious argument, it is quite telling that Mackraz is the *only* attorney MHSAA can present to the Court to counter Plaintiffs' compelling argument that Michigan attorneys lacked competency in this area of the law. The Court in no way means to discredit Mackraz's practice, but he was simply not qualified in 1998. MHSAA's argument magnifies the frustration Plaintiffs and Galles must have felt when searching for local counsel. Galles-acting without the benefit of hindsight that MHSAA has enjoyed in its search for potentially competent local counsel-surely felt that if Plaintiffs retained incompetent local counsel, it would prove fatal to their claims.

If Plaintiffs had kept searching for lead local counsel and receiving rejections after Galles contacted at least four local attorneys and five local organizations, which in the aggregate represent thousands of local attorneys, this meritorious suit may have been abandoned due to overwhelming frustration. The Court holds that expending almost ten hours in search of competent counsel and contacting thousands of attorneys-albeit indirectly-constitutes a good-faith effort to find local counsel. *See Gottlieb v. Barry,* 43 F.3d 474, 485 n. 8 (10th Cir.1994) (finding out-of-town counsel reasonably necessary

where there existed "neither a lawyer nor a firm in this town which could have devoted to this case the timely expertise, experience, and manpower" of the plaintiffs' counsel); *Avalon Cinema Corp. v. Thompson,* 689 F.2d 137, 140 (8th Cir.1982) (concluding it is not always possible to find local counsel willing or able to undertake difficult and controversial civil rights litigation). Thus, Plaintiffs appropriately ventured to find competent counsel outside Michigan.

i. Galles and Pinsky

It is undisputed that Galles is a leading Title IX and Equal Protection attorney with extensive litigation experience. Based on this background, her previous work getting Plaintiffs' case off the ground, and the request of Plaintiffs, Galles assumed the role of lead counsel. [13] Because at least one competent out-of-town attorney was necessary, Galles was surely reasonably employed and is properly compensated based on Washington, D.C. rates. Pinsky was also necessary for all intents and purposes since a Michigan attorney was required as "local counsel." *See* W.D. Mich. LCivR 83.1(f). The determination of whether the other out-of-town attorneys were reasonably employed is unfortunately not as straightforward.

[13] "I agreed to become lead counsel because there was no one else to do it, because I knew that MHSAA was violating the law, and because Plaintiffs had begun to rely on me as the only person who told them they were right." (Galles' Suppl. Decl. ¶ 95.)

ii. NWLC

MHSAA objects to counsel from NWLC when Galles was already acting as lead counsel and questions how many experts in Title IX and sex discrimination were necessary. MHSAA claims the Department of Justice, which has considerable experience in Title IX and sex discrimination law, essentially assisted Plaintiffs as "co-counsel" because of its role as *amicus curiae,* which negates the need for perhaps any experts in these areas or at least NWLC. (Def.'s Expert Report 3; *see also* Suppl. Resp. 6.) While the assistance of *amicus curiae* no doubt benefits a plaintiff, it is not the *amicus curiae's* case to win. Based on the relative strength of MHSAA and the number of hours necessary to successfully prosecute this case, Galles reasonably believed Plaintiffs would need more attorneys than just herself and Pinsky. (*See* Reply 18.) She therefore sought out NWLC for its highly-regarded expertise in Title IX and sex discrimination. This was a reasonable decision given NWLC's experience and the

Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...

2008 WL 906031

number of attorneys it could provide to assist in this case. NWLC is thus also entitled to Washington, D.C. rates.

**\*8** Moreover, the number of attorneys employed by a party is not dispositive of whether an attorneys' fees award is reasonable. The important consideration is the number of billable hours requested. More than one attorney working on a case simply signals to the Court that it must be mindful of hours that are duplicative or excessive. An analysis of the hours that are allegedly duplicative and excessive is discussed *infra.*

iii. DLA Piper

MHSAA objects to compensating DLA Piper counsel because neither Cohan nor Bohnenstengel had any Title IX, civil rights or sex discrimination experience when they were brought onto Plaintiffs' trial team. (Def.'s Expert Report 3.) These attorneys, however, were not added for Title IX or civil rights experience, but for trial experience. [14] (Reply 10.) Admittedly, the Court ordered the parties to pare down their cases considerably so that trial would not last longer than two weeks. [15] As is the case with many parties facing this situation, Plaintiffs retained counsel with extensive trial experience and the proven ability to expeditiously and effectively condense Plaintiffs' case within the allotted time frame. Nevertheless, even though it was reasonable to hire experienced trial counsel, this does not mean that local attorneys did not possess the same competency. Plaintiffs have failed to convince the Court otherwise because no affidavits demonstrate a lack of local competent trial counsel. The Court concludes that these out-of-town attorneys are only entitled to local rates and not rates based on the Washington, D.C. market.

[14] Plaintiffs' female attorneys also ironically admit they "felt compelled to bring in a white male to succeed" due to defense counsel's alleged intimidation tactics against female counsel. (*See* Reply 10.)

[15] Interestingly, while MHSAA objects to Plaintiffs' hiring of experienced trial counsel, MHSAA also added new trial counsel in 2001.

iv. Steptoe & Johnson

Finally, MHSAA argues it is unreasonable to compensate counsel from Steptoe & Johnson-a firm

known for, *inter alia,* its extensive attorneys' fees practice-to assist in fee petition litigation. "Where necessary, fee petitioners may hire outside counsel to represent them in fee litigation. The outside counsel may also recover reasonable attorneys fees." *Knop v. Johnson,* 712 F.Supp. 571, 592 (W.D.Mich.1989) (citations omitted). The vigor with which the defendant has litigated the fee issue may render the decision to retain outside fee counsel as reasonable. *Id.* MHSAA vigorously litigated the fee issue and retained an expert to file two substantial reports nitpicking the Fee Petition. As such, it was entirely reasonable for Plaintiffs to hire outside fee counsel.

Plaintiffs have not convinced the Court, however, that competent fee counsel was unavailable locally. Plaintiffs cite to a recent decision in the Eastern District of Michigan where lead counsel, Jenner & Block of Washington, D.C., was awarded Washington, D.C. attorneys' rates. *Entm't Software Ass'n v. Granholm,* No. 05-73634, slip op. at 2 (E.D.Mich. July 6, 2006). In pertinent part, the court stated:

> The Court finds that it was reasonable for plaintiffs to hire Jenner & Block because of their expertise in the issues involved with this litigation, given their involvement in representing the video game industry in five other cases involving similar laws. *See Northcross v. Bd. of Educ. Of the Memphis City Schools,* 611 F.2d 624, 637 (6th Cir.1979) (awarding fees for out-of-town civil rights attorneys because "the attorneys' intimate familiarity with the issues involved in [this] litigation undoubtedly meant that their time was far more productive in this area than would be that of a local attorney with less expertise"). While Detroit has its share of qualified First Amendment attorneys, Jenner & Block was uniquely qualified to head the litigation effort on behalf of plaintiffs due to their recent and on-going involvement in other jurisdictions, the compressed time-frame involved, and their sole access to deposition transcripts of expert witnesses in the Illinois case.

**\*9** *Id.* Plaintiffs argue Steptoe & Johnson's recent and ongoing involvement in litigating similar issues in other jurisdictions made them uniquely qualified to represent Plaintiffs against MHSAA. (Suppl. Reply 21.) Plaintiffs do not provide enough information in this regard to compare this case to Entertainment Software. Accordingly, Plaintiffs will be compensated for the services of Steptoe & Johnson attorneys based on local rates and not Washington, D.C. rates. [16]

16

In awarding fees, the fee award is technically made to the party and not to counsel *per se. See Evans v. Jeff D.,* 475 U.S. 717, 756, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). The client's liability to the attorney is a separate contract matter. *See Gisbrecht v. Barnhart,* 535 U.S. 789, 806, 122 S.Ct. 1817, 152 L.Ed.2d 996 (2002) (noting that "nothing prevents the attorney for the prevailing party from gaining additional fees, pursuant to contract, from his own client") (citation omitted).

### 2. Reasonable Rates

Although some out-of-town counsel were reasonably employed, this does not necessarily mean the rates charged by said counsel are reasonable. Likewise, just because certain out-of-town counsel were not necessary, this does not necessarily mean the rates charged by said counsel are unreasonable.

[I]f the client needs to go to a different city to find [a] specialist, he will expect to pay the rate prevailing in that city. In such a case, there is no basis for concluding that the specialist's ordinary rate is unreasonably high. If one wishes to be literal, the "prevailing" rate "in the community" for work performed by an outside specialist ... is most likely to be that outside specialist's ordinary rate. If the courts (without cause) award fees at less than that rate, they will tend to prevent those in smaller communities from obtaining the experienced legal counsel they may need, contrary to the

policy behind awards of attorneys' fees to prevailing parties.

*Maceira,* 698 F.2d at 40 (citations omitted). The issue is not, as MHSAA argues, whether Plaintiffs hired the "best" attorneys. Even the "best" attorneys may charge reasonable rates. Once a party has demonstrated lack of local competent counsel, the party need not begin searching for "cheap" out-ofstate counsel. Such a requirement would indubitably discourage plaintiffs with worthy claims from pursuing them because instead of searching for the proverbial needle in a (local) haystack, plaintiffs would be saddled with the more onerous burden of searching for the needle in a (national) hayfield. Each attorney representing Plaintiffs must be scrutinized. All attorneys request compensation based on current market rates to compensate for the almost ten-year delay in payment. Such a request is entirely equitable and in accord with firmly-established precedent. *See Barnes v. City of Cincinnati,* 401 F.3d 729, 745 (6th Cir.2005); *Ams. United For Separation of Church & State v. Sch. Dist. of the City of Grand Rapids,* 717 F.Supp. 488, 499 (W.D.Mich.1989). Plaintiffs' counsel additionally seek their customary rates, which likely represents the market value of the services provided. *See Adcock-Ladd v. Sec'y of Treasury,* 227 F.3d 343, 351 (6th Cir.2000) (holding that "special need" for out-of-state specialists dictates compensation at counsel's customary rates); *Louisville Black Police Officers Org., Inc. v. City of Louisville,* 700 F.2d 268, 277-78 (6th Cir.1983); *cf. Berry v. Sch. Dist. of the City of Benton Harbor,* 703 F.Supp. 1277, 1282-83 (W.D.Mich.1986) ("Especially in cases involving particularly complex issues ... [a] national market or a market for a particular legal specialization may provide the appropriate market.") (citations omitted). The following rates represent the customary rate requested for each attorney based on the 2008 market:

| Attorney | Firm | Experience | Hourly Rate |
| --- | --- | --- | --- |
| Rhett Pinsky | Pinsky, Smith, Fayette & Kennedy | 42 years | $250 |
| Kristen Galles | Equity Legal | 18 years | $390 |
| Marcia Greenberger | NWLC | 38 years | $440 |

Case 2:18-cv-11776-AJT-EAS ECF No. 179-1, PageID.4999 Filed 12/03/21 Page 24 of 59
Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...
2008 WL 906031

| Neena Chaudhry | NWLC | 12 years | $390 |
| Barbara Burr | NWLC | 19 years | $390 |
| Jocelyn Samuels | NWLC | 26 years | $440 |
| Leslie Annexstein | NWLC | 16 years | $390 |
| Laura Duos | NWLC | Law Clerk | $125 |
| Beth Burkstrand-Reid | NWLC | Law Clerk | $125 |
| Dina Lassow | NWLC | 36 years | $440 |
| Andrea Kahn | NWLC | Law Clerk | $125 |
| Roger Warin | Steptoe & Johnson | 37 years | $440 |
| Lindsey Lang | Steptoe & Johnson | 26 years | $375 |
| Philip Cohan | DLA Piper | 42 years | $440 |
| Robin Bohnenstengel | DLA Piper | 13 years | $390 |

i. Pinsky, Smith, Fayette & Kennedy (Local Rates for Local Counsel)

**\*10** The Court first analyzes whether the rate requested by Pinsky is a reasonable local rate. When deciding whether a Michigan attorney's rate is reasonable, the Court relies on a combination of its own expertise and judgment, *see Garber v. Shiner Enters., Inc.,* No. 1:06-CV-646, 2007 WL 4557857, at \*1 (W.D.Mich. Dec.21, 2007), the State Bar of Michigan's "Economics of Law Practice Survey," *see Citizens Ins. Co. of Am. v. KIC Chems., Inc.,* No. 1:04-CV-385, 2007 WL 2902213, at \*5 (W.D.Mich. Oct.1, 2007), other market surveys if necessary, *see id.* at \*6, and the "attorney's normal billing rate [which] will often show the market value of the services provided." *Ams. United For Separation of Church & State,* 717 F.Supp. at 495.

MHSAA submitted an affidavit of Barbara A. Ruga-a long-standing Grand Rapids attorney-which sets forth her opinion regarding reasonable rates in the Western District of Michigan for attorneys and paralegals. (*See* Ruga's Aff. ¶ 1) Based on Ruga's market assessment, MHSAA argues Pinsky, Plaintiffs' sole Michigan attorney, should not be compensated more than $185 an hour. (Def.'s Expert Report 3, 11.) This suggested rate is too low based on the Court's knowledge of the current market. The Court accords little deference to Ruga's assessment of the legal market. The 2007 "Economics of Law Practice Survey" provides a much more authoritative summary of hourly billing rates. The following table compares the hourly rates of litigators at all Michigan firms to attorneys at Grand Rapids firms of any size:

|  | **All Michigan Firms** | | **Grand Rapids Firms** | |

Case 2:18-cv-11776-AJT-EAS ECF No. 179-1, PageID.5000 Filed 12/03/21 Page 25 of 59
Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...
2008 WL 906031

| | | |
|---|---|---|
| Mean | $200 | $298 |
| Median | $195 | $263 |
| 10th Percentile | $150 | $230 |
| 25th Percentile | $155 | $250 |
| 50th Percentile | $195 | $263 |
| 75th Percentile | $225 | $294 |
| 90th Percentile | $275 | $400 |

*Economics of Law Practice Survey,* State Bar of Michigan (2007) (numbers are rounded to nearest dollar). As can be seen, Pinsky's customary rate is charged by the twenty-fifth percentile of Grand Rapids attorneys. Based on his 42 years of experience and the quality of his advocacy, this rate is extremely reasonable. Were Ruga's market analysis to be accepted, Pinsky would be compensated at a rate significantly lower than that charged by the bottom ten percent of Grand Rapids attorneys. While the Court is happy to consider the opinions of local attorneys such as Ruga, sometimes the rates suggested by such "long-standing" attorneys fail to consider the changes in the legal market and inflation that have occurred over the last decade.

Besides being reasonable based on the State Bar of Michigan's survey, Pinsky's rate is also reasonable based on local precedent. In *Spurlock v. Rajt,* an Eastern District of Michigan court awarded an attorney with 16 years of experience $300 an hour based on the 2003 "Economics of Law Practice Survey." No. 06-15251, 2008 WL 474082, at *2-3 (E.D.Mich. Feb.15, 2008). Noting that in 2003 such a rate represented the ninety-fifth percentile of all Michigan attorneys, the court nevertheless found such an award proper. *Id.* at *2. In this case, Pinsky has much more experience than the attorney in *Spurlock* and is requesting $50 less an hour. Moreover, the rates at issue in *Spurlock* are over four years behind the current market. Accordingly, Pinsky's billed hours are computed based on his $250 an hour rate.

ii. Equity Legal and NWLC (Washington, D.C. Rates for Out-of-Town Counsel)

**\*11** The Court next turns to compensation requested by Galles and NWLC. As aforesaid, rates based on the Washington, D.C. market are appropriate for both. The Sixth Circuit has seemingly endorsed the use of the *Laffey* Matrix [17] to determine the reasonableness of rates for Washington, D.C. attorneys. *See Adcock-Ladd,* 227 F.3d at 347 n. 3 (noting that the *Laffey* Matrix is an "official statement of market-supported reasonable attorney fee rates" for Washington, D.C.). The *Laffey* Matrix for June 1, 2007 through May 31, 2008 is as follows:

[17]    The *Laffey* Matrix was created in *Laffey v. Nw. Airlines, Inc.,* 746 F.2d 4 (D.C.Cir.1984).

| Experience Level | Hourly Rate |
|---|---|
| 20+ years | $440 |
| 11-19 years | $390 |
| 8-10 years | $315 |
| 4-7 years | $255 |
| 1-3 years | $215 |
| Paralegals & Law Clerks | $125 |

United States Attorneys's Office for the District of Columbia, *Laffey* Matrix 2003-2008, http://www.usdoj.gov/usao/dc / Divisions/Civil_ Division/Laffey_Matrix_7.html (last visited Mar. 24, 2008). For almost two decades, courts have relied on the *Laffey* Matrix–or a variation of it–as evidence of reasonable rates for attorneys in Washington, D.C. *See, e.g., Covington v. District of Columbia,* 57 F.3d 1101, 1109 (D.C.Cir.1995); *Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d

1516, 1525 (D.C.Cir.1988) (en banc); *Smith v. District of Columbia,* 466 F.Supp.2d 151, 156 (D.D.C.2006).

MHSAA objects to any presumptive market rate associated with Galles because she is a solo-practitioner and employs no support staff. (Resp.13.) Solo practitioners with no support staff, MHSAA argues, traditionally charge less than attorneys working with other attorneys at a law firm with support staff. For example, if a market rate of $175 an hour is appropriate for attorneys comparable to Galles, MHSAA argues she is only worth $150 an hour. (*Id.; see also* Ruga's Aff. ¶¶ 5-6.) The Court finds this argument baseless due to lack of authority or compelling evidence. Accordingly, the Court awards Plaintiffs' fees for the services of Galles and NWLC attorneys at their requested rates since they are in accord with the *Laffey* Matrix.

   iii. DLA Piper and Steptoe & Johnson (Local Rates for
   Out-of-Town Counsel)
Determining appropriate rates for DLA Piper and Steptoe & Johnson attorneys presents more of a challenge than Plaintiffs' other attorneys since they are out-of-town attorneys but only entitled to local rates. Although counsel are only entitled to local rates, it is notable that they are requesting rates based on the *Laffey* Matrix as opposed to their customary rates, which are higher. Plaintiffs' counsel hoped "this litigation decision [would] reduce the potential of even more rancorous litigation over fees and result in a quicker realization of the fee award." (Suppl.Pet.8.) By all accounts, MHSAA was no less rancorous in fighting almost every dollar Plaintiffs requested in attorneys' fees.

MHSAA objects to any compensation flowing to DLA Piper counsel because the attorneys originally stated they were appearing *pro bono.* (*See* Resp. 8-9.) This argument can be summarily dismissed. Courts are instructed to avoid "decreasing reasonable fees because the attorneys conducted the litigation more as an act of pro bono publico than as an effort at securing a large monetary return." *Blum,* 465 U.S. at 895 (quoting *Stanford Daily v. Zurcher,* 64 F.R.D. 680, 681 (N.D.Cal.1974)). Thus, the Court will not prohibit reasonable fees just because attorneys were willing to volunteer their time without charging a fee.

 **\*12** Based on the 2007 "Economics of Law Practice Survey," Warin and Cohan's requested rates of $440 an hour are above the ninetieth percentile of Grand Rapids litigators, Bohnenstengel's requested rate of $390 an hour is just below the ninetieth percentile, and Lang's requested rate of $375 an hour is a little further below the ninetieth

percentile. *See Economics of Law Practice Survey,* State Bar of Michigan (2007). Based on the impressive resumes of these four attorneys, extensive experience, and high quality briefing and documentation, the Court is satisfied that they are all well-above the ninetieth percentile of Grand Rapids litigators and deserve compensation at the top of the local market.

> [They] are nationally recognized
> experts in a complex field of federal
> practice. They are by no means the
> "median" member of the bar, and their
> hourly rates should be adjusted upward
> to reflect both their specialization and
> the extremely high quality of the
> representation they provided to the
> plaintiff class. Such an adjustment is
> not simply reasonable, it is mandated
> by equity and fairness.

*Knop,* 712 F.Supp. 583. Other compensation surveys compel the same conclusion. For example, the National Law Journal's 2007 survey concludes that top rates for partners in the reporting Michigan firms ranged between $530 to $625 an hour, with most partners averaging $400 an hour. *See A Nationwide Sampling of Law Firm Billing Rates,* Nat'l L. J., Dec. 10, 2007, at B2, B4. Accordingly, the Court finds that counsel's requested rates are reasonable based on the local market. *See Citizens Ins. Co. of Am.,* 2007 WL 2902213, at *6 (citing *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.,* 51 F.Supp.2d 302, 305 (S.D.N.Y.1999)) (finding that counsel's rates need only be "ball-park reasonable"). [18]

[18]    Although MHSAA does not voice much objection
        to the requested rates of paralegals and law clerks
        relative to the rates requested by attorneys, the
        Court finds that all such rates are reasonable based
        on the applicable market.

 **B. Improper Staffing**
MHSAA argues Plaintiffs' counsel were improperly staffed on assignments and performed clerical work that should have been performed by paralegals. (Resp. 13 n. 4, 15-17; Def.'s Suppl. Expert Report 24-25.) Statutes conferring attorneys' fees on prevailing parties are "not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney

could earn through a private fee arrangement with his client." *Coulter,* 805 F.2d at 149 n. 4 (quoting *Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

> Nor do [courts] approve the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals or less experienced associates. Routine tasks, if performed by senior partners in large firms, should not be billed at their usual rates. A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn.

*Ursic v. Bethlehem Mines,* 719 F.2d 670, 677 (3d Cir.1983). The Supreme Court of Oklahoma has identified a useful list of common tasks performed by paralegals, including interviewing clients and witnesses, drafting pleadings and other documents, researching legal issues, researching public records, preparing discovery requests and responses, scheduling depositions, preparing notices and subpoenas, summarizing depositions and other discovery responses, coordinating and managing document production, organizing pleadings and trial exhibits, preparing witness and exhibit lists, preparing trial notebooks, preparing for the attendance of witnesses at trial, and assisting attorneys at trial. *See Taylor v. Chubb Group of Ins. Cos.,* 874 P.2d 806, 809 (Okla.1994).

**\*13** MHSAA concludes that approximately 2,600 hours billed by Plaintiffs' counsel should have instead been performed by paralegals. These tasks include legal research (700 hours), factual research (175 hours), scheduling depositions (55 hours), compiling witness and exhibit lists (150 hours), digesting depositions (100 hours), preparing trial notebooks (75 hours), organizing documents (350 hours), reviewing discovery responses and requests (450 hours), and managing document production (475 hours). [19] (Def.'s Expert Report 41.) MHSAA recommends compensating 75% of these hours at prevailing paralegal rates in Michigan, which it argues is $62.50 an hour. (*Id.*) MHSAA also encourages the Court to use the rate for hiring temporary paralegals for calculation purposes, which it suggests is $25.00 an hour. (*Id.*)

[19]     All hours are approximate.

"[D]ecisions concerning which tasks an attorney performs and involving the allocation of personnel toward the efficient and effective completion of tasks will be left to the discretion of the professional unless the allocation is egregious." *In re Seneca Oil Co.,* 65 B.R. 902, 911 (Bankr.W.D.Okla.1986) (citation omitted). "Competent plaintiffs' counsel are in the best position to determine how their time and the time of their associates can best be allocated." *Muehler v. Land O'Lakes, Inc.,* 617 F.Supp. 1370, 1379 (D.Minn.1985). In *Roberts v. Nat'l Bank of Detroit,* 556 F.Supp. 724, 728 n. 1 (E.D.Mich.1983), the court concluded that experienced attorneys who complete routine work themselves should not be penalized if they are not involved in large law practices because they have no lower-level associates for delegation purposes. The case at bar is sufficiently analogous to *Roberts.* Thus, the Court will not decrease an attorney's rate even though the attorney performed tasks that could have been completed by a lower-level associate or paralegal, provided the attorney is not involved in a law firm where such delegation is possible.

In this case, the work characterized by MHSAA as "clerical"-most of which was performed by Galles who is a solo-practitioner and thus has no lower-level associates to delegate work to-was all reasonably necessary to the success of the litigation and was not unreasonable in duration. After reviewing the time entries and affidavits, the Court finds no merit in MHSAA's contention that the legal research, factual research, digestion of depositions, and reviewing of discovery responses and requests should have been performed by paralegals. Regarding the other tasks contested, although this work may have been more appropriate for lower-level associates or paralegals, a reduction in fees is inappropriate. Most of this work was performed by Galles, however, some was completed by other attorneys although it totals less than 90 hours. Due to the significant number of hours rendered overall in this case, the Court accords discretion to the judgment of Plaintiffs' other attorneys in determining that it was reasonable to perform these tasks themselves. By performing this work themselves, Plaintiffs' counsel were likely able to enhance their trial preparation because of their increased familiarity with the matters. *See Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1583 (5th Cir.1989) ("Though some of the work done by plaintiff's attorneys arguably could have been done by paralegals, the fact that this work was done by the attorneys will not diminish the fee award as their efforts enhanced trial preparation."). Therefore, the Court concludes that the challenged staffing was proper.

### C. Vague Billing Records

**\*14** MHSAA argues the time records of Plaintiffs' counsel are impermissibly vague. (Def.'s Suppl. Expert Report 13-21.) The absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in hours or, in egregious cases, disallowance. *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984). Any ambiguities arising out of poor time records should be resolved against the fee applicant. *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1142 (2d Cir.1983).

MHSAA protests any compensation for approximately 17% of allegedly vague time entries. (*See* Def.'s Expert Report 4, 19-26; Def.'s Suppl. Expert Report 13-21.) A common objection is time billed for a telephone call or the drafting of a letter in which an attorney failed to state the subject matter discussed. (*See* Def.'s Expert Report 20-26.) Viewing MHSAA's argument broadly, it essentially argues counsel should not be compensated if a detailed memorandum was not drafted for every billable six-minute increment of time. Had counsel provided this level of detail, however, MHSAA would likely instead complain that counsel devoted far too many hours to billing and recommend substantial reductions. This typical argument espoused by losing defendants tries to place prevailing plaintiffs in a "Catch-22."

The Court finds merit in some of MHSAA's vagueness arguments due to overly ambiguous time records. Although a large majority of the time records are more detailed than necessary, which makes fee petition review much easier, the same cannot be said for all records. Accordingly, the Court imposes an across-the-board reduction of 10% on the total attorneys' fees award. [20] *Cf. Bronco's Entm't, Ltd. v. Charter Twp. of Van Buren,* Civil Action No. 99-70197, 2007 WL 2221406, at \*1, 6 (E.D.Mich. July 31, 2007). In so holding, the Court seeks to penalize Plaintiffs' counsel not only for vagueness, but also for general over-billing problems such as excessiveness and duplicity. These over-billing problems are discussed separately *infra,* although further reductions in excess of 10% are not appropriate.

[20]    This reduction is imposed after reducing fees for individual reductions. *See infra.*

### D. Excessive Hours

MHSAA argues Plaintiffs' counsel billed an excessive amount of hours and that most hours, if not all, should not be compensated. (Def.'s Suppl. Expert Report 25-30.) "The aggregate time for their cause exceeds 9000 hours, despite the fact that they boast of being the Nation's most acclaimed and experienced litigators in civil rights suits of this nature, and in handling the legal issues involved." (Resp.14.) This argument seems to suggest that great attorneys do not have to work hard. In the Court's experience, the exact opposite is true. Most great attorneys realize that to achieve a goal, much hard work and toil is necessary, especially when entering unchartered legal territory.

MHSAA chastises numerous days where Plaintiffs' attorneys worked extremely long hours, most notably Galles. [21] (*See id.* at 6-7; Def.'s Expert Report 16.) Although discussing each day individually would prove tedious, the most seemingly egregious day is worth mentioning. On June 30, 1999, Galles billed 25.10 hours. This was the only day Galles billed in excess of 24 hours and she readily admits that during certain periods of time, she worked every waking minute and slept little. Further, she "worked all night several days in a row, so that [she] did not carefully pay attention to when one day ended and another began." (Galles' Suppl. Decl. ¶ 199.) The Court could punish Galles' inaccuracy, assuming it is inaccurate, but doing so is inequitable.

[21]    MHSAA notes Galles billed "almost 700% more long days than any other attorney working on the Litigation." (Def.'s Expert Report 16.) As lead counsel, this should be expected.

**\*15** Contrary to the "normal" hours MHSAA implies all attorneys keep, [22] most attorneys have had to pull "all-nighters," as have many judges and their law clerks. [23] "It is certainly not unusual for attorneys to work long hours when they are litigating a complex matter." *Knop,* 712 F.Supp. at 579. Indeed, attorneys who have not experienced an unexpected event requiring such hours on the eve of a trial, proceeding, or transaction represent anomalies of the profession. (*See gen.* Kator's Decl. ¶¶ 5-7 (stating that as an attorney, long hours are common in complex cases).) Alternatively, even if Galles should have billed the hours she worked between 3:00 a.m. and 5:00 a.m. under July 1 instead of June 30, for example, this does not change the total hours billed. Either way, MHSAA's argument is void of merit.

*Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...*

2008 WL 906031

22    MHSAA also suggests that "[n]ot every event in an attorney's day is a billable one.... It has been estimated that a lawyer must generally spend three hours in the office to legitimately bill for two hours. Furthermore, an attorney working a lengthy day will inevitably be less efficient as the day progresses." (Def.'s Expert Report 16.)

23    In this Court's chambers, for example, "working hours ... exceed 50 hours a week as a general rule, and often total between 60 and 80 hours per week during trial terms." *Knop,* 712 F.Supp. at 579 n. 5.

MHSAA next takes issue with 640 hours Galles billed in initial research,[24] 346 hours of which were related to the "basic" legal issues and claims in the litigation. (Def.'s Expert Report 3.) MHSAA fails to specify whether it objects to all the research hours or only those related to "basic" legal issues, although it would not be surprising if MHSAA believes an "expert" like Galles cannot justify a single hour of research. If "a district court decides to eliminate hours of service adequately documented by the attorneys, it must identify those hours and articulate its reasons for their elimination." *Northcross,* 611 F.2d at 637. MHSAA summarily identifies the dates this alleged unnecessary research was performed. (*See* Def.'s Supp. Expert Report 25-28.) MHSAA fails, however, to adequately articulate why these hours should be eliminated and why the research was in fact unnecessary. Conclusory statements do not suffice. Thus, the Court is unable to find merit in the objection.

24    This research took place during the merit-phase of the case. In later briefing, MHSAA chides many of the additional hours performed relating to the Fee Petition.

Alternatively, based on review of billed research hours, the amount of research undertaken by Plaintiffs' counsel was reasonable based on the circumstances of this case. Title IX is a complex area of the law and contains relatively few reported decisions to guide practitioners. *See Cohen v. Brown Univ.,* 101 F.3d 155, 169 (1st Cir.1996) (recognizing "factual intricacies and legal complexities that characterize Title IX litigation"). Plaintiffs' counsel treaded new ground with their claims, including the applicability of Title IX to state high school athletic associations. To tackle this issue required learning how MHSAA operates in order to establish that it controls and operates interscholastic athletics in Michigan and is thus a "state actor" subject to Plaintiffs' constitutional claims. This involved review of over 30 years

of MHSAA's handbooks, bulletins, representative council packets, and agendas. It was not until the middle of this case that the Supreme Court resolved the "state actor" issue, which essentially adopted the position advocated for by Plaintiffs. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). Had less-experienced counsel handled this case, it would have greatly increased the number of hours that would have been billed.

**\*16**   Generally speaking, the number of overall hours expended was reasonably necessary due in large part to defense counsel's tactics. "Defendants' counsel harassed plaintiffs and their counsel, intimidated the named plaintiffs and their minor children, were rude, uncooperative, and dilatory, and introduced a level of hostility into the litigation that vastly increased both the workload and the stress of prosecuting this case." (Reply 2.)

> Defendants challenged plaintiffs at every turn, filing motion after motion. Issues of capacity and standing, standards governing motions to compel and for protective orders, standards governing Rule 15 motions to amend, standards for interlocutory appeals, mandamus, rehearing *en banc,* and *certiorari,* the standards governing judicial disqualification, and several evidentiary issues were briefed in response to Defendants' obstructionist strategy.

(*Id.* at 9-10.) MHSAA cannot choose to "litigate tenaciously and then be heard to complain about the time necessarily spent by plaintiff in response." *City of Riverside v. Rivera,* 477 U.S. 561, 580 n. 11, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986); *Knop,* 712 F.Supp. at 578. The time required to litigate increases when the defendant bitterly contests the case, forcing the plaintiffs to win their victory from "rock to rock and from tree to tree." *Lipsett v. Blanco,* 975 F.2d 934, 939 (1st Cir.1992). Accordingly, MHSAA must reap what it has sown. The excessiveness objection is denied.

**E. Duplicative Hours**

MHSAA argues that Plaintiffs' counsel exhibited duplicative efforts. (*See* Def.'s Expert Report 28-38; Def.'s Suppl. Expert Report 25-30.) "[I]f the same task is performed by more than one lawyer, multiple compensation should be denied. The more lawyers representing a side of the litigation, the greater the likelihood will be for duplication of services." *Ramos v. Lamm,* 713 F.2d 546, 554 (10th Cir.1983). MHSAA takes issue with approximately 1,100 hours that resulted from attorneys speaking to one another or meeting with the Department of Justice, such as telephone conferences, meetings, and emails. (Def.'s Export Report 27-28.) MHSAA also argues unnecessary staffing added over 200 billable hours to time billed for depositions as well as additional travel costs. (*Id.* at 6.) MHSAA posits it was unnecessary for more than one attorney to be present at almost every event, including depositions, status conferences, pretrial conferences, and mediation. (*See id.*)

In complex matters, it is standard practice for at least two attorneys to appear at most proceedings, along with paralegals or law clerks to assist with document handling. If two attorneys are present at a deposition, for example, one can interrogate the witness while the other can consider what topics are not being adequately covered because of rude defense tactics, an evasive witness, or witnesses who claim not to remember. Similarly, it is reasonable for all trial counsel to be present for mediation. This case is an example of the success of such a staffing practice because mediation resulted in trial being reduced to a single issue. This successful result indubitably saved time and attorneys' fees because a favorable result in mediation is almost always reached in a shorter period of time than it would take for the same result to be reached at trial.

**\*17** After reviewing the numerous time entries associated with the hours at issue, the Court is satisfied that Plaintiffs' counsel did not overly duplicate or otherwise improperly staff proceedings and assignments. Counsel reasonably consulted each other concerning pretrial orders, especially given the hostile and uncooperative nature of defense counsel, which eventually led the Court to order all parties to convene in the Court's jury room to produce a pretrial order. This also applies to the drafting of the final order of proof and court appearances where multiple attorneys were present. [25] Plaintiffs' expert provides a pointed summary of this issue:

[25] The most seemingly egregious of these appearances occurred at the final pretrial conference when all five trial counsel were present.

Although such a practice would not be reasonable for every appearance in court, it was appropriate in this circumstance because all attorneys who are going to appear at trial should be at the final pretrial conference. This is a courtesy to the Court where, as here, new attorneys are appearing for the first time.

This case was lengthy, complex and vigorously contested. Undoubtedly, the defense tactics of rude, offensive behavior, foot dragging, dissembling and totally refusing to cooperate to move the case to a conclusion resulted in the expenditure of many more hours of lawyer time on the part of plaintiffs' counsel than would have been necessary if defense counsel had been more professional in their responsibilities to their client, to opposing counsel and to the Court.

(Pls.' Expert Report 15.) Accordingly, the Court finds that there was no duplication of attorney effort or unreasonable use of attorney time. *Cf. Knop,* 712 F.Supp. at 577-78 (finding billable time for eight attorneys, "one paralegal and a number of law clerks and law student interns" constituted reasonable staffing).

### F. Billing Fraud

MHSAA argues Galles fraudulently "padded" her billing records. [26] MHSAA tries to prove this allegation in two ways. First, MHSAA cites the approximately 3,400 aggregate hours Galles billed in 1999 in this case, *Paton v. New Mexico Highlands Univ.,* No. 97-01360-JC (D.N.M.), and *Alston v. Va. High School League, Inc.,* No. CIV. A. 97-0095-C (W.D.Va.). [27] When coupled with her community, special interest, and professional activities, MHSAA questions, "[w]hen did counsel have time to sleep, eat, conduct personal business and attend to administrative matters?" (Addendum to Resp. 4; *see also* Resp. 4.) Given that Galles only took off 28 days in 1999, 3,400 hours roughly equates to billing 10 hours a workday. These three cases-especially the case *sub judice*-were extremely time intensive and involved numerous deadlines. Billing 3,400 hours is not facially unreasonable, especially given the amount of travel required. The Court does not assume fraud based solely on the number of hours Galles billed.

[26] Along these same lines, MHSAA argues Plaintiffs' counsel failed to use billing judgment and that substantial reductions are necessary to the hours claimed. (*See* Resp. 14; Def.'s Expert Report 41-43.) Plaintiffs' counsel claims to have exercised billing judgment to exclude over 1,000 billable

Case 2:18-cv-11776-AJT-EAS ECF No. 179-1, PageID.5006 Filed 12/03/21 Page 31 of 59

Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...

2008 WL 906031

hours. (*See* Reply 3 n. 4.) Upon review of the time entries and affidavits, there is nothing to indicate that MHSAA's allegation has merit so it is therefore rejected.

27    In *Alston,* Galles was one of ten attorneys and claimed personal attorney's fees of $157,900. MHSAA implies fraud by questioning why Galles is claiming much higher fees in this case and argues the two cases have virtually identical legal and factual issues. (Resp.19.) MHSAA also argues "Galles has never sought or been awarded out-of-state billing rates in any of her other Title IX case [sic]." (Suppl. Resp. 4; *see also* Resp. 9.) MHSAA's position is untenable and irrelevant because the rates used to compensate Galles for her representation in *Alston,* local Virginia rates, has no bearing on the central question of whether competent counsel exists in Michigan. Moreover, Galles worked many more hours in this case than she did in *Alston.*

MHSAA's expert also argues Galles consistently billed more time for attendance at trial, depositions, pretrial conferences, and other proceedings than the time records reflect the proceedings actually lasted. (Def.'s Expert Report 4, 12-14.) As any *trial* attorney knows, it is not acceptable to show up to court a second before the judge bangs the gavel to commence the proceeding. Well-prepared attorneys are "working" before the start of any proceeding because they may need to assemble necessary materials, confer with clients or co-counsel, negotiate with opposing counsel, or engage in a plethora of other legitimate activities. These incidentals performed in furtherance of the proceeding need not be billed under separate task descriptions from the underlying proceeding. "[C]ounsel ... is not required to record in great detail how each minute of his time was expended." *Knop,* 712 F.Supp. at 576 (quoting *Hensley,* 461 U.S. at 437 n. 12); *cf. Lenihan v. City of New York,* 640 F.Supp. 822, 826 (S.D.N.Y.1986) (finding that a seven hour entry for "general preparation" or "preparation" followed by entries for a trial or preliminary hearing are "not so vague that the Court is unable to assess their reasonableness"). On average, Galles worked approximately 45 minutes in addition to the time it actually took to complete each proceeding. This time likely reflects dealing with administrative matters such as those aforementioned. Upon review of the time records, the Court does not find any abnormalities and thus rejects MHSAA's argument.

**\*18** MHSAA's final argument alleging fraud concerns time billed for alleged telephone calls between Galles and Pinsky which she billed for but he did not. (Def.'s Expert Report 14-15.) MHSAA suggests such calls never actually took place and that Galles fabricated these records. Galles contends that such discrepancies indicate only that the two attorneys exercised their billing judgment independently. (Reply 13.) To the Court, these billing "discrepancies" do not raise suspicion because it is well-known not every attorney exercises his or her billing discretion the same way. The Court is satisfied that these billing records were contemporaneously compiled and accurately reflect telephone calls that took place.

### G. Unreasonable Billing Increments and Block Billing

In its initial briefing, MHSAA contended some of Plaintiffs' attorneys billed in unreasonably large billing increments, such as quarter-hour, half-hour, and full-hour increments. (Resp. 17; Def.'s Expert Report 17; Def.'s Suppl. Expert Report 9-14.) This problem was allegedly compounded due to block billing. Plaintiffs' attorneys countered that they billed in tenths of an hour and that "[t]he fact that a task took sixty minutes does not imply ... a sixty-minute billing increment, rounding up to a full hour for tasks that took less time." (Reply 14.) MHSAA appears to concede in later briefing-albeit evasively-that Plaintiffs' counsel did not bill in such large increments. (*See* Suppl. Resp. 7.) If this concession was not meant to be made, the Court nevertheless finds that counsel did not bill in unreasonable increments and rejects any argument to the contrary.

### H. Travel Hours

MHSAA argues attorneys' fees are inappropriate for travel time, or alternatively only worthy of half of the attorney's billing rate. The thrust of MHSAA's argument is that traveling costs would not have been incurred had Plaintiffs not hired out-of-town counsel. (*See* Def.'s Expert Report 47-48; Def.'s Suppl. Expert Report 32, 36.) Plaintiffs' attorneys seek compensation for over 600 travel hours, most of which represents long-distance travel. MHSAA faults all counsel who traveled-besides Cohan-for not working while traveling and underscores they may have instead been sleeping or relaxing. (Def.'s Expert Report 7, 39.) Since it was reasonable to employ out-of-town counsel, it was necessary for counsel to travel to necessary proceedings and other matters. Travel time billed at an attorney's usual rate has routinely been awarded as a matter of course. *See, e.g., Wayne v. Village of Sebring,* 36 F.3d 517, 532 (6th Cir.1994); *Citizens Ins. Co. of*

*Am.,* 2007 WL 2902213, at *6. The Court makes no exception in this case and rejects MHSAA's argument to the contrary.

### I. "Fees for Fees" Hours

MHSAA argues Plaintiffs' counsel are requesting unreasonable "fees for fees" compensation. (Def.'s Suppl. Expert Report 33-34.) "It would be inconsistent with the purpose of the Fees Act to dilute a fees award by refusing to compensate the attorney for the time reasonably spent in establishing and negotiating his rightful claim to the fee." *Lund v. Affleck,* 587 F.2d 75, 77 (1st Cir.1978). Nevertheless, prevailing parties do not have unlimited access to attorneys' fees. The Sixth Circuit, in *Coulter,* 805 F.2d at 151, provides guidance on "fees for fees" compensation. In the absence of unusual circumstances, the hours allowed for preparing and litigating a fee petition should not exceed 3% of the total hours in the underlying case if the issue is submitted on the briefing without a trial. *Id.* If there is a trial on the fee issue, the hours allowed should not exceed 5%. *Id.* The suggested 3% to 5% range represents a guideline and not an unbending rule. *See id.*

 **\*19**  Plaintiffs' original Fee Petition and Bill of Costs [28] contained 96 hours spent on the Fee Petition, which represents approximately 2.2% of the hours billed in the underlying case. (Suppl. Reply 14-15.) MHSAA objects to these hours because Galles did not present contemporaneous time records to verify the hours claimed. Based on Galles' affidavit and the Fee Petition itself, numerous hours were undoubtably spent. Due to the lack of contemporaneous time records, however, the Court reduces these hours by 25% to 72 hours. *Cf. Hensley,* 461 U.S. at 428; *Kelley v. Metro. County Bd. of Educ.,* 773 F.2d 677, 683-84 (6th Cir.1985).

[28]  On August 13, 2002, the Court awarded $22,359.14 to Plaintiffs after reviewing their Bill of Costs. (*See* Dkt. No. 595.) MHSAA argues a "plethora of expenses previously awarded Plaintiffs with their Bill of Costs are again claimed in their present Fee Petition." (Resp.23.) This equates to approximately $20,000 in costs. (*See* Def.'s Expert Report 9, 44-45.) Plaintiffs counter that the costs claimed in the Fee Petition are computed in two ways: (1) total costs if no costs were awarded pursuant to the Bill of Costs, and (2) a reduced cost amount taking into account any costs awarded on the Bill of Costs. (Reply 23-24.) Plaintiffs clearly are not entitled to a double recovery for incurred costs; however, Plaintiffs have correctly categorized the operation

of their reimbursement request and thus MHSAA's objection is denied.

The heart of MHSAA's "fees for fees" objection concerns the approximately 1,100 additional hours incurred after the original Petition was filed. "Supplemental attorneys' fees can be awarded in the same manner as attorneys' fees." *McCombs v. Meijer, Inc.,* 395 F.3d 346, 361 (6th Cir.2005) (citation omitted). As Plaintiffs concede, since there was no trial on this issue, the total number of hours actually billed for fee litigation is roughly three times the 3% guideline recommended by the *Coulter* Court. (*See* Suppl. Reply 13.) Plaintiffs blame this departure from the guideline on MHSAA:

> MHSAA opposed the bill of costs; it filed unsuccessful motions for costs on behalf of the MHSAA individual defendants; it retained a hired gun [29] to search plaintiffs' records for entries that might provide fodder for its buckshot attack on CFE counsel personally and their legal services on behalf of the plaintiff class; it opposed a routine motion to exceed page limits; it moved to strike the majority of the exhibits to plaintiffs' Reply-exhibits necessary to meet its burden of proof in face of the allegations in MHSAA's Opposition.

[29]  This "hired gun," MHSAA's expert, tremendously increased the workload of Plaintiffs' counsel and the Court while advancing few meritorious arguments.

(*Id.* at 15.) As Plaintiffs correctly note, "[t]his kind of procedural posturing wastes everyone's time and drives up the cost of the litigation. Yet Plaintiffs had no choice but to respond thoroughly." (Suppl.Pet.5.)

The congressional purpose behind the Fees Act would be thwarted if losing defendants were able to dilute a fee award by forcing prevailing plaintiffs to devote uncompensated time to defend their legitimate fees. *See Weisenberger v. Huecker,* 593 F.2d 49, 53-54 (6th Cir.1979). If the defendant vigorously objects to a fee petition with lengthy and specific objections,

Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...

2008 WL 906031

it is necessary for fee counsel to respond in kind. *Knop,* 712 F.Supp. at 592. MHSAA's vigorous objections, employment of an expert, and obstructionist tactics compel finding that the efforts of Plaintiffs' counsel was reasonably expended and absolutely necessary to secure their fee award. *Cf. Ams. United For Separation of Church & State,* 717 F.Supp. at 494-95 (awarding attorneys' fees for hours that constituted 15% of the total hours in the underlying case based on atypical circumstances). Accordingly, the Court finds that this departure from the 3% "fees for fees" guideline is proper.

### J. Motion to Intervene Hours

**\*20** On July 13, 2007, the Court denied the Motion to Intervene of the Michigan High School Tennis Coaches' Association and individual movants. *See Communities for Equity v. MHSAA,* No. 1:98-CV-479, 2007 WL 2078753, at \*5 (W.D.Mich. July 13, 2007). On the same day, the Court also denied the Motion to Intervene of certain coaches of female and male high school soccer teams in the Upper Peninsula of Michigan and individual movants. (*See* Dkt. No. 719.) MHSAA argues it should not have to pay for the approximately 180 hours devoted by Plaintiffs' counsel to defeating these intervention efforts. (Suppl. Resp. 4-5, 16; *see also* Def.'s Suppl. Expert Report 30-31.)

The Supreme Court has held that a prevailing party in a civil rights suit cannot recover attorneys' fees and costs from an intervenor who has not violated the law, unless the intervention is frivolous or unreasonable. *Indep. Fed'n of Flight Attendants v. Zipes,* 491 U.S. 754, 761, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989). The Supreme Court has not decided whether the prevailing party can recover fees and costs from the defendant whose illegal conduct precipitated the intervention. This issue was discussed in detail by the district court in *Gratz v. Bollinger:*

> At least two circuit courts have interpreted *Zipes* as implying that the prevailing plaintiffs should bear the risk of incurring intervention-related costs as a result of filing a lawsuit and therefore have extended *Zipes* to a prevailing parties' [sic] request for intervention-related attorneys' fees from the losing defendant. *See, e.g., Rum Creek Coal Sales, Inc. v. Caperton,* 32 F.3d 169, 176-78 (4th Cir.1994); *Bigby v. City of Chicago,* 927 F.2d 1426, 1428-29 (7th Cir.1991). In a case similar to the one now before this Court, the Fifth Circuit upheld the district court's refusal to award intervention-related fees and costs from the defendant's pocket because the plaintiffs "did not 'prevail' on this issue vis-a-vís [the defendant]." *Hopwood v. Texas,* 236 F.3d 256,

> 280 (5th Cir.2000). As the court explained "[the defendant] remained neutral on the intervention issue. In addition, the potential intervenors made clear ... that the purpose of their intervention was to raise arguments and defenses that [the defendant] itself had no interest in raising." *Id.* The Fifth Circuit, however, declined to decide whether a prevailing party always should be barred from shifting to the defendant the costs associated with defending against an intervention. *Id.*

353 F.Supp.2d 929, 940 (E.D.Mich.2005). In *Gratz,* the district court disallowed fees related to defeating intervention efforts by intervenors who asserted a ground the defendant "never asserted during the litigation." *Id.*

This case is distinguishable from *Gratz, Hopwood,* and *Rum Creek Coal Sales.* In this case, the unsuccessful intervenors asserted a ground which was previously abandoned by MHSAA after all appeals were exhausted. Thus, Plaintiffs are the "prevailing party" on grounds advocated for by MHSAA. These arguments were rejected when they were made by both MHSAA and the intervenors. Moreover, the intervenors in *Gratz* tried to intervene during litigation on the merits by alleging that the defendant might not defend the case with the same vigor or on the same grounds as the intervenors would. *See id.* In this case, the interveners moved to intervene after the trial on the merits, at a point in time where there could be no argument that MHSAA had not vigorously represented the interveners' interests because MHSAA opposed any rescheduling of seasons.

**\*21** If Plaintiffs' counsel had not argued against intervention, Plaintiffs would have potentially exposed themselves to a reversal of the victory already achieved. This would have resulted in Plaintiffs thereafter "starting over" in hopes of winning another victory, which would have no doubt involved ample billable hours and numerous more years of litigation. There can be no question that the time spent for anti-intervention efforts was reasonably necessary to the successful completion of the litigation. *Cf. Del. Valley Citizens' Council for Clean Air,* 478 U.S. at 559-60 (recognizing that post-judgment services to enforce the relief obtained can be as important as securing the relief in the first instance). Thus, the Court denies MHSAA's objection.

### K. Public Relations Efforts

MHSAA objects to public relations efforts undertaken by Galles, such as hours billed when Galles spoke at a 2004 luncheon of federal bar practitioners in Grand

Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...

2008 WL 906031

Rapids; for conducting press conferences; and generally for media communications. (Suppl. Resp. 4, 17; Def.'s Suppl. Expert Report 31-32.) Galles billed 241 hours for these activities. Media-related services are compensable under certain circumstances. *See, e.g., Davis v. City & County of San Francisco,* 976 F.2d 1536, 1545 (9th Cir.1992), vacated in part on other grounds, 984 F.2d 345 (9th Cir.1993) (concluding that narrowly focused public relations efforts are compensable); *United States ex rel. Scott v. Metro. Health Corp.,* No. 1:02-CV-485, 2005 WL 3434830, at *8 n. 15 (W.D.Mich. Dec.13, 2005) (noting that the heavy use of the media by one party may render media services by the other party essential). Moreover, "review of media statements by an opponent is proper investigation in connection with a suit." *Metro. Health Corp.,* 2005 WL 3434830, at *8 n. 15 (citation omitted). The "fact that private lawyers may perform tasks other than legal services for their clients, with their consent and approval, does not justify foisting off such expenses on an adversary under the guise of reimbursable fees." *Gratz,* 353 F.Supp.2d at 941 (citation omitted).

In this case, Plaintiffs' counsel responded to media inquiries prompted no MHSAA's press releases and other attempts to publicly discredit Plaintiffs. At times, it appeared Plaintiffs' cause was vilified by MHSAA, teachers, coaches, parents, the media, and the general public. Attempting to sway public opinion in favor of Plaintiffs, however, is not compensable. "The legitimate goals of litigation are almost always attained in a courtroom, not in the media." *Rum Creek Coal Sales,* 31 F.3d at 176. The Court will therefore deny compensation for the 241 hours expended relating to public relations. *See Halderman by Halderman v. Pennhurst State Sch. & Hosp.,* 49 F.3d 939, 942 (3d Cir.1995); *Hart v. Bourque,* 798 F.2d 519, 523 (1st Cir.1986); *Gratz,* 353 F.Supp.2d at 941-42.

### L. *Amicus Curiae* Fees

**\*22** MHSAA argues Plaintiffs' counsel should not recover attorneys' fees for services performed in connection with obtaining and later working with *amicus curiae.* (Suppl. Resp. 16-17; Def.'s Suppl. Expert Report 30-31.) MHSAA argues these services were not necessary to the litigation but admits no Sixth Circuit precedent exists supporting this view. (Suppl.Resp.17.) MHSAA does cite, however, non-persuasive authority such as *Shakman v. Democratic Org. of Cook County,* 634 F.Supp. 895 (N.D.Ill.1986), and *United States v. Washington,* 626 F.Supp. 1405 (W.D.Wash.1985). *Shakman* and *State of Washington* both concerned fees for an *amicus* brief prepared by the prevailing plaintiffs' counsel but filed in a different case. *Shakman,* 634 F.Supp. at 900;

*Washington,* 626 F.Supp. at 1514. Since this issue is not present in the case at bar, these cases are not useful.

MHSAA's conduct is quite telling because even MHSAA solicited several groups as *amici* to argue in support of its position, apparently because it thought enlisting this help was a reasonable cost in defending this action. Based on the significance of this case, it is inequitable to deny Plaintiffs' attorneys compensation for time spent responding to *amici* filings and soliciting *amici* in support of its own position. These actions were reasonably necessary to the successful prosecution of this case and compensation shall be awarded in full.

### M. Specific Cost Objections

The Sixth Circuit has counseled that there exists "two separate sources of authority to award out-of-pocket expenses. Some expenses are included in the concept of attorney's fees, as 'incidental and necessary expenses incurred in furnishing effective and competent representation,' and thus are authorized by [42 U.S.C.] section 1988." *Northcross,* 611 F.2d at 639 (citations omitted). Costs under § 1920, however, "are on a different footing." *Id.* Under § 1988, Sixth Circuit courts have consistently awarded "reasonable photocopying ... and travel and telephone costs." *Id.* The court will not "second-guess" an attorney's decision on how many copies are necessary. *Id.* at 642.

#### 1. Photocopying and Printing

MHSAA argues against a reimbursement request of over $31,000 in photocopying and printing costs, most of which is attributable to Galles. (Def.'s Suppl. Expert Report 35-36.) Galles seeks reimbursement of in-house photocopying costs at 20 cents per page early in the case, 25 cents per page later in the case, and at actual cost when copies were made through Kinko's. Galles seeks reimbursement at 10 cents a page for documents printed from her computer. MHSAA recommends reducing photocopying and printing costs 75% for Galles and by a lesser amount for other attorneys. (*See* Def.'s Expert Report 46.) MHSAA claims a very small percentage of these documents were admitted as exhibits at trial and that only costs incurred for those documents presented at trial are recoverable. MHSAA further argues that most of the copies made of MHSAA's documents were not necessary as "Defendant offered Plaintiff [sic] access to *inspect* these documents." (Resp. 22 (emphasis added); *see also* Def.'s Expert Report 9, 45-46.) *Federal Rule of Civil Procedure 34* provides any party the right "to inspect

Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...

2008 WL 906031

and copy" any documents within the broad scope of Rule 26(b). Thus, Plaintiffs had the right to copy these documents. MHSAA's argument is untenable because these copying costs are obviously reasonable litigation costs. The Court concludes that all of the requested photocopying and printing costs are reasonable and should be reimbursed in full.

### 2. Postage

**\*23** MHSAA argues Plaintiffs' counsel cannot be reimbursed for postage costs because some courts have held that postage is ordinarily part of a firm's overhead. *See, e.g., Altergott v. Modern Collection Techniques, Inc.,* 864 F.Supp. 778, 783 (N.D.Ill.1994). "Other courts have routinely allowed recovery for non-overhead expenses such as postage," such as this Court. *Knop,* 712 F.Supp. at 590. Accordingly, MHSAA's objection is denied.

### 3. Telephone

MHSAA objects to certain telephone calls billed by NWLC counsel and suggests reducing these costs by 75%, which equals approximately $2,700. MHSAA questions whether these costs were related to the litigation. (Def.'s Expert Report 48.) The Court is satisfied that these costs were related to the litigation, although greater detail in the cost records would have been preferred.

### 4. Westlaw and Lexis Research

MHSAA objects to legal research costs incurred by counsel such as Westlaw and Lexis charges. (Def.'s Suppl. Expert Report 35.) The Third, Seventh, Tenth, and District of Columbia Circuit Courts of Appeal have all found these costs reasonable. *See, e.g., Case v. Unified Sch. Dist. No. 233, Johnson County, Kan.,* 157 F.3d 1243, 1258 (10th Cir.1998); *Matter of Cont'l Ill. Sec. Litig.,* 962 F.2d 566, 570 (7th Cir.1992). "The logic of these cases is irrefutable." *Citizens Ins. Co. of Am.,* 2007 WL 2902213, at \*7 (citing *Crosby,* 262 F.Supp.2d at 817)). These costs are routinely billed to clients and are necessary in the studied practice of law. *Cf. Northcross,* 611 F.2d at 638-39 (holding that costs which are routinely charged to clients and aid in the effective practice of law should be reimbursed.) Therefore, these costs will be awarded to Plaintiffs.

### N. Prejudgment Interest

Michigan's Elliott-Larsen Civil Rights Act, which specifically defines "damages" to include attorneys' fees and costs,

entitles counsel to interest on the attorneys' fees and costs award calculated from the filing date of the complaint. *See* Mich. Comp. Laws § 600.6013; *Grow v. W.A. Thomas Co.,* 236 Mich.App. 696, 601 N.W.2d 426, 438 (Mich.App.1999); *Schellenberg v. Rochester Mich. Lodge No. 2225,* 228 Mich.App. 20, 577 N.W.2d 163, 177 (Mich.App.1998). In this case, prejudgment interest accrues from the filing date of the Complaint in June 1998 until the issuance of the Court's Opinion and Judgment. The Court leaves it to the parties to determine the applicable interest rate and amount of interest. [30] *See* Mich. Comp. Laws § 600.6013.

[30]    The prejudgment interest rate shall be "equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually ...." Mich. Comp. Laws § 600.6013(8). It is noted that post-judgment interest, which is calculated from the date of the entry of the judgment, is controlled by 28 U.S.C. § 1961 since this case involved both federal and state law claims. *See Reed v. Country Miss, Inc.,* Nos. 93-6370 & 94-5005, 1995 WL 348041, at \*2 (6th Cir. June 8, 1995).

## IV. CONCLUSION

For the reasons stated above, the Court reduces the requested attorneys' fee award of $5,023,991.25 through an across-the-board reduction for "fees for fees" hours claimed [31] and public relations hours claimed. [32] After deducting these amounts, the fee award is $4,921,241.25. This amount, however, is further reduced by a 10% across-the-board reduction for vagueness, excessiveness, and duplicity in the hours billed. [33]

[31]    This reduction equates to 24 hours at $390 an hour (Galles' rate), which is $9,360.00.

[32]    This reduction equates to 241 hours at $390 an hour (Galles' rate), which is $93,390.00.

[33]    To avoid a duplicative reduction, the Court reduces the award by 10% after making the "fees for fees" and public relations adjustments, as opposed to before.

**\*24** Accordingly, the Court awards Plaintiffs Communities for Equity $4,429,117.13 in attorneys' fees and $131,144.80

Communities for Equity v. Michigan High School Athletic Ass'n, Not Reported in...

2008 WL 906031

in costs, for a total award of $4,560,261.93. Prejudgment interest is payable on the total award and shall be calculated from the filing date of Plaintiffs' Complaint, with post-judgment interest payable from the date of this Opinion and Judgment. A Judgment consistent with this Opinion shall issue.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 906031

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2922875
United States District Court,
E.D. Michigan,
Southern Division.

FORD MOTOR COMPANY, Plaintiff,
v.
UNITED STATES of America, Defendant.

No. 08–12960.
|
Sept. 9, 2009.

**Attorneys and Law Firms**

Richard E. Zuckerman, Douglas C. Salzenstein, Jennifer Z. Belveal, Honigman, Miller, Detroit, MI, for Plaintiff.

Christine Hooks, U.S. Department of Justice, Washington, DC, for Defendant.

*ORDER DENYING DEFENDANT'S OBJECTIONS TO MAGISTRATE JUDGE MAZJOUB'S JULY 21, 2009 ORDER AND DENYING AS MOOT DEFENDANT'S REQUEST FOR A STAY OF ORDER AND REVIEW PENDING OUTCOME OF DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS*

PATRICK J. DUGGAN, District Judge.

**\*1** Plaintiff Ford Motor Co. ("Ford") filed this lawsuit, seeking interest it claims is due on overpayments of corporate income tax. On May 14, 2009, Ford filed a Motion to Compel Discovery, which this Court referred to Magistrate Judge Majzoub in an order filed on May 15, 2009. On July 21, 2009, Magistrate Judge Majzoub issued an opinion and order granting in part Ford's motion. Presently before the Court are the government's Objections to Magistrate Judge Majzoub's decision, filed August 4, 2009. In its objections, the government also asks the Court to stay the discovery order and the Court's review of the order pending the outcome of the government's motion for judgment on the pleadings.

As an initial matter, this Court's August 27, 2009 opinion and order renders the government's request for a stay of Magistrate Judge Majzoub's order and this Court's consideration of that order moot. As the Court concluded in that decision,

> ... before Ford is required to respond to the Government's motion for judgment on the pleadings, the Government's objections to Magistrate Judge Majzoub's July 21, 2009 opinion and order should be addressed and the Government should provide the disputed discovery, to the extent still required.

(Doc. 35 at 2.) Thus the Court will address the Government's objections at this time.

A party may object to a magistrate judge's non-dispositive orders. Fed.R.Civ.P. 72(a); 28 U.S.C. § 636(b)(1)(A). The magistrate judge's decision must be affirmed unless the objecting party demonstrates that the decision is "clearly erroneous" or "contrary to law." *Id.* A district court may not reverse a magistrate judge's ruling on a non-dispositive matter simply because the court would have decided the matter differently. *See, e.g., Anderson v. Bessemer City, N.C., 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).* Instead, the court may reverse only " '... when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Id.* at 573, 105 S.Ct. at 1511 (quoting *United States v. U.S. Gypsum Co., 33 U.S. 364, 395, 68 S.Ct. 525, 542 (1948)*). "An order is contrary to law 'when it fails to apply or misapplies relevant statutes, case law, or rules of procedure.' " *SEC v. McKnight, No. 08–11887, 2009 WL 1107675, at \*1 (E.D.Mich. Apr.22, 2009)* (quoting, *Catskill Dev., L.L. C. v. Park Place Entm't Corp., 206 F.R.D. 78, 86 (S.D.N.Y.2002)*).

In light of the authority relied upon by Magistrate Judge Majzoub and Ford, this Court cannot conclude that the magistrate judge's order is "contrary to law." First, Federal Rule of Civil Procedure 26 allows for broad discovery, including "any nonprivileged matter that is relevant to any party's claim or defense." Fed.R.Civ.P. 26(b)(1). The matter sought need not be admissible at trial; instead, it need only appear "reasonably calculated to lead to the discovery of admissible evidence." *Id.*

Ford Motor Co. v. U.S., Not Reported in F.Supp.2d (2009)

2009 WL 2922875, 104 A.F.T.R.2d 2009-6352

**\*2** Second, the case law cited by the magistrate judge and Ford indicate that, at least in tax cases, the documents Ford seeks are relevant and discoverable even though they are otherwise publicly available and only may shed light on a legal issue-specifically the IRS' interpretation of the statutory and regulatory scheme for overpayment interest. *See, e.g., Ford Motor Co. v. United States,* 84 Fed. Cl. 168 (2008) (rejecting the government's request for a protective order with respect to discovery of all documents relating to particular revenue rulings, finding that "documents illuminating the IRS' own assessment of these rulings are relevant for discovery purposes"); *Jade Trading LLC v. United States,* 65 Fed. Cl. 487, 492 (2005) (granting the plaintiffs' motion to compel discovery of documents relating to the promulgation of a Treasury Regulation and the IRS' internal interpretation of a term, reasoning that documents "relating to IRS' construction of [the statutory term at issue] would potentially be relevant to the extent they embody the IRS' interpretation of this term at any point in time pertinent to this action"); *Marriott Int'l Resorts, L.P. v. United States,* 61 Fed. Cl. 411 (2004) (same). As the Federal Claims Court reasoned in *Jade Trading:*

> The *Marriott* Court found that documents relating to IRS' ongoing consideration and interpretation of a revenue ruling were relevant to the issue of whether the IRS had abandoned a longstanding interpretation of [the relevant statute], recognizing that 'conflicting interpretations of the law might constitute an important framework for the matters at issue.' "

*65 Fed. Cl. at 493* (quoting *Marriott Int'l,* 61 Fed. Cl. at 416).

Magistrate Judge Majzoub's rejection of the government's general assertion that producing the requested documents would be unduly burdensome, also is not contrary to law. A party opposing discovery requests must assert the ground for its opposition with specificity. *See Powerhouse Marks, LLC v. Chi Hsin Impex, Inc.,* No. 04–73923, 2005 WL83477, at \*2 (E.D.Mich. Jan. 12, 2006). " 'An objecting party must specifically establish the nature of any alleged burden, usually

by affidavit or other reliable evidence.' " *Id.* (quoting *Burton Mech. Contractors, Inc. v. Foreman,* 148 F.R.D. 230, 233 (N.D.Ind.1992)). As the Third Circuit Court of Appeals has explained:

> [T]he mere statement by a party that the interrogatory was "overly broad, burdensome, oppressive and irrelevant" is not adequate to voice a successful objection to an interrogatory. On the contrary, the party resisting discovery "must show specifically how ... each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive."

*Josephs v. Harris Corp.,* 677 F.2d 985, 992 (1982) (quoting *Roesberg v. Johns–Manville Corp.,* 85 F.R.D. 292, 296–97 (E.D.Pa.1980)).

For the above reasons, this Court concludes that Magistrate Judge Mazjoub's July 21, 2009 opinion and order granting in part Ford's motion to compel discovery is not contrary to law.

**\*3** Accordingly,

**IT IS ORDERED,** that the government's request for a stay of Magistrate Judge Majzoub's July 21, 2009 discovery order and this Court's review of the order are **DENIED AS MOOT** and the government's objections to Magistrate Judge Majzoub's July 21, 2009 opinion and order are **DENIED;**

**IT IS FURTHER ORDERED,** that the government must supplement its discovery responses as set forth in Magistrate Judge Majzoub's July 21, 2009 order on or before twenty-one (21) days from the date of this Opinion and Order;

**IT IS FURTHER ORDERED,** that Ford's response to the government's pending motion for judgment on the pleadings must be filed within twenty-one (21) days of its receipt of the government's supplemented discovery responses.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2922875, 104 A.F.T.R.2d 2009-6352

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.

1991 WL 88413, 55 Fair Empl.Prac.Cas. (BNA) 777

1991 WL 88413
United States District Court, E.D.
Michigan, Southern Division.

Dennis Hazen HUGULEY, Larry Kitchen, James
E. Kennedy and Larry Dodson, for themselves
and for all others similarly involved, Plaintiffs,
v.
GENERAL MOTORS CORPORATION, Defendant.

Civ. A. No. 83–2864.
|
May 26, 1991.

*MEMORANDUM OPINION AND ORDER*

FEIKENS, District Judge.

 **\*1** Before me is the petition for attorney fees of Clifford
R. Williams, Charles Hammonds and Niven Renwick
(petitioners), former counsel to the plaintiff class. I find the
documentation provided to be totally inadequate. Therefore,
former counsel's application for attorney fees and costs is
denied entirely.

I.

*Background*
This suit was originally filed by Laras Eason on July 15,
1983 as a class action pursuant to Title VII of the Civil
Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et
seq.,* and the Civil Rights Act of 1866, 42 U.S.C. § 1981
*et seq.* The complaint alleges that General Motors' job
performance appraisal system discriminates against its black
salaried employees. I certified a class consisting of all black
employees of General Motors in Indiana, Michigan and Ohio
who were subject between October 8, 1982 and September
25, 1986 to General Motors' appraisal system for salaried
employees. I have preliminarily approved a proposed consent
decree resolving the claims against General Motors. *See
Order,* February 3, 1989.

Plaintiffs were originally represented by Clifford Williams.
He served as counsel from July 15, 1983 until December
1984. At that time Williams sought to withdraw from the
case citing a breakdown in the attorney-client relationship.

Plaintiffs' present counsel entered their appearance on May
24, 1985.

During the course of his representation Williams collected
$29,750 [1] from his clients. [2] At the time of withdrawal
Williams refused to return his clients' files claiming that
his clients had failed to reimburse him completely for costs
advanced. After a series of hearings in April of 1985,
I ordered Williams to release plaintiffs' files and granted
Williams a lien against any future recovery by plaintiffs to
secure payments of costs and attorney fees, if merited, [3]
under the applicable civil rights statutes. *See Order,* May
21, 1985. As part of the settlement process, General Motors
filed a motion to extinguish the lien. The hearing on this
motion was adjourned to provide Williams an opportunity
to document properly the time he expended on this case.
On February 28, 1989 Williams, along with two associates,
Hammonds and Renwick, filed a document entitled "Costs
and Billings Combined as to Attorneys Williams, Hammonds
and Renwick" (fee schedule). At a hearing on March 30,
1989 Williams, Hammonds and Renwick agreed to stand on
their written submissions which consist principally of the fee
schedule.

II.

*Fee Schedule*
Petitioners' fee schedule is disorganized, confusing and, at
points, incomprehensible. Moreover the fee schedule does not
appear to be based on contemporaneous records but rather on
reconstructed records which are inaccurate. Petitioners have a
duty to maintain accurate records and to submit "reasonable,
carefully calculated, and conscientiously measured claims
when seeking statutory counsel fees." *Brown v. Stackler,* 612
F.2d 1057 (CA 7 1980). As set forth in greater detail below,
petitioners have breached this duty and for that reason I deny
their fee request in its entirety. *See Vocca v. Playboy Hotel of
Chicago, Inc.,* 686 F.2d 605 (CA 7 1982).

 **\*2** I have identified six categories of defects in the fee
schedule: (1) no basis is provided for the hourly rate charged
by petitioners; (2) time is double, triple and even quadruple
billed; (3) services performed are not sufficiently itemized;
(4) time is billed for services performed for parties other
than plaintiffs; (5) compensation is sought for unnecessary or
non-compensable services; and (6) excessive time is spent on
compensable activity.

Huguley v. General Motors Corp., Not Reported in F.Supp. (1991)

1991 WL 88413, 55 Fair Empl.Prac.Cas. (BNA) 777

III.

A. *No Basis For Hourly Rate*

The starting point for determining a reasonable attorney fee is multiplying the number of hours documented by petitioners by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424 (1983). A reasonable hourly rate is determined by the prevailing market rate; that is, "the customary fee for similar work in the community." *Blum v. Stenson*, 465 U.S. 886, 894 n. 9, 896 n. 11 (1983). The burden, however, is on petitioners to justify the reasonableness of the requested rates. *Id.* at 896 n. 11. Petitioners have defaulted completely in this respect.

The fee schedule does not expressly indicate the hourly rate charged. One can only discern the hourly rate by dividing the total fee request by the number of hours billed. The rate structured is $175 per hour. Petitioners have not submitted any evidence, not even by their own affidavits, justifying this rate for themselves, much less for their secretary whose time also appears to be billed at this rate.[4] Petitioners' claim for attorney fees fails at its inception. *Vocca*, 686 F.2d at 607.

B. *Double, Triple and Quadruple Billing*

Petitioners bill two, three, perhaps even four times, for hours spent by Renwick on the deposition of plaintiff Dennis Huguley. Item 74 of the fee schedule bills eight hours for Renwick's attendance at Huguley's January 16, 1984 deposition. Item 100 bills a second time for these same eight hours. Item 9 bills forty hours for preparation and attendance at the depositions of four persons: (i) Barbara Simmons; (ii) Laras Eason; (iii) Larry Kitchen; and (iv) Dennis Huguley. It purports to represent the time of Williams, Renwick and Hammonds combined. Petitioners have triple billed this time because some fraction of item 9 purports to bill time for Renwick's attendance at the Huguley deposition. Item 40, entitled "List of Depositions," bills another sixty hours for the depositions of seven persons, including the Huguley deposition conducted on January 16, 1984. Item 40 does not identify the petitioner whose time is being billed. This may be a quadruple billing.

Petitioners also bill three times for preparation and attendance at the deposition of Laras Eason. *See* Fee Schedule: Items 9, 18 and 40. Petitioners double bill for preparation and attendance at the deposition of Larry Kitchen. *See* Fee Schedule: Items 9, 40(i). It may well be that these billing mistakes were caused by inattention and carelessness rather

than a willful attempt to mislead; nonetheless they undermine the credibility of petitioners' entire fee request.

C. *Services Performed Not Sufficiently Itemized*

**\*3** Petitioners' submission is filled with instances of what defendant has aptly termed "lumping" activities together. In item 1(a) petitioners bill forty hours for interviews with potential plaintiffs conducted over a six-month period and for the filing of the original lawsuit in this case. No breakdown is given as to interviewees, how long each interview took, and how much time was spent on the interviews as opposed to preparing the complaint. Item 16 lists ten hours for thirty telephone calls to a Mr. Freeman at the Equal Employment Opportunity Commission. Nothing is said about the purpose of these calls. No telephone bills for these calls are attached. Items 6, 9, 11, 40 and 99 also suffer from a lack of specificity.

D. *Services Performed For Other Clients*

Items 22, 51, 86, 91, 92 and 104 bill time spent on Eason's state court lawsuit. Eason was the original plaintiff in this lawsuit. Eason was dismissed as a named plaintiff on January 4, 1984 and, it appears, that at approximately the same time, Eason lost his job at General Motors. Petitioners now bill for time spent representing Eason before both the Michigan Employment Security Commission and in the Michigan courts. Petitioners may bill only for work on this case and not for efforts expended to solve the non-related legal difficulties of members of the class.

Items 14, 15, 33, 41, 42, 48, 54, 72, 73, 95 and 105 seek payment for time spent attending meetings of the Pro Minority Action Committee (PMAC), a political support and fundraising organization for minorities fighting employment discrimination. Time spent on PMAC affairs is non-compensable. Although there may be a degree of overlap between the PMAC membership and the class membership, and thus PMAC meetings may have presented a convenient way to communicate with class members during the course of this litigation, I distinguish between reasonably necessary time spent advancing this litigation and time spent organizing PMAC and generating community support for its causes. *See Riddell v. National Democratic Party*, 712 F.2d 165 (CA 5 1983). Items 33, 41, 42, 48, 54 and 73 appear related to the organization and maintenance of PMAC. It is impossible to determine from the fee schedule whether other PMAC activities relate to this litigation. Therefore, I disallow attorney fees for all PMAC-related items.

1991 WL 88413, 55 Fair Empl.Prac.Cas. (BNA) 777

Finally, there are a number of items which are either noncompensable,[5] such as item 57 which seeks reimbursement of $2.47 for motor oil, or for which petitioners have sought excessive compensation, such as item 44 which bills six hours of attorney time for printing computer records of their attorney fees. I disallow these as well.

IV.

For the foregoing reasons, petitioners' request for attorney fees is DENIED, and petitioners' lien on attorney fees to be paid by General Motors pursuant to any consent judgment in this case is EXTINGUISHED.

IT IS SO ORDERED.

[1] This amount was reduced by $3,062.50 for deposition costs which I ordered Williams to pay directly. *See Order,* May 21, 1985. At the February 28, 1989 hearing on petitioners' fee request, Williams claimed that he was entitled to reimbursement for this amount. My May 21, 1985 Order indicates that Williams is not so entitled.

[2] It appears that the dispute between petitioners and their clients centered on petitioners' demands for payment. Plaintiffs, either correctly or incorrectly, were under the impression that they would owe no money to petitioners until the lawsuit had come to a successful conclusion. I note that contrary to the Local Rules of this Court, *see* Rule A–4(b), and the Michigan Rules of Professional Conduct, *see* Rule 1.5(c), the contingency fee arrangement in this case was not set forth in writing. Perhaps if petitioners had seen the wisdom of Rule 1.5(c) and complied with their professional duty, the necessity of their withdrawal from this case could have been avoided.

[3] Petitioners' entitlement to attorney fees is questionable. Presumably petitioners move under 42 U.S.C.A. § 2000e–5(k) (West 1988) and 42 U.S.C.A. § 1988 (West 1988) for attorney fees available to "prevailing parties." Perhaps they also move for attorney fees pursuant to the contingency fee arrangement. The rule with respect to contingency fee arrangements is that the withdrawing attorney is entitled to a recovery in *quantum meruit* only where withdrawal is for good cause. *Ambrose v. Detroit Edison,* 65 Mich.App. 484, 237 N.W.2d 520, 88 A.L.R.3d 239 (1976). Rather than determine whether petitioners had good cause to withdraw, I will assume for purposes of this opinion that petitioners are entitled to attorney fees provided that the extent of their entitlement is properly documented.

[4] I conclude that petitioners have billed secretarial time at the attorney rate because the fee schedule does not indicate a separate rate for secretarial time and because secretarial time is included in the 745.1 "attorney hours" requested in the schedule. *See* Fee Schedule, Item 99 (twenty-two hours of secretarial time undifferentiated from attorney time).

[5] *See Opposition of General Motors Corporation to the Request for Approval [sic] Attorneys' Fees Filed By Clifford R. Williams, Charles Hammonds and Niven Renwick* (Opposition), March 13, 1989, at 16. *See also* "Appendix of Other Examples" (attached to Opposition).

**All Citations**

Not Reported in F.Supp., 1991 WL 88413, 55 Fair Empl.Prac.Cas. (BNA) 777

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4733602
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

IN RE Subpoena of CENTER
FOR MILITARY READINESS
Underlying case: Ryan Karnoski, et al., Plaintiffs,
v.
Donald J. Trump, in his official capacity as
President of the United States, et al., Defendants.

Misc. Case No. 18-51013
|
Signed 09/28/2019

United States District Court Western District of Washington
Civil Action No.: 2:17-cv-01297-MJP

**Attorneys and Law Firms**

Jordan M. Heinz, Vanessa A. Barsanti, Kirkland & Ellis LLP,
Chicago, IL, Kyle A. Palazzolo, Salvatore Prescott & Porter,
PLLC, Evanston, IL, for Plaintiffs.

Ashley Cheung, Matthew Skurnik, U.S. Department of
Justice, Washington, DC, for Defendants.

**ORDER ACCEPTING AND ADOPTING THE
MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION GRANTING IN PART
AND DENYING IN PART PLAINTIFFS'
MOTION TO COMPEL [1] AND GRANTING
IN PART AND DENYING IN PART NONPARTY
CENTER FOR MILITARY READINESS'S
MOTION FOR PROTECTIVE ORDER [10]**

Nancy G. Edmunds, United States District Judge

**\*1** This is a nonparty discovery dispute arising out
of *Karnoski, et al., v. Trump et al.*, Case No 2:17-
cv-01297, which is currently pending in the United States
District Court for the Western District of Washington.
In the underlying case, Plaintiffs are challenging the
Trump administration's allegedly unconstitutional policies
of prohibiting or disqualifying transgender individuals from
serving in the United States military. [1] In this Court,
Plaintiffs are seeking documents from a nonparty, the

Center for Military Readiness, which Plaintiffs contend are
relevant to their underlying claims. Specifically, Plaintiffs
seek documents and communications between CMR and
government officials related to the Ban. CMR refuses
to voluntarily produce responsive documents to Plaintiffs,
which resulted in this discovery dispute.

[1]    The policy is sometimes referred to by the parties
       as the "Ban."

Pending before the Court is the Magistrate Judge's Report
and Recommendation granting in part and denying in part
Plaintiffs' motion to compel and granting in part and denying
in part CMR's motion for a protective order. (ECF No. 34.)
The Magistrate Judge recommends the Court order CMR to
comply with Plaintiffs' subpoena, but that the Court narrow
the time scope of the subpoena to documents dated June
16, 2015 through March 23, 2018 and narrow the scope of
individuals covered by the subpoena.

CMR and the Government raise several objections to the
R&R. Plaintiffs oppose their objections. After reviewing
the parties' initial briefing, the Court took the R&R and
the objections under advisement pending the Ninth Circuit's
resolution of potentially related discovery matters in the
underlying lawsuit. On June 14, 2019, the Ninth Circuit
issued its opinion in *Karnoski v. Trump*, 926 F.3d 1180 (9th
Cir. 2019). Thereafter, the parties submitted supplemental
briefing addressing the Ninth Circuit's opinion as it relates
to this nonparty discovery dispute. Having now reviewed
the complete record in this matter, including the parties'
supplemental submissions, and for the reasons set forth
below, the Court **OVERRULES** CMR's objections and the
Government's objections, **ACCEPTS and ADOPTS** the
Magistrate Judge's R&R, **GRANTS IN PART** and **DENIES
IN PART** Plaintiffs' motion to compel, and **GRANTS IN
PART** and **DENIES IN PART** CMR's motion for a protective
order.

**I. Standard of Review**
The parties dispute the applicable standard of review. Under
Federal Rule of Civil Procedure 72, a district court reviewing
objections to an order issued on a non-dispositive matter that
was referred to a magistrate judge may "modify or set aside
any part of the order that is clearly erroneous or contrary to
law." *See* Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A). In
contrast, when considering objections to an order issued by
a magistrate judge on a dispositive motion, the district court
must conduct a *de novo* review of the objected to portions of

2019 WL 4733602

the magistrate judge's report and recommendation. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b).

**\*2** Discovery disputes between parties are typically considered non-dispositive and a magistrate judge's order on a motion to compel is typically reviewed by the district court under the clearly erroneous standard. *See Brown v. Wesley's Quaker Maid, Inc.*, 771 F.2d 952, 954 (6th Cir. 1985) (stating that discovery motions are non-dispositive pretrial motions reviewed under the clearly erroneous standard). CMR and the Government contend, however, that Plaintiffs' motion to compel should be considered a dispositive motion because the dispute over this nonparty subpoena constitutes the "entire proceeding before this Court."[2] In other words, resolution of the motion to compel is dispositive of CMR's role in the case, and this Court's role in this case, and therefore the motion should be treated as a dispositive motion. CMR and the Government point to one unpublished opinion from the Eastern District of Michigan[3] and a few unpublished opinions from other district courts around the Sixth Circuit to support their position. In addition, the Government notes that the Magistrate Judge issued a "report and recommendation," not an "order and opinion."

[2]    CMR and the Government raise this argument for the first time in their reply briefs in support of their objections to the R&R.

[3]    In *Luppino v. Mercedes-Benz Fin. Servs. USA, LLC*, No. 13-50212, 2013 WL 1844075, at \*3 (E.D. Mich. Apr. 11, 2013), *report and recommendation adopted*, No. 13-50212, 2013 WL 1844073 (E.D. Mich. Apr. 30, 2013), then-Magistrate Judge Michaelson recommended that a motion to enforce a subpoena against a nonparty be treated as a dispositive motion, and Judge Lawson accepted this recommendation without objection from either party. In reaching this conclusion, Judge Michaelson relied on an unpublished opinion from the Northern District of Illinois, which relied on cases discussing administrative law subpoenas, not subpoenas issued under Federal Rule of Civil Procedure 45. *See Hartford Fire Ins. Co. v. Transgroup Exp., Inc.*, No. 09 C 3473, 2009 WL 2916832, at \*1 (N.D. Ill. Sept. 1, 2009). The Court is not aware of any published opinion from a district court in this Circuit taking this same approach in connection with a Rule 45 subpoena.

The Court finds some merit to CMR's and the Government's interpretation of Rule 72 as it relates to nonparty discovery motions. But their position also raises some concerns. First, the Court referred the motion to the Magistrate Judge under 28 U.S.C. § 636(b)(1)(A), which applies to non-dispositive motions. Yet, neither CMR nor the Government objected to the referral order. Second, a motion to compel is a non-dispositive motion under the Local Rules for the Eastern District of Michigan, though there is an argument that the Local Rules may not contemplate nonparty discovery proceedings under Rule 45 in defining "dispositive" and "non-dispositive" motions. Finally, there are several examples within the Sixth Circuit and elsewhere of courts treating motions to compel a nonparty's compliance with a Rule 45 subpoena as non-dispositive motions.[4] *See State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, No. 14-CV-11700, 2017 WL 5664183, at \*1 (E.D. Mich. Nov. 27, 2017) (applying clearly erroneous standard to a magistrate judge's order compelling a nonparty's compliance with discovery subpoena); *Anwalt Energy Holdings, LLC v. Falor Companies, Inc.*, No. 2:06-CV-0955, 2008 WL 2268316, at \*1 (S.D. Ohio June 2, 2008) (applying clearly erroneous standard to magistrate judge's ruling on a motion to compel compliance with a nonparty subpoena); *NetJets Aviation, Inc. v. NetJets Association of Shared Aircraft Pilots*, No. 2:17-MC-038, 2017 WL 6497104, at \*1 (S.D. Ohio Dec. 19, 2017) (same); *3B Med., Inc. v. Resmed Corp.*, No. 16-CV-2050-AJB-JMA, 2016 WL 6818953, at \*2 (S.D. Cal. Oct. 11, 2016) (finding that motion to compel compliance with a subpoena is a non-dispositive motion). *See also Jordan v. Comm'r, Mississippi Dep't of Corr.*, 908 F.3d 1259, 1264 (11th Cir. 2018) (finding that a nonparty's motion to quash a Rule 45 subpoena was a non-dispositive pretrial motion, concluding that the clearly erroneous standard applied to the district court's review, and rejecting arguments similar to those made by CMR and the Government here).

[4]    This includes cases extensively cited by CMR. *See, e.g., Tesla Motors, Inc. v. Johnson, et al.*, Case No. 16-cv-01158, ECF No. 200 (W.D. Michigan, June 06, 2018).

**\*3** The Sixth Circuit has not expressly addressed this issue. In an abundance of caution, the Court will apply the higher standard of review applicable to dispositive motions.[5] This means the Court performs a *de novo* review of those portions of the Magistrate Judge's R&R to which the CMR and the Government have objected. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b). The Court need not and does not perform a

2019 WL 4733602

*de novo* review of the R&R's unobjected-to findings. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Moreover, an objection that "does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context." *Aldrich v. Bock*, 327 F. Supp. 2d. 743, 747 (E.D. Mich. 2004).

5    Because the Court ultimately finds no error in the Magistrate Judge's R&R under the *de novo* standard of review, any prejudice to Plaintiffs in applying this higher standard is harmless. However, the Court notes that it would also overrule CMR's and the Government's objections under the clearly erroneous and contrary to law standard.

## II. Analysis

### A. CMR's Objection No. 1: Whether the Magistrate Judge misapplied the scope of permissible discovery.

#### 1. Relevance objections

CMR objects to the Magistrate Judge's finding that the documents and communications sought by Plaintiffs are relevant to the underlying dispute. CMR's relevance objection includes several subparts, each of which is addressed below.

**Relevance Objection Part 1(a)(1): Whether the Magistrate Judge misapplied the relevance standard.**

According to CMR, Plaintiffs were required to prove as a prerequisite to obtaining their requested discovery that CMR's policy positions and communications about the transgender policy with the Trump administration were grounded in animus. CMR argues that "the absence of any finding in the R&R that CMR's policy positions are grounded in animus eliminates any logical connection between CMR's state of mind and the allegedly biased state of mind of President Trump when he changed the policy." (ECF No. 39 at 8.) The Court disagrees.

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401. As the Magistrate Judge found, Plaintiffs satisfied their relatively low burden to establish that the discovery they seek from CMR is relevant to their claims. Plaintiffs met Rule 26's standard for discovery by demonstrating that CMR

communicated with Government decisionmakers about the transgender policy, that those communications may have conveyed animus to those decisionmakers, and that such communications may make it more probable that the Ban was influenced by discriminatory intent or animus.

Plaintiffs were not required to affirmatively prove that CMR harbored animus towards transgender individuals or that CMR's alleged animus was in fact communicated to Government decision makers. The purpose of the discovery process is, at least in part, to determine whether there is merit to Plaintiffs' allegations. Under CMR's view of relevancy, all litigants would be required to prove the essential elements of their claims before pursuing discovery to obtain the evidence they need to prove their claims. Such a circular standard is not supported by the Federal Rules of Civil Procedure and conflicts with the very purpose of discovery. Indeed, CMR's documents and communications will be equally relevant to this dispute if it turns out that CMR does not harbor animus towards transgender individuals or did not communicate such alleged animus to government decision makers. CMR's first objection is overruled.

**\*4  Relevance Objection Part 1(a)(2): Whether CMR's communications are relevant when CMR is not mentioned in Plaintiffs' complaint.**

CMR next argues that the Magistrate Judge erred in finding the requested discovery is relevant because CMR is not mentioned in Plaintiffs' complaint. In other words, according to CMR, a nonparty must be mentioned in the complaint to obtain discovery from that nonparty. The Court is not aware of any rule or authority that requires a party to name every potential witness or potential source of relevant information in its complaint. And the cases cited by CMR do not support its position. This objection is overruled.

**Relevance Objection Part 1(a)(3): Whether the R&R misreads *Trump v. Hawaii* as it applies to the relevance of CMR's communications.**

The Magistrate Judge rejected CMR's argument that the holding of *Trump v. Hawaii,*138 S. Ct. 2392 (2018) deems extrinsic evidence of animus irrelevant to Plaintiffs' claims. CMR argues the Magistrate Judge erred because the Supreme Court in *Hawaii* only found extrinsic evidence could be considered because the Government conceded extrinsic evidence may be relevant to that specific case. According to CMR, because the Government has not made the same concession here, the Magistrate Judge had no basis to find

2019 WL 4733602

that documents and communications in CMR's possession are relevant to Plaintiffs' claims.

The Court finds no support for CMR's interpretation of *Hawaii* or its application to this case. Addressing whether extrinsic evidence could be considered under the higher deferential standard, the Court stated:

> For our purposes today, we assume that we may look behind the face of the Proclamation to the extent of applying rational basis review. That standard of review considers whether the entry policy is plausibly related to the Government's stated objective to protect the country and improve vetting processes. See *Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). As a result, we may consider plaintiffs' extrinsic evidence, but will uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds.

*Trump v. Hawaii,* 138 S. Ct. 2392, 2420 (2018). The Court's discussion of the role of extrinsic evidence is consistent with the Sixth Circuit's reliance on extrinsic evidence in evaluating claims under a rational-basis review. *See, e.g., Davis v. Prison Health Servs.,* 679 F.3d 433, 438 (6th Cir. 2012) ("Under this test, a " 'plaintiff may demonstrate that the government action lacks a rational basis ... either by negating every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will.").

Here, as the Magistrate Judge found, Plaintiffs are entitled to discovery into whether the Ban was motived by discriminatory intent, animus, or ill-will under either a strict scrutiny, rational basis, or deferential review. And while the Court agrees with CMR that a party may not be entitled to "wide-ranging" discovery into potential extrinsic evidence of discriminatory animus under a rational basis review, the Court finds Plaintiffs' subpoena and discovery requests are sufficiently narrow as modified by the Magistrate Judge. CMR's objection is overruled.

### 2. Proportionality Objections

**\*5** CMR objects to the Magistrate Judge's proportionality analysis and her finding that producing the documents and communications sought by Plaintiffs would not pose an undue burden on CMR. CMR's proportionality objection includes several subparts, each of which is addressed below.

**Proportionality Objection Part 1(b)(1): Whether the Magistrate Judge erred in finding the importance of the issues at stake in the litigation favored discovery.**
The Magistrate Judge found that the "issues at stake" factor weighed in favor of allowing the discovery. CMR argues that this was error for two reasons. First, CMR claims the Magistrate Judge incorrectly relied on unsubstantiated statistics in concluding that the outcome of this litigation could impact thousands of individuals. Second, CMR contends the Magistrate Judge overlooks the fact that the underlying action is not a class action—the implication being that because Plaintiffs do not assert class action claims, the litigation is only important to the named Plaintiffs.

CMR's objections are without merit. As the Magistrate Judge points out, the issues in this lawsuit are important even if they vindicate the constitutional rights of only one person. Moreover, the underlying litigation does not need to be a class action to affect others beyond the named Plaintiffs. Plaintiffs are challenging the constitutionality of the Ban on its face. The outcome of this litigation could affect tens, or hundreds, or thousands, or whatever the number may be, of individuals whose constitutional rights have allegedly been violated. The Court agrees with the Magistrate Judge that this factor weighs in favor of production.

**Proportionality Objection Part 1(b)(2): Whether the Magistrate Judge erred in finding the importance of the relative access to the information favored production.**
CMR argues the Magistrate Judge erred in finding this factor weighed in favor of production because Plaintiffs can obtain this same information from an additional source—the Government. The Court disagrees. As the Magistrate Judge found, both CMR and the Government are attempting to avoid their discovery obligations by pointing to each other as the party responsible for producing responsive documents. Moreover, as discussed further *infra,* requiring CMR to produce its own communications and documents is consistent with the objective of limiting the burden of discovery on

the Executive Branch. CMR is in possession of responsive and relevant documents. Plaintiffs are not. The Magistrate Judge correctly found that this factor weighed in favor of production.

**Proportionality Objection Part 1(b)(3): Whether the Magistrate Judge erred in finding the burden and expense of discovery favored production.**

The Magistrate Judge concluded that this factor weighed in favor of production because Plaintiffs agreed to bear all of CMR's expenses with no cap. CMR argues that this is an insufficient basis for evaluating the burden and expense factor because the R&R did not specifically order Plaintiffs to pay CMR's expenses or set out a definitive payment plan, and because there are other burdens to CMR beyond the financial expenses associated with responding to the discovery requests. This objection is overruled. As Plaintiffs correctly point out, CMR cannot insist that it has no responsive and relevant documents in its possession and then complain that the burden of responding to the requested discovery is too large. Based on the record before the Court, there are two possible outcomes here: (1) CMR finds few or no responsive documents in its possession and therefore suffers minimal expense in responding to the subpoena, or (2) CMR is in possession of responsive documents and Plaintiffs will bear the costs of CMR's production of those documents. Either way, the discovery burden on CMR will be minimal. That CMR's sole employee must expend time responding to the subpoena to the detriment of her primary work functions does not render the subpoena overly burdensome or disproportional. All discovery subpoenas require nonparties to respond to discovery requests using time that would otherwise be spent performing other tasks. The Magistrate Judge correctly concluded that this factor weighed in favor of production.

**\*6  Proportionality Objection Part 1(b)(4): Whether the Magistrate Judge erred in finding the impact on other nonparties favored production.**

CMR argues the Magistrate Judge failed to adequately consider the privacy rights and expectations of CMR's correspondents. The Court finds no merit in this objection. As Plaintiffs note, communications passing along stories of the personal experiences of CMR's correspondents would not be responsive to the subpoena. Moreover, as Plaintiffs acknowledge, personal or sensitive information can be protected through redactions. But the issue of redacting or protecting personal or private information was not before the

Magistrate Judge as CMR wholly refuses to produce any documents or information. Finally, any confidential or private information is protected from improper use or disclosure by the protective order entered in the underlying litigation. The Magistrate Judge correctly concluded that this factor weighed in favor of production or was at least neutral.

**Proportionality Objection Part 1(b)(5): Whether the Magistrate Judge erred in failing to expressly consider: the parties resources, the importance of the discovery in resolving issues in the case, and CMR's nonparty status.**

CMR argues that the Magistrate Judge erred by failing to consider some of the additional factors courts typically consider in analyzing the proportionality and scope of requested discovery. Specifically, CMR claims the Magistrate Judge failed to consider (1) the parties' resources, (2) the importance of the discovery in resolving the issues in the case, and (3) CMR's nonparty status. This objection is without merit. While the Magistrate Judge may not have expressly analyzed each of these factors in the "proportionality" section under separate subheadings, she addressed these factors in other ways throughout the R&R. For example, the Magistrate Judge found that Plaintiffs agreed to pay the expense of responding to the subpoena. There was no need for the Magistrate Judge to further elaborate on the parties' resources factor because Plaintiffs' agreement to pay CMR's costs rendered this factor neutral. The Magistrate Judge's analysis of the relative access to the information also considered CMR's nonparty status. And the Magistrate Judge found that CMR should have to respond to the subpoena notwithstanding its nonparty status.

The same is true of the importance of the discovery factor. The Magistrate Judge spent considerable time addressing the importance of the discovery in connection with both CMR's and the Government's relevance objections. Any failure of the Magistrate Judge to expressly discuss the importance of the requested communications in the proportionality section of the R&R was harmless. Furthermore, CMR fails to demonstrate that additional analysis of these factors would tip the proportionality scales in its favor. The Court finds no error in the Magistrate Judge's proportionality analysis and CMR's objections are overruled.

**B. CMR's Objection No. 2: Whether the Magistrate Judge erred in finding that Plaintiffs' requested discovery does not violate CMR's First Amendment rights.**

2019 WL 4733602

**\*7** CMR claims the Magistrate Judge erred by not applying a two-step framework for analyzing whether Plaintiffs' discovery requests infringe CMR's First Amendment rights. According to CMR, the Magistrate Judge was required to consider whether CMR demonstrated an objectively reasonable probability that disclosure of the requested communications would chill its First Amendment rights, *i.e.* that disclosure of the materials would deter CMR's membership or participation in the political process due to fears of threats, harassment or reprisal from either government officials or private parties which may affect members' physical well-being, political activities, or economic interests. *See In re Motor Fuel Temperature Sales Practices Litig.*, 707 F. Supp. 2d 1145, 1158 (D. Kan. 2010). Then, assuming CMR could make this *prima facie* showing of a chilling effect on its First Amendment rights, the Magistrate Judge should have considered whether Plaintiffs could prove that the information sought is relevant to their case; that the information sought is needed to prove their claims; that the information is not available from an alternative source; and that the request is the least restrictive way to obtain the information. *See Pulte Home Corp. v. Montgomery Cty. Maryland*, No. GJH-14-3955, 2017 WL 1104670, at \*4 (D. Md. Mar. 24, 2017).

CMR's objection is without merit. The Magistrate Judge correctly found that CMR's communications with government officials about matters of a public concern were not afforded First Amendment protection from disclosure under the facts and circumstances presented here. Therefore, there was no need for the Magistrate Judge to continue with the two-step analytical framework.[6] Moreover, based on the record before the Court, CMR failed to prove that compliance with Plaintiffs' subpoena would in fact chill its First Amendment rights. As Plaintiffs point out, "CMR has neither offered evidence to suggest that producing CMR's communications advocating a ban on military service by transgender individuals would expose CMR to any more risk of harassment than already exists from the public disclosure of its positions, nor demonstrated an objectively reasonable fear of harassment." (ECF No. 45 at 24.) Thus even if the two-part framework applies, CMR would still be required to produce the requested documents because it has not met its *prima facie* burden.

[6] The Court notes that the Sixth Circuit has not expressly adopted this two-step framework for balancing First Amendment protections with a party's need for discovery. *See Ohio A. Philip*

*Randolph Inst. v. Larose*, 761 F. App'x 506, 515 (6th Cir. 2019).

As a final point, the Court will address CMR's arguments regarding the Magistrate Judge's alleged failure to consider *Tesla Motors, Inc. v. Johnson, et al.*, 2017 WL 2875203 (W.D. Mich. May 22, 2017). In its objection, CMR represents to this Court that the court in *Tesla Motors* squashed a nonparty subpoena and "denied discovery of a non-party lobbyist's communications with legislators concerning pending litigation because 'disclosure would have an impermissible chilling effect' on the non-party's ability to participate in the political process." (*See* ECF No. 39 at 26-27; ECF No. 48 at 5.) CMR contends the Magistrate Judge erred by failing to consider this authority and claims that *Tesla Motors* "protects non-parties like CMR in this situation." (ECF No. 48 at 5.) CMR did not include this authority in its briefing before the Magistrate Judge, but asserts that it raised the authority at the hearing, and therefore the Magistrate Judge should have discussed it in her R&R. It is not clear from the record whether CMR provided the Magistrate Judge with a physical copy of this authority.

In connection with its objection, CMR did not provide this Court with a copy of this unpublished authority or even the case number or ECF citation. Notwithstanding, the Court on its own initiative obtained a copy of *Tesla Motors, Inc. v. Johnson, et al.*, 2017 WL 2875203 (W.D. Mich. May 22, 2017). The Court discovered that this is a citation to the nonparty's *motion* to quash—not an order and opinion granting a motion to quash as represented by CMR. Upon further independent research, the Court obtained the magistrate judge's order addressing the nonparty's motion to quash. *See Tesla Motors, Inc. v. Johnson, et al.*, Case No. 16-cv-01158, ECF No. 200 (W.D. Michigan June 06, 2018). In contrast to CMR's representations to this Court, in *Tesla Motors*, the magistrate judge denied the motion to quash, found that the First Amendment considerations did not prevent disclosure, and required the nonparty lobbyist to produce responsive documents. *See id.* While the magistrate judge in *Tesla Motors* did find that First Amendment protections could apply to external communications between the lobbyist and certain legislators, the Court declines to adopt her reasoning here.[7]

[7] In stating that the First Amendment privilege could apply to communications between the nonparty lobbyist and certain state legislators, the magistrate judge appears to have copied the nonparty's

Case 2:18-cv-11776-AJT-EAS   ECF No. 179-1, PageID.5023   Filed 12/03/21   Page 48 of 59

In re Center for Military Readiness, Not Reported in Fed. Supp. (2019)
2019 WL 4733602

authorities on the issue directly from the nonparty's motion to quash without further investigation or analysis, perhaps because she went on to compel compliance with the subpoena. This Court does not agree that the cases cited by the magistrate judge in *Tesla Motors* support CMR's position here.

### C. CMR's Objection No. 3: Whether the Magistrate Judge failed to properly apply Fed. R. Civ. P. 45(d) (1) and (d)(3)(iv) to protect CMR from burdensome discovery.

**\*8** CMR claims the Magistrate Judge failed to properly apply Federal Rule of Civil Procedure 45(d)(1) and (d) (3)(iv). In this objection, CMR re-urges the relevance and proportionality objections previously rejected by the Court. In addition, CMR contends the Magistrate Judge did not go far enough in narrowing the scope of discovery. The Court disagrees. The Magistrate Judge carefully considered the relevance, burden, and proportionality of the discovery sought by Plaintiffs and the Court agrees with the Magistrate Judge's assessment. This is objection is overruled.

### D. The Government's Objections.

The Government raises two objections to the R&R. In its first objection, the Government argues the Magistrate Judge erred by not holding Plaintiffs' motion in abeyance pending the Ninth Circuit's ruling on purportedly related discovery issues in the underlying case. This portion of the objection is overruled as moot. The Court took Plaintiffs' motion to compel under advisement pending the Ninth Circuit's ruling. Notwithstanding, the Court will consider the issues raised by the Ninth Circuit's opinion in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) as they relate to the Government's remaining objections.

In its second objection, the Government generally complains that the Magistrate Judge should not have granted Plaintiffs' motion to compel and provides several reasons for its position. Many of the Government's arguments are duplicative of CMR's objections. For example, the Government raises the same or similar relevance objections as CMR, which have already been discussed and addressed by the Court. The Government's relevance objections are likewise overruled.

In addition, in its second objection, the Government generally objects to the R&R and attempts to rehash the same arguments it raised in its initial briefing before the Magistrate Judge.

In doing so, the government fails to identify any specific error in the Magistrate Judge's R&R. But in the Sixth Circuit, "[o]nly those objections that are specific are entitled to a *de novo* review under the statute." *Sumpter v. Atkins*, No. 12-13958, 2014 WL 1389088, at \*1 (E.D. Mich. Apr. 9, 2014), *aff'd* (Apr. 2, 2015) (citing *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986)). "The parties have the duty to pinpoint those portions of the magistrate's report that the district court must specially consider." *Mira*, 806 F.2d at 637. A general objection, or one that merely restates the arguments previously presented, does not sufficiently identify alleged errors on the part of the magistrate judge. *Sumpter*, 2014 WL 1389088, at \*1. Moreover, an "objection" that does nothing more than disagree with a magistrate judge's determination, "without explaining the source of the error," is not considered a valid objection. *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Here, the Government's objections fail because the Government does not identify the specific portions of the R&R to which it objects. *See Sumpter*, 2014 WL 1389088, at \*1; *Smith v. Stellar Recovery, Inc.*, No. 2:15-CV-11717, 2017 WL 955128, at \*3 (E.D. Mich. Mar. 13, 2017), *reconsideration denied*, No. 2:15-CV-11717, 2017 WL 1362794 (E.D. Mich. Mar. 29, 2017) (overruling objections where party failed to identify the specific legal or factual error in the report and recommendation that would mandate a different outcome on review). The Government's discussion of the arguments it initially raised in opposition to Plaintiffs' motion to compel and its reference to the fact that the Magistrate Judge disagreed with or failed to adopt the Government's position does not satisfy the requirements of Rule 72.

**\*9** Notwithstanding, and although there is no obligation to do so, the Court will address the merits of the some of the Government's nonduplicative objections below. Specifically, the Court will consider the impact of the Ninth Circuit's opinion in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) on the Government's deliberative process privilege and executive privilege objections.

The first issue is whether the Ninth Circuit's discussion of the deliberative process privilege in *Karnoski* disturbs the Magistrate Judge's finding that the privilege does not apply to prevent CMR's production of documents here. In requesting that the Court hold Plaintiffs' motion in abeyance pending the Ninth Circuit's ruling, the Government claimed the Ninth Circuit's interpretation of the deliberative process

privilege issues in the underlying case would likely weigh on this Court's application of the privilege. However, in its supplemental briefing before this Court, the Government does not argue that the Ninth Circuit's discussion of the deliberative process privilege impacts the Magistrate Judge's finding that the privilege does not apply under the facts and circumstances of this nonparty discovery dispute. The Court nevertheless reviewed the Ninth Circuit's opinion and agrees with Plaintiffs that the Magistrate Judge correctly concluded the deliberative process privilege does not apply here. The Court notes that the Magistrate Judge found that CMR conceded at the hearing that none of the documents in its possession were privileged, and no party has objected to that finding. [8] Furthermore, the Court agrees with Plaintiffs that even if the deliberative process privilege applies, Plaintiffs are entitled to the discovery they seek from CMR.

[8]    In fact, in the opening line of its objection, CMR states that it "is a private 501(c)(3) organization with no official or unofficial role in developing or implementing the policy Plaintiffs challenge." (ECF No. 39 at 1.)

The next issue is whether the Ninth Circuit's opinion in *Karnoski* affects the Magistrate Judge's finding that separation of powers principles and the Supreme Court's decision in *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367 (2004) do not restrict CMR's production of documents here. In the R&R, the Magistrate Judge rejected the Government's separation of powers concerns and reliance on *Cheney* to bar the discovery sought from CMR. The Magistrate Judge agreed with Plaintiffs that the Government was attempting to use the idea of executive privilege to conduct a "multi-district shell game" by arguing that Plaintiffs must obtain documents from other avenues in the main case, but then objecting to Plaintiffs' efforts to do just that here. The Magistrate judge also found no merit in the Government's reliance on *Cheney* because the purpose of the Supreme Court's application of executive privilege there was to protect the Executive (*i.e.*, the Vice-President) from the onerous burden of responding to discovery, and here, CMR is the party with burden of responding to the subpoena.

Pointing to the Ninth Circuit's discussion of *Cheney* in *Karnoski*, the Government contends the Magistrate Judge erred by not giving "full consideration to the Executive Article II prerogatives" by requiring Plaintiffs to "explore other avenues, short of forcing the Executive to invoke privilege." (ECF No. 57 at 3.) The Government also argues

that the Magistrate Judge failed to apply the heighted showing of need for the requested discovery as discussed in *Cheney*. And the Government claims the Magistrate Judge incorrectly found that "Cheney was a narrow, fact bound decision," even though no such finding was included in the R&R.

**\*10** The Government's objections are without merit for several reasons. First, as the Magistrate Judge found, the discovery requests are narrowly tailored and seek information which Plaintiffs contend to be critical to their claims. Second, Plaintiffs demonstrated that the information is not available from other sources, in part because the Government refuses to produce the same categories of documents, and therefore established that there is no other source for this information. Third, neither the Government nor CMR made any effort to show that the executive branch has an interest in secrecy or nondisclosure of the requested information that outweighs the needs of this case. Thus even if executive privilege applies to Plaintiffs' discovery requests to CMR, the Magistrate Judge sufficiently considered the relevancy of the requested information and the need for the discovery in light of the prerogatives of the Executive. And the Magistrate Judge sufficiently narrowed the scope of permissible discovery.

Finally, as the Magistrate Judge found, Plaintiffs' discovery requests to CMR place no burden on the Government and therefore *Cheney* does not apply. *Cheney* instructs district courts to limit the burden of the Executive in having to respond to onerous discovery directed to it and to protect the Executive from unnecessarily invoking executive privilege on a line by line basis. *See Cheney*, 542 U.S. at 388 ("In these circumstances, *Nixon* does not require the Executive Branch to bear the onus of critiquing the unacceptable discovery requests line by line."). And the Ninth Circuit echoed *Cheney's* holding in instructing the district court in the underlying case here to consider whether there were alternative avenues of discovery available before requiring the Trump administration to invoke executive privilege for each and every category of documents requested. *See Karnoski*, 926 F.3d at 1205. Consistent with the Ninth Circuit's opinion, the Magistrate Judge found that Plaintiffs are satisfying the requirements of *Cheney* by pursuing "other avenues" of discovery "short of forcing the Executive to invoke privilege." *See id.* (quoting *Cheney*, 542 U.S. at 390). The Government's objections are overruled.

### III. Conclusion

For the above-stated reasons, and for the reasons provided in the Magistrate Judge's Report and Recommendation, the

2019 WL 4733602

Court **OVERRULES** CMR's objections, **OVERRULES** the Government's objections, **ACCEPTS** and **ADOPTS** the Magistrate Judge's Report and Recommendation, **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion to compel (ECF No. 1), and **GRANTS IN PART AND DENIES IN PART** CMR's motion for protective order (ECF No. 10).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4733602

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Kotyk v. Ford Motor Co., Not Reported in F.Supp.2d (2011)

2011 WL 6780643

2011 WL 6780643
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Stephen J. KOTYK, Plaintiff,
v.
FORD MOTOR COMPANY, Defendant.

No. 09–14604.
|
Dec. 27, 2011.

**Attorneys and Law Firms**

Michael M. Wachsberg, Pedersen, Keenan, Commerce Township, MI, for Plaintiff.

Sherry D. O'Neal Taylor, Dickinson Wright, Detroit, MI, for Defendant.

*ORDER REJECTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION [501 AND GRANTING PLAINTIFF'S MOTION FOR ATTORNEY FEES AND COSTS [43]*

ARTHUR J. TARNOW, Senior District Judge.

 **\*1** Now before the Court is the Magistrate Judge's Report and Recommendation ("R & R") [50], entered July 25, 2011, recommending that Plaintiff's Motion for Attorney's Fees and Costs [43] be denied. On October 10, 2011, Plaintiff filed an objection [51] to the R & R. Defendant filed a response [52] to the objection on October 24, 2011, and on October 31, 2011, Plaintiff filed a reply [53].

**I. Standard of Review**

According to Fed.R.Civ.P. 54(D) and 72(b), this Court may refer a motion for attorney's fees to a magistrate judge as though the motion for attorney's fees was a dispositive pretrial matter. This Court reviews objections to a Magistrate Judge's R & R on dispositive motions *de novo. See* 28 U.S.C. § 636(b)(1)(C).

**II. Background**

This case concerns Defendant's denial of benefits to Plaintiff under Defendant's Salaried Disability Plan. On July 25, 2011, this Court issued an Order [40] granting Plaintiff's Motion for Summary Judgment and directing Defendant's plan administrator to award Plaintiff disability benefits retroactive to the date on which Plaintiff's benefits ceased. Specifically, this Court found that Defendant had acted arbitrarily and capriciously in improperly rejecting Plaintiff's application for the Salaried Disability Plan by "cherry-picking" medical evidence to come to the desired conclusion that Plaintiff was not disabled. In addition, this Court found that remand to the plan administrator was inappropriate because Plaintiff was "clearly entitled" to benefits based on the medical evidence in the record, such that there were no material facts in dispute as to whether Plaintiff qualified as "disabled" under the auspices of Defendant's plan. Summary judgment for Plaintiff was granted.

Plaintiff subsequently filed a Motion for Attorney Fees and Costs [43] on August 8, 2011. This motion was referred to the Magistrate Judge, who issued an R & R recommending that Plaintiff's motion be denied.

**III. Analysis**

**A. Factors in Considering an Award of Attorney's Fees**

Under 29 U.S.C. § 1132(g)(1) a district court is given wide discretion to allow reasonable attorney's fees and costs of action to either party. In an ERISA case such as this one, a district court must consider the following factors in deciding whether to award attorney's fees to a Plaintiff:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sough to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

Case 2:18-cv-11776-AJT-EAS ECF No. 179-1, PageID.5027 Filed 12/03/21 Page 52 of 59
Kotyk v. Ford Motor Co., Not Reported in F.Supp.2d (2011)
2011 WL 6780643

*Shelby Cnty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund,* 203 F.3d 926, 936 (6th Cir.2000) (quoting *Schwartz v. Gregori,* 160 F.3d 1116, 1119 (6th Cir.1998)).

**\*2** Because no single factor is determinative in the district court's analysis, the court must consider each factor before exercising its discretion. *Schwartz,* 160 F.3d at 1119. With respect to factor (2), Defendant conceded that it was able to satisfy an award of attorney's fees. In addition, Plaintiff conceded that with respect to factor (4) the instant case would only confer benefits upon Plaintiff, and not upon plan participants as a whole. Thus, the Court need only consider factors (1), (3), and (5).

**Factor (1)—Degree of Opposing Party's Culpability or Bad Faith**
The Magistrate Judge reported that this factor did not weigh strongly in Plaintiff's favor.

In the R & R the Magistrate Judge acknowledges that this Court had made a factual finding that Defendant's physicians had "cherry-picked" Plaintiff's medical records and had simply ignored the substantial medical evidence that Plaintiff was, in fact, disabled. However, the Magistrate Judge discounted this finding because the record indicated that the Plaintiff did not "submit all of his relevant medical information" to the Independent Medical Examiner. The Magistrate Judge did not indicate which relevant information Plaintiff failed to submit to Defendant, nor Plaintiff's reasons for failing to submit said information. Similarly, Defendant's response does not indicate which specific information Plaintiff failed to submit to Defendant, though Defendant seeks to place the blame for any inconsistencies in the analysis of the Independent Medical Examiner on the alleged failure to provide information. Based on this argument, the Magistrate Judge reported that the question of culpability did not weigh in Plaintiff's favor.

As this Court stated in its order granting Plaintiff summary judgment, Defendant arbitrarily and capriciously denied Plaintiff benefits. This Court found that Defendant "selectively relied on portions of the record and failed to provide an adequate explanation for its denial of disability benefits...." This Court found that Defendant cherry-picked medical evidence to arrive at a desired outcome, namely, denial of benefits that were properly due to Plaintiff. Defendant's argument that Plaintiff failed to submit required

medical information seems to be in reference to information that Plaintiff later submitted to Defendant, and which Defendant's physician reviewed prior to making a final recommendation regarding Plaintiff's disability.[1] The reason that Defendant's denial of benefits was arbitrary and capricious was because the physician who evaluated the file of Plaintiff failed to "rebut the contrary medical conclusions reached by" a doctor who regularly examined the Plaintiff, and failed to "even mention" evidence that undermined the evaluator's diagnosis. *Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Bos.,* 419 F.3d 501, 510 (6th Cir.2005).

[1]     Plaintiff, in his objection, states that the only material that Plaintiff did not provide as part of the original administrative record was Ford's own records from its separate disability retirement program, in which Ford's doctor had found Plaintiff to be disabled.

Based upon this Court's findings that Plaintiff was wrongfully denied benefits and was denied said benefits because of improper medical review, the weight in terms of culpability is heavily in Plaintiff's favor.

**Factor (3)—Deterrent Effect of an Award**
**\*3** The Magistrate Judge reported that an award of fees was "unnecessary to have a 'deterrent effect' on Ford or to achieve a correct decision in the future," and found that this factor did not weigh in Plaintiff's favor. Defendant argues that Plaintiff was properly physically examined by two Independent Medical Examiners, and dismisses Plaintiff's argument as relying on cases where no physical examination occurred. Essentially, Defendant argues that their actions were proper, and that therefore there is no future improper behavior to deter.

As is obvious from this Court's order granting Plaintiff summary judgment, Defendant's actions in this case were arbitrary and improper. The Court did not simply find that Defendant came to the wrong decision, but that Defendant wrongly ignored relevant medical evidence and arrived at a decision to deny Plaintiff benefits only by selectively picking out portions of Plaintiff's medical records that supported Defendant's view. That Defendant continues to argue that their actions were, in fact, completely proper only serves to highlight the need to deter Defendant from engaging in precisely the same behavior when considering future claims for disability benefits.

Kotyk v. Ford Motor Co., Not Reported in F.Supp.2d (2011)

2011 WL 6780643

The Court therefore finds that this factor weighs in Plaintiff's favor.

### Factor (5)—Relative Merits of the Parties' Positions

The Magistrate Judge reported that this factor did not weigh heavily in Plaintiff's favor. Defendant argues that simply prevailing on the merits cannot justify the award of attorney's fees, as prevailing on the merits is a factor met in every case where attorney's fees are requested by a plaintiff.

While Defendant's argument is correct, the Court notes that this is not a case where Defendant was found liable after a jury trial, or indeed, where the outcome was in doubt. This Court granted summary judgment to Plaintiff because there were no genuine issues of material fact with regard to whether Defendant had acted arbitrarily and capriciously in denying Plaintiff salaried disability benefits. Thus, the merits of Plaintiff's claim heavily outweighed the merits of Defendant's position.

The Court finds that this factor weighs in Plaintiff's favor.

### Attorney's Fees Warranted

In summary, four of the five factors to be considered by a district court (the relative culpability of the parties, defendant's ability to pay an award, the deterrent effects of an award, and the relative merits of the parties' positions) favor the Plaintiff. The only factor which does not favor the Plaintiff is that this case does not concern an award of benefits to all plan beneficiaries. The Court thus finds that an award of attorney's fees and costs to Plaintiff in this case is warranted.

### B. Calculation of Proper Amount of Attorney's Fees

Plaintiff, in his motion, requests costs of $470.70, and attorney fees of $350.00/hour for 77.1 hours of work, for a total attorney fee award of $26,985.00, and a total award of (inclusive of costs) of $27,455.70. Plaintiff also requests an additional five (5) hours of work time to argue and file the motion for attorney's fees. Plaintiff's counsel has 33 years of experience in civil litigation in state and federal court, and is a partner at a small (7–10 attorney) firm located in Oakland County. Plaintiff contends that a rate of $350/hour is appropriate, and submits affidavits of two similarly

experienced practitioners who opine that such a rate is reasonable.

**\*4** Defendant contends that 7.2 hours of work should be subtracted from Plaintiff's hours because these hours concerned service of discovery upon Ford and a former co-Defendant. Defendant cites *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609 (6th Cir.1998) for the proposition that discovery is "both unwarranted and inappropriate" in an ERISA-governed matter, and that the district court may not consider any discovered material in such cases. Defendant oversimplifies the holding in *Wilkins*. While a district court is generally required to limit its review of a decision to the administrative record, a district court may consider, and discovery is permitted, of any evidence that addresses a lack of due process on the part of a plan administrator. Defendant's contention that discovery is simply not permitted in ERISA cases is incorrect; moreover, Plaintiff indicates that the material sought through discovery was Ford's file on the Plaintiff, which would be relevant towards determining whether there were any procedural irregularities in Defendant's decision-making process.[2] The Court finds that the 7.2 billed hours in pursuit of discovery are appropriate.

[2]   This file was apparently later voluntarily provided to Plaintiff at a settlement conference.

In terms of the proper rate, Defendant contends that this Court should be governed by the values set out in the State Bar of Michigan's Economics of Law Practice Survey. The Court agrees that this source has frequently been used as a benchmark to determined the reasonableness of an hourly rate. Focusing on the length of Plaintiff's counsel's experience, size of the firm, and location of counsel's office, Defendant argues that the maximum rate counsel should be awarded is $260/hour. Plaintiff responds by noting a similar case where a lead attorney was awarded $375/hour, and another case where a petition was filed for hour fees as high as $600/hour. Plaintiff also notes that attorneys in the 75th and 95th percentile of various metrics can be awarded fees as high as $455/hour. Plaintiff's counsel does not allege specialized experience in the field of labor law or ERISA-related cases.

The Court finds that, when taken as a whole, Plaintiff's counsel's many years of experience in state and federal court and status as an equity partner/shareholder of a small (7–10 person) firm qualify counsel as in the 75th percentile of the various categories set out in the Survey. This leads

Kotyk v. Ford Motor Co., Not Reported in F.Supp.2d (2011)

2011 WL 6780643

to a benchmark range of between $233/hour [3] and $350/hour. [4] The Court finds that $350/hour is a reasonable rate for attorney's fees in this case. The Court also finds that the 82.1 hours billed by Plaintiff's counsel is reasonable. Thus, the Court finds that an award of $28,735.00 of attorney fees, and $470.70 of costs, for a total award of $29,205.70 for attorney's fees and costs, is reasonable in this case.

[3]    Based upon the size of Plaintiff's counsel's firm.

[4]    Based upon Plaintiff's counsel's position as an equity partner.

## IV. Conclusion

The Court having reviewed the record in this case, the Report and Recommendation of the Magistrate Judge is hereby **REJECTED. IT IS ORDERED** that Plaintiff's Motion for Attorney Fees and Costs is **GRANTED.** Defendant will provide Plaintiff with a payment for $29, 205.70 by January 27, 2012.

**\*5  SO ORDERED.**

## All Citations

Not Reported in F.Supp.2d, 2011 WL 6780643

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:18-cv-11776-AJT-EAS ECF No. 179-1, PageID.5030 Filed 12/03/21 Page 55 of 59
Michigan Bldg. and Const. Trades Council, AFL-CIO v. Snyder, Not Reported in...
2012 WL 1893516

2012 WL 1893516
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

MICHIGAN BUILDING AND CONSTRUCTION
TRADES COUNCIL, AFL–CIO, and Genesee,
Lapeer, Shiawassee Building and Construction
Trades Council, AFL–CIO, Plaintiffs,
v.
Richard SNYDER, Governor of the State of
Michigan, in his official capacity, Defendant.

No. 11–13520.
|
May 23, 2012.

**Attorneys and Law Firms**

John R. Canzano, Klimist, McKnight, Southfield, MI, for
Plaintiffs.

Danila V. Artaev, State of Michigan, Dennis J. Raterink,
Susan Przekop-Shaw, MI Dept of Attorney General, Lansing,
MI, for Defendant.

*ORDER DENYING PLAINTIFFS'*
*MOTION FOR ATTORNEY FEES AND*
*GRANTING IN PART AND DENYING IN*
*PART DEFENDANT'S MOTION TO STAY*

VICTORIA A. ROBERTS, District Judge.

**I. INTRODUCTION**

**\*1** This matter is before the Court on two motions:
Plaintiffs' Amended Motion for Attorney's Fees Pursuant to
Fed.R.Civ.P. 54(d) (2) (Doc. 42), and Defendant's Motion to
Stay Order and Judgment Pending Appeal (Doc. 47)

For the reasons below, the Court **DENIES WITHOUT
PREJUDICE** Plaintiffs' motion for attorney's fees. The Court
**GRANTS IN PART AND DENIES IN PART** Defendant's
motion to stay.

**II. BACKGROUND**

On February 29, 2012, the Court entered an Order granting
Plaintiffs' Motion for Summary Judgment and denying
Defendant's Motion for Summary Judgment (Doc. 37).
Judgment for Plaintiffs was entered that same day. It states:

> Consistent with the Court's Order
> of February 29, 2012, **JUDGMENT**
> enters for Plaintiffs together with
> costs and attorneys fees. The Court
> **DECLARES** that the Michigan
> Fair and Open Competition in
> Governmental Construction Act (the
> "Act"), 2011 Mich. Pub. Acts 98,
> M.C.L. § 408.871, *et seq.*(1) is
> invalid and unenforceable because it
> is preempted by operation of the
> Supremacy Clause of the United States
> Constitution and the National Labor
> Relations Act, 29 U.S.C. § 151 *et
> seq.;* and (2) violates Plaintiffs' rights
> under the National Labor Relations
> Act. Further, the Court permanently
> **ENJOINS** enforcement of the Act.

The facts underlying this case were laid out in great detail in
that Order and will not be repeated here.

On March 5, 2012, Defendant filed a Notice of Appeal of
the Court's February 29 Order and Judgment. The appeal is
pending before the Sixth Circuit Court of Appeals.

On March 14, 2012, Plaintiffs filed a motion for attorney's
fees. An amended motion was filed on March 15, 2012
and supplemented on March 28, 2012, with itemized billing
entries and other exhibits. On March 30, 2012, Defendant
filed a motion to stay the Court's February 29 Order and
Judgment pending resolution of his appeal before the Sixth
Circuit.

**III. ANALYSIS**

**A. Plaintiff's Motion for Attorney's Fees**

**1. Stay of Costs and Attorney's Fees**
The Court first addresses Defendant's request to stay an
award of costs and attorney's fees until after the resolution

Michigan Bldg. and Const. Trades Council, AFL-CIO v. Snyder, Not Reported in...

2012 WL 1893516

of his appeal. As part of its motion to stay the Court's February 29 Order and Judgment, Defendant says "it would be impracticable to award such fees until all appeals have been exhausted, given the complexity of this matter of first impression; the Councils will not suffer harm from the stay; and the public interest strongly favors staying the expenditure of significant State funds given the unsettled nature of the issue before the Circuit Court of Appeals." Doc. 47, p. 2.

Fed.R.Civ.P. 54(d)(2) provides that a prevailing party may move for attorney's fees after entry of judgment. The notes to the 1993 Amendments discuss the district court's two options when faced with a motion for attorney's fees filed after an appeal is taken on the merits. The court may promptly rule on a fee request so that "any appellate review of a dispute over fees [may] proceed at the same time as a review on the merits of the case." *Id.* Or, the court may "defer its ruling on the motion, or may deny the motion without prejudice, directing ... a new period for filing after the appeal has been resolved." *Id.* The 1993 Amendments to Rule 58, Entering Judgment, explain further:

> **\*2** Particularly if the claim for fees involves substantial issues or is likely to be affected by the appellate decision, the district court may prefer to defer consideration of the claim for fees until after the appeal is resolved. However, in many cases it may be more efficient to decide fee questions before an appeal is taken so that appeals relating to the fee award can be heard at the same time as appeals relating to the merits of the case.

The Sixth Circuit does not appear to have expressed a preference for prompt adjudication of motions for attorney's fee. The Court believes an award of attorney's fees at this stage is premature. The merits of the case are now on review before the Sixth Circuit Court of Appeals. If Plaintiffs prevail, they will be entitled to additional fees for time spent on the appeal. *Dowling v. Litton Loan Servicing LP,* 320 Fed. Appx. 442, 450 (6th Cir.2009) ("Where a statute provides for an award of attorney's fees to a prevailing party, 'reasonable appellate fees may [also] be awarded to [the] prevailing part [y].' ") (citation omitted). If the Court's decision is reversed in full, as Defendant urges, then Plaintiffs will no longer be a prevailing

party, and likely would not be entitled any fees. A third option is also possible: the Sixth Circuit could affirm certain parts of the Court's order, and overrule others. If that were to occur, this Court would need to consider Plaintiff's partial success in calculating a fee award. *See Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In short, the decision whether to award fees, and in what amount, is certain to be affected by the pending appellate litigation.

Staying the Fees Motion until after appeals have been exhausted is necessary to avoid piecemeal litigation. Indeed, this was the approach taken in this District in the case *Gratz v. Bollinger,* 353 F.Supp.2d 929 (E.D.Mich.2005), discussed by the parties in their briefs. There, the District Judge waited until after appeals to the Sixth Circuit and the Supreme Court were complete before awarding fees. It would not be in the interest of judicial economy to award fees now, only to revisit the issue after the appellate litigation is complete.

Further, the fee petition itself does not present difficult legal issues that would warrant an expeditious trip to the Sixth Circuit. Rather, Plaintiffs' fee petition involves the application of straightforward legal principles. In fact, Defendant admits that Plaintiffs are prevailing parties and that the Court is entitled to award attorney's fees. Doc. 51, p. 1 ("The Governor acknowledges that *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (*Golden State II* ) is controlling authority and requires this Court to find that when the NLRA preempts a state action, the Councils' rights are violated under § 1983 and § 1988 applies to allow the Court to shift attorney fees to the prevailing party."). The decision whether to grant fees here turns solely on whether Plaintiffs are prevailing parties. This is a decision that this Court can easily make, subject to the results of the appellate litigation. And though Defendant disputes the amount of fees Plaintiffs claim, this Court is well-suited in its role as fact finder to resolve this type of dispute, and need not do so now.

**\*3** Lastly, a stay of the fee motion is in the interests of justice. The Court believes the reasoning of its February 29 Order is correct but acknowledges that this case presents new and difficult issues, and that reasonable jurists could disagree about the proper outcome. Staying an award of attorney's fees prevents Defendant from having to pay an uncertain judgment or posting a bond. Plaintiffs will not be prejudiced by a stay because they may account for the delay, if ultimately successful, by requesting interest, requesting higher hourly rates to account for the passage of time, or by adjusting the fee

2012 WL 1893516

based on historical rates to reflect its present value. *Missouri v. Jenkins,* 491 U.S. 274, 282–83, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).

Accordingly, Plaintiffs motion for fees is **DENIED WITHOUT PREJUDICE.** Plaintiff may refile the motion after the conclusion of the appellate litigation. Defendant's motion to stay is **GRANTED WITH RESPECT TO ATTORNEY'S FEES.** Defendant's motion to stay the merits is discussed below.

### B. Defendant's Motion to Stay

Defendant asks the Court to stay its February 29 Order and Judgment pending appeal pursuant to Fed.R.Civ.P. 62(c). In determining whether to grant a stay, the Court must consider the same four factors considered in deciding a motion for preliminary injunction:

> (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal;

> (2) the likelihood that the moving party will be irreparably harmed absent a stay;

> (3) the prospect that others will be harmed if the court grants the stay; and,

> (4) the public interest in granting the stay.

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir.1991). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Id.* (citation omitted).

Though the factors are the same for both a preliminary injunction and a stay pending appeal, the balancing process is not identical due to the different procedural postures. *Id.* Most notably, a motion for stay pending appeal is made after significant factual development and after the court has fully considered the merits. *Id.* As a result, a movant seeking a stay pending appeal will have a greater difficulty in demonstrating a likelihood of success on the merits. A party seeking a stay must demonstrate that "there is a likelihood of reversal." *Id.* This high standard is justified because "there is a reduced probability of error, at least with respect to a court's findings of fact, because the district court had the benefit of a complete record ...." *Id.*

However, to justify the granting of a stay, a movant need not always establish a high probability of success on the merits. *Ohio ex. rel. Celebrezze,* 812 F.2d 288, 290 (6th Cir.1987). Rather, "[t]he probability of success on the merits that must be shown is inversely proportional to the degree of irreparable injury the plaintiffs will suffer absent the stay." *Id.* This means that a stay may be granted with either a high probability of success on the merits and some irreparable injury, or serious questions going to the merits and "irreparable harm which decidedly outweighs any potential harm to the defendant if a stay is issued." *Id.* (citation omitted). Mere possibility of success on the merits is never sufficient though. *Id.*

**\*4** In evaluating the harm to the moving party and others depending on whether or not the stay is granted, the court looks to three factors: "(1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided." *Griepentrog,* 945 F.2d at 154 (citing *Ohio ex rel. Celebrezze,* 812 F.2d at 290). The harm alleged must be irreparable. *Id.* (quoting *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). In addition the harm must be "both certain and immediate, rather than speculative or theoretical." *Id.* (citing *Wisconsin Gas Co. v. Fed. Energy Regul. Comm'n,* 758 F.2d 669, 674 (D.C.Cir.1985)).

With these guiding principles in mind, the Court turns its analysis to the four factors for granting a stay.

### 1. Likelihood of Success on the Merits

Based upon the record before the Court, and the arguments set forth in Defendant's Motion to Stay, the Court believes that Defendant established no more than a mere possibility of success on the merits. A mere possibility of success on the merits is not sufficient to justify a stay. *Griepentrog,* 945 F.2d at 153 (citing *Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 n. 4 (6th Cir.1977)).

Defendant raises several arguments as to why he is likely to prevail on the merits. First, he says that the law is far from settled in this area, and points to the inconsistent decisions that recently issued in Iowa and Idaho. *Cf. Cent. Iowa Bldg. & Constr. Trades Council v. Branstad,* No. 11–00202 (S.D.Iowa Sept. 7, 2011); *Idaho Bldg. & Constr. Trades Council v. Wasden,* No. 11–00253 (D.Idaho Jan. 3, 2012). Defendant also says that the Court engaged in a novel interpretation of precedent by declining to follow the D.C. Circuit's decision in *Bldg. & Constr. Trades Dep't, AFL–CIO v. Allbaugh,* 295 F.3d 28, 34 (D.C.Cir.2002), and instead "adopt[ing]" a

2012 WL 1893516

decision of the Ohio State Supreme Court, *Ohio State Bldg. & Constr. Trades Council v. Cuyahoga County Board of Commissioners,* 98 Ohio St.3d 214, 781 N.E.2d 951 (Ohio 2002). Defendant also argues that the fact that this case raises issues of first impression in this circuit is sufficient to satisfy the likelihood of success on the merits prong.

The Court is reluctant to discuss in any depth the merits of its February 29 Order, especially since the Sixth Circuit now has jurisdiction. The February 29 Order speaks for itself. The Court devoted substantial resources to this case and is now very familiar with the facts and applicable law. The Court is confident that it reached the correct conclusions and that its Order will be upheld on appeal. That said, the Court will briefly address Defendant's arguments.

First, the fact that district courts in Iowa and Idaho reached discordant conclusions on similar facts does not alone establish a likelihood of success on the merits. At most, these cases establish a mere possibility of success on the merits, which is insufficient to warrant a stay. Second, Defendant makes much of a quotation in the February 29 Order to an Ohio Supreme Court decision, and repeatedly states that this Court "relied upon" or "adopted" non-precedential state authority. This is simply not an accurate characterization of the February 29 Order. Because the Court was not aware of Sixth Circuit precedent directly on point, it cited the Ohio case as *persuasive* authority to explain its position, not as controlling precedent. Lastly, the fact that this Court did not follow *Allbaugh* does not establish a likelihood of success on the merits. *Allbaugh* is not controlling authority in this circuit. Further, the Court believed that the two-prong market-participation test formulated by the Fifth Circuit in *Cardinal Towing & Auto Repair Inc. v. City of Bedford,* 180 F.3d 686, 693 (5th Cir.1999) was a more accurate distillation of Supreme Court precedent than the single-prong test in *Allbaugh.* The Court is confident its application of the *Cardinal Towing* test rather than the *Allbaugh* test will be upheld on appeal.

 **\*5** Defendant has failed to establish more than a mere possibility of success on the merits. This factor weighs against a stay.

### 2. Irreparable Injury to Moving Party

As stated above, the harm alleged is evaluated in terms of its substantiality, the likelihood of its occurrence, and the proof provided by the movant. *Griepentrog,* 945 F.2d at 154.

Defendant says the State and People of Michigan will suffer irreparable harm absent a stay because the Court's February 29 Order compromises the State's ability to ensure prudent spending of government funds. Defendant says the Act was passed to ensure open competition for bidding on government construction projects, thereby decreasing costs to Michigan taxpayers. But, since the Court entered an injunction banning enforcement of the Act, certain governmental units have again begun to restrict bids to contractors who are willing to become a party to a PLA. Defendant says the Court's Order has produced two types of irreparable harm: (1) imprudent expenditure of taxpayer dollars which cannot be recouped; and (2) preclusion of Michigan general contractors from participating in Michigan's free labor market.

The problem with Defendant's arguments is that the Court's Order does not require the State or its subdivisions to incorporate PLAs into construction projects. Rather, the Order restores the status quo that existed prior to the passage of the Act, when the State and its subdivisions were free to exercise discretion on a case-by-case basis whether or not to use a PLA. Thus, governmental units are now free to enter into PLAs when they determine on an individualized basis that it is in their best interests.

Nor does the court order prohibit so-called "merit shop" contractors from bidding on projects that have a PLA in place. Non-union contractors are free to bid on projects with PLAs, so long as they agree to adhere to the terms of the PLA. With that in mind, it is difficult to see how the Court's Order causes any irreparable harm at all. The affidavit attached to Defendant's brief actually illustrates this point quite well. In that affidavit, a non-union contractor states that he "does not bid on projects ... where the governmental unit requires [the contractor] to become signatory to a[PLA]" because he believes working under a PLA "is not in the best interest of the [company] or its employees." Doc. 47, ex. 2. This contractor is certainly free to choose not to bid on projects that have PLAs in place, but it is a stretch to say that he is irreparably harmed where he has made a personal policy decision not to bid on projects that are technically still available to him.

In short, the Court's February 29 Order does not mandate PLAs on State construction projects, nor does it prohibit non-union contractors from bidding on projects that have PLAs in place. It is difficult to see how any irreparable harm results when parties are free to exercise discretion whether to use a PLA, and whether to agree to be bound by a PLA.

Michigan Bldg. and Const. Trades Council, AFL-CIO v. Snyder, Not Reported in...
2012 WL 1893516

*6 Lastly, the Court rejects Defendant's argument that its decision will result in harm to Michigan taxpayers. The Court explicitly found in its Order that the research regarding cost savings and the use of PLAs is, at best, inconclusive. It is not going to revisit that conclusion now. Further, harm must be "both certain and immediate, rather than speculative or theoretical." *Griepentrog,* 945 F.2d at 154.

Defendant does not demonstrate irreparable harm. This factor weighs against a stay.

Because Defendant has not established more than a possibility of success on the merits, and has not established irreparable harm, the Court need not consider the last two factors. However, for the sake of completeness, it will address them very briefly.

### 3. Harm to Others

Defendant says Plaintiffs will not suffer any irreparable harm if the Court enters a stay because "throughout this litigation, the Council's allegations of harm and injury have been abstract, incomplete, and otherwise illusory and insufficient to sustain a cause of action." Doc. 47 p. 8. Defendant appears to be questioning the Court's conclusion that Plaintiffs have standing. While Defendant is free to make that argument on appeal, the Court will not revisit it here. The Court's February 29 Order found that the Michigan Act effectively banned

PLAs from state construction projects, resulting in direct harm to Plaintiffs. The Court, therefore, enjoined the Act. The Court is not going to revisit its conclusion that the Michigan Act harmed the Plaintiffs.

### 4. The Public Interest

The public interest "lies in a correct application of the federal constitutional and statutory provisions upon which the claimants have brought this claim." *Coalition to Defend Affirmative Action v. Granholm,* 473 F.3d 237, 252 (6th Cir.2006). Thus, the public interest does not permit states to pass laws that conflict with the NLRA, or regulate within an area that the NLRA intended to leave unregulated.

### IV. CONCLUSION

For these reasons, Plaintiff's motion for attorney's fees is **DENIED WITHOUT PREJUDICE.** Defendant's motion to stay is **GRANTED** with respect to attorney's fees, and **DENIED** with respect to the merits.

**IT IS ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1893516

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.